888.27232

IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| INDIANA GRQ, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No: 3:21-cv-00227-DRL-MGG |
| | ) |
| AMERICAN GUARANTEE AND | ) |
| LIABIILITY INSURANCE COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT, INTERSTATE FIRE & CASUALTY COMPANY'S
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now comes the defendant, INTERSTATE FIRE & CASUALTY COMPANY

("Interstate") , by and through its attorneys, Mitchell A. Orpett and David E. Schroeder, and for its

Statement of Material Facts in support of its Motion for Partial Summary Judgment, states as

follows:

    **A.**    **Facts About Plaintiff IRG**

    1.    Plaintiff Indiana GRQ, LLC ("GRQ") is an affiliate of Industrial Realty Group,

LLC ("IRG").  ECF No. 26, p. 3.

    2.    IRG directly or indirectly controls GRQ.  *Id*. at p. 2, footnote 1, continued.

    3.    The policies at issue were procured for IRG in Ohio.  *Id*. at p. 3.

    4.    Affiliates of IRG own assets in over 30 states.   More of those assets –

approximately 40 million square feet – are owned in Ohio than in any other state.  *Id*.

    5.    GRQ owns a property located at 701 Chippewa Avenue in South Bend, Indiana

(the "South Bend Location").  ECF No. 107, ¶1.

6.      IRG Realty Advisors, LLC ("IRG Realty") manages the South Bend Location from its offices in Richfield, Ohio.  ECF No. 26, pp. 1 and 2, footnote 1.

7.      IRG Realty has 160 employees in its Richfield, Ohio headquarters and handles all aspects of the management of the South Bend Location from that location.  *Id*.

**B.      The Flood Event**

8.      On August 15, 2016, heavy rains flooded the South Bend Location (the "Occurrence").  Water inundated the South Bend Location's underground electrical vaults.  The vaults contained electrical switchgear, transformers and main switches and related electrical equipment and components in six electrical distribution substations.  ECF No. 107, ¶2.

9.      Plaintiff claims the Occurrence caused the flooded transformers to release oils containing polychlorinated biphenyls ("PCBs") into the floodwater.[1]  *Id*.

10.     Plaintiff claims that the "PCB contamination in the basement, vaults, sumps, and tunnels underlying the main building at the [South Bend Location] must be cleaned up in accordance with the TSCA continued use standards or managed as PCB remediation waste." See Declaration of David Schroeder, Exhibit 1, report of plaintiff's expert, Tod Delaney, p. 18.

11.     Plaintiff estimates the cost of the PCB abatement and clean up to a Low Occupancy Standard to be between $11.1 and $11.4 million.   *Id*. at p. 22, Schroeder Declaration, Exhibit 2, plaintiff's Rule 26 Initial Disclosures, p.4.

**C.  Plaintiff's Insurance Coverage**

12.     During the relevant period, from April 15, 2016, to April 15, 2017, IRG was insured under a tower of property insurance with total limits of $500 million.  ECF No. 107, ¶5.

---

[1] Defendants deny that PCBs were released from the transformers or were released in levels that require remediation by GRQ.  *See* Schroeder Declaration, Exhibit 5, Rule 26 Expert Report of R.A. West,  pp. 2-5.  However, this fact is not material to Interstate's cross-motion for partial summary judgment.  If there is no PCB contamination at the South Bend Location or GRQ is not required to remediate it, if it exists, then there is no $11 million claim for PCB clean up.  If PCBs are present and in need of remediation, then that portion of GRQ's claim is not covered by Interstate's policy.

13.     Defendant Insurers sold IRG the first $30 million layer of coverage that is relevant to the claim.  This first layer of coverage consisted of $30 million in coverage shared among the seven Defendant Insurers.  ECF No. 107, ¶6.

14.     Defendant Insurers are American Guarantee and Liability Insurance Company ("Zurich"), Interstate Fire & Casualty Company ("Interstate"), Starr Surplus Lines Insurance Company ("Starr"), Chubb Custom Insurance Company ("Chubb"), General Security Indemnity Company of Arizona ("General Security"), Axis Surplus Insurance Company ("Axis"), and Ironshore Specialty Insurance Company ("Ironshore").  ECF No. 107, ¶7.

15.     Defendant Zurich issued the lead policy form and endorsements and accepted 66.67% of the risk, or $20 million in the primary limits.  ECF No. 107, ¶8.

16.     Interstate issued a separate policy accepting 10% of the risk, or limits of $3 million (the "Interstate Policy").  Schroeder Dec., Exhibit 3, Interstate Policy, IFCC-0000069-0000086.

17.     The Interstate Policy contains the following provision:

A. This is following form insurance, which means that this insurance follows all the **Terms and Conditions** of the **Lead Insurance Policy** <u>except</u> as to any **Terms and Conditions** of this **Policy** that:

(1) differ from any term or condition contained in the **Lead Insurance Policy**; or
(2) is not contained in the **Lead Insurance Policy**.

*Id*. at IFCC-C0000073 (emphasis in the original).

18.     The Interstate Policy contains the following exclusions clause:

**24. EXCLUSIONS CLAUSE:**

If the following perils or insurance coverages are <u>not</u> excluded in the **Lead Insurance Policy**, the following exclusionary language does apply to the insurance we provide under this **Policy**, and this insurance will not apply to any **Covered Loss** or any payments of any kind that may arise out of:

*Id*. at IFCC-C0000080 (emphasis in the original).

19.    The Interstate Policy contains the following exclusion, following the language in paragraph 18 above ("absolute pollution exclusion"):

B. <u>Pollution Contamination</u>

The release, discharge or dispersal of Pollutants unless the release, discharge or dispersal is itself caused by any of the Specified Causes of Loss.

As used in this Exclusion, the term "Pollutants", means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids alkalis, chemicals and waste.   Waste includes material to be recycled, reconditioned or reclaimed.

As used in this Exclusion, "Specified Causes of Loss" means loss or damage caused by or resulting from the following:

(1) Building glass breakage.

(2) The actual, abrupt falling down of a building or part of a building. A collapse occurs only when a building or part of a building has actually and abruptly fallen down. Collapse does not include a threat of collapse, even if collapse is imminent, and collapse does not mean a condition of a building including cracking, bulging, sagging, bending, shifting, leaning, settling, shrinkage, or expansion, that could lead to or contribute to its actual, abrupt falling down.

(3) Explosion, including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass. This cause of loss does not include damage by:

   (a) Rupture, bursting or operation of pressure relief devices; or

   (b) Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water.

(4) Falling objects.

(5) Fire, lightning, or smoke. Smoke must cause sudden and accidental loss or damage and does not include smoke from agricultural smudging or industrial operations.

(6) Leakage from fire protection equipment, meaning leakage or discharge of any substance from fire protection equipment, including collapse of a tank that is part of the system.

(7) Riot or civil commotion, including:

   (a) Acts of striking employees while occupying the described premises; and

4

(b) Looting occurring at the time and place of a riot or civil commotion.

(8) Sinkhole collapse, meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

(a) The cost of filling sinkholes;

(b) Sinking, subsidence, or collapse of land into man-made underground cavities; or

(c) Mine subsidence which is earth movement caused by a failure initiated at the mine level of man-made underground mines, including but not limited to coal, clay, limestone or fluorspar mines.

(9) Theft, meaning any act of stealing; or attempted theft.

(10) Vandalism, meaning the willful and malicious damage to, or destruction of covered property.

(11) Vehicles, meaning the physical contact of an automobile; motorcycle; motor truck; tractor; self-propelled machine; trailer or semi-trailer; aircraft; watercraft; or any similar means of transporting persons or property including an object thrown up by a vehicle. However, we will not pay for loss or damage caused by or resulting from vehicles you own or operate.

*Id*. at IFCC-C0000080-81.

20.   The Interstate Policy contains the following exclusion ("PCB exclusion")

following the language in paragraph 18:

C. Asbestos, Dioxin or Polychlorinated Biphenols

(1) Asbestos, dioxin or polychlorinated biphenols (hereinafter all referred to as "Materials") removal from any good, product or structure unless the asbestos is itself damaged by fire, lightning, aircraft impact, explosion, riot, civil commotion, smoke, vehicle impact, windstorm or hail, vandalism, malicious mischief, leakage or accidental discharge from automatic fire protective system.

(2) Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating such Materials;

(3) Any governmental direction or request declaring that such Materials present in or part of or utilized on any undamaged portion of the insured's property

5

can no longer be used for the purpose for which it was intended or installed and must be removed or modified.

The exception to exclusion C. (1), above, does not apply to payment for the investigation or defense of any loss, damage or any undamaged portion of the insured's property can no longer be used for the purpose for which it was intended.

*Id*. at IFCC-C0000081.

21.     The Interstate Policy contains the following exclusion ("debris removal exclusion"), after the language in paragraph 18 above.

D. <u>Debris Removal Exclusion</u>

As a result of a Covered Loss, we will pay the expense subject to the Limit of Insurance to remove debris that has been damaged or destroyed. However, in connection with the removal of debris, we will not pay the expense to:

(1) Extract contaminants or pollutants from the debris;
(2) Extract contaminants or pollutants from land or water;

*Id*. at IFCC-C0000081.

22.     Interstate declined the contamination portion of IRG's claim based upon the exclusions set forth in paragraphs 19-21.  Schroeder Declaration, Exhibit 4, dep. of Keith Hargan, p. 93, lines 12-14.

23.     IRG asked Interstate to "take another look" at its denial.  *Id*., p. 93, lines 3-15.

24.     Interstate took another look at the claim and determined that the contamination portion was still excluded.  *Id*. p. 93, lines 14-21.

25.     Interstate then received another request to reconsider its coverage position, from senior leadership at AmWINS, the wholesale broker that placed the Interstate Policy.  *Id*., p. 94, lines 8-11, p. 101, lines 14-15.

26.     In responding to this request, if Interstate was not going to continue to deny the claim it had two choices: agree to a post-loss policy reformation or make an *ex-gratia* payment. *Id*., p. 95, line 20.

27.     Interstate rejected the option of a post-loss policy reformation. *Id*., p. 96, lines 3-10.

28.     Interstate ultimately decided to make as *ex-gratia* payment of $360,000 to IRG. *Id*., p. 113, line 20 – p. 114, line 14.

29.     Interstate explained the *ex-gratia* payment as follows:

> Q . . . is it your position that this payment for $360,000 is not an acknowledgement by Interstate that its pol -- that its policy does, in fact, cover pollution and contamination cleanup cost?
> **A To make sure I answer this correctly: It was not an acknowledgement of coverage whatsoever.**
> Q Or an admission of coverage, correct?
> **A Or admission of coverage.**
> Q It was a payment made out of the goodness of Interstate's corporate heart, correct?
> **A Correct.**

*Id*., p. 116, lines 7-19.

Respectfully submitted,
/s/ *David E. Schroeder*
Mitchell A. Orpett
David E. Schroeder
Tribler Orpett & Meyer PC
225 W. Washington St., Suite 2550
Chicago, Illinois 60606
312-201-6400
maorpett@tribler.com
deschroeder@tribler.com
Service accepted at docket@tribler.com
*Attorneys for Interstate Fire & Casualty Company*

IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| INDIANA GRQ, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No: 3:21-cv-00227-DRL-MGG |
| | ) |
| AMERICAN GUARANTEE AND | ) |
| LIABIILITY INSURANCE COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

**DECLARATION OF DAVID SCHROEDER IN SUPPORT OF DEFENDANT
INTERSTATE FIRE & CASUALTY COMPANY'S RESPONSE TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT
INTERSTATE'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, David Schroeder, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am counsel for Defendant Interstate Fire & Casualty Company ("Interstate") in this matter. I am over 18 years of age and have personal knowledge of the facts set forth in this Declaration, and would be competent to testify to them if called upon to do so.

2. Attached to this Declaration as **Exhibit 1** is a true and correct copy of the Report prepared by plaintiff's expert, Tod Delaney dated February 15, 2022.

3. Attached to this Declaration as **Exhibit 2** is a true and correct copy of plaintiff's initial disclosures.

4. Attached to this Declaration as **Exhibit 3** is a true and correct copy of policy AMW-150803 issued by Interstate to Industrial Realty Group, LLC for the policy period April 15, 2016 to April 15, 2017, bates numbers IFCC-C0000069-86.

5. Attached to this Declaration as **Exhibit 4** is a true and correct copy of the deposition transcript of Keith Hargan.

6.  Attached to this Declaration as **Exhibit 5** is a true and correct copy of the Report prepared by Defendants' expert, R.A. West, dated March 31, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of August, 2022.

/s/ *David E. Schroeder*_____
David E. Schroeder

<u>**CERTIFICATE OF SERVICE**</u>

I, David E. Schroeder, hereby certify that on August 12, 2022, a copy of **Interstate Fire & Casualty's Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment** was served electronically on the parties listed below via the Court's electronic filing system:

<u>**SERVICE LIST**</u>

| <u>***Attorneys for Plaintiff***</u> | <u>***Attorneys for American Guarantee and Liability Insurance Company; Interstate Fire & Casualty Company; Starr Surplus Lines Insurance Company; Chubb Custom Insurance Company; General Security Indemnity Company; Axis Surplus Insurance Company; Ironshore Specialty Insurance Company***</u> |
|---|---|
| Clint A. Zalas<br>Lee Groves and Zalas<br>54391 30th Street<br>South Bend, IN 46635<br>574-232-5923<br>cazalas@lgzlegal.com | Peter E. Kanaris<br>David E. Heiss<br>Jennifer J. Kalas<br>Hinshaw & Culbertson LLP<br>151 N. Franklin St., Suite 2500<br>Chicago, IL 60606<br>312-704-3000<br>pkanaris@hinshawlaw.com<br>dheiss@hinshawlaw.com<br>jkalas@hinshawlaw.com |
| Mark E. Miller<br>Brian G. Friel<br>William T. O'Neil<br>Benjamin Massarsky<br>Miller Friel PLLC<br>2445 M Street NW, Ste. 910<br>Washington, DC 20037<br>202-760-3160<br>millerm@millerfriel.com<br>frielb@millerfriel.com<br>oneilw@millerfriel.com<br>massarskyb@millerfriel.com | |

s/David E. Schroeder

Signature

# EXHIBIT 1

# Expert Report of
# B. Tod Delaney, Ph.D., P.E., BCEE

**Indiana GRQ, LLC, et al.**

> **v.**

**American Guarantee and
Liability Company, et al.**

**Civil Action No. 3:21-CV-227-DRL-MGG**

_____
**Bernard T. Delaney, Ph.D., P.E., BCEE**

**February 15, 2022**

Prepared by:   **First Environment, Inc.
10 Park Place
Building 1A, Suite 504
Butler, New Jersey  07405**



TABLE OF CONTENTS

1.0   Introduction ................................................................................................ 1

2.0   Professional Experience and Qualifications........................................................ 2

3.0   Facts ......................................................................................................... 4

 3.1   Overview of the Facility and the Water Inundation Event ............................................ 4

 3.2   Background on Transformers and PCBs.......................................................... 6

  3.2.1   Transformers ....................................................................................... 6

  3.2.2   PCBs ................................................................................................. 7

 3.3   Transformers at the Site ..............................................................................8

 3.4   Site Investigation and Response Actions Undertaken .................................................11

  3.4.1   Site Investigation ................................................................................11

  3.4.2   Site Response Actions ..........................................................................12

 3.5.   Federal TSCA Regulations with Respect to PCB Cleanup and Disposal ....................13

4.0   Opinions ...................................................................................................16

 4.1   The Event Caused the Release of PCBs from the Transformer(s) and the Ensuing
 Waters Spread the PCBs through the Basement, Vaults, Sumps, and Tunnels Underlying
 the Main Building at the Facility that Necessitated Response Actions Including Emergency
 Response and Abatement/Remediation ................................................................16

 4.2   The Remediation Actions Undertaken Did Not Meet The Requirements of Federal
 Regulations under TSCA and Are Therefore Inadequate.......................................................17

  4.2.1 Spill Policy and Shortcomings with Respect to Cleanup Requirements ....................18

  4.2.2 Summary ...........................................................................................21

 4.3   An Adequate Response Will Require Development of a Workplan That Provides
 Sampling, Remediation, and Disposal in Accordance with TSCA Regulations......................21

 4.4   The Cost of Successful Abatement and Cleanup to a Low Occupancy Standard is
 Estimated to Be Approximately $11,400,000 ........................................................22

 4.5   The Cost of Successful Abatement and Cleanup to An Unrestricted Use Standard is
 Estimated to Be Approximately $25,200,000 ........................................................23

References .......................................................................................................24

APPENDICES

Appendix A – List of Documents Reviewed, Considered and Relied On

Appendix B – Resumé of B. Tod Delaney, Ph.D., P.E., BCEE

Appendix C – Cost Estimates

# 1.0   Introduction

I have been retained by Miller Friel, PLLC ("Counsel") to render my professional expert opinion in this insurance coverage litigation entitled *Indiana GRQ, LLC   v. American Guarantee and Liability Insurance Company, et al.*, United States District Court for the Northern District of Indiana, Civil Action No. 3:21-CV-227-DRL-MGG, with respect to cleanup and decontamination work connected with the release of polychlorinated biphenyls (PCBs) at an industrial facility located at 701 West Chippewa Avenue (the "Site" or the "Facility") in South Bend, Indiana and owned by Plaintiff, Indiana GRQ, LLC ("IRG").   The Site is located approximately 1.5 miles south of the St. Joseph's River and was inundated with water (the "Event") when City of South Bend authorities diverted flood waters away from a local bridge, for fear of a washout, in connection with heavy rains on August 15-16, 2006.

I have been asked to render opinions with respect to causation of the PCB contamination, the adequacy of the abatement, cleanup and decontamination work performed, and the cost of performing successful abatement, cleanup, and decontamination.

First Environment staff visited the Site on January 12, 2022.

## 2.0   Professional Experience and Qualifications

I am a Professional Engineer licensed in 15 states, including the State of Indiana, and a Board Certified member of the American Academy of Environmental Engineers and Scientists.  I was awarded the Bachelor of Science Degree in 1968 and the Master of Science degree in 1972, both in Chemical Engineering, from the University of New Mexico, and a Ph.D. degree in Environmental Health Engineering from the University of Texas in 1976.  I have also earned a Master's degree in Business Administration from Pepperdine University.  I am currently the President of First Environment, Inc., an environmental engineering and consulting firm with corporate headquarters at 10 Park Place in Butler, New Jersey.

I have practiced in the pollution prevention and hazardous waste management fields for more than 40 years with an emphasis on forensic environmental engineering, site investigations, industrial audits, remedial design, remedial construction, environmental management systems, strategic planning, air pollution control, and the applications of control and treatment technologies.  My professional experience includes the design, development, and management of investigatory programs and air, water, and soil contamination controls.  My work has covered a variety of manufacturing industries including aircraft, automotive, electronics manufacturers, refineries, and chemical facilities.

I have also directed numerous industrial site investigations and remediation projects focused on former industrial plants.  These efforts included developing sampling plans, performing remedial site investigations, implementing feasibility studies, evaluating cleanup alternatives, designing and operating treatment systems, and supervising and managing cleanup programs.  These cleanup programs have involved soil removal, building decontamination, and groundwater remediation through pumping and *in-situ* treatment methods and *ex-situ* treatment of groundwater.  My experience includes investigating and remediating sites involving contamination due to the use and release of PCBs and chlorinated solvents. I am familiar with the chemical properties and industrial uses of PCBs, solvents, and other chemicals.

I have provided litigation support to plaintiffs and defendants in a wide variety of matters including Superfund actions, RCRA actions, private cost recovery and cleanup allocations, bankruptcies, toxic torts, and insurance claims.  I have produced reports and/or testimony related to areas of expertise including, but not limited to, industrial operations and manufacturing processes at facilities that manufactured aircraft and related equipment,

electronics facilities, military facilities, manufactured gas plants, refineries, and past industry standards.  I have served as a court-appointed expert and testified in state and federal court.

The opinions presented herein are made using my scientific, technical, and specialized knowledge based on the specific information reviewed at the time of preparation of this Expert Report and are subject to modification if more detailed and/or new information becomes available in the future.

A list of the documents, facts, and data considered and relied upon is provided in Appendix A. My resumé containing a summary of my qualifications, a listing of the professional papers I have authored over the last 10 years, and the cases I have testified in over the last 4 years, is attached hereto as Appendix B.  The compensation for my time is $400 per hour.

## 3.0   Facts

### 3.1   Overview of the Facility and the Water Inundation Event

Plaintiff, IRG, is the owner of the Site, which is an industrial facility at 701 West Chippewa Avenue, South Bend Indiana located approximately 1.5 miles south of the St. Joseph's River. IRG purchased the Site on October 1, 1991 and utilizes the facility as investment property while acting in the role of landlord that leases space to commercial tenants.   The figure below is a drawing from 1984 of the layout of the Site.



Plant Layout rev 1984

The physical features and layout of the Site include the following:

- The Site was built in 1941 - 1942 by Studebaker Corporation as a military aircraft engine manufacturing and testing facility. (Edison 2013, 1)

- An 850,000 SF building was completed in 1941.   A second phase consisting of an additional 160,000 SF was completed in 1942. (Edison 2013, 1 - 2)

- The Site was sold by Studebaker to Curtis Wright Corporation in 1958. (Edison 2013, 1)

- Between 1958 and 1994, ownership of the Site was transferred approximately seven times.   The facility was abandoned in 1989 as a result of the bankruptcy filing of A.M. General. (Edison 2013, 1)

- The subject property was purchased in 1994 and is currently owned by Indiana GRQ, LLC. (Edison 2013, 1).
- The Site primarily consists of a main building, a mechanical electrical plumbing (MEP) easement building, and an abandoned building.
- The main building covers approximately 1,200,000 SF of ground surface area and includes approximately 276,425 SF of basement, tunnel, and substation rooms. (McLarens 2016 Preliminary Report [McLarens002586 at 002620]
- The MEP easement building is not owned by IRG, but there is an MEP Easement which runs through the building. (Id.)
- The Site was occupied by 11 tenants in 2016.
- The facility has a series of underground tunnels and substation electrical vaults which are utilized for power distribution within the Site.
- The MEP Easement Building's basement is the lowest point of the tunnels and basements which span through the Main Building.
- The main building had six power substations located along tunnels 1 and 2.
- Each power substation contained one 2,000 KVE (480v) and one 300 KVE (240v) General Electric transformer, with the exception of Substation 2 which contained one 300 KVE (200v) transformer.

On August 15, 2016, the area of South Bend was inundated with heavy rain and thunderstorms. "In the span of an 8 to 12 hour period, an estimated 7.69 inches of rain fell across the area." (McLarens 2016 Preliminary Report at 3 [McLarens002586 at 2588] referring also to reports attached at McLarens002594 -2603) Inundation of water at the Site was the result of the City of South Bend authorities diverting flood waters away from a local bridge for fear of a washout. Diverted waters, along with normal rain runoff from the storm, flowed to the south driveway of the Site and into the main building causing damage to several tenant-occupied and otherwise vacant spaces. "It is estimated that waters made their way about 750 to 800 feet into the building, heading south to north" and into building's system of underground tunnels and basement areas. (McLarens 2016 Preliminary Report at 3) Most of those tunnels/basements were flooded completely; however, "a small portion of tunnels may have only been flooded to approximately 60 to 70 percent of the way full." (Id.) Approximately, 1,300,000 gallons of water entered the building, running to its lowest point - the neighboring powerhouse - through the tunnels and basement. (Id.)[1]  (See a sketch (McLarens 003089) showing elevations of the main floor, tunnels and substations in McLarens 2016 Report No. 2.)

---

[1] The basement houses a large portion of the mechanical, electrical and plumbing (MEP) components supporting operations of tenants occupying the Site.

As the substations are located in the basement, PCB-containing dielectric fluid (askarel, see definition in Section 3.2.2 below) was released into the waters.   The presence of PCBs was confirmed by testing after an oily sheen was detected in the water (see INSERV 2018), and the City mandated that IRG stop draining water from the building into the City's sewer system due to environmental concerns.  As a result, IRG retained INSERV, Inc. (INSERV) to safely remove and dispose the contaminated water.  INSERV set up Frac tanks in the parking lot and began pumping out water from the building.  (McLarens 2016 Preliminary Report at 3)

A site inspection conducted after the incident revealed that all eleven transformers located in six substation vaults had taken on water, indicating displacement of PCB-containing transformer oil into the waters.  In addition, at least one (Transformer No. 11 in Substation No. 6), and possibly two, vertical oil level sight glasses on the back of the transformers had broken, allowing further release of transformer oil into the water. (INSERV 2018; McLarens 2018 with Nov 9 Letter from West) As much as 14 inches of water was observed on top of transformer oil inside the transformers. (Benson 2016 email to West)

Water removal activities continued at the Site in order to eliminate remaining water accumulated in the substation vaults and tunnels.  After the majority of the water was removed from the vaults and tunnels, samples of the recovered water and oil were collected to determine the levels of PCBs present.  In addition, samples of the utility piping insulation were collected to determine whether the insulation that had been under water was impacted with PCBs.  The water samples were collected and analyzed by INSERV, and a sample of the oil and samples of the utility piping insulation collected by Burns & McDonnell Engineering Co., Inc. (Burns & McDonnell 2017, 2-1)

## 3.2    Background on Transformers and PCBs

### 3.2.1  Transformers

A transformer is a static electrical device that transfers electrical energy between circuits by electromagnetic induction.   (Transformer Engineering 2004)   Because electric power is transmitted most efficiently at high voltages, but is best generated and used at low voltages, the transformer is a critical component of electric power systems.  In simple terms, "a transformer converts electricity with a low current and a high voltage into electricity with a high current and a low voltage (and *vice versa*) with almost no loss of energy."   (Coltman 2002, IEEE). Transformers are crucial links between power generating plants and points of power usage. (Transformer Engineering 2004)

Transformers typically consist of a core and coils immersed in a dielectric fluid which insulates and serves as a coolant for the electrical device.   "There are two broad classifications of transformers: distribution transformers, which are used to step down voltages, and power transformers, which are used primarily to step up voltages." (US EPA 1976, 84)

"A great majority of distribution type transformers have provision for venting.  Many of these units are equipped with spring loaded venting devices which vent upon a pressure excursion, and diaphragm rupture discs are offered as a customer option." (US EPA 1976, 85; see, for example, General Electric Instructions for Secondary Unit Substation Transformers, Liquid-Filled discussing its pressure-relief device at pp. 3 – 4)

### 3.2.2  PCBs

Polychlorinated biphenyls (PCBs) – a combination of chlorine atoms on a biphenyl molecule - are members of a family of synthetic chemicals with a unique set of chemical and physical and properties.  Due to those properties, PCBs were used in a wide array of industrial, commercial, and consumer products. (EPRI 1999, 1-1)

The chemical, physical and electrical properties of PCBs made them ideal dielectric fluids (insulator fluids that do not conduct electricity) for electrical applications in transformers.  The dielectric fluids used in PCB transformers are called **askarels**, which is a generic term for a group of synthetic, fire-resistant, electrical insulating liquids containing PCBs. (EPRI 1999, 3-4)

Individual PCB compounds (there are 209 based on the number and location of chlorine atoms on the biphenyl molecule) are referred to as **congeners**.   Most PCBs were produced commercially as mixtures containing varying combinations of PCB congeners or homologs (PCB molecules containing the same number of chlorine atoms); this resulted in PCB blends with somewhat different physical and chemical characteristics.   In the United States, PCB mixtures were produced for about 50 years from the late 1920s to the early 1970s and sold under the registered trade name of **Aroclor ®",** marketed by Monsanto which produced the vast majority of PCBs in the US. (EPRI 1999, 2-2)

"Each PCB Aroclor mixture had a four-number code to distinguish it from other Aroclors.  The first two numbers of the four-number code started with 12 (meaning that the mixture was made from PCBs only and contained 12 carbon atoms) and ended with two numbers indicating the approximate weight percentage of chlorine in the overall mixture.  For example, Aroclor 1242

was the trade name for a mixture of PCBs containing about 42% chlorine by weight." (EPRI 1999, 2-3)

**Pyranol** was a GE tradename for its askarel (transformer fluid containing PCBs). (EPRI 1999, 2-3) Pyranol was made from Aroclor 1260 between the 1930s and 1960 with variations in composition (see Table 3-8 below from the EPRI report), and then in 1971 the fluid was modified to an Aroclor 1254-based askarel.  (EPRI 1999, 3-8)

**Table 3-8**
**General Electric Pyranol Transformer Askarels**

| Code Number | #1488 | #1467 | #1470 | #A13B3B |
|---|---|---|---|---|
| Year initiated | 1932 | 1944 | 1952 | 1963 |
| **Approximate Composition of Pyranol in Percent by Weight** | | | | |
| Aroclor 1260 | 60% | 60% | 45% | 45% |
| Trichlorobenzene | 40 | 40 | 40 | 40 |
| Tetrachlorobenzene | — | — | 15 | 15 |
| Tin tetraphenyl | — | 0.125 | 0.125 | — |
| Diepoxide | — | — | — | 0.125 |

Source: Monsanto, no date

## 3.3 Transformers at the Site

As stated previously, each power substation contained one 2,000 KVA (480v) and one 300 KVA (240v) General Electric transformer, apart from Area 2, which contained one 300 KVA (200v) transformer.  A description of these transformers is as follows:

2,000 KVA General Electric Transformer – a three-phase, 60 cycle, 480-volt transformer, manufactured by GE at its Schenectady, New York plant, that was designed to hold 443 gallons of Pyranol (a PCB-containing dielectric fluid) in its main tank. (See Transformer Nameplate Photo 1)

300 KVA General Electric Transformer – a three-phase, 60 cycle, 220-volt transformer, manufactured by GE at its Schenectady, New York plant, that was designed to contain 185 gallons of Pyranol (a PCB-containing dielectric fluid) (See Transformer Nameplate Photo 2)

A diagram showing the location of the substations housing the transformers is presented below for ease of reference.



Details regarding the transformers, their locations, and amount of askarels contained (liquid PCB contents) is also presented in the table below:

| Location | Type of Apperatus or container | ID of Apparatus | Description of Apparatus | Liquid PCB Contents (GAL.) | Weight of PCBs in LBS. |
|---|---|---|---|---|---|
| Sub #1 | Transformer | GE 5524045 | 2000 KVA -  4160/480V | 470 | 6100 |
| Sub #1 | Transformer | GE 6609033 | 300 KVA - 4160/220V | 185 | 2425 |
| Sub #2 | Transformer | GE 6609034 | 300 KVA - 4160/200V | 185 | 2425 |
| Sub #3 | Transformer | GE 6624051 | 2000 KVA -  4160/480V | 470 | 6100 |
| Sub #3 | Transformer | GE 6609037 | 300 KVA - 4160/220V | 185 | 2425 |
| Sub #4 | Transformer | GE 6624046 | 2000 KVA -  4160/480V | 470 | 6100 |
| Sub #4 | Transformer | GE 6609042 | 300 KVA - 4160/220V | 185 | 2425 |
| Sub #5 | Transformer | GE 6624047 | 2000 KVA -  4160/480V | 470 | 6100 |
| Sub #5 | Transformer | GE 6609031 | 300 KVA - 4160/220V | 185 | 2425 |
| Sub #6 | Transformer | GE 6624048 | 2000 KVA -  4160/480V | 470 | 6100 |
| Sub #6 | Transformer | GE 6609038 | 300 KVA - 4160/220V | 185 | 2425 |

A photograph of the nameplate and dielectric fluid temperature gauge of the 2000 KVA transformer at Substation 6 is shown below.   The nameplate clearly states "Pyranol Transformer."



Photo 3

Substation 6.

Photo taken at our 10/18/16 site inspection.

Transformer information.

Laboratory data of samples of askarels collected from the transformers prior to their disposal is presented in the table below:

**IRG (11) Transformers-Analytical Summary for PCB:**

| | |
|---|---|
| 1A    Substation 1-Small unit | 4,110 ppm |
| 2A    Substation 1-Large unit | 75,200 ppm |
| 3A    Substation 2-Small unit | 505,000 ppm |
| 4A    Substation 3-Small unit | 458,000 ppm |
| 5A    Substation 3-Large unit | 17,000 ppm |
| 6A    Substation 4-Small unit | 62,200 ppm |
| 7A    Substation 4-Large unit | 1,200 ppm |
| 8A    Substation 5-Small unit | 45 ppm |
| 9A    Substation 5-Large unit | 95,200 ppm |
| 10A  Substation 6-Small unit | 506,000 ppm |
| 11A  Substation 6-Large unit | 549,000 ppm |

**West 2018, Attachment 1 (see McLarens 2018)**

PCBs are regulated under the Toxic Substances Control Act 15 U.S.C. §2601 et seq. (1976) (TSCA). TCSA regulations (40 CFR 761) provide for three categories of transformers based on the PCB content of their dielectric fluid: PCB Transformers (transformers containing dielectric fluid with PCBs at a concentration greater than 500 ppm; PCB-Contaminated Transformers (transformers containing dielectric fluid with PCBs at concentrations between 50 and 500 ppm); and non-PCB Transformers (transformers containing dielectric fluid with PCBs at concentrations less than 50 ppm). Some of the transformers (those in vaults 1, 4, and 5) on the Site were retro-filled with alternative fluids (i.e., mineral oil or other non-PCB dielectric fluid) replacing the original Pyranol fluids. (See A.M. General 2019)

## 3.4    Site Investigation and Response Actions Undertaken

### 3.4.1   Site Investigation

On August 22, 2016, INSERV collected composite grab samples from floating oil (716 ppm PCBs) and water (2,810 ug/L PCBs) in the north basement area of the main building. (INSERV 2018; Pace Analytical 2016). Based on the results of laboratory analysis of these samples, cleanup response activities including water removal began on August 30, 2016. (INSERV 2016)

On or about September 1, 2016, the Indiana Department of Environmental Management (IDEM) requested that IRG conduct additional sampling to further characterize the extent of the PCB contamination in the basement, vaults, sumps, and tunnels, underlying the main building at the Facility and in the powerhouse building (see Opinion 4.2, herein, regarding the limitations of IDEM's jurisdiction over PCB cleanups). Sample collection activities consisting primarily of surface wipe sampling and several bulk samples of debris were conducted in September and October 2016. No core or chip samples of the porous concrete wall and floor surfaces were collected as is required by TSCA. The results of the sampling identified PCB impacts throughout the Facility, including the walls of the powerhouse basement, tunnel walls, piping insulation in the tunnels, and basement sumps, with PCB concentrations ranging up to 420 ppm in a floor debris sample collected in the basement. (INSERV 2016 including IRG Sample Locations and Results; see also Burns & McDonnell 2017, Figure 3, Insulation Removal Requirements (McLarens 000425) presented below).



**From Burns & McDonnell 2017 (McLarens 000425)**

### 3.4.2  Site Response Actions

Emergency response activities to date include pumping water out of the tunnels, vaults, and basement into on-site frac tank(s) and employing an oil skimmer in the frac tank to separate oil from the water.  Wastewater samples collected from the frac tank showed PCB concentrations ranging from non-detect to 18 ppb. (*INSERV2016*).  Initially, PCB-contaminated wastewater was transported off-site for further treatment and processing.  Later, PCB-contaminated water was treated on-site with activated carbon and then directly discharged to the City of South Bend sanitary sewer system through an on-site conduit.  Although the INSERV Progress Reports indicate that the PCB-contaminated water was properly disposed, we have not seen any waste manifest documentation supporting that assertion.

The Progress Reports also recommended removing the oily scum from the water, storing it on-site until it could be analyzed and then sending it off-site for incineration, but we have not seen documentation indicating that the oil waste was, in fact, analyzed and properly disposed of off-site.  Pumping activities that were initiated to remove the water from inside the facility were discontinued on October 7, 2016.  It is unclear from the information available whether pumping

activities were discontinued because all water had been pumped out of the Facility, or for some other reason.

In an attempt to return the areas to a low occupancy standard, PCB remediation and confirmation sampling activities were conducted in the tunnels and substations from December 2016 to February 2018.  The remediation was conducted under a work plan reportedly approved by IDEM on March 20, 2017.[2]  (McLarens 2017 Report No. 5 at 003108)  The Cleanup Plan prepared by Burns & McDonnell, presumably the work plan reportedly approved, included the following actions for cleaning and rinsing:

- employing a cleaning/rinsing procedure with an industrial strength detergent;
- scrubbing rough surfaces with a brush/pad or wiping smooth surfaces, using a cleaning solution in all instances;
- wiping the surface dry;
- rinsing the surface with clean (potable) water; and
- repeating the process for all surfaces.

(Burns & McDonnell 2017, 3-1 – 3-2)

A standard wipe test was to be used on both porous and non-porous surfaces to determine if decontamination activities were sufficient. (Burns & McDonnell 2017, 5-1)

Post-remediation wipe samples were collected from cleaned surfaces to confirm the completion of the cleanup. (Burns & McDonnell 2018, Confirmation Sampling Results Memorandum)

As of today, some sampling activities have been conducted in the basement and a remediation work plan was prepared (Burns & McDonnell 2017, Basement Area Work Plan), but it is my understanding at the time of this report's writing that basement remediation has not occurred.

## 3.5. Federal TSCA Regulations with Respect to PCB Cleanup and Disposal

Federal regulations promulgated under TSCA set forth regulations that implement USEPA's Spill Cleanup Policy (40 CFR 761, Subpart G) and the minimum requirements for the cleanup of PCBs and disposal of PCB remediation waste, absent any other state requirements that would be more stringent.  (See 40 CFR 761)  IDEM, or any other Indiana state agency, does not have more stringent requirements than those stated in TSCA.

---

[2] Again, see Opinion 4.2, herein, regarding the limitations of IDEM's jurisdiction over PCB cleanups.

Under TSCA, US EPA established a procedure for "Self-implementing on-site cleanup and disposal of PCB remediation waste." (40 CFR 761.61[a]) [2010]; see also US EPA 2005, Site Revitalization Guidance)  Primary elements of the "self-implementing" regulations include:

PCB cleanup levels based on occupancy level and waste type (40 CFR 761.61[a] [1-1]):

- For "high occupancy" areas:

  o ≤1.0 mg/kg if not capped;
  o 1.0 to 10 mg/kg if capped;

- For "low occupancy" areas:

  o ≤25 mg/kg with institutional controls;
  o >25 to 50 mg/kg if the site is fenced and institutional controls are implemented;
  o >25 to 100 mg/kg if the site is capped and institutional controls are implemented.

- Self-implementing procedures may only be used to clean up soils or bulk remediation waste.  They are not applicable to sediments in ecosystems; drinking, surface or groundwater; sewers; or agricultural lands.

- Capping requirements (40 CFR761.61[a][7-8]):

  o A cap must be a continuous uniform barrier of concrete (>6 inches), asphalt (>6 inches), or clean soil (>10 inches) to prevent or minimize human exposure, erosion, and infiltration of water.

  o The cap must be maintained and any breach repaired within 72 hours of discovery.

  o A deed restriction must be filed to inform any potential purchaser of site restrictions.

- Disposal requirements for PCB waste (40 CFR761.61[a][5]):

  o PCB bulk remediation waste with PCB concentrations <50 mg/kg may be disposed  at  a permitted non-hazardous waste facility.

  o PCB bulk remediation waste with concentrations ≥50 mg/kg must be disposed in a RCRA- permitted hazardous waste landfill or other approved PCB disposal facility.  A Uniform Hazardous Waste Manifest must be used to ship waste.

TSCA regulations and guidance for self-implementing cleanup also have specific regulations on pre- and post- remedial sampling of PCB-contaminated waste.  Pre-remedial sampling is prescribed in 40 CFR 761 Subpart N—Cleanup Site Characterization Sampling for PCB Remediation Waste.   Post-remediation sampling is described in 40 CRF 761 Subpart O-Sampling to Verify Completion of Self-Implementing Cleanup and On-Site Disposal of Bulk PCB Remediation Waste and Porous Surfaces.

USEPA also requires specific analytical protocols for PCB sample extraction and analysis as follows:

- Extraction:  US EPA Method 3500B/3540C or US EPA Method 3500B/3550B.

▪      Analysis:  US EPA Method 8082 from SW-846.

Alternate extraction or analysis methods are permitted under Subpart Q-Self-Implementing Alternative Extraction and Chemical Analysis Procedures for Non-liquid PCB Remediation Waste Samples.  Composite sampling is allowed and described in 40 CFR 761.289.

All of these provisions apply to "self-implementing" cleanups.   Exemptions from these sampling requirements can be requested by petitioning a US EPA administrator for risk-based approval (see 40 CFR 761.61[c]) of alternative methods.

# 4.0  Opinions

## 4.1  The Event Caused the Release of PCBs from the Transformer(s) and the Ensuing Waters Spread the PCBs through the Basement, Vaults, Sumps, and Tunnels Underlying the Main Building at the Facility that Necessitated Response Actions Including Emergency Response and Abatement/Remediation

One or more PCB Transformers located in substation vaults released PCBs during the Event. As noted in the background section (3.1), all eleven transformers located in six substation vaults took on water during the Event.

Many of the transformers were energized at the time of the incident.  As they became immersed in the water, excess heat and pressure would have built up in the energized transformers possibly through electrical arcing.  This pressure increase would have caused the pressure relief valve located on the top of those transformers to open and expel potentially significant volumes of oil.

After the opening of the pressure relief valves, water entered the transformers through the orifice.  As noted in Section 3.1, as much as 14 inches of water was observed on top of transformer oil inside the transformers (askarels are denser than water).  Also as previously stated, the vertical oil level sight glasses on the back of at least one transformer (Transformer No. 11 in Substation No. 6), and possibly two, were broken during water infiltration caused by the Event, allowing further release of transformer oil into the water.

Non-PCB oils in transformers that were retrofitted would also have been released by the opening of the pressure relief valves.  Because water has a higher specific gravity (i.e., is denser than the non-PCB retrofit oils in the transformer), the waters displaced the oils forcing them out of the transformer and into the waters through openings in the transformer.[3]  Upon entering the transformers, the water and suspended sediment contacted residual PCBs in the retro-fitted transformers.

The presence of water in each transformer is a certain indicator that PCB-containing oil was released into waters and dispersed throughout the tunnels, vaults, and basement area.  This is

---

[3] These openings can consist of pressure relief valves, gauges, sight glasses, unlined screw and bolt openings, etc.

further evidenced by the presence of PCBs detected in floating oil in the basement at a concentration of 716 ppm.

## 4.2   The Remediation Actions Undertaken Did Not Meet The Requirements of Federal Regulations under TSCA and Are Therefore Inadequate

Based on my review of the remediation work plans prepared for the basement, vaults, sumps, and tunnels underlying the main building at the Site, the contractor charged with the cleanup of the facility failed to properly implement the cleanup in violation of the appropriate TSCA regulations and guidance.

TSCA provides USEPA with jurisdiction over the cleanup of PCB contamination at concentrations as low as 1 ppm for high occupancy areas and the disposal of PCB wastes. TSCA prescribes specific actions and cleanup targets for porous surfaces such as concrete when remediating PCBs.  These actions were not implemented during the remediation of the Facility making the cleanup that was conducted at the Site, non-compliant with TSCA, the regulations promulgated thereunder, and USEPA guidance (collectively, the "TSCA PCB Cleanup Program").

The TSCA PCB Cleanup Program regulates PCBs and their presence in buildings, building materials, and environmental media such as soils.  The program further prescribes the means and methods for the related sampling of PCB releases and the remediation of those releases into the environment and onto building structures, fixtures, and materials.  USEPA has strict authority under TSCA to regulate the management of PCBs that have been released into the environment.  USEPA has issued extensive regulations and guidance on PCB sampling, remediation, and related issues.  Compliance with these regulations is required for PCB cleanups and the disposal of PCB waste; otherwise, the party responsible for the cleanup will be in violation of TSCA.

USEPA does not generally delegate the administration and enforcement of the TSCA PCB Cleanup Program to the States.  Accordingly, due to a lack of delegated authority from USEPA, IDEM's role regarding PCBs is limited to overseeing an "emergency response" to ensure the protection of surface water and groundwater.  Without the delegated authority under TSCA, IDEM's Emergency Response Program cannot issue a determination of TSCA compliance regarding a release of PCBs in the tunnel, vaults, basement, or sediments.  Furthermore, IDEM

cannot issue a "No Further Action" decision for TSCA compliance related to the Incident at the IRG Facility. In any event, in this case, IDEM did not issue a "No Further Action" decision.

### 4.2.1 Spill Policy and Shortcomings with Respect to Cleanup Requirements

The availability of various PCB cleanup options and applicable standards is dependent on the timing of cleanup in relation to the spill.

Decontamination under TSCA PCB Spill Policy is not applicable due to untimely response. The decontamination procedures and cleanup standards under the PCB Spill Policy (40 CFR 761, Subpart G) are limited to new spills for which cleanup is commenced within 48 hours after becoming aware of the spill. Moreover, due to its porous physical characteristics, the surficial decontamination standard of concrete (10 micrograms/square centimeter; $ug/cm^2$) is only applicable for concrete that has been contaminated by a PCB spill less than 72 hours old (40 CFR 761.79(b)(4)). Because the PCB-contaminated water remained in contact with Site surfaces for several weeks or months, USEPA would deem decontamination under the PCB Spill Policy inappropriate. Instead, PCB contamination in the basement, vaults, sumps, and tunnels underlying the main building at the Facility must be cleaned up in accordance with the TSCA continued use standards or managed as PCB remediation waste.

The remediation of PCB-contaminated porous surfaces, nonporous surfaces, sediments, and water that was implemented in the vaults, sumps, and tunnels underlying the main building at the Facility (and proposed for the basement) was not in compliance with TSCA. Additional remediation work is needed in order to continue to use the tunnels/substations and the basement area in compliance with TSCA guidance.

The PCB remediation that was conducted in the Facility tunnels and substations in accordance with the PCB Decontamination Work Plan for Substation #1 and #4 Vaults and Utility Tunnels (Burns and McDonald, March 2017) involved the decontamination of all surfaces, including porous surfaces, by employing a cleaning/rinsing procedure with an industrial strength detergent and, depending on the type of surface, either scrubbed with a brush or wiped, left to dry, and rinsed off with clean (potable) water. This process was then repeated for all surfaces. A standard wipe test was used on both porous and non-porous surfaces to determine if decontamination activities were sufficient. For large, flat surfaces (i.e., walls, floors, and ceiling) samples were collected using a grid system with sampling points 1.5 meters apart. The cleanup criteria employed were as follows:

- Porous surfaces = 10 ug/100cm$^2$
- Non-porous surfaces = 10 ug/100cm$^2$

The PCB remediation activities implemented in the tunnels and substations were not in compliance with TSCA.  The non-solvent double-wash/rinse decontamination method and wipe sampling that was employed in the tunnels/substations is generally consistent with the PCB Spill Policy for cleanups that are implemented within 48 hours after the incident occurred.  However, this method is not appropriate for cleanups that take place more than 48 hours after the release of PCBs which is the case at the Facility.  For cleanups that take place more than 48 hours after the release of PCBs, TSCA prescribes two cleanup options (these assume the continued use of the Facility's basement, tunnels, and vaults as Low Occupancy Areas):

**Porous surfaces (concrete and insulation)**

1. Continued Use –

   - Remove the source of PCB contamination and, if the porous surface is accessible to superficial surface cleaning: (i) double wash/rinse the surface in accordance with 40 CFR 761, Subpart S; (ii) cover the surface with two coats of epoxy, or fasten a solid barrier to the surface; and (iii) mark the area as containing PCBs.

2. Managed as PCB Remediation Waste –

   - Self-Implementing Cleanup.
   - Work plan must be submitted to USEPA before implementing cleanup.
   - Characterization sampling of cleanup area is required; collect core samples using a grid system with 1.5 meter intervals.
   - Porous surfaces must be decontaminated or removed to achieve prescribed cleanup standards, as follow:

     o For high occupancy areas:

       ▪ Unrestricted use = < 1 part per million; ppm (bulk core sample).
       ▪ With barrier encapsulation and deed restriction = > 1 ppm and < 10 ppm.

     o For low occupancy areas (the current status of the tunnels and substations):

       ▪ With deed restriction only = < 25 ppm.
       ▪ With deed restriction, barrier, and marking = > 25 ppm and < 50 ppm.
       ▪ With deed restriction and encapsulation = > 25 ppm and < 100 ppm.
       ▪ Post-remediation verification sampling is required; collect core samples using grid system with 1.5 meter intervals in accordance with 40 CFR 761.

**Non-porous surfaces (piping and equipment)**

1. Continued Use –

   - For unrestricted use: decontaminate surface to <10ug/100cm$^2$ (wipe sample).
   - Verification sampling is required; collect wipe samples using a grid system with 1 meter intervals in accordance with 40 CFR 761, Subpart P.

2. PCB Remediation Waste –

   - Self-Implementing Cleanup.
   - Work plan must be submitted to USEPA before implementing cleanup.
   - Non-porous surfaces must be decontaminated or removed to achieve prescribed cleanup standards:
     o For high occupancy areas = < 10ug/100cm$^2$.
     o For low occupancy areas = < 100 ug/100cm$^2$.

As noted above, any person conducting a Self-Implementing cleanup of PCB remediation waste must characterize the site in accordance with 40 CFR Part 761, Subpart N. Notably, core sampling using a specific grid interval is required for bulk PCB remediation waste (i.e., sediment) and porous surfaces (i.e., concrete floors and walls).  No core sampling of building surfaces has been done or is planned at the Facility; only non-compliant wipe samples have been collected.

Porous surfaces and bulk PCB remediation waste must be cleaned up to the target levels specified in 40 CFR 761.61(a)(4), as verified by core sampling.  Porous surfaces may also be either: (a) decontaminated to the target level of < 10 ug/100cm2 as measured by a wipe test if the decontamination procedure is commenced within 72 hours of the initial spill of PCBs,9 or (b) cleaned up for continued use by completing the double wash rinse procedure in 40 CFR Part 761, Subpart S and then covering the surface with two solvent resistant coatings or a solid barrier.  The decontamination procedure used to clean the tunnel walls and floor under 40 CFR 761.79 is not applicable to porous surfaces at the Facility because it was not implemented within 72 hours of the initial spill of PCBs.  Therefore, all PCB-contaminated porous surfaces at the Facility must be either treated as PCB remediation waste and removed and disposed in accordance with 40 CFR 761.61(a)(4)(iii) or cleaned up for continued use in accordance with 40 CFR 761.30(p).  The cleanup at the Facility did not involve the removal and disposal of any PCB-contaminated porous surfaces.  While some contaminated walls and floors in the tunnels at the Facility were double washed/rinsed, they were not encapsulated with resistant coatings or a solid barrier in accordance with 40 CFR 761.30(p).

### *4.2.2 Summary*

Based on a review of available information, the remedial activities implemented in the tunnels/substations and proposed for the basement area (but not completed) are not in compliance with TSCA requirements. Although the cleanup that was implemented and the standards applied appear to have satisfied IDEM Emergency Response requirements, the cleanup was not in compliance with TSCA.  The cleanup that was implemented is not appropriate due to the amount of time between when the PCB spill occurred and when cleanup activities were implemented.   PCB contaminated surfaces must be decontaminated in accordance with continued use standards or managed as PCB remediation waste, which requires prior submittal of a cleanup work plan to USEPA, not IDEM.

## 4.3   An Adequate Response Will Require Development of a Workplan That Provides Sampling, Remediation, and Disposal in Accordance with TSCA Regulations

The cleanup of PCB-contaminated surfaces and materials in the basement, substation vaults, and tunnels must be completed in accordance with the applicable TSCA regulations.   The cleanup is designed to return the PCB-impacted areas to use as a Low-occupancy Area under the TSCA regulations.   We reviewed the work plan for these areas outlined by Hull and Associates on behalf of IRG in June 2020 to facilitate cost estimates for the cleanup.  (See IRG2020, Signed Sworn Statement In Proof of Loss, Axis-C00481 - Axis-C00486)


The work plan includes the following elements:

- Basement Area Dewatering (assumes average of 0.2 ft. of water in the 209,000 sq. ft. basement and assumes extracted water will require disposal as a PCB contaminated medium).

- Assessment of the concrete surfaces of the basement, tunnels, and vaults using coring or chip samples to identify areas requiring remedial action.

- Removal and disposal of asbestos containing material (debris) on floors and patching of damaged in-place insulation.

- Cleanup of impacted surfaces in the basement area, tunnels, vaults, and the sump [assumes basement and columns impacted to three ft. above slab (237,348 sq. ft. PCB of impacted surfaces), vaults contain 1,172 sq. ft. of PCB impacted surfaces, tunnels contain 6,312 sq. ft. of PCB impacted surfaces.

  - PCB Cleanup consists of following elements

    - Mobilization/demobilization/health & safety.

    - Double washing/rinsing all PCB impacted concrete (porous) surfaces; cleaning/rinsing with an industrial strength detergent and either scrubbed with a brush or wiped, left to dry, and rinsed off with clean (potable) water.

- Decontamination of Non-Porous Surfaces (plastic, metal, glass, etc.).
- Management and disposal of rinse liquid and sediments.
- Confirmation core sampling of concrete (porous) materials and laboratory analysis by subcontractor on a 1.5 meter grid in tunnels, vaults, and basement.
- PCB wipe sampling of non-porous surfaces and laboratory analysis in basement area on 1.5 meter interval.

- Encapsulation of Cleaned Building Surfaces (Tunnels, Vaults, and Basement)
  - Encapsulation of Concrete/Porous Surfaces in the basement area, tunnels, vaults and the sump using two coats (different colors) of non-porous epoxy paint [assumes basement and columns impacted to three ft. above slab (237,348 sq. ft. PCB of impacted surfaces), vaults contain 1,172 sq. ft. of PCB impacted surfaces, tunnels contain 6,312 sq. ft. of PCB impacted surfaces.
  - Posting of signage warning of the presence of PCBs beneath encapsulated surfaces.

The above work plan outline is the minimum required under TSCA to return the basement, tunnels, and vaults to a Low-Occupancy work area (suitable for maintenance and service activities).  Should future use of the basement change to a High-Occupancy classification such as office space or industrial assembly space used by employees, or if the building is to be demolished, then significant additional remedial activities would be required to bring the site into compliance with Unrestricted Use.  Depending on the concentration of PCBs left in place in concrete in the basement, tunnels, and vaults, demolition and segregation of PCB-containing concrete rubble would be necessary to complete the cleanup.

## 4.4   The Cost of Successful Abatement and Cleanup to a Low Occupancy Standard is Estimated to Be Approximately $11,400,000

Table 1 (Axis_C00485), presented in Appendix C, provides the cost estimate prepared by Hull & Associates, Inc. (Hull) in June 2020 to bring the basement, tunnels, and vaults back to a Low Occupancy Use Standard in accordance with TSCA regulations.  The cost estimate is reliable except for the cost of encapsulation for the basement, tunnel, and vault concrete (porous) surfaces.  The cost estimate provides for a single layer of epoxy paint, whereas two coats of noticeably different colors are required.  The additional coat of epoxy is estimated to cost $1.5 million, bringing the cost estimate to approximately $11.4 million.

It should be noted that cost estimate is based on a scenario assuming all surfaces below the water levels in the basement, tunnels, and vaults will require washing and encapsulation, except

in those limited areas already washed, in which case only encapsulation of previously washed will be needed.  The proper assessment of the porous concrete surfaces using core samples may find that only selected areas of the basement, vaults, and tunnels require cleaning and encapsulation, significantly reducing the costs to complete cleanup.

## 4.5  The Cost of Successful Abatement and Cleanup to An Unrestricted Use Standard is Estimated to Be Approximately $25,200,000

Table 3, presented in Appendix C, provides a cost estimate prepared by Hull in June 2020 to bring the Site to an Unrestricted Use Standard in accordance with TSCA regulations. Appendix C also includes Table 2 (Axis_C00486), prepared by Hull, which presents the cost assessment activities of environmental media (soil, sediment stormwater, and groundwater) at the exterior of the building to provide minimal screening for owner comfort or due diligence given the Event. The cost estimate is as reliable as practical given the many unknowns with respect to future use (residential, non-residential, scholastic, retail/commercial, industrial, open space, etc.) and limited PCB concentration data for the basement surfaces.

It should be noted that the cost estimate for unrestricted use is based on the assumption that all concrete from below the water infiltration level in the basement, tunnels, and vaults will require demolition and disposal of PCB waste.  The assessment of the PCB concentration in the concrete may significantly reduce the volume of concrete to be removed and disposed of in accordance with TSCA.

# References

40 CFR 761.  Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions.  July 1, 2010 Edition.

A.M. General. 2009. Email from R. Miller (AM General) to J. Graf re Transformer Oil Retro-filling.  November 16.

Benson, Steve. 2016.  Email from Steve Benson, H & G Services, to R.A. West, dated October 25.

Burns & McDonnell.  2017.  Substation #1 and #4 Vaults and Utility Tunnel Cleanup Plan. Prepared for Indiana GRQ, Inc. Project No. 97186. March 2017 Rev.1.  McLarens 000408. – 000574.

Burns & McDonnell.  2017.  Basement Area Work Plan. October 2017. IRGQ000964-IRGQ001049.

Burns & McDonnell.  2018.  Memorandum. February 2, 2018 Confirmation Sampling Results. February 8.

Coltman, John  W.  2002.  The Transformer. IEEE Industry Applications Magazine. January – February.

EPRI. 1999.  The PCB Information Manual. Volume 1: Production, Uses, Characteristics, and Toxicity of PCBs. Electric Power Research Institute. TR-114091-V1.

Edison Environmental.  2013. Remediation Work Plan (Revised). South Bend. Business Park (Former Studebaker Commerce Center). Edison Environmental & Engineering Services. February 2013.  IRQG011825 – 12601.

General Electric. 1971.  Instructions, GEJ-65074C, Secondary Unit Substation Transformers, Liquid Filled, Rev. October 1971, General Electric, Rome, GA, (obtained from Electricalpartsmanuals.com).

Hull and Associates, June 2020.  Table 1 - Minimum Cleanup and Mitigation (Cost Estimate for Low-Occupancy Use Cleanup) Axis-C00485.

Hull and Associates, June 2020.  Table 3 - Potential Remediation (Cost Estimate for Unrestricted Use Cleanup).

IRG. 2020. Signed Sworn Statement In Proof of Loss. June 13. Includes Exhibit 2 – Tables 1 and 2  Hull Associates: Minimum Cleanup and Mitigation Costs and Minimum Required Assessment Activities …  June 2020.  Axis_C00481 – Axis_C00486.

INSERV.  2016.  Email from Dan Wilson (August 30) and Weekly Progress Reports No. 1 through 5 (September 12 – October 14) and listing of IRG Sample Locations with Results (September 21)

INSERV.  2018.  Memo from Dan Wilson to Justin Lichter (IRG). Summary of PCB Work Activity at IRG. June 19.

McLarens.  2016. Preliminary Report. Industrial Realty Group, LLC. October 7, 2016.  McLarens 002586 - 002633.

McLarens. 2016. Report No. 2. Industrial Realty Group, LLC. November 4, 2016.  McLarens 003074 - 003089.

McLarens. 2017. Report No. 5. Industrial Realty Group, LLC. April 25, 2017.  McLarens 003107-003112.

McLarens. 2018.  Letter to the Mark Miley dated November 9, 2018 with letter from West Associates dated November 9, 2018.

Pace Analytical.  2016. Laboratory Analysis of Water and Oil Layer.  August 27, 2016.

Plant Layout rev 1984.

Site Photo – GE Transformer Name Plate.

TSCA PCB Spill Policy (40 CFR Party 761 Subpart G).

Toxic Substances Control Act (TSCA), 15 USC Sections 2601 et seq.

Transformer Engineering. 2004. S.V. Kulkarni and S.A. Kahparde. Transformer Fundamentals. 1.1 Perspective. Marcel Dekker, Inc. Taylor and Francis e-Library 2005.

Transformer Nameplate Photo 1.  Transformer Data Plate Pic 1.jpeg.

Transformer Nameplate Photo 2.  Transformer Data Plate Pic 2.jpeg.

US EPA. 1976.  PCBs in the United States Industrial Use and Environmental Distribution.  Task 1. Final Report.  Prepared under the direction of Dr. Robert Durfee (Versar). EPA 560/6-76-005. February 26.

US EPA. 2005. Polychlorinated Biphenyl (PCB) Site Revitalization Guidance Under the Toxic Substances Control Act (TSCA).

White Paper. Final PCB Cleanup.  Prepared by Justin Lichter. September 2018,  See Declaration of Justin Lichter, February 14, 2022.

**Appendix A**

**List of Documents Considered and Relied Upon**

40 CFR 761.  Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions.  July 1, 2010 Edition.

A.M. General. 2009. Email from R. Miller (AM General) to J. Graf re Transformer Oil Retro-filling.  November 16.

Benson, Steve. 2016.  Email from Steve Benson, H & G Services, to R.A. West, dated October 25.

Burns & McDonnell.  2017.  Substation #1 and #4 Vaults and Utility Tunnel Cleanup Plan. Prepared for Indiana GRQ, Inc. Project No. 97186. March 2017 Rev.1.  McLarens 000408. – 000574

Burns & McDonnell.  2017.  Basement Area Work Plan. October 2017. IRGQ000964-IRGQ001049.

Burns & McDonnell.  2018.  Memorandum. February 2, 2018 Confirmation Sampling Results. February 8.

Coltman, John  W.  2002.  The Transformer. IEEE Industry Applications Magazine. January – February.

EPRI. 1999.  The PCB Information Manual. Volume 1: Production, Uses, Characteristics, and Toxicity of PCBs. Electric Power Research Institute. TR-114091-V1.

Edison Environmental.  2013. Remediation Work Plan (Revised). South Bend. Business Park (Former Studebaker Commerce Center). Edison Environmental & Engineering Services. February 2013.  IRQG011825 - 12601

General Electric. 1971.  Instructions, GEJ-65074C, Secondary Unit Substation Transformers, Liquid Filled, Rev. October 1971, General Electric, Rome, GA, (obtained from Electricalpartsmanuals.com).

Hull and Associates, June 2020.  Table 1 - Minimum Cleanup and Mitigation (Cost Estimate for Low-Occupancy Use Cleanup) Axis-C00485.

Hull and Associates, June 2020.  Table 3 - Potential Remediation (Cost Estimate for Unrestricted Use Cleanup).

IRG. 2020. Signed Sworn Statement In Proof of Loss. June 13. Includes Exhibit 2 – Tables 1 and 2  Hull Associates: Minimum Cleanup and Mitigation Costs and Minimum Required Assessment Activities …  June 2020.  Axis_C00481 – Axis_C00486.

INSERV.  2016.  Email from Dan Wilson (August 30) and Weekly Progress Reports No. 1 through 5 (September 12 – October 14) and listing of IRG Sample Locations with Results (September 21)

INSERV.  2018.  Memo from Dan Wilson to Justin Lichter (IRG). Summary of PCB Work Activity at IRG. June 19.

McLarens.  2016. Preliminary Report. Industrial Realty Group, LLC. October 7, 2016.  McLarens 002586 - 002633.

McLarens. 2016. Report No. 2. Industrial Realty Group, LLC. November 4, 2016.  McLarens 003074 - 003089.

McLarens. 2017. Report No. 5. Industrial Realty Group, LLC. April 25, 2017.  McLarens 003107-003112.

McLarens. 2018.  Letter to the Mark Miley dated November 9, 2018 with letter from West Associates dated November 9, 2018.

Pace Analytical.  2016. Laboratory Analysis of Water and Oil Layer.  August 27, 2016.

Plant Layout rev 1984

Site Photo – GE Transformer Name Plate.

TSCA PCB Spill Policy (40 CFR Party 761 Subpart G).

Toxic Substances Control Act (TSCA), 15 USC Sections 2601 et seq.

Transformer Engineering. 2004. S.V. Kulkarni and S.A. Kahparde. Transformer Fundamentals. 1.1 Perspective. Marcel Dekker, Inc. Taylor and Francis e-Library 2005.

Transformer Nameplate Photo 1.  Transformer Data Plate Pic 1.jpeg

Transformer Nameplate Photo 2.  Transformer Data Plate Pic 2.jpeg

US EPA. 1976.  PCBs in the United States Industrial Use and Environmental Distribution.  Task 1. Final Report.  Prepared under the direction of Dr. Robert Durfee (Versar). EPA 560/6-76-005. February 26.

US EPA. 2005. Polychlorinated Biphenyl (PCB) Site Revitalization Guidance Under the Toxic Substances Control Act (TSCA).

White Paper. Final PCB Cleanup.  Prepared by Justin Lichter. September 2018,  See Declaration of Justin Lichter, February 14, 2022.


IN ADDITION TO THE REFERNCES LISTED ABOVE, SOME OF WHICH CARRY THE BATES

STAMPS IN THE RANGES LISTED BELOW, THE FOLLOWING DOCUMENTS:

Axis_C00588 – Axis_C00668

IRGQ011482 - IRGQ033765

McLarens001220 – McLarens 001227

McLarens001503 – McLarens 001803

McLarens002161 – McLarens 002171

McLarens002586 – McLarens 003455

McLarens004636 – McLarens 004779

Files from Site Visit.  IRGQ034927 - IRGQ036858

Reply to R.A. West

Studebaker in World War Two / WWII and Studebaker South Bend Plant Photos. From The American Automobile Industry in World War Two: An American Auto Industry Heritage Tribute by David D Jackson. Page Last Updated March 6, 2021.
http://usautoindustryworldwartwo.com/studebaker.htm

**APPENDIX B**

# B. TOD DELANEY, PHD, PE, BCEE
*President/Testifying Expert Witness*

**Summary of Professional Experience:**

Dr. Delaney has testified in more than 30 litigations involving the management, disposal, and handling of hazardous substances, volatile organics, chlorinated solvents, fuels and oils, BTEX, PAH compounds, MGP wastes, PCBs and elemental materials such as chromium, lead and mercury, in the context of CERCLA, RCRA, state-law cleanup statutes and toxic tort lawsuits. He also opines on the environmental fate and transport of numerous contaminants, historic operations performed at numerous industrial facilities, the timing of chemical contamination, and cost allocation. He has prepared expert opinions for clients in California, New Jersey, New York, Washington, New Mexico, Mississippi, Louisiana, Ohio, Missouri, Oklahoma, New Hampshire, Georgia, and Maryland and has testified in both federal and state courts. Dr. Delaney also possesses expert credentials with regard to allocations, environmental fate and transport modeling, and regularly opines on historic industrial standard of care in addition to petroleum, hazardous and solid waste management, treatment, and disposal.

**Education:**
PhD, Environmental Health Engineering, University of Texas at Austin, 1976
MBA, Pepperdine University, 1991
MS, Chemical Engineering, University of New Mexico, 1972
BS, Chemical Engineering, University of New Mexico, 1968

**Years of Experience:** 40 +

**Certifications / Registrations:**
Professional Engineer (NJ, NY, PA, CT, AL, CO, FL, GA, IA, IL, IN, MS, NE, OH, SC, TX)
Board Certified Environmental Engineer – American Academy of Environmental Engineers
Certified Principal Environmental Auditor – Institute of Environmental Management and Assessment, England

**Professional Affiliations:**
ISO Climate Change Coordinating Committee, Chair
American Institute of Chemical Engineers
Air and Waste Management Association
American Chemical Society
International Standards Association – W2 Chair, SC7
Editorial Board of Environmental Claims Journal
Business Council for Sustainable Energy - Chairman Emeritus
Town of Cornwall, New York - Conservation Commission Appointee

**Relevant Project Experience:**

## LITIGATION SUPPORT/EXPERT TESTIMONY

Dr. Delaney has provided litigation support to clients in a wide variety of matters concerning landfills, industrial facilities and refineries with regard to Natural Resource Damages (NRDs), RCRA Corrective Actions, Superfund remedial actions, private cost recovery and cleanup allocation issues, bankruptcies and insurance claims. He has provided expert witness services for plaintiffs and defendants and has served as a court-appointed expert. Dr. Delaney has testified in state and federal court. As a result of his 30 years of experience, Dr. Delaney is an expert with regard to historical waste disposal practices. As such, he provides expert testimony on chemical uses, storage and disposal practices and their consistency or inconsistency with the prevailing industry/refinery practices at the time; ensuring that the past waste management practices are evaluated within a proper historical context.

- Dr. Delaney has opined on the operations, maintenance, and spill response practices at a number of hazardous waste and chemical facilities and the contamination that emanates from such facilities. Dr. Delaney testified with regard to the historical usage, handling and disposal, and fate and transport of the raw materials, by-products and wastes that were generated from such operations. Dr. Delaney employed modeling techniques to determine the fate and transport of coal tar and water gas tar in the Hudson River in New York. He has also opined on historic refinery operations in New York, New Jersey, Louisiana and Oklahoma.

- Dr. Delaney's experience and expertise enables him to play an integral role in counsel's development of litigation strategies. For example, Dr. Delaney's detailed evaluation of a cost allocation scheme developed by his adversaries revealed inadequacies and inaccuracies in the scheme. Based on his findings, Dr. Delaney assisted counsel with the

preparation of their case against the applicability of the cost allocation scheme. This strategic litigation support resulted in a very favorable outcome for his client.

- Dr. Delaney has prepared expert reports, given deposition testimony and served as a testifying expert witness for litigation matters involving CERCLA cost recovery and natural resource damage claims resulting from petroleum refining, use, storage and leaks. His experience includes serving as a testifying expert witness for a case involving natural resource damage claims resulting from discharges of refined petroleum at a refinery in New Jersey. Dr. Delaney's expert testimony included the time dating of the releases, supporting a claim that the refinery was discharging petroleum after the purchase of the property by the current owner. His work has involved "fingerprinting" petroleum contamination to demonstrate that the contaminants were not attributable to certain refinery operations.

## Site Remediation Cost Allocations

- **Confidential Client. Berry's Creek Superfund Site. East Rutherford, NJ, Allocation Expert.** Project involved contamination source and migration assessment focused on a manufacturing facility within the Berry's Creek site. Performed forensic evaluation of historical, physical, hydraulic, and chemical data involving PCBs, mercury and metals. Concluded that lack of nexus to the environmental and human health receptors was a mitigating factor in the allocation of costs. Used stream, tidal and drone data to help develop allocation position papers stating that any contaminant migration from the facility was limited to a narrow area within a tidal ditch that was ultimately remediated. 2016 - ongoing.

- **Confidential Client. Passaic River Superfund Site. Bergen-Essex-Hudson Counties, NJ, Allocation Expert.** Reviewed materials in connection with a client amongst other PRPs for the 17.4-mile stretch of the Passaic River and tributaries downstream of Dundee Dam regarding allocation for costs of remedial design and remedial action for the Lower 8 Miles of the Passaic River known as OU-2 of the Diamond Alkali Superfund Site. Concluded through development of an Allocation Report and Pathways Report that client bore very little to no responsibility for the costs, which was confirmed by the findings of the Allocator. 2018 - 2020.

## Historical Site Operations

- **ExxonMobil Refineries, New Jersey.** *Expert witness.* Dr. Delaney served as an expert witness on a matter involving two large petroleum refineries located in New Jersey, the operations of which date back to the late 1800s. His work on this matter included review of practices from the late 19th century through the 20th

century with respect to aspects of refinery construction, development and operations in the defense of a multi-billion dollar Natural Resources Damages claim against ExxonMobil by the State of New Jersey acting under the New Jersey Spill Compensation and Control Act. Marshalled and reviewed numerous historic documents from ExxonMobil, public archives and organizations such as the American Petroleum Institute (API) to help establish the historical record and state of engineering and construction practices. His expert opinion was used to defend ExxonMobil by proving that much of the damage at the refineries were caused by physical damages and not chemical discharges, as required by the statute. Dr. Delaney worked with litigation support experts to devise visual demonstratives that provide an archival photographic and mapping history of the properties using GIS. In August 2015, the trial court approved a consent judgment between the State and ExxonMobil to settle the $8.9 billion case for $225 million. 2008-2014.

- **Hudson Oil Refinery Superfund Site, Oklahoma.** Retained to provide expert services for two proceedings: one stayed before U.S. EPA's Environmental Appeals Board (EAB); the other a civil cost recovery action filed by the U.S. Department of Justice against the successor of a previous owner of the former refinery. For the EAB matter, Dr. Delaney evaluated the historic refining operations and the nexus between the refining operations and the extensive contamination found at the Site over the years. Dr. Delaney opined that EPA mischaracterized tar like materials encountered during the investigation and excavation of the Site as "Coke Tar." This mischaracterized "coke tar" was crude oil or a petroleum product and was not a specific RCRA listed waste. Based on the review of historical maps and documentation associated with site remediation, Dr. Delaney concluded that leaks and spills of crude oil or refined petroleum products was the source of contamination at the Site and that the Petroleum Exclusion was therefore applicable. For the civil matter, Dr. Delaney provided affirmative opinions regarding industry best practices, maintenance and turnovers, and materials remaining based on process throughput. Dr. Delaney also opined on issues with an Alkylation Unit and presented rebuttal opinions. 2015 - ongoing.

- **Pennzoil Refinery, Louisiana.** Dr. Delaney provided historic operational research and contaminant fate and transport modeling services for litigation involving the Pennzoil Refinery in Shreveport, Louisiana during the 1995 to 1996 timeframe. He established a history of site operations through a review of facility documents and agency reports, site visits, and interviews with facility personnel with knowledge of

operations during the relevant timeframe. Dr. Delaney developed exposure assessments based on single and multiple event scenarios and developed the operational standard-of-care for the years the refinery was operating.

## Mass/Toxic Tort Cases

**Chlorinated Solvent Use IBM Corporation, Endicott, New York.** *Expert witness.* Large toxic tort lawsuit in New York concerning the determination of the standard of care for solvent use and handling over the period from 1940 to 2002. The lawsuit involves hundreds of plaintiffs making claims regarding a neighboring plant site where electronics were manufactured on a large scale. Reviewed historical documents concerning the facility and applied his expertise on how chemicals were handled during the period in question by the client and by members of the client's industrial sector. A key aspect of his opinion is how industry and regulators viewed discharges of solvents to sanitary sewers and what was the state of the art in disposal practices for the time period in question. 2010 – 2013.

**Kirk V. Schaeffler Group USA - Chlorinated Solvent Use, Joplin, Missouri.** *Expert witness.* The matter involved a toxic tort lawsuit brought by plaintiff over the alleged impacts of trichloroethylene (TCE) contaminated groundwater, surface water, soil, soil gas, and indoor air contamination in and around the former FAG Bearings facility on plaintiff's health prognosis of autoimmune hepatitis. Dr. Delaney provided an expert report and trial testimony concerning his opinions as to the standard of care for the use, handling, and disposal of TCE at the FAG Bearings manufacturing facility during their operations that employed TCE degreasing. The disposal of TCE was consistent with the technologies employed at the time and included disposal in on-site lagoons and tanks. 2014 -2016

**In re Redlands Tort Litigation- Chlorinated Solvent and Perchlorate Use, Redlands, California.** Consulting expert *witness.* Dr. Delaney assisted counsel with the defense of a multi-party toxic tort litigation case on behalf of Lockheed Corporation. Dr. Delaney was asked to review site data and develop a detailed explanation and demonstrative for how quickly water and TCE evaporated. He also analyzed operations involving the generation of wastewater from propellant mixing, grinding and cleaning operations and the generation of waste solvents from the mixer cleanout and degreasing operations. Additional contaminated water generating operations were reviewed including power washing and hog-out operations and the use of an on-site burn pit. 2000 - 2013

**Abel v. Lockheed, Chlorinated Solvent and Chromium Use, Burbank, California.** *Expert Witness.* Retained to consider whether Lockheed Martin's practices at its Burbank facility regarding trichloroethylene (TCE), perchloroethylene (PCE) and hexavalent chromium (Cr(VI)) was consistent with then-prevailing industry standards,

particularly with respect to the potential impact of releases on community residents through public drinking water supplies and the ambient air. The period of review extended until 1980 for releases to the ground and covers the entire period of aircraft manufacture in Burbank for releases to the air. Reviewed and opined on the operation of vapor degreasing and spray-painting systems, chrome-based process tank systems, cooling water and painting waste disposal practices. 1996 - 2000

## Environmental Fraud/Misappropriation of Indemnity Reserves

**Occidental Chemical Corporation v. YPF and Repsol, Newark, New Jersey.** *Expert witness.* Retained as expert witness on lawsuit involving failure of acquiring company to adequately fund environmental indemnity agreement related to purchase of basic/specialty chemical manufacturing company. Indemnity called for reimbursement of liabilities and defense costs relating to site where dioxin had contaminated a chemical production facility as well as a large tract of the Passaic River. Developed expert opinions regarding obligations of parties under stock purchase agreement, indemnity agreement, contribution agreement, and subsequent buy-out agreement to properly and accurately value the scope and cost of cleanup work at the site and the valuation of natural resource damages related to loss of use and restoration. Reviewed due diligence and valuation techniques employed by the purchaser and compared them to standards that should have been employed at the time of the transactions. Opined on a series of asset transfers designed to side step current environmental laws and divert funds away from environmental liabilities. 2014 – 2016

**Catena v. Raytheon, et al., Teterboro, New Jersey.** *Expert witness.* Retained in Consumer Fraud Act/Common law fraud case to opine on the standard of care with respect to pre-purchase due diligence wherein First Fidelity Bank and its employees arranged the sale of the subject property with the intent to deceive the purchaser about the Property's value by concealing facts material to the transaction, including: that the property was contaminated with PCE, that PCE-contaminated soil had been unlawfully excavated and hauled away without notice to any regulatory agency, and the use of falsified affidavits.

The Bank did not provide the Purchaser with any of the reports, tests or other investigations which would have alerted Purchaser to the fact that the Property was contaminated with PCE and other pollutants, and in fact, First Fidelity concealed same from Plaintiff.

Other aspects of the case before settlements included sources of chlorinated solvent contamination of soils and groundwater. Historical operations included production of aircraft components and equipment during World War II, the assembly of electronic aerospace components, and the dry cleaning of fabric in a textile operation in the 1970s. 2013 – 2020.

## Additional Litigation Support & Expert Testimony

- **City of Newburgh, Former MGP Site Investigation, Newburgh, New York.** *Project Director and Expert Witness.* Led a team of site investigators that were retained by the City of Newburgh to commence subsurface investigations to determine the source and extent of the contamination at the city's sewage treatment plant. Investigation revealed that an adjacent property – the site of a former manufactured gas plant owned by Central Hudson Gas & Electric – was the source of tarry DNAPL wastes on the City's property. Research included review of historic maps, aerial photographs, and geologic survey maps and interviews knowledgeable individuals. Site investigation data regarding tar contamination was obtained from 160 soil borings. The team analyzed the land configuration, historic operations, and the subsurface conditions at the site to determine its hydraulic connectivity with the Hudson River.

- Developed two dynamic computer-driven models to clearly and accurately define the source areas and migration patterns of tar wastes. First, used a shoreline model to illustrate how the depth, extent, and configuration of fill changed during the evolution of the shoreline from 1865 to 1998. Next, used a subsurface model to illustrate the preferential geologic pathways and the distribution over time of tar in these pathways that ran from the former MGP plant to the Hudson River. These models were then converted to onscreen animations to demonstrate to regulators the source of the contamination. 1998 – 2001.

**DRS Technologies, PRP Search Support for Orphan Uranium Mine Contamination, Grand Canyon, Arizona.** *Technical expert.* Project involved historical PRP, legal, and policy research for a large site contaminated by uranium tailings. Oversaw corporate history research for past and current owners as PRPs. Ensured coordination with local, state, and federal government agencies, including National Archives and Records Agency, National Park Service, Bureau of Land Management, Nuclear Regulatory Commission, U.S. Department of Energy, Department of Energy Historical Center, Arizona Department of Mines, Arizona State Land Department, Arizona State Mine Inspector, and other agencies to obtain relevant government documents. Scope of research focused on tracing historic mining operations to Source Material Licenses issued by the Atomic Energy Commission in 1950s and early 1960s and various leases and contracts authorizing the mine to operate. Analyzed various contracts and documents, including Atomic Energy Commission contracts, milling and mining contracts, purchase agreements, and corporate letters. 2010 – 2011.

**Successor/Predecessor Research - Redlands/Beaumont CERCLA Litigation, Redlands, California.** *Technical expert.* Reviewed expert reports and underlying complex ownership, operator and technical data regarding soil and groundwater contamination as part of the Redlands/Beaumont CERCLA litigation. Supported litigation to recover environmental remediation costs incurred, or to be incurred in the future, under CERCLA and other environmental causes of action at former solid rocket motor production and testing facility. Work entailed organization and review of thousands of ownership, operational, regulatory, and technical documents related to ammonium perchlorate (AP) rocket fuel formulation and manufacture at Redlands. Required special document retrieval and organization software and technical understanding of document significance and value to the litigation process. Work product was used by attorneys and experts on the case to understand the ownership by successors and predecessors of the rocket manufacturing facility before, during and after the "Cold War" era. 2007 – 2013.

**Burbank Airport PRP Search – Groundwater Contamination, Burbank, California.** *Technical expert.* After several responsible parties settled out of a lawsuit in California, First Environment was retained to determine the identity of additional PRPs who owned property or conducted historic operations in and around the Burbank International Airport. The site itself was used for historic aircraft manufacturing and maintenance operations and many of the off-site PRPs were involved in the aircraft industry. Reviewed historical corporate and land records in its files; utilized industry-standard research methods to perform a historical review of the area; and engaged and interfaced with a third-party during its performance of a Chain-Of-Title search for selected land parcels to identify certain additional PRPs in the area and their potential connection to the key constituents of concern at the site, TCE and PCE and their breakdown products. Provided critical analysis of identities of PRPs and predecessor entities. 2010 – 2012.

**Historic Groundwater Contamination, Hollister, California.** *Technical expert/expert witness.* Reviewed and analyzed complex ownership and operational documents, technical specifications, regulatory requirements, and historic soil and groundwater contamination data to determine successor and predecessor allocations for operating a solid rocket fuel propellant manufacturing facility from 1950s through early 1990s. Served as expert witness to assist clients with successor and predecessor evaluations for the recovery of environmental remediation costs. Work entailed organization and review of thousands of documents related to ammonium perchlorate (AP) rocket propellant formulation, manufacture and disposal at the site to formulate litigation strategy. Opined on government specifications and requirements for propellant production, solvents cleaning, and waste disposal including safety requirements and standard of care. 2015.

**Chlorinated Solvent and Emerging Contaminant TCP, California.** *Expert witness.* Reviewed historic information (including site histories, archival research and technical manuals), chemical production processes and analytical data at site in California to determine how certain chlorinated substances, including TCE and 1,2,3-trichloropropane (TCP), were used in the repair, maintenance, overhauling, and refurbishing of aircraft from the 1940s through the 1980s. 2007 – 2010.

**U.S. War Department –sponsored and Defense Plant Corporation-financed Facility, New York.** *Expert witness.* Opined on the availability of TCE and its use in vapor degreasers during the World War II era; the use of TCE and PCE thereafter through the 1970s; and the handling, reclamation and disposition of oils and solvents during the time frame. Case involves successor to manufacturer of precision equipment and the allocation of costs for remediation of groundwater contaminated with chlorinated solvents. Most manufacturing activities at the site during World War II and thereafter were conducted for, or on behalf of, the U.S. Government.  2003 – 2013.

**Source of Groundwater Contamination - U.S. Army Ammunition Backup Storage Point, Rialto, California.** *Technical expert.* Performed PRP source review of groundwater contamination near Rialto Ammunition Backup Storage Point (RABSP), part of a vast complex of facilities and activities supporting the U.S. war effort during World War II. Groundwater at the RABSP is contaminated with perchlorate and TCE.  Research centered upon types, constituents, and volume of munitions shipped through RABSP during the World War II era and the procedures and practices associated with the handling, storage, and disposition of those munitions.2011 – 2012.

### State of the Art/Standard of Care

Dr. Delaney has extensive experience in the review of historical chemical handling and industrial manufacturing operations. He routinely analyzes solvent handling, storage, use, recycling and disposal systems at industrial plant sites and dry cleaning facilities with specific emphasis on determining the state of the industrial practices at the time and the historical standard of care.

**Dry Cleaning Plant, Standard of Care, Seattle, Washington.** *Expert witness.* At a commercial dry cleaning plant located in Seattle, retained to opine on the standard of care involving the operation of several industrial dry cleaning machines including the Spencer GT 110 I Dry Cleaning Machine Serial 1427 and a Permac dry cleaning machine (125 gallon capacity). This matter involved an insurance claim where the operation of the Permac and Spencer dry cleaning machines were at the center of the litigation. Cleaning operations that involved water, detergents and Perc were analyzed and distinguished as part of his opinion. Prepared two expert declarations in

this matter and was deposed by opposing counsel.  2011 - 2012

**Retail Dry Cleaning, Litigation Support, Georgia.** Testified at a trial in Georgia involving the release of Perc to the groundwater that resulted from the operation of the retail-scale dry cleaning machine and the handling and disposal of Perc throughout the retail establishment.

## AIR EMISSIONS MEASUREMENT AND ESTIMATION

Dr. Delaney began his career primarily in the air emissions field. His work has included the development and execution of extensive field data collection programs (ambient and stack as well as associated meteorological data); atmospheric dispersion modeling; and the conceptual, preliminary, and final designs of air emissions control equipment. Dr. Delaney has executed extensive emission stack testing programs for automobile manufacturers, sugar refineries, electrical utilities, cement kilns, cogeneration facilities, and many other industrial establishments.

Dr. Delaney's experience in the air pollution control field includes the design and installation of air pollution control equipment for Universal Oil Products (now Honeywell UOP). UOP installed one of the first limestone slurry and mobile bed scrubber systems to remove sulfur dioxide in 1965. Dr. Delaney designed and installed a UOP scrubber system at a production facility for the control of acid gases and sulfur dioxide emissions. Dr. Delaney supervised the construction and installation of air pollution control units and evaluated them during shake-down test operations. As part of this project, Dr. Delaney led a group of designers to determine the optimum control techniques for pH, reagent utilization, scaling and sulfurization.

Dr. Delaney has conducted numerous site audits/environmental assessments for private clients throughout the United States, Canada and Mexico. An important part of these audits/environmental assessments is making a determination of the adequacy of a company program for dealing with any asbestos that may be in use at the site or in place procedures for remediation and/or monitoring. Dr. Delaney has directed numerous projects for private industry dealing with the removal and disposal of asbestos and asbestos containing materials from a wide range of industries.

Dr. Delaney has taught graduate-level courses on air pollution in the Departments of Chemical Engineering at the University of New Mexico and Rutgers University and basic chemical engineering at Cooper Union in New York.

**Large Petroleum Company, Air Emissions Measurement and Management.** Dr. Delaney had responsibility for the measurement of emissions and development of emission factors for refinery and chemical plant pumps and valves.

He also performed dispersion modeling to evaluate the effects of releases from refinery safety valves. He served as a member of an American Petroleum Institute Committee and had responsibility for the development of a test program and a data analysis program to evaluate tanker emissions during all phases of operations, including loading and unloading. Prior to his involvement with air emissions in the petroleum industry, he also worked in oil field and refinery operations. Late 1960s and 1970s.

### U.S. Air Force, Airbase Emissions Dispersion Model.
*Consultant.* Member of a team that developed a dispersion model to simulate airbase emissions. Sources modeled included jet aircraft, fueling, operations, fueling storage tanks, support vehicles, and maintenance. He was also part of the team that collected field emissions to calibrate the model. Along with this work, he developed a three-dimensional model, which simulates the downward transport and dispersion of an aircraft's exhaust products during climb-out and approach. Also in connection with his Air Force consulting, he drafted a field data collection manual for gathering the required input data for the airbase model. 1971

### Electric Power Research Institute / Edison Electric Institute Coal Combustion Studies. *Principal investigator.*
For these and other utility groups, principal investigator for numerous studies that assessed the impact of air emissions of heavy metals on the environment resulting from the combustion of coal. As part of these studies, he assessed the environmental impacts of fly ash, bottom ash, coal gasification and liquidification technologies, and flue gas desulfurization. Late 1970s

### Stack Testing Programs.
Participated directly in the field operations and project management of stack testing programs involving the collection and interpretation of compliance, design, and operating data from pollution control equipment such as limestone scrubber systems. He designed the stack tests to address particulate matter (organic and inorganic) and gaseous emission collection (organic and inorganic), ambient air sampling programs (organic and inorganic), particle size distribution and analysis for particulate matter, flue gas desulfurization, and the quantification of acid-gas emissions.

### Field Data Collection.
Work has included the development and execution of extensive field data collection programs (ambient and stack as well as associated meteorological data); and atmospheric dispersion modeling in support of the conceptual, preliminary, and final designs of air pollution control equipment.

### Air Permitting.
Provides regulatory support in obtaining all required air pollution control permits for industrial and utility operations and equipment including Title V permits, state construction and operating permits, PSD permits,

and non-attainment permits. At a cogeneration plant in New Jersey, determined the water-to-fuel ratio while measuring the plant's pollutant output to establish compliance with New Source Performance Standards (NSPS).

### Engineering Assessments.
Performed plant inspections to evaluate the efficiency of operating assets and the potential redesign or replacement of such assets to maximize pollution control at the most efficient cost. He quantifies GHG emissions from industrial and utility operations using generally accepted scientific models and formulas. At a foil printer located in New Jersey, Retained to demonstrate the destruction efficiency of two large thermal oxidizers and to evaluate the continuous emissions monitoring system (CEMS) associated with the oxidizers.

## SITE INVESTIGATION AND REMEDIATION

Over the past 30 years Dr. Delaney has directed numerous industrial site investigations and remediation projects. These efforts include the development of sampling plans, the performance of remedial site investigation, the design and feasibility studies of cleanup alternatives, and the supervision and management of final cleanup. Final cleanup efforts include soil removal, building decontamination, and groundwater pumping and treatment. These investigation and cleanup efforts have involved all types of organic chemicals from simple petroleum hydrocarbons like gasoline to refractory organics typified by polychlorinated biphenyls (PCBs); and inorganic chemicals (heavy metals) such as lead, arsenic, cadmium, and chromium.

- Dr. Delaney's work with solid and hazardous contamination of the soil and groundwater has been extensive. He has developed design manuals for the disposal of wastes, developed and executed field investigation programs, developed remedial designs for treatment facilities, and provided complete permit support.

- For the Electric Power Research Institute, Edison Electric Institute, and other utility groups, he has directed or has been the principal investigator for numerous studies, which assessed the impact of heavy metals on the environment resulting from the combustion of coal. These have included the following: the impact of RCRA and other regulatory programs on utility solid wastes (including flyash and bottom ash,) the impact of RCRA on coal gasification and liquification technology, and the preparation of comments for flue gas desulfurization equipment manufacturers that focuses on the impacts that RCRA has on the disposal of ordinary flue gas desulfurization waste products.

- Dr. Delaney has also directed numerous projects for private industry directed at compliance with the

Resource Conservation and Recovery Act (RCRA) and the Underground Storage Tank (UST) program included in the 1984 RCRA Amendments.

• Dr. Delaney is certified in New Jersey under the New Jersey Department of Environmental Protection, Bureau of Underground Storage Tank Program for all aspects of UST work including installation, closure, corrosion protection, testing, and subsurface evaluations.

• Dr. Delaney has extensive experience in the investigation of underground storage tank (UST) leaks involving a wide variety of petroleum products and solvents. He also has extensive experience in the design, installation and operation of soil and groundwater remediation systems for UST leaks. Dr. Delaney was the project manager on a design manual for a national car rental firm. This manual, created for all of the company's facilities, provided generic designs and specifications for the installation of new tankage and the retrofitting of old tankage in accordance with Federal and state UST regulations.

• Dr. Delaney directed a project to stabilize a six-acre fly ash surface impoundment. This project required the investigation, testing, design, and installation of a novel dewatering program to stabilize fly ash by removal of excess water. This program and two pilot surface impoundment stabilization programs (one for a tire manufacturer and another for a synthetic dye manufacturer) have proven this technique applicable to a wide variety of industrial process surface impoundments.

**Dri-Print Manufacturing Site, Site Investigation and Remediation, Rahway, New Jersey.** *Project director.* Investigation and remediation at 28-acre site located adjacent to the South Branch of the Rahway River. Responsible for assessing and then designing the remedial action for a wide range of contaminants of concern, including volatile organic compounds (VOCs), heavy metals, and polychlorinated biphenyls (PCBs). The contamination was nested around a variety of areas of concern including buried drums, underground storage tanks, wetlands, stream beds, and stormwater outfalls.

The investigation involved the collection of 180 soil and sediment samples from 109 locations to delineate the area of impacted soil (containing heavy metals) associated with the buried drum areas. Remediation work included the excavation and disposal of approximately 6,000 tons of soil and sediment which contained elevated concentration of cadmium, chromium, and lead. Conducted a feasibility study to evaluate remedial alternatives and disposal options for the soil. The feasibility study identified a nearby beneficial use project that provided the client with a cost effective remedial option. PCBs were identified during follow-up investigation

activities within the floodplain and riverbed adjacent to site.

Led the horizontal and vertical delineation project to determine the impact PCBs had on the ecological receptors in the floodplain and river channel. Developed the Ecological Risk Assessment for 3.5 acres of wooded wetlands/ floodplain and portions of the river channel. The work area was located within the 100-year floodplain. Also completed a wetland delineation survey, soil erosion sediment control plan, and freshwater wetland, stream encroachment, and waterfront development permits to complete the work. 2008 – 2012.

**Kikuchi Colour, Site Investigation, Paterson, New Jersey.** *Expert witness.* Performed a sump investigation at a former paint pigment site located in Paterson, New Jersey. He led a team of scientists and engineers to determine the source of contamination at the site. Investigated the design of the sewer system at the site and the structural integrity of the sewer sumps that were interconnected to the sewer system. Discovered the leaks in the sump system were caused by faulty construction of the sumps, and that wood artifacts and construction debris had been used to support the cement structure of the sump and that these wooden artifacts rotted providing an egress route to the environment. 2009 – 2010.

**Frontier Environmental/American Linen Supply Site Investigation, Seattle, Washington.** *Expert witness.* Led a team of geologists and engineers in performing a sewer integrity investigation related to the discharge of PCE into the soils and groundwater underlying an industrial dry cleaning site in Seattle. Designed the investigation of the plant's cast iron sewer pipes and concrete sump system to determine the source of PCE contamination. PCE was detected at the site in high concentrations in the deep groundwater. Excavated the sewer line at several pints within the building. Determined the sewer joints were the source of leaking wastewaters that contained dilute amounts of PCE. The sewer joints were composed of lead seals that had been compromised during several earthquakes that hit the Seattle area in the 1960s and '70s. Also investigated the sump system that interlaced with the sewer system throughout the plant. 2011 – 2012.

**City of Newburgh, Provan Ford Brownfields Site Remediation, Newburgh, New York.** *Project director and lead engineer.* Providing Brownfields remediation services at the Provan Ford Brownfields Site in Newburgh. Began working on the site by performing a detailed environmental study in 1999. The study identified petroleum contamination in soils and groundwater, as well as several leaking underground storage tanks (USTs). Performed an environmental assessment of petroleum hydrocarbons and other contaminants and developed a Site Investigation/Remedial Alternatives Report (SI/RAR).

Led the study of the groundwater for petroleum hydrocarbons and related volatile organic compounds (VOCs). Groundwater contaminated with chlorinated solvents was also identified originating from two separate areas as dense non-aqueous phase liquid (DNAPL).

Also investigated free-phase, two 5,000-gallon waste oil USTs, an 8,000-gallon UST, a 4,000-gallon gasoline UST, a 10,000-gallon gasoline UST, and a 20,000-gallon diesel fuel UST. Work led to the extensive excavation of contaminated soils. Also conducted several soil gas surveys to identify VOCs emanating from the shallow groundwater and addressed potential off-site vapor intrusion issues.

Designed the remedial actions completed at the site and has conducted additional soil, soil gas, and groundwater sampling of the overburden and bedrock aquifers to define the extent of soil contamination identified on site. Based on these data, conducted a thorough evaluation of viable remedial alternatives for the site and prepared a Remedial Action Report/Remedial Action Work Plan (RAR/RAWP) for submission to the New York State Department of Environmental Conservation (NYSDEC) that resulted in a Record of Decision. 1999 – 2012.

**Condominium Complex, Flood Damage Assessment, Greenwich Village, New York.** *Expert witness.* Called by the owner of a condominium complex near the Hudson River Manhattan to evaluate the extent of flooding damage from Hurricane Sandy. The owners experienced flooding in the first floor and basement of their complex and sewage was spread throughout the unit and complicated the cleanup. Performed several inspections of the units and evaluated the amount of damages for an insurance claims made regarding damages experienced during Sandy's storm surge event. 2013.

**Former Potter Company Site, Wesson, Mississippi.** *Project director/engineer.* Dr. Delaney supported a large food production company who were owners of the Former Potter Company in providing CERCLA remedial investigation/ feasibility study (RI/FS) services at their plant site. The site was proposed for inclusion on the U.S. Environmental Protection Agency's (EPA's) National Priorities List (NPL) and consists of a former industrial plant that manufactured electronic components from 1953 until the mid-1990s. Dr. Delaney led the project team in investigating the manufacturing process that used degreasing materials, primarily trichloroethylene (TCE), and polychlorinated biphenyls (PCBs) as dielectric oil in electronic components. Both the degreasing materials and PCBs were inadvertently discharged into the environment. The site is also located over the primary drinking water aquifer for the City of Wesson, with drinking water wells positioned within 1,000 feet of the plant site. Dr. Delaney identified remedial alternatives to control direct contact with the PCB-contaminated soil and off-site

migration of PCB material, as well as protect public health and the environment from PCBs transported through storm water runoff. 2000- present.

**Former Potter Company, Brookhaven, Mississippi.** *Project director/engineer.* Dr. Delaney was the project director/engineer on a major PCB/TCE cleanup site in Brookhaven Mississippi. In addition to groundwater monitoring and remediation, source area remediation was performed and long-term monitoring of several remedial systems was performed. Dr. Delaney was responsible for the design and implementation of the ground water remediation system and conducted effectiveness and performance evaluations while in the system was in operation. Dr. Delaney interacted directly with the Mississippi Department of Environmental Quality (MDEQ) and won approval of a Remedial Action Work Plan (RAWP) for the Site. Dr. Delaney evaluated large amounts of data that was collected since collected since August 1998. He also was in charge of an evaluation of other remedial alternatives for the onsite source area and off-site groundwater plumes containing the contaminants of concern. Dr. Delaney determined through an evaluation of the ground water monitoring program that the groundwater remediation was effective in reducing the mass of COCs. The evaluation indicated that TCE concentrations in the source area remediation zone were under control. 1998-present.

**ExxonMobil Refinery Engineering, Linden, New Jersey.** *Environmental process research engineer.* Formerly employed by ExxonMobil at its Bayway Refinery in Linden, New Jersey.  As an environmental process engineer, evaluated the refinery process systems to upgrade efficiencies, implement pollution prevention and improve energy conservation.  Also performed environmental site assessment work at the facility and performed environmental testing of the air, soil and groundwater at the site.

**Pennzoil and Shell Refineries.** *Environmental process engineer.* Evaluated air quality at refineries in an effort to quantify pollutants being emitted under the refineries' Clean Air Act permits.  Calculated emissions levels and concentrations using process flow diagrams to calculate air emissions factors and other indexes for quantifying pollutants.

## PUBLICATIONS / PRESENTATIONS

- "The Emerging Threat of PFAS Contamination at Airports," NEC/AAAE Airports Conference, Hershey, PA, March 29, 2019.

- "New Jersey – Once and Future Leader for NRD Programs?" Panelist. "NRD Proceedings Involving the Bayonne and Bayway Refineries." Law Seminars International, Natural Resource Damages, Washington, DC, March 14, 2019

- "Contaminants of Emerging Concern – Some Old Ones, Some New Ones," New Jersey State Bar Association, Environmental Law Forum, Avalon, NJ, June, 2017

- With Phillip Ludvigsen, Ph.D. and Josh Heltzer, M.Sc., "Reconstruction Of Historic Processes: The Key To Quantifying Contaminant Mass Loading From Manufactured Gas Plants And Other Industrial Facilities", Poster, Battelle - Ninth International Conference on Remediation and Management of Contaminated Sediments, January, 2017

- With Phillip Ludvigsen, Ph.D, "Green Bonds: De-Risking Deals To Maximize Returns," Environmental Law in New York, October, 2016

- "Walking on Thin Ice: Climate Change Today," Lowenstein Sandler, New Jersey, October 20, 2014

- "Climate Change Coordinating Committee Overview." International Standards Organization, London, April 2014

- "Anatomy of a Carbon Credit: How Transportation Agencies Can Engage in Carbon Markets - Pratt & Whitney Engine Cleaning Protocol for Hawaiian Airlines." Transportation Research Board, Washington, D.C., January 13, 2013

- "Adaptation and MRV (Measurement, Reporting and Verification)," United Nations 18th Annual Climate Change Conference, Doha, Qatar. November 30, 2012

- "Climate Change - Infrastructure – Adaptation," Presented at New Jersey Water Environment Association Conference, Atlantic City, NJ, May 14, 2012

- "What the Science Tells Us & How Practitioners Can Use the Science," Presented at US DOT FTA Climate Change Workshop: Washington, D.C., August 3, 2011

- "Benefits of ISO 14064, 14065 and 14066," Presented at Low Carbon Earth Summit: Dalian China, October 20, 2011

- "ISO 14064 Series of Standards: A Comprehensive Approach to GHG", Presented at Chicago Climate Exchange-CCFE Sixth Annual Members Meeting, Chicago, IL. June 11, 2009

- "The Coming of Age of the Voluntary Market: Perspective from an American Verification Company," Presented at Carbon TradeEx, Washington, DC. April 7, 2009

- "Verification: Standards & Quality: The evolution of verification, its role in the climate change world and an introduction to the process and ISO Standards," Presented at Navigating the American Carbon World, San Diego, CA. April 3, 2009

- "Carbon Offsets: The Whats, Hows, And Watchouts of Verifying Offsets," Presented at EBC Carbon Management Series, GHG Inventories, Registries, Life Cycle Assessments and Disclosure Requirements, Westborough, MA. March 6, 2009

- "Verification from a Verifier's Perspective: Tips for an Easier Verification," Presented at The Climate Registry Pre-Forum Workshop, Boston, MA. November 19, 2008

- "RIOS QEH&S Management Systems: Certification and Best Practices for the Electronics Recycling Industry," Presented at E-Scrap 2008 Pre-Conference Workshop, Orlando, FL. September 16, 2008
  "ISO 14064 Series of Standards: A Comprehensive Approach to GHG," Presented at Auditing Roundtable, Crystal City, VA. September 4, 2008

- "Understanding Your Footprint," Presented at BIO International Convention, San Diego, CA. June 2008

- "De-mystifying the Carbon Footprint," Presented at the Institute of Scrap Recycling Industries Annual Convention, Las Vegas, NV. April 7, 2008

- "Issues Regarding GHG Validation and Verification," Presented at Operating in a Carbon-Constrained World: Positive Experiences from the UK, Los Angeles, CA. October 12, 2007

- "Use of ISO 14064-2 and ISO 14064-3 in Voluntary Emissions Reductions Schemes," Presented at ISO 14064 Workshop - Implementation and Outlook, Beijing, China. June 28, 2007

- "ISO 14064: An International Standard for GHG Management," Presented at Carbon Finance Conference 2006, Millennium Gloucester, London. October 9, 2006

- "Best Practices in Greenhouse Gas Verification," Presented at the Business Roundtable GHG Verification Workshop, August 23, 2006

- "ISO 14064: An International Standard for GHG Management," Presented at SEMARNAT National Institute of Ecology, Mexico City. April 25 & 26, 2006

- "ISO 14064: An International Standard for GHG Management." Presented at GLOBE 2006, Vancouver, Canada. March 29, 2006

- With Jay Wintergreen, "Climate Change: Pressroom, Boardroom, Courtroom". Presented at American Bar Association Environmental Law Conference, Keystone, CO. March 10, 2006

- "ISO 14064: An International Standard for GHG Management," Presented at AWMA International Specialty Conference, "Planning for the Future: Climate Change, Greenhouse Gas Inventories & Clean Energy Linkages", San Francisco, CA. March 8, 2006

- "Role of CDM Credits in Financing in South America Emerging Markets," Presented at Latin America Energy Finance, Miami, FL. February 3, 2006

- Moderator of side event "Market Perspectives on the Clean Development Mechanism Reform." UNFCCC Conference of the Parties, Montreal, Canada. December 2005

- "Overview on International Scenario for Certification of Projects and Organization Inventories upon GHG," Presented at Brazilian Climate Change Workshop, Sao Paulo, Brazil. November 8, 2005

- "Climate Change as an Issue of Jobs and Trade: Reframing Climate Change Debate." Presented at Stephen M. Ross School of Business. June 3, 2005

- "Incorporating Sustainability into Business Practices: A Practical Approach," Presented at American Bar Association Environmental Law Conference, Keystone, CO. March 10, 2005

- "Role of Clean Development Mechanism credits in financing in South American emerging markets," Presented at Financing Latin American Energy Projects, Miami, FL. February 4, 2005

- "The Status of the Development of the New ISO Climate Change Standard: ISO 14064," Presented at Business Roundtable GHG Management Workshop, San Francisco, CA. September 18-19, 2003

- With James D. Heeren, P.E., "Benefits of New Technology Demonstrated through Life Cycle Assessment," Presented at AIChE 2001 Annual Meeting: Reno, NV, November 2001

- With Reeva I. Schiffman, J.D., "Flexibility of the ISO 14001 EMS Standard: A Presentation of Case Studies from Different Sectors," Presented at AWMA's Annual Conference, Orlando, FL, June 2001

- With James D. Heeren, P.E., "Life Cycle Analysis, Environmental Management and Global Climate Change," Presented at AIChE Annual Conference in Los Angeles, CA, November 2000

- With Elizabeth Delaney, MBA, "Kyoto Protocol – Toward COP6 ISO and the CDM, "CEEM Newsletter, September 2000

- With William S.S. Pendexter, Ph.D., "Characterization of the Complex Flow Geometry of DNAPL's in the Vadose Zone," Presented in Warsaw, Poland and included in The Warsaw 1998 Symposium Proceedings, September 1998

- With Reeva I. Schiffman, Esq. and Scott Fleming, "Implementation of an ISO 14001 Environmental Management System." Chapter in ISO 14000 Handbook, Irwin P. Publishing Co., Burr Ridge, IL

- With Reeva I. Schiffman, Esq., "Organizational Issues Associated with the Implementation of ISO 14000." AAEE Environmental Engineer, January 1997

- With Reeva I. Schiffman, Esq. "The Clean Air Act: Strategic Environmental Planning." Environmental Law and Practice Journal, July/August 1994

- With First Environment "Bioremediation of Soils Contaminated with Bis-(2-ethylhexyl) Phthalate (BEHP) in a Soil Slurry Sequency Batch Reactor." Presented at the Pittsburgh National AIChE Meeting, August 1991

- Delaney, B. Tod, Ph.D., P. E., "Site Assessments and Clean-up Plan Development." Presented at the ECRA Update seminar: Somerset, NJ, May 2, 1985

- With J. L. Duncan, "A Remedial Action Evaluation for Asbestos-Containing Materials in the Ceiling of Washington Dulles International Airport." A Report Prepared for the Federal Aviation Administrator, February 1985

- Delaney, B. Tod, Ph.D., P.E., "Dewatering to Stabilize Ponded Fly Ash." Presented at the Center for Energy and Environmental Management 1984 Conference on Superfund, November 1984

- With J. L. Duncan, "Organic Contamination in Groundwater Removal by Spray Irrigation." Presented at the Center for Energy and Environmental Management's 1984 Conference on Groundwater Compliance: Designing, Installing and Operation of Groundwater Wells, September 1984

- With T. S. Sekulic, "Assessing Hazardous Waste Treatment Facility Fugitive Atmospheric Emissions." Presented at the Center for Energy and Environmental Management 1983 Conference on Superfund, May 1983

- With T. S. Sekulic, Ron C. Tai and K. R.Bolt, "Air Quality Effects of a Hazardous Waste Incineration System." Environmental Progress Vol. 2, No. 1, February 1983

- With J. D. Lauber and W. J. Hinckley, "Controlling the Burning of Hazardous Waste as Fuels in Combustion Installations and Processes." Presented at the Mid-Atlantic Air Pollution Control Association Technical Conference: Albany, NY, November 1982

- With T. S. Sekulic, "Hazardous Waste Facility Air Monitoring Program." Presented at the Mid-Atlantic States Section Air Pollution Control Association Technical Conference: Philadelphia, PA, May 1982

- With F. Lorincz, "Treatment and Disposal of Coal Conversion Residues." Presented at Western Conference on Energy/Water Resources: Boulder, CO, April 1982

- With D. D. Roderique and W. K. Tusa, "The Future of Utility Waste Disposal in New York State." Presented

at the Governor's Conference on Expanding the Use of Coal in New York State: Albany, NY, May 1981

- Delaney, B. Tod, Ph.D., P.E., "Technical Standards for Landfills." Presented at the Energy Bureau Conference on Consolidated Permits: Washington, D.C., December 1980

- With A. R. Japhet and J. A. Isacs, "Environmental Aspects of the Hazardous Waste Chemical, Physical and Biological Permit Writer Guidelines Manual." Presented at the American Institute of Chemical Engineers 73rd Annual Meeting: Chicago, IL, November 1980

- With D. Lipsky and I. Lelichter, "Air Monitoring of Vinyl Chloride on and Adjacent to the Hauppauge Landfill, Islip, New York." Task Report to Environmental Protection Agency: New York, NY, 1980

- Delaney, B. Tod, Ph.D., P.E., "Cogeneration in the Brooklyn Gas Company Service Area." Presented at the Cogeneration Society of New York and New Jersey: New York, NY, 1980

- With P. H. Woods, S. A. Smith and W. H. Crowell, "On-Site Cogeneration on Urban Areas." Cogeneration Society of New York and New Jersey: New York, NY, 1980

- With T. Sekulic, "Atmospheric Emission Estimating Model for Aqueous Waste Lagoons." 1979

- With P. H. Woods and T. S. Sekulic, "Advantages and Disadvantages of Industrial Cogeneration as Compared to Central Power Stations." Presented at 72nd Annual Meeting of the Air Pollution Control Association: Cincinnati, OH, June 1979

- With S. A. Smith, "Potential Problem Waste Streams Generated by Coal-Fired Industrial Boilers." Presented at the 72nd Annual Meeting of the Air Pollution Control Association: Cincinnati, OH, June 1979

- With F. C. Hart, "The Impact of RCRA (PL 94-580) on Utility Solid Wastes." Prepared for Electric Power Research Institute, FP-878, June 1978

- Delaney, B. Tod, Ph.D., P.E., "Dispersion from Safety Valves and Other Momentum Emission Sources; Intermittent." Exxon Research and Engineering. Florham Park, NJ, 1978

- Delaney, B. Tod, Ph.D., P.E., "Vaporization During Loading, Transit and Unloading of a Tanker," American Petroleum Institute, 1977

- Delaney, B. Tod, Ph.D., P.E., Aircraft Vortex Effects on Ground Level Pollutant Concentration and Tracking of Vortex Movement in the Airport Environment, Dissertation. University of Texas at Austin, December 1976

- With Dennis F. Naugle, "United States Air Force Aircraft Pollution Emissions." USAF, 1973

## WORK HISTORY

**First Environment, Inc., Butler, New Jersey.** *President.* Provides active oversight of the firm's key marketing and project initiatives and serves as technical advisor on projects across all service areas. Participates in regular meetings with management level staff to discuss ongoing and upcoming project assignments, workload distribution, and marketing pursuits. Maintains key client relationships through in person meetings, quality reviews of deliverables, and oversight of cost submittals. Serves as an expert witness on several of the firm's litigation support contracts. Participates in national and international conferences on climate change adaptation (including ISO engagements), renewable fuels, natural resource litigation, and other relevant topics; often serves as a speaker/presenter for such events. Actively manages the firm's subsidiary and international activities. 1987 – ongoing.

**Groundwater Technology (wholly-owned subsidiary of Moretrench), Rockaway, New Jersey.** *Executive Vice President.* Responsibilities included management and coordination of company operations, including technical oversight of key projects and strategic pursuits. 1982 – 1984; 1986 – 1987.

**CH2M Hill, Oakland, New Jersey.** *Office Manager.* Job duties included management and coordination of office operations, including technical oversight of key projects and strategic pursuits. 1984 – 1986.

**Fred C. Hart Associates, New York, New York.** *Associate.* Oversaw all aspects of firm's air pollution program. 1978 – 1982.

**Exxonmobil Research and Engineering, Annandale, New Jersey.** *Engineer.* Job duties including project level engineering. 1976 – 1978.

**U.S. Army, Nationwide.** *Spec. 5.* Served as a chemical warfare specialist stationed at Fort Riley, Kansas in the U.S. Army's Chemical Warfare Division. Thereafter through 1972, employed at the Air Force Weapons Laboratory at Kirkland Air Force Base, New Mexico working on redesign of fire training programs at air bases. 1969 – 1972.

B. TOD DELANEY, PhD, PE, BCEE

## Expert Deposition and Testimony Cases (2018 – 2021)

| Case Name | Case No. | Court | Plaintiff / Defendant | Deposition | Trial Testimony |
|---|---|---|---|---|---|
| Borough of Edgewater, v. Waterside Construction, LLC, et al | Case No. 2:14-CV-05060 (JMV-NC) | United States District Court, District Of New Jersey | Plaintiff | 2/28/19 3/1/19 | ------ |
| Hobart Corporation, et al., v. the Dayton Power and Light Company et al. | Case No. 3:13-cv-00115-WHR | United States District Court for the Southern District of Ohio, Western Division | Defendant | 10/12/18 | ------ |
| Richard Catena v. Raytheon, et al. | Docket No. BER-L-1267-11 | Superior Court of New Jersey, Bergen County | Plaintiff | 1/9/13 2/13/13 3/8/13 12/18/18 7/15/19 | 5/14/13 |
| White Plains Housing Authority v. BP Products North America, Inc., Marianina Oil Corp. and Atlantic Richfield Company | Docket No. 17-cv-6250-NSR-JCM | United States District Court for the Southern District of New York | Plaintiff | 5/13/21 | Expected 2022 |
| United States of America v. Land O'Lakes, Inc., et al, | Case No. 16-CV-00170-R | United States District Court for the Western District of Oklahoma | Defendant | 7/21/20 | ------ |
| Kuhlman Electric Corporation, et al.  v. The Travelers Indemnity Company, et al. | Cause No. 251-07-549 Civ | The Circuit Court for the First Judicial District of Hinds County, Mississippi | Defendant | 6/18/20 | Expected 2022 |
| D.S.A. Properties, L.P., v. Micro Instrument Co., Inc., et al | Case No. SC126972 | Superior Court of California, County of Los Angeles | Defendant | 10/15/21 | ------ |

**APPENDIX C**

**Exhibit 2**

Table 1
Minimum Cleanup and Mitigation

| Activity | Regulatory Authority | Source of Cost Information | Unit Cost | Units | Cost |
|---|---|---|---|---|---|
| **Wastewater Pumping/Storage/Disposal and Basement Sump Repair** | | | | | |
| On-going sump water pumping/sampling/frac tank storage and disposal | USEPA (TSCA) | Client | $200,000 /LS | 1 LS | $200,000 |
| Long term solution to sump issues | USEPA (TSCA) | Client | $750,000 /LS | 1 LS | $750,000 |
| | | | | Activity Total: | $950,000 |
| **Additional Required Cleanup and Mitigation** | | | | | |
| Basement area dewatering  (assumes average of 0.2 ft. of water in the 308,000 sq. ft. basement and  assumes | USEPA (TSCA) | Vendors | | | |
| extracted  water will require disposal as a PCB contaminated medium). | | | | | |
| Pumping for dewatering. | | | $6,000 /LS | 1 LS | $6,000 |
| Testing for water disposal. | | | $1,000 /LS | 1 LS | $1,000 |
| PCB-impacted water disposal. | | | $0.75 /Gallon | 406,800 Gallons | $305,100 |
| Reporting/Documentation. | | | $2,000 /LS | 1 LS | $2,000 |
| | | | | Subtotal: | $314,100 |
| | | | | Subtotal with 15% Contingency | $361,215 |
| Removal and disposal of asbestos containing material on floors and patching of damaged in-place insulation | Health Dept. (NESHAP) | Vendors | | | |
| - Asbestos Management | | | $176,000 /LS | 1    LS    Subtotal: | $176,000 |
| Cleanup of impacted surfaces in the basement area, tunnels, vaults and sumps | USEPA (TSCA) | | | | |
| [assumes basement and columns impacted to three ft. above slab (237,348 sq. ft. PCB of impacted surfaces), vaults | | | | | |
| contain 1,172 sq. ft. of PCB impacted surfaces, tunnels contain 6,312 sq. ft. of PCB impacted surfaces. | | | | | |
| - Cleanup | | Vendors | | | |
| Mobilization/demobilization/general conditions/health & safety. | | | $110,000 /LS | 1 LS | $110,000 |
| Double washing/rinsing all PCB impacted concrete surfaces; cleaning/rinsing with an industrial strength detergent | | | | | |
| and either scrubbed with a brush or wiped, left to dry, and rinsed off with clean (potable) water. | | | $2 /sq. ft. | 420,604 sq. ft. | $844,232 |
| Decontamination of Non-Porous Surfaces | | | $25,000 /LS | 1 LS | $25,000 |
| Management and disposal of rinse liquid and sediments. | | | $3,130,000 /LS | 1 LS | $3,130,000 |
| Confirmation core sampling by subcontractor on a 1.5 meter grid. | | | $1,321,000 /LS | 1 LS | $1,321,000 |
| Concrete core testing for PCBs. | | | $75 /Sample | 24,000 Samples | $1,800,000 |
| PCB wipe sampling basement per 1.0 meter interval. | | | $306,000 /LS | 1 LS | $306,000 |
| PCB wipe sample testing for PCBs. | | | $75 /Sample | 1,333 Samples | $100,000 |
| | | | | Subtotal: | $7,636,232 |
| Remaining Signed Inserv Contract Amount | | | | | |
| - Inserv Contract Amount | N/A | Client | | Subtotal: | $186,517.40 |
| | | | | Activity Total: | $8,359,964 |
| **Encapsulation of Cleaned Building Surfaces** | | | | | |
| Encapsulation of Concrete/Porous Surfaces in the basement area, tunnels, vaults and sumps | | Vendors | | | |
| [assumes basement and columns impacted to three ft. above slab (237,348 sq. ft. PCB of impacted surfaces), vaults | | | | | |
| contain 1,172 sq. ft. of PCB impacted surfaces, tunnels contain 6,312 sq. ft. of PCB impacted surfaces. | | | | | |
| Mobilization/demobilization/general conditions/health & safety. | | | $30,000 /LS | 1 LS | $30,000 |
| Encapsulation | | | $6.25 /sq. ft. | 244,832 sq. ft. | $1,529,546 |
| | | | | Subtotal: | $1,559,546 |
| | | | | Activity Total: | $1,559,546 |
| | | | | Total: | $10,869,510 |

**Table 2**
**Minimum Required Assessment Activities Due to the Actual Presence of Contaminants**

| Activity | Regulatory Authority | Source of Cost Information | Unit Cost | Units | Cost |
|---|---|---|---|---|---|
| **Environmental Media Assessment** | | | | | |
| COC release evaluation (consulting labor) | IDEM | *Experience with Similar Tasks* | $25,000 /LS | 1 LS | $25,000 |
| | | | | *Subtotal:* | $25,000 |
| *Soil sampling* | | USEPA (TSCA for PCBs) and IDEM | | | |
| - Equipment | | *Experience with Similar Tasks* | $3,000 /LS | 1 LS | $3,000 |
| - Analytical (211 samples tested for PCBs, PAHs, TPH and asbestos containing material) | | Vendors | $327 /Sample | 211 Samples | $69,000 |
| - FieldsSubcontractors | | Vendors | $42,000 /LS | 1 LS | $42,000 |
| - Preparation and Field Labor | | *Experience with Similar Tasks* | $22,000 /LS | 1 LS | $22,000 |
| - Project management | | *Experience with Similar Tasks* | $2,000 /LS | 1 LS | $2,000 |
| - Risk evaluation | | *Experience with Similar Tasks* | $7,000 /LS | 1 LS | $7,000 |
| - Reporting | | *Experience with Similar Tasks* | $6,000 /LS | 1 LS | $6,000 |
| | | | | *Subtotal:* | $151,000 |
| *Sediment and surface water (stormwater) sampling* | | USEPA (TSCA for PCBs) and IDEM | | | |
| - Equipment | | *Experience with Similar Tasks* | $1,000 /LS | 1 LS | $1,000 |
| - Analytical (40 samples tested for PCBs, PAHs, TPH and asbestos containing material) | | Vendors | $300 /Sample | 40 Samples | $12,000 |
| - Preparation and field labor | | Vendors | $8,000 /LS | 1 LS | $8,000 |
| - Project management | | *Experience with Similar Tasks* | $2,000 /LS | 1 LS | $2,000 |
| - Risk evaluation | | *Experience with Similar Tasks* | $7,000 /LS | 1 LS | $7,000 |
| - Reporting | | *Experience with Similar Tasks* | $6,000 /LS | 1 LS | $6,000 |
| | | | | *Subtotal:* | $36,000 |
| *Groundwater sampling* | | USEPA (TSCA for PCBs) and IDEM | | | |
| - Equipment | | *Experience with Similar Tasks* | $3,000 /LS | 1 LS | $3,000 |
| - Analytical (Eight samples plus QA/QC samples tested for PCBs and PAHs) | | Vendors | $150 /Sample | 10 Samples | $1,500 |
| - Field subcontractors | | Vendors | $42,000 /LS | 1 LS | $42,000 |
| - Preparation and field labor | | *Experience with Similar Tasks* | $22,000 /LS | 1 LS | $22,000 |
| - Project management | | *Experience with Similar Tasks* | $2,000 /LS | 1 LS | $2,000 |
| - Risk evaluation | | *Experience with Similar Tasks* | $7,000 /LS | 1 LS | $7,000 |
| - Reporting | | *Experience with Similar Tasks* | $6,000 /LS | 1 LS | $6,000 |
| | | | | Subtotal: | $83,500 |
| | | | | *Activity Total:* | $295,500 |
| | | | | Total: | $295,500 |

Axis_C00486

Table 3
Potential Remediation

| Activity | Regulatory Authority | Source of Cost Information | Unit Cost | Units | Cost |
|---|---|---|---|---|---|
| **Environmental Media Remediation** | | | | | |
| *Remediation of Environmental Media* | | | | | |
| - Soil (Excavation and disposal off-Site as PCB waste, excavated soil replacement) | *USEPA (TSCA for PCBs) and IDEM* | Experience with Similar Tasks | $1,200,000 /LS | 1 LS | $1,200,000 |
| - Groundwater (Installation and operation of total fluids recovery wells, disposal of recovered water as PCB waste) | *USEPA (TSCA for PCBs) and IDEM* | Experience with Similar Tasks | $600,000 /LS | 1 LS | $600,000 |
| - Sediments (Excavation and disposal off-Site as PCB waste, replacement of excavated sediments/flora recovery) | *USEPA (TSCA for PCBs) and IDEM* | Experience with Similar Tasks | $1,200,000 /LS | 1 LS | $1,200,000 |
| | | | | Subtotal: | $3,000,000 |
| | | | | **Activity Total:** | **$3,000,000** |
| **Remediation and Management of PCB Remediation Wastes from the Basement Area, Tunnels,  Vaults and the Sump** | | | | | |
| *Management of PCB Remediation Wastes from the Basement Area, Tunnels, Vaults and the Sump* | USEPA (TSCA) | | | | |
| *[assumes basement and columns impacted to three ft. above slab (237,348 sq. ft. PCB of impacted surfaces), vaults contain 1,172 sq. ft. of PCB impacted surfaces and tunnels contain 6,312 sq. ft. of PCB impacted surfaces.* | | | | | |
| - Professional Services (includes:   project management; closure plan; environmental consulting support; bid document preparation/bid management; six-months construction management/meeting/technical assistance/travel; | | | | | |
| construction observation and documentation; and closure reporting. | | Experience with Similar Tasks | $217,000 /LS | 1 LS | $217,000 |
| | | | | Subtotal: | $217,000 |
| - Characterization (includes: mobilization/demobilization/general conditions; concrete core sampling;  concrete core testing for PCBs; and PCB wipe sampling/analysis in the basement (and including a 15% contingency)]. | | Vendors | | | |
| Mobilization/demobilization/general conditions/health & safety. | | | $30,000 /LS | 1 LS | $30,000 |
| Concrete core Sampling on a 1.5 meter grid. | | | $1,321,000 /LS | 1 LS | $1,321,000 |
| Concrete core sample analysis. | | | $75 /Sample | 24,000 Samples | $1,850,000 |
| PCB wipe sampling basement per 1.0 meter interval. | | | $306,000 /LS | 1 LS | $306,000 |
| PCB wipe sample testing for PCBs. | | | $75 /Sample | 1,333 Samples | $100,000 |
| | | | | Subtotal: | $3,607,000 |
| | | | | Subtotal with 15% Contingency: | $4,148,650 |
| - Demolition of impacted areas (includes mobilization/demobilization/general conditions; demolition and removal of PCB impacted materials; loading, off-Site transportation of PCB impacted materials; and import, placement and backfill of basement area). | | Vendors | | | |
| Mobilization/demobilization/general conditions/health & safety. | | | $30,000 /LS | 1 LS | $30,000 |
| Demolition and removal. | | | $10 /sq. ft. | 420,604 sq. ft. | $4,201,972 |
| Loading, off-Site transportation and disposal of PCB impacted concrete materials | | | $315 /ton | 28,859 tons | $9,090,330 |
| Loading, off-Site transportation and disposal of PCB impacted drainage pipe in basement area. | | | $30 /LF | 4,000 LF | $120,000 |
| Import, placement and backfill voids, | | | $50 /cu. yd. | 41,048 cu. yd. | $2,050,101 |
| | | | | Subtotal: | $15,492,403 |
| | | | | Subtotal with 15% Contingency: | $17,817,063 |
| | | | | **Activity Total:** | **$22,182,713** |
| | | | | **Total:** | **$25,182,713** |

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| INDIANA GRQ, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 3:21-cv-00227-DRL-MGG |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN GUARANTEE AND | ) | |
| LIABILITY INSURANCE | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF INDIANA GRQ LLC'S**
**RULE 26 INITIAL DISCLOSURES**

Plaintiff Indiana GRQ LLC ("IRG"), by and through its undersigned counsel, hereby provides these disclosures pursuant to Rule 26(a) of the Federal Rules of Civil Procedure in the above-referenced matter to Defendants.  These disclosures are made to Defendants based on knowledge, information, and/or belief reasonably available to and/or presently known by IRG at the time these disclosures were made.

**CONDITIONS**

All disclosures are made without in any way waiving or intending to waive but rather preserving and intending to preserve:

a.      All objections as to competency, relevancy, materiality, privilege, work product immunity, admissibility, undue burden, overbreadth, or any other valid objection in any subsequent proceedings or the trial of this or any other action;

b.      The right to object to the use of these disclosures or documents and information obtained as a result of these disclosures, or the subject matter thereof, in any subsequent proceedings or the trial of this or any other action;

c.      The right to object to a demand for further disclosures or to other discovery proceedings involving or relating to the subject matter of these disclosures; and

d.      The right to revise, correct, supplement, clarify, and/or amend the disclosures set forth herein.

IRG does not represent that these disclosures identify every fact, basis of every claim, every relevant document, every legal argument related to each claim and defense, every tangible thing, or every witness that is potentially relevant to this lawsuit or that may be used at trial, as the parties are still in the process of discovery and, accordingly, the disclosures herein are not a statement that no other persons have knowledge of relevant facts or that no other relevant facts or documents exist.

## **DISCLOSURES**

**(1)    The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that IRG may use to support its claims or defenses.**

1.      Justin Lichter -- IRG (please contact through counsel)

Mr. Lichter has knowledge of the flood at the South Bend plant, the damages caused and the work needed to address that damage.

2.      Jeff Pope – Burns & McDonnell, Downers Grove, IL

Mr. Pope is expected to have knowledge of environmental contamination at the South Bend plant as a result of the flood and efforts at remediation and work needed to address the damage.

3.      Steve Benson -- Herrman & Goetz, Inc., South Bend, IN

2

Mr. Benson is expected to have knowledge of environmental contamination at the South Bend plant as a result of the flood, electrical damage and efforts at remediation and work needed to address the damage.

4.      Jerry Graf  -- IRG (please contact through counsel)

Mr. Graf is expected to have knowledge of the flood at the South Bend plant, the damages caused and the work needed to address that damage.

5.      Micah Thoman – Charles Taylor, Phoenix AZ

Mr. Thoman is likely to have knowledge of the flood at the South Bend plant, the damages caused, the work needed to address that damage and the insurers actions to date.

6.      Stuart Stromeyer – McLarens

Mr. Stromeyer is likely to have knowledge of the flood at the South Bend plant, the damages caused, the work needed to address that damage and the insurers actions to date.

7.      Bob West – West & Associates, Newtown PA

Mr. West is likely to have knowledge of environmental contamination at the South Bend plant as a result of the flood and efforts at remediation and work needed to address the damage.

8.       Chaz Mello – JS Held, Downers Grove, IL

Mr. Mello is expected to have knowledge of environmental contamination at the South Bend plant as a result of the flood, electrical damage and efforts at remediation and work needed to address the damage.

9.      IRG reserves the right to amend and supplement this response.

**(2)   Documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses.**

Relevant non-privileged Documents are being produced.

**(3)   A computation of each category of damages alleged by IRG.**

1.      <u>Computation</u>.   IRG's total losses are set forth in the table below (total recoverable losses limited to $10 million policy limit).

| CLAIM ELEMENT | TOTAL LOSS |
|---|---|
| ELECTRICAL EQUIPMENT | $10,474,422 |
| ENVIRONMENTAL | $11,165,010 |

IRG's recoverable damages include:

a.      Damages recoverable under the policies, including Defendants' obligation to pay their full $10 million policy limits under the Policies.

b.      Other compensatory and consequential damages.  (TBD)

c.      Punitive damages.  (TBD)

d.      Attorneys' fees and costs.  (TBD)

e.      Prejudgment interest.  (TBD)

f.      Post-judgment interest.  (TBD)

g.      Costs of suit and attorneys' fees.  (TBD)

4

**(4)     Relevant Insurance Agreements**

Other than the insurance policies at issue in this litigation, there are no other insurance agreements applicable to this action.

DATED this 2nd day of June, 2021.          Respectfully submitted,

By:      _____/s/_____
          Mark E. Miller
          William T. O'Neil
          MILLER FRIEL PLLC
          2445 M Street NW, Suite 910
          Washington, DC  20037
          Tel: (202) 760-3160
          Fax: (202) 459-9537
          millerm@millerfriel.com
          oneilw@millerfriel.com

By:      _____/s/_____
          Clint A. Zalas
          LEE, GROVE and ZALAS
          54391 30th Street
          South Bend, Indiana 46635
          Tel: (574) 232-5923
          Fax: (574) 232-5942
          cazalas@lgzlegal.com

          *Attorneys for Plaintiff Indiana GRQ, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, William O'Neil, hereby certify that on June 2, 2021, a copy of the foregoing **Plaintiff Indiana GRQ, LLC's Rule 26 Initial Disclosures** was served electronically on the parties listed below:

> Peter E. Kanaris
> David E. Heiss
> Jennifer J. Kalas
> Hinshaw & Culbertson LLP
> 151 N. Franklin Street, Suite 2500
> Chicago, Illinois 60606
> pkanaris@hinshawlaw.com
> dheiss@hinshawlaw.com
> jkalas@hinshawlaw.com

*William O'Neil*
William O'Neil

# EXHIBIT 3

# General Declarations – AmWINS Property Program Coverage



---

**Policy Number: AMW-150803**

**Previous Policy Number: NEW**

**Policy Period:**
Inception Date: 04/15/2016 to  Expiration Date: 04/15/2017
(12:01 A.M.  Standard time at the address of the Named
Insured  as stated herein)

Coverage is provided in the following
company, a stock company

Interstate Fire & Casualty Company

**Named Insured and Mailing Address:**
Industrial Realty Group, LLC
7400 Impala Drive
Henrico, VA 23228
United States of America

**Producer Name and Address:**
AmWINS Brokerage of Illinois, LLC
10 S. LaSalle St. Suite 2000
Chicago, IL 60603

**Business or Operations of the Named Insured:** NAICS code:531120      NAICS short description: Lessors of
Nonresidential Buildings (except Miniwarehouses)

---

The insurance provided by this policy consists of the following coverage form(s). In return for payment of the
premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

### PROPERTY INSURANCE

---

PREMIUM SUMMARY

| | |
|---|---|
| Annual Premium (excluding Terrorism Risk Insurance Act) | $277,875.00 |
| Service Fee | $     500.00 |
| Terrorism Risk Insurance Act ("The Act") - Certified Acts Coverage –<br>All Coverages Subject to the Act Excl WC and Umbrella – | $14,625.00 |
| TOTAL | $293,000.00 |

---

ART-General Property Declarations-003  02-16

Page 1 of 2

IFCC-C0000069

---

```
LOCATIONS OF PREMISES--Applicable to Coverages specified in these
                          Declarations

             Locations on file with the company
```

---

**FORMS ATTACHED AT INCEPTION**

**GENERAL PROVISIONS**

**145927 01-15**          Disclosure of Premium and Estimate Premium for Certified Acts of Terrorism
**386359 01-15**          Important Disclosure Notice Regarding Terrorism Coverage

**PROPERTY**

ART100-001-140215          Primary and Excess Co-Insuring Form

ART100-001S -140215        Schedule to Primary and Excess Co-Insurance Schedule

| Date of Issue: | Countersignature of Authorized Agent: |
|---|---|
| 06/14/2016 | |

These Master Policy Declarations and other coverage Declarations, together with any common policy conditions, coverage  form(s) and endorsements if any issued to form a part thereof, complete the above numbered policy.

ART- General Property Declarations-003 02-16

IFCC-C0000070

SCHEDULE

TO

PRIMARY & EXCESS PROPERTY CO-INSURANCE

**Named Insured**: Industrial Realty Group, LLC

Issued by:  AmWINS Special Risk Underwriters on behalf of Interstate Fire & Casualty

**Policy** no.: AMW-150803

Part I.  Total Limit of Insurance applicable to this **Policy** in a primary insurance Layer is:

$3,000,000 part of $30,000,000

Part II.  Total Limit(s) of Insurance applicable to excess of loss **Layer(s)**:

Layer 1.  $7,000,000 part of $70,000,000 excess of $30,000,000

Part III.  **Lead Insurance Company**:

a.  Name of Insurer: American Guarantee and Liability Insurance Company

b.  Policy Number:  ERP9156492-02

c.  Policy Period:  From: 04/15/2016          To:04/15/2017

Part IV.  Premium in primary insurance **Layer**: $247,950

a.  Premium in **Layer** 1:  $29,925

Page 1 of 2

ART100-001S-140215
© 2015 Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000071

# SCHEDULE
## TO
### PRIMARY & EXCESS PROPERTY CO-INSURANCE

Part V.       Minimum Earned Premium: per **Lead Insurance Policy**

Part VI.       **Certified Acts of Terrorism** Coverage:

| Layer | Certified Acts of Terrorism Coverage Included? | Premium ($) |
|---|---|---|
| | | |
| Primary | Yes | $13,050.00 |
| Layer 1 | Yes | $1,575.00 |

Page 2 of 2

ART100-001S-140215

© 2015 Fireman's Fund Insurance Company, Novato, CA. All rights reserved.

Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000072

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

Throughout this **Policy**, the "you" and "your" refer to the **Named Insured** identified in the **Declarations**. The words "we", "us" and "our" refer to the Company providing the insurance identified in the **Declarations**.  Words that are in bold type have special meanings which are provided in the **Declarations** or in the **Definitions** of this **Policy**.

This **Policy** provides primary loss layer and/or excess of loss layer insurance to you for your property as specifically identified in the **Schedule** to this **Policy**.

1.  **PRIMARY AND EXCESS PARTICIPATING INSURANCE CLAUSE:**

    We insure your property, in accordance with the **Terms and Conditions** of this **Policy** and in consideration of the payment of premium, shown in the **Schedule**, for the proportion of each **Covered Loss**, shown in the **Schedule**, that arises during the **Policy Period** stated in the **Declarations** and within the period of insurance identified in the **Lead Insurance Policy**, as follows:

    A.  This is following form insurance, which means that this insurance follows all the **Terms and Conditions** of the **Lead Insurance Policy** except as to any **Terms and Conditions** of this **Policy** that:

        (1)  differ from any term or condition contained in the **Lead Insurance Policy**; or

        (2)  is not contained in the **Lead Insurance Policy**.

    B.  If there is any change in the terms and conditions of the **Lead Insurance Policy**, including but not limited to any change in the **Limit of Insurance**, after the inception date of this **Policy**, then we will not provide any insurance coverage for such change without prior submission and written approval by us.

    C.  If we insure you for the primary insurance layer, as shown in Part I of the **Schedule**, then we will pay you our proportion of your **Covered Loss** that exceeds the **Attachment Point**, but in any event we will not pay you in excess of our **Limit of Insurance** for that primary insurance **Layer**.

    D.  If we insure you for any **Layer** that is excess of loss, as shown in Part II of the **Schedule**, then for each such **Layer** that we insure:

        (1)  we will pay you for your **Covered Loss** for each **Layer** insured by us for an amount not to exceed our proportion, shown in the **Schedule**, of the excess over and above the **Underlying Insurance**, and in no event will this **Policy** respond until your aggregate **Covered Loss** exceeds the **Attachment Point** of the **Layer**;

        (2)  we will pay our share of **Covered Losses**, on a proportionate basis, and up to the **Limit of Insurance** for the insurance provided by this **Policy**, as shown in the **Schedule,** that exceed the total of **Attachment Point** for such **Layer**; and

        (3)  in the event any peril insured is subject to any annual **Limit of Insurance**, then the maximum that we will pay for all **Covered Losses** arising during the **Policy Period** attributable to such peril will be subject to the amount of such annual **Limit of Insurance**.

    E.  Coverage under this **Policy** with respect to any **Layer** insured by us, as shown in the **Schedule**, is conditioned upon:

        (1)  All **Contributing Insurance**:

© 2015 Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

(a) will be effective at the **Inception Date** of this **Policy** shown in the **Declarations**, and will continue in full force and effect during the entire **Policy Period** as shown in the **Schedule** of this **Policy**; and

(b) if any **Contributing Insurance** is not maintained and in effect at any time during the **Policy Period**, then we will not be liable for more than our share of each **Covered Loss**, up to the **Limit of Insurance** specified for the affected **Layer**, as shown in the **Schedule** of this **Policy**.

(2) All **Underlying Insurance** will be effective at the **Inception Date** of this **Policy** shown in the **Declarations**, and will continue in full force and effect, by its terms, conditions and **Limits of Insurance**, during the entire **Policy Period**, without interruption, and if it is not, then we will insure you as though such **Underlying Insurance** were in effect, at such terms, conditions and **Limits of Insurance**, as of the **Inception Date**.

F.   The amount we pay for a **Covered Loss** for insurance provided herein will be less:

(1) if we are insuring you for a proportion of the primary insurance **Layer**, as shown in Part I of the **Schedule**, the deductible or self-insured retention specified in the **Lead Insurance Policy**;

(2) salvage recoveries; and,

(3) any other recoveries, except this **Policy**.

2. **LIMITS OF INSURER'S LIABILITY CLAUSE:**

The following limitations apply to this **Policy**:

A. Regardless of any other coverage, **Limits of Insurance** provided under the **Lead Insurance Policy** or the number of locations involved, the most we will pay for any **Layer** for which we provide insurance, as shown in the **Schedule**, for any **Covered Loss** resulting from any one occurrence or event is the **Limit of Insurance** shown in the **Schedule** for such **Layer**.

B. It is a condition precedent for there to be any insurance provided under this **Policy** for any **Layer** that a **Limit of Insurance** (other than "0") is shown in the **Schedule** with respect to such **Layer**.

C. When "0", "N/A", or "not covered", or any other similar statement or amount is shown in the **Schedule** with respect to a particular **Layer**, then no insurance is provided for the **Layer** by this **Policy**.

3. **TERRITORY CLAUSE:**
This insurance applies anywhere that the **Lead Insurance Policy** applies.

4. **PREMIUMS CLAUSE:**
You are responsible for the payment of all premiums shown in Part IV of the **Schedule**, and you will be the payee for any return premiums.

5. **MINIMUM EARNED PREMIUM CLAUSE:**
If you cancel this **Policy**, then the **Minimum Earned Premium** described in Part V of the **Schedule** will be immediately due and payable.

© 2015 Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000074

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

6.  **UNCOLLECTIBILITY OF OTHER INSURANCE CLAUSE:**

Notwithstanding any of the terms of this **Policy** that might be construed otherwise, the risk of uncollectability (in whole or in part) of **Underlying Insurance**, including any **Co-Insurance**, whether because of financial impairment or insolvency of an insurer providing **Underlying Insurance** or any insurer providing **Co-Insurance**, or for any other reason, is expressly retained by you and is not in any way or under any circumstances insured or assumed by us.

7.  **INSURANCE UNDER TWO OR MORE COVERAGES CLAUSE:**

If two or more coverages apply under the **Lead Insurance Policy** with respect to the same occurrence or event for a **Covered Loss**, we will not pay more than the actual amount of the loss or expense suffered by you, subject to the terms and conditions of the **Lead Insurance Policy**.

8.  **APPLICATION OF RECOVERIES BY INSURER CLAUSE:**

All salvages, recoveries or payments received subsequent to our settlement of any **Covered Loss** that we are required to pay to you under this **Policy** shall be applied as if recovered or received prior to such settlement, and all necessary adjustments shall then be made between you and us in accordance with the provisions of the **Lead Insurance Policy**, provided always that nothing in this **Policy** shall be construed to mean that we may not make any settlement under this **Policy** until the **Covered Loss** claimed by you under this **Policy** has been finally and fully ascertained.   You understand that we may seek salvage and subrogation in connection with any settlement by us in connection with a **Covered Loss**.   Unless otherwise provided for in the **Lead Insurance Policy**, where salvage or subrogation or any other recovery is made by us and we have insured you for more than one **Layer**, we shall apply each such recovery first to the **Layer** which we insure with the highest **Attachment Point** and then to each successively lower **Layer** that we insure and for which we have paid a **Covered Loss** until such salvage, subrogation or other recovery has been fully distributed.

9.  **CANCELLATION AND ADDITIONS CLAUSE:**

This **Policy** may be canceled by you at any time upon your written request and it may be canceled by us by mailing via registered or certified mail to you at the mailing address shown in the **Declarations** and to the **Insureds**, loss payees, mortgagees indicated on the certificates of insurance duly issued during the term of this **Policy**, written notice (provided in conformance with the applicable notice provisions of the **Lead Insurance Policy**) stating when such cancellation shall be effective.   The earned premium shall be calculated as provided for in the **Lead Insurance Policy**.

10. **VOLUNTARY PAYMENTS CLAUSE:**

Neither you, nor any other **Insured**, shall, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense, without our written consent, that does or may in any way increase the our liability under this **Policy**.

11. **CONCEALMENT, MISREPRESENTATION OR FRAUD CLAUSE:**

This **Policy** is void in the case of fraud by you as it relates to the procurement, payment or negotiation for this insurance.  This **Policy** is also void if you or any other **Insured**, at any time, intentionally conceal or misrepresent a material fact concerning:

© 2015 Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000075

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

    A. this **Policy**;

    B. the property and locations insured under this **Policy**;

    C. your interest in the property insured under this **Policy**; or

    D. any claim made by you or any person having rights to make a claim under the **Lead Insurance Policy**, or at your direction or with your permission, under this **Policy**.

12. **CLAIMS CONTACT INFORMATION CLAUSE:**

In the event of a loss, claims are to be submitted as follows (email is preferable for quickest response):

    Peninsula Insurance Bureau
    2842 Lent Road, Apopka, FL 32712
    Phone: (407) 880-1100
    tpa@pibadjusters.com

13. **INSPECTIONS AND SURVEYS CLAUSE:**
In connection with the perils, property and locations covered by this **Policy** we have the right to make inspections and surveys at any time at all relevant locations, and if we do so and provide any information to you, it is solely for the purpose of insurability and rating and is not to be relied upon for any other purpose, including health and safety or compliance with law or regulation.

14. **EXAMINATION OF YOUR BOOKS AND RECORDS CLAUSE:**
We may examine and audit your books and records as they relate to this **Policy** at any time during the **Policy Period** and up to three years afterwards.

15. **DISCLOSURE AND REPRESENTATIONS CLAUSE:**

We have issued this insurance and provide the coverage under this **Policy**:

    A. based upon and in reliance upon any and all disclosures and representations made by you to us and to the **Lead Insurance Company** in connection with this **Policy** and the **Lead Insurance Policy**, as the case may be; and

    B. based on any information contained in or provided with any insurance application and other materials or submissions provided by you or on your behalf to us or the **Lead Insurance Company**, whether directly or indirectly.

16. **TITLES OF PROVISIONS AND ENDORSEMENTS CLAUSE:**

    A. The several titles of the various provisions of this **Policy** as now or hereafter attached to this **Policy**, are inserted solely for convenience of reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

    B. This **Policy** contains all the agreements between you and us concerning the insurance provided under this **Policy**. Any amendments or modifications to the **Terms and Conditions** may be

© 2015 Fireman's Fund Insurance Company, Novato, CA. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

made with our prior written consent and shall be evidenced by endorsement issued by us.  The **Terms and Conditions** can be amended or waived only by endorsement issued by us and made a part of this **Policy**.

17. **DEFINITIONS CLAUSE:**

The following terms used in this **Policy**, or any part of it, have the special meanings given to them below:

A. **Annual Aggregate Sublimit** means the most that any **Underlying Insurance** will pay for all loss, damage, or expense arising from all occurrences, loss events, or both (as applicable), during any one annual policy period with respect to a particular peril. If the **Underlying Insurance** is written for a term of more than one year, then we will apply the **Annual Aggregate Sublimit** to each consecutive year of the **Policy Period**. If the **Underlying Insurance** is extended for a period of time that is less than a year, then the remaining **Annual Aggregate Sublimit** from the prior term applies to the extended period of time.

B. **Attachment Point**, means for each **Layer**, the dollar amount where the applicable insurer will begin to pay in the event of a **Covered Loss**, or in the case of a self-insured **Layer**, the dollar amount where you bear all the financial loss.

C. **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury in accordance with the provisions of the federal Terrorism Risk Insurance Act, as amended, to be an act of terrorism.  The criteria contained in that Act for a **Certified Act of Terrorism** include the following:

   (1) The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended; and

   (2) The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

D. **Co-Insurance** means any insurance, other the insurance provided by this **Policy**, for a share of a **Layer** provided by this **Policy**, as identified in the **Schedule**.

E. **Contributing Insurance** means, for each **Layer** on which we insure you, as shown in the **Schedule**, the combined total or aggregate **Limits of Insurance**, as shown in the **Schedule**, for all **Co-Insurance**.

F. **Covered Loss** means each direct or indirect loss you suffer with respect to the perils, interests and locations insured or insurable by the **Lead Insurance Company** pursuant to the terms and conditions of the **Lead Insurance Policy**.

G. **Layer** means with respect to the property insured under this **Policy**, a defined **Limit of Insurance** (or risk of loss retained by you) excess of an **Attachment Point**.

H. **Lead Insurance Company** means the insurance company, shown in Part III of the **Schedule** to this **Policy** that issues the **Lead Insurance Policy**.

I. **Lead Insurance Policy** means the property insurance policy or other insuring agreement provided by the **Lead Insurance Company** shown in Part III of the **Schedule**.

© 2015 Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000077

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

J. **Limit of Insurance** means, for any **Layer** including the insurance provided by this **Policy**, the most insurance that will be paid for **Covered Losses** during the **Policy Period**. **Limits of Insurance** are reduced by the amount of any paid **Covered Loss** paid.

K. **Schedule** means the Schedule attaching to and forming a part of this **Policy**.

L. **Underlying Insurance** means for any **Layer**, all insurance and self-retained risk with respect to the property insured under this **Policy** below the **Attachment Point**.

M. **Underlying Policy** means each policy of insurance or other evidence of insurance coverage that provides for one or more **Layers** of insurance for the property insured under this **Policy**.

N. **Terms and Conditions** mean the terms and conditions, inclusive of the definitions, **Limits of Insurance**, warranties and exclusions, individually and collectively, upon which insurance coverage is provided to you under this **Policy**, as the case may be, and as may be provided for in any endorsements, declarations and schedules to this **Policy**.

18. **OFAC CLAUSE**

The Office of Foreign Asset Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency".
In accordance with OFAC regulations, if you or any other insured, or any person or entity claiming the benefits of this insurance, has violated US sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Others limitations on the premium and payment also apply.

19. **LEGAL ACTION AGAINST US CLAUSE:**

You may not commence, bring or cause to be commenced or bring any legal action, claim, demand or suit against us unless:

A. there has been full compliance with all of the **Terms And Conditions** and the terms and conditions of the **Lead Insurance Policy**; and
B. the legal action, claim, demand or suit is brought within two (2) years after the date of the occurrence or event which occasioned the direct physical loss or damage.

20. **SERVICE OF SUIT CLAUSE:**

A. In the event of our failure to pay any amount claimed to be due under this **Policy**, we agree to submit to the jurisdiction of any court of competent jurisdiction within the United States in which a suit for those amounts may be brought. Nothing in this condition constitutes or should be understood to constitute a waiver of our right to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

B. Service of process in such suit may be made upon:

> General Counsel's Office
> Interstate Fire & Casualty Company
> 33 West Monroe Street

ART100-002-250215

© 2015 Fireman's Fund Insurance Company, Novato, CA. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000078

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

Chicago, IL 60603

or his or her representative, and that in any suit instituted against us with respect to this **Policy**, we will abide by the final decision of such court or of any Appellate Court in the event of an appeal.

C. To the extent required by the express provisions of any statute of any state, territory, or district of the United States, we hereby designate the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his successor or successors in office as our true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by you or on your behalf or any beneficiary hereunder arising out of this policy, and we hereby designate the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## 21. SEVERAL LIABLITY CLAUSE:

Our liability to you under this **Policy** for **Covered Losses** are several and not joint to the the **Co-Insurance**.

## 22. PRIORITY OF LOSS PAYMENTS CLAUSE:

A. If this **Policy** provides excess insurance, as shown in Part II of the **Schedule**, in determining the amount of a **Covered Loss** from any one loss occurrence or event for which your property is insured under all **Underlying Insurance**, the total **Covered Loss** (including any applicable sublimits) caused by any combination of perils shall be used to the extent insured under the **Underlying Insurance**, even though all such perils or sublimited coverages may not be insured under this **Policy**.

B. Any claims payments made under the **Underlying Insurance** shall first apply to those perils or sublimited coverages not insured against by this **Policy**.  Upon exhaustion of all the **Limits of Insurance** provided by all **Underlying Insurance**, this **Policy** will pay for the amount of **Covered Loss** remaining, but only to the extent that the loss occurrence, event, perils and sublimited coverages are insured under this **Policy** and then only as provided for under the **Terms and Conditions**.  In such event, the applicable amount of the deductible provision of the **Lead Insurance Company** shall apply to the combination of all **Underlying Insurance** and this **Policy**.

## 23. DROP DOWN CLAUSE:

For any peril that is subject to an **Annual Aggregate Sublimit** provided by any **Underlying Insurance**, and such **Annual Aggregate Sublimit** is reduced or exhausted from payments for **Covered Losses** under an **Underlying Policy**, the insurance provided by this **Policy** will apply in excess of the reduced **Annual Aggregate Sublimit** provided by any **Underlying Insurance**.  As such **Underlying Insurance's Annual Aggregate Sublimit** is exhausted with respect to a peril, the insurance coverage with respect to such peril provided by this **Policy** will apply as **Underlying Insurance**.  We will not insure you for **Covered Loss** that is a direct result of any peril that is subject to an **Annual Aggregate Sublimit** except as specifically provided for in the **Terms and Conditions** of this **Policy**, nor will we pay more than our proportion of the **Annual Aggregate Sublimit**.  Should this **Policy's** available **Limit of Insurance** for a peril subject to an **Annual Aggregate Sublimit** in an **Underlying Policy** drop down over an exhausted limit of insurance provided by an **Underlying Policy**, the coverage provided under this **Policy** for **Covered Loss** caused by or resulting from such peril is subject to deduction of an amount equal to the deductible applicable to the **Lead Insurance Policy**.

ART100-002-250215

© 2015 Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000079

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

24. **EXCLUSIONS CLAUSE:**

If the following perils or insurance coverages are <u>not</u> excluded in the **Lead Insurance Policy**, the following exclusionary language does apply to the insurance we provide under this **Policy**, and this insurance will not apply to any **Covered Loss** or any payments of any kind that may arise out of:

A. <u>Nuclear, Chemical or Biological</u>

Nuclear reaction or radiation, or radioactive contamination, however caused.  But if loss or damage by fire results, we will pay for that **Covered Loss**.

It is agreed that this Insurance excludes **Covered Losses** of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto.

B. <u>Pollution Contamination</u>

The release, discharge or dispersal of Pollutants unless the release, discharge or dispersal is itself caused by any of the Specified Causes of Loss.

As used in this Exclusion, the term "Pollutants"**,** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

As used in this Exclusion, "Specified Causes of Loss" means loss or damage caused by or resulting from the following:

(1) Building glass breakage.

(2) The actual, abrupt falling down of a building or part of a building. A collapse occurs only when a building or part of a building has actually and abruptly fallen down. Collapse does not include a threat of collapse, even if collapse is imminent, and collapse does not mean a condition of a building including cracking, bulging, sagging, bending, shifting, leaning, settling, shrinkage, or expansion, that could lead to or contribute to its actual, abrupt falling down.

(3) Explosion, including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.  This cause of loss does not include loss or damage by:

(a) Rupture, bursting or operation of pressure relief devices; or

(b) Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water.

(4) Falling objects.

(5) Fire, lightning, or smoke.  Smoke must cause sudden and accidental loss or damage and does not include smoke from agricultural smudging or industrial operations.

(6) Leakage from fire protection equipment, meaning leakage or discharge of any substance from fire protection equipment, including collapse of a tank that is part of the system.

© 2015 Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000080

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

(7) Riot or civil commotion, including:

   (a) Acts of striking employees while occupying the described premises; and

   (b) Looting occurring at the time and place of a riot or civil commotion.

(8) Sinkhole collapse, meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.  This cause of loss does not include:

   (a) The cost of filling sinkholes;

   (b) Sinking, subsidence, or collapse of land into man-made underground cavities; or

   (c) Mine subsidence which is earth movement caused by a failure initiated at the mine level of man-made underground mines, including but not limited to coal, clay, limestone or fluorspar mines.

(9) Theft, meaning any act of stealing; or attempted theft.

(10) Vandalism, meaning the willful and malicious damage to, or destruction of covered property.

(11) Vehicles, meaning the physical contact of an automobile; motorcycle; motor truck; tractor; self-propelled machine; trailer or semi-trailer; aircraft; watercraft; or any similar means of transporting persons or property including an object thrown up by a vehicle.  However, we will not pay for loss or damage caused by or resulting from vehicles you own or operate.

C. Asbestos, Dioxin or Polychlorinated Biphenols

(1) Asbestos, dioxin or polychlorinated biphenols (hereinafter all referred to as "Materials") removal from any good, product or structure unless the asbestos is itself damaged by fire, lightning, aircraft impact, explosion, riot, civil commotion, smoke, vehicle impact, windstorm or hail, vandalism, malicious mischief, leakage or accidental discharge from automatic fire protective system.

(2) Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating such Materials;

(3) Any governmental direction or request declaring that such Materials present in or part of or utilized on any undamaged portion of the insured's property can no longer be used for the purpose for which it was intended or installed and must be removed or modified.

The exception to exclusion C. (1), above, does not apply to payment for the investigation or defense of any loss, damage or any undamaged portion of the insured's property can no longer be used for the purpose for which it was intended.

D. Debris Removal Exclusion

As a result of a **Covered Loss**, we will pay the expense subject to the **Limit of Insurance** to remove debris that has been damaged or destroyed.  However, in connection with the removal of debris, we will not pay the expense to:

(1) Extract contaminants or pollutants from the debris;

(2) Extract contaminants or pollutants from land or water;

© 2015 Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000081

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

(3) Remove, restore or replace contaminated or polluted land or water;

(4) Remove or transport any property or debris to a site for storage or decontamination required because the property or debris is affected by pollutants or contaminants, whether or not such removal, transport, or decontamination is required by law or regulation.

It is a condition precedent to recovery under this insurance that we shall have paid or will pay a **Covered Loss** and that you shall give written notice to us of your intent to claim for the cost of removal of debris or cost to clean up not later than 180 days after the date of such physical loss or damage to your property.

E. Authorities Exclusion

Fines or penalties incurred or sustained by or imposed on you at the order of any government agency, court or other governmental authority arising from any cause whatsoever, and any seizure or destruction of property by order of any government agency, court or governmental authority.  But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this **Policy**.

F. War and Terrorism Exclusion

(1) Regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

(a) war;

(b) invasion;

(c) acts of foreign enemies;

(d) hostilities or warlike operations (whether war be declared or not);

(e) civil war;

(f) rebellion;

(g) revolution, insurrection;

(h) civil commotion assuming the proportions of or amounting to an uprising; or

(i) military or usurped power; and

(j) Terrorism.

(2) This **Policy** also excludes **Covered Losses** of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to (a) through (j), inclusive, above.

(3) If we allege that by reason of this exclusion F, any **Covered Losses** is not covered by this **Policy**, the burden of proving the contrary shall be upon you to demonstrate that coverage under this insurance applies.

(4) For the purpose of this exclusion F, "Terrorism" means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether

ART100-002-250215

Page 10 of 11

© 2015 Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

# PRIMARY & EXCESS PROPERTY CO-INSURING FORM

acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

(5) Notwithstanding the exclusion for Terrorism, if you have elected to purchase **Certified Act of Terrorism** coverage, shown in Part IV of the **Schedule**, and paid the relevant premium, we will pay for **Covered Loss** caused directly or indirectly by a **Certified Act of Terrorism** as follows:

    (a) If a **Certified Act of Terrorism** results in fire, then we will pay for your **Covered Losses** as provided for herein, caused by that fire. Such coverage for fire applies only to direct loss or damage by fire to your property insured under this **Policy**. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements which apply to those forms, or to the Legal Liability Coverage Form, or the Leasehold Interest Coverage Form, or the Net Leasehold Coverage Form.

    (b) Notwithstanding F. (5) (a), above, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed $100 billion in a calendar year and we have met our insurer deductible under the federal Terrorism Risk Insurance Act, as amended, then we shall not be liable for the payment on any portion of the amount such losses that exceeds $100 billion, and in each such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

(6) Application of Other Exclusions

The terms and limitations of any terrorism exclusions, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any **Covered Loss** which would otherwise be excluded under this **Policy**.

[End]

© 2015 Fireman's Fund Insurance Company, Novato, CA. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission

IFCC-C0000083

# Disclosure of Premium and Estimated Premium for Certified Acts of Terrorism Coverage (Pursuant to Terrorism Risk Insurance Act) 145927 01 15

**This Endorsement is attached to and made part of your policy in response to the disclosure requirements of the Terrorism Risk Insurance Act.**

## A. Disclosure of Premium

In accordance with the federal Terrorism Risk Insurance Act, as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act, as amended ("**certified acts of terrorism**"). The portion of your premium attributable to such coverage is shown in the policy Declarations. This premium is based on the rates in effect at the time of policy issuance or policy anniversary and was calculated for the full term of the current policy period.

## B. Disclosure of Federal Participation in Payment of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceed $100 billion.

## C. Cap on Insurer Participation in Payment of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, as amended, then we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

## D. Possibility of Additional or Return Premium

The premium for **certified acts of terrorism** coverage is calculated based in part on the federal participation in payment of terrorism losses as set forth in the Terrorism Risk Insurance Act, as amended. If the federal program terminates or if the level or terms of federal participation change, the premium charge for acts of terrorism as shown in the Declarations of this policy may also change. If this policy contains a Conditional Exclusion, continuation of coverage for **certified acts of terrorism**, or termination of such coverage, will be determined upon disposition of the federal program, subject to the terms and conditions of the Conditional Exclusion. If this policy does not contain a Conditional Exclusion, coverage for **certified acts of terrorism** will continue. In either case, when disposition of the federal program is determined, we will recalculate the premium charge made for those acts of terrorism covered by the Terrorism Risk Insurance Act, as amended, that remain covered by this policy after the disposition of the federal program. We will calculate the premium charge as follows:

1. We will calculate the pro-rated premium shown in the Declarations for **certified acts of terrorism** from the effective date of your policy to the date of expiration or change of the federal program.

---

This Form must be attached to Change Endorsement when issued after the policy is written.
One of the **Allianz Global Corporate and Specialty Insurance Companies** as named in the policy

145927 1-15
2015 Allianz Global Corporate and Specialty Insurance Company All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

IFCC-C0000084

2.  We will calculate the pro-rated premium charge for acts of terrorism that remain covered for the policy period that remains in effect from the expiration or change of the federal Program to the anniversary or expiration date of your policy.

3.  We will add the amount determined in D.1. above to the amount determined in D.2. above. Such premium will be your revised annual premium for coverage for acts of terrorism.

a.  If the revised annual premium determined above is an additional premium, this additional premium may be waived by us for the remainder of the policy term.

b.  If the revised annual premium determined above is a return premium, we will refund this amount to you.

All other terms and conditions of the policy remain unchanged.

IFCC-C0000085

# Important Disclosure Notice  Regarding Terrorism Coverage -  386359  01  15

Insured: Industrial Realty Group, LLC

Producer: AmWINS Brokerage of Illinois, LLC

Policy Number: AMW-150803

Effective Date: 04/15/2016

This notice applies to the type(s) of insurance provided under this policy that are subject to the Terrorism Risk Insurance Act, as amended ("The Act").  You are hereby notified that under The Act, you have a right to purchase insurance coverage for losses arising out of **certified acts of terrorism**, as defined in Section 102(1) of The Act:  The term **certified act of terrorism** means any act or acts that are certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, as amended, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHEN COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM **CERTIFIED ACTS OF TERRORISM** , SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER   A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS.  UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING  ON JANUARY  1, 2016; 83% BEGINNING  ON JANUARY  1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020 OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY   ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM  RISK INSURANCE ACT, AS AMENDED, CONTAINS $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURER'S LIABILITY FOR LOSSES RESULTING FROM **CERTIFIED ACTS OF TERRORISM** WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION.  IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEEDS $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

Our records indicate that you previously accepted our offer of terrorism coverage, which was made at the time we issued our quote. Accordingly, the policy referenced above includes coverage for **certified acts of terrorism**, as defined in The Act. If your policy provides workers compensation coverage, you cannot reject that coverage because applicable workers compensation laws in your state mandate that this coverage be included. No additional action on your part is required at this time.

If you have any questions about this or any other insurance matter, please contact your agent or broker representing the Allianz Global Corporate and Specialty Insurance Companies.

One of the **Allianz Global Corporate and Specialty Insurance Companies** as named in the declaration page of your policy

386359 1-15

IFCC-C0000086

# EXHIBIT 4



# Transcript of Keith Hargan, Corporate Designee

**Date:** May 19, 2022
**Case:** Indiana GRQ, LLC -v- American Guarantee and Liability Insurance Company, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

## Page 1

```
1            IN THE UNITED STATES DISTRICT FOR
             THE NORTHERN DISTRICT OF INDIANA
2                  SOUTH BEND DIVISION

3    - - - - - - - - - - - - -x

4  INDIANA GRQ, LLC,        :

5          Plaintiff,        :

6  v.                 : Cause No.
                        3:21-cv-00227-DRL-MGG
7  AMERICAN GUARANTEE     :
   AND LIABILITY
8  INSURANCE COMPANY,     :
   et al.,
9                          :
          Defendants.      :
10                          :

11   - - - - - - - - - - - - -x

12

13          Deposition of KEITH HARGAN

14     30(b)(6) Corporate Designee for Interstate

15             Fire & Casualty

16             Chicago, Illinois

17          Thursday, May 19, 2022

18             9:01 a.m. CST

19

20

21

22

23  Job No.: 447978
    Pages: 1 - 142
24  Reported By: Beth A. Wakenight,
              B.A., CSR, RPR, CRR
25
```

## Page 2

```
1      Deposition of KEITH HARGAN, held at

2  the offices of:

3          Tribler, Orpett & Meyer P.C.

4          225 West Washington Street

5          Suite 2550

6          Chicago, Illinois 60606

7          312-201-6400

8

9

10

11

12

13

14

15

16     Pursuant to notice, before Beth A. Wakenight,

17  a Certified Shorthand Reporter, Registered

18  Professional Reporter, and Certified

19  Realtime Reporter, in and for the State of

20  Illinois.

21

22

23

24

25
```

## Page 3

```
1            A P P E A R A N C E S

2  ON BEHALF OF THE PLAINTIFF:

3     Mr. Brian G. Friel, Esquire

4     MILLER FRIEL PLLC

5     2445 M Street NW

6     Washington, D.C. 20037

7     202-760-3160

8

9  ON BEHALF OF THE DEFENDANT INTERSTATE FIRE &

10  CASUALTY COMPANY:

11

12     Mr. David E. Schroeder, Esquire

13     TRIBLER, ORPETT & MEYER P.C.

14     225 West Washington Street

15     Suite 2550

16     Chicago, Illinois 60606

17     312-201-6400

18

19

20

21

22

23

24

25
```

## Page 4

```
1  ON BEHALF OF THE DEFENDANTS AMERICAN GUARANTEE

2  AND LIABILITY INSURANCE COMPANY, STARR SURPLUS

3  LINES INSURANCE COMPANY, CHUBB CUSTOM

4  INSURANCE COMPANY, GENERAL SECURITY INDEMNITY

5  COMPANY, AXIS SURPLUS INSURANCE COMPANY,

6  IRONSHORE SPECIALTY INSURANCE COMPANY:

7

8     Mr. Brett Thomaston, Esquire

9     HINSHAW & CULBERTSON LLP

10     151 North Franklin Street

11     Suite 2500

12     Chicago, Illinois 60606

13     312-704-3000

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 5**

I N D E X

WITNESS:  Keith Hargan

EXAMINATION                                    PAGE

By Mr. Friel                                      7


E X H I B I T

(Attached to transcript)

NUMBER    DESCRIPTION                         PAGE

1   IRG's Rule 30(b)(6) Notice of              26
    Deposition of Interstate Fire
    & Casualty Company

2   Allianz policy issued to IRG              60
    Bates IFCC 69 through 86

3   Endorsement to Allianz AmWINS             74
    policy - Bates IFCC 3078

4   PIB TPA Check Request Form                79
    Bates IFCC 928

5   Check of $2,126.70                        81
    Bates IFCC 965

6   Web article/re: Nephila Capital           84

7   E-mail chain - Bates IFCC 4002            88
    thru 4007

8   E-mail chain - Bates IFCC 3589           111
    thru 3592

**Page 6**

9   PIB report of 8/8/19 - Bates IFCC        117
    4267 thru 4269

10  PIB report of 10/1/18 - Bates IFCC       123
    2332 thru 2334

11  PIB report of 7/24/19 - Bates IFCC       124
    1484 thru 1487

12  E-mail chain - Bates IFCC 1652           126
    thru 1654

13  PIB report dated 8/15/19 - Bates         132
    IFCC 4264 thru 4266


E X H I B I T

PREVIOUSLY MARKED

(Attached to transcript)

NUMBER    DESCRIPTION                         PAGE

1   (Thoman) Zurich policy issued             72
    to IRG

**Page 7**

TRANSCRIPT OF PROCEEDINGS

KEITH HARGAN, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. FRIEL:

Q   Mr. Hagan, thank you for being here this morning.  My name is Brian Friel with the firm Miller Friel in Washington, D.C.  We represent the plaintiff in this action, IRG.  You are here as a corporate designee witness under the Rule 30(b)(6); is that correct?

A   I believe that's correct, yeah.

Q   Okay.  That's fine.  I'm sure your -- and your counsel is Mr. David Schroeder?

A   Correct.

Q   Okay.  I'm sure Mr. Schroeder went over some of the rules with you about depositions.  Let me just go over a few and do a little background.  Have you been deposed before?

A   No.

Q   Interesting; I always find it interesting, someone in the claims area not being deposed.

MR. SCHROEDER:  He's not --

THE WITNESS:  I'm an underwriter.

**Page 8**

MR. SCHROEDER:  He's an underwriter.

BY MR. FRIEL:

Q   Okay.  Okay.  That --

A   Almost.

Q   -- explains it.

A   But never all the way.

Q   Okay.  All right.  If I ask any questions today you don't understand, it's confusing, it's run on, and it's complicated, and you're not quite sure what I'm asking, would I -- please tell me that, that you don't understand the question.  I'll do my best to rephrase the question in a way that you can understand; is that fair?

A   Correct.

Q   Okay.  We have one court reporter; two of us; plus counsel, other counsel.  She can only take down one of us at a time.  This is for all of us here.  I just ask that you, myself, other counsel, try our best to let -- if someone is speaking, let that person finish before, you know, you jump in or I jump in; is that fair?

A   Yes.

Q   Okay.  I think Beth will greatly appreciate that.  All right.  Let's launch into it.  Let's go through a little bit of your

9

1 background. You mentioned you're an underwriter,
2 correct?
3 **A Correct, underwriting director.**
4 Q Underwriting director.
5 **A Official title, is -- I do not remember --**
6 **can't remember -- product development**
7 **underwriting. I'd have to go look it up. They**
8 **changed them.**
9 Q Okay.
10 **A Yeah.**
11 Q All right. And actually just prompts me
12 to say: This is not a memory test.
13 **A Okay.**
14 Q So if you can't remember something, date,
15 numbers --
16 **A Okay.**
17 Q -- time period, that's fine. I may follow
18 up and see if I can sort of refresh your memory a
19 little bit.
20 **A Okay.**
21 Q But it's not a memory test.
22 **A Okay.**
23 Q Okay. And you are an underwriter director
24 for what company?
25 **A Interstate Fire and Casualty.**

10

1 Q Okay.
2 **A And other AGCS companies, but that one**
3 **in particular.**
4 Q Okay. And tell me again. What -- what
5 was the parent company, or I think it was the
6 parent company. You gave the acronym?
7 **A AGCS, Allianz Global -- I'm going to choke**
8 **on that -- "A," Allianz Global and Corporate and**
9 **Specialty, AGCS, part of Allianz.**
10 Q And Interstate falls under this Allianz
11 Global --
12 **A Yes.**
13 Q -- you just mentioned?
14 **A It's one of the carriers.**
15 Q Okay. Let me just stop you for a second.
16 You knew where my question was going to go, and
17 you answered it right before I finished.
18 **A Sorry.**
19 Q Don't worry about it. We all do it. Just
20 do your best. Just let me get there.
21 **A All right.**
22 Q All right.
23 THE REPORTER: And if you can speak a
24 little louder for me.
25 THE WITNESS: Sure.

11

1 THE REPORTER: Okay. Thank you.
2 THE WITNESS: Okay.
3 BY MR. FRIEL:
4 Q In addition to Interstate Fire, who else
5 are you affiliated with within this Allianz Global
6 company?
7 **A They have multiple carriers, as most**
8 **companies do. So I can't remember all the names**
9 **of them; but predominantly the business I wrote**
10 **was on Interstate Fire and Casualty, which is a**
11 **nonadmitted carrier.**
12 Q Okay.
13 THE REPORTER: Nonadmitted?
14 THE WITNESS: Correct.
15 BY MR. FRIEL:
16 Q And that's in all 50 states?
17 **A Correct.**
18 Q Okay. I don't need the exhaustive list,
19 but can you remember another one of these
20 Allianz --
21 **A AGR- -- sorry.**
22 THE REPORTER: One of these -- what was
23 the question?
24 MR. FRIEL: Yeah.
25 (Mr. Schroeder and the witness confer,

12

1 outside the hearing of all outside parties.)
2 BY MR. FRIEL:
3 Q Allianz affiliates, so I'll ask it again.
4 I don't need an exhaustive list; but other than
5 Interstate Fire and Casualty, can you tell me
6 any other affiliates of Allianz that you're an
7 underwriting director for?
8 **A AGRUS, the full list of the Fireman's Fund**
9 **carriers that moved over into when Fireman's --**
10 **when Allianz combined AGCS with Fireman's Fund,**
11 **which is -- they're, again, an exhaustive list;**
12 **but the key -- the key markets that we use are**
13 **AGRUS for the admitted and Interstate Fire and**
14 **Casualty for nonadmitted.**
15 Q All right. What's the R? So it's Allianz
16 Global something, Specialty?
17 **A Global Risk.**
18 Q Okay.
19 **A United States.**
20 Q Okay. U.N. (sic), United States?
21 **A Right.**
22 Q All right. Got it. And let's -- how long
23 have you been at Allianz?
24 **A I've been a Fireman's Fund/Allianz**
25 **employee for 20, 21 years.**

13

1  Q So help me with the math. That was about
2  2001, 2002?
3  **A 2001.**
4  Q Okay. And when did you pick up
5  Interstate?
6  **A There again, Interstate was one of the**
7  **multiple carriers used by Fireman's Fund to write**
8  **business in. It was their -- one of their -- and**
9  **their -- their nonadmitted carrier. So when we**
10 **would write nonadmitted business, it generally**
11 **would be on Interstate Fire and Casualty.**
12 Q Could that -- the work you did on behalf
13 of the nonadmitted paper with Interstate, would
14 that have started in 2001, or would it have been
15 a little later in your career there?
16 **A I don't recall using that paper initially,**
17 **so probably ten years into the career.**
18 Q Okay.
19 **A Something like that.**
20 Q 2011-ish, '10?
21 **A '10.**
22 Q '10?
23 **A Probably '10.**
24 Q That's fine. Okay. I have an
25 understanding of admitted versus nonadmitted;

14

1  but why don't you tell me what it means to be
2  nonadmitted in writing -- underwriting a
3  nonadmitted paper?
4  **A Nonadmitted carriers are free of rate and**
5  **form, which allows the carrier to charge and**
6  **provide coverage that isn't filed with each state,**
7  **and rates that are not filed with each state.**
8  Q In order to do that, does that nonadmitted
9  carrier have to establish that there is a lack of
10 market in a certain state that they're sort of
11 addressing, the lack of admitted market?
12 **A That responsibility is with the surplus**
13 **lines broker.**
14 Q Okay. All right. Let's go back. So
15 what was your title when you started in 2001 with
16 Fireman's Fund/Allianz?
17 **A West -- I believe west region HPR manager,**
18 **Highly Protected Risk, HPR.**
19 Q And what type of risk fall under highly
20 protected risk?
21 **A There are property risks that are highly**
22 **engineered.**
23 Q Skyscrapers in Chicago, for example,
24 right?
25 **A Yes.**

15

1      THE REPORTER: I'm sorry. What did you
2  say, "scape"?
3      MR. FRIEL: Skyscrapers --
4      THE REPORTER: Oh, okay.
5      MR. FRIEL: -- as an example.
6  Q And what was your title at the time when
7  you started?
8  **A I think I just said manager.**
9      MR. SCHROEDER: You just asked him that.
10     THE WITNESS: Manager of the western
11 region --
12 BY MR. FRIEL:
13 Q Sorry.
14 **A -- for HPR.**
15 Q Thank you. And when did you change over
16 to the title of underwriting director?
17 **A I don't recall when they changed titles.**
18 **I may have been an underwriting director when I**
19 **was hired.**
20 Q Uh-huh, okay. And within your role as
21 an underwriter director -- and let's -- let's say
22 beginning -- and I hate to put a firm date on it.
23 But say over the last six, seven years, do you
24 manage people within that position?
25 **A In the last six or seven years I do not**

16

1  **manage people.**
2  Q Okay. Did you manage people before at
3  some point?
4  **A Yes.**
5  Q Okay. What year roughly, if you can
6  remember, does it change over?
7  **A 2015.**
8  Q Okay. And explain to me why -- what --
9  that transition of managing people, not managing
10 people, how does that impact what you're doing at
11 Allianz?
12 **A So 2015 was when Allianz folded Fireman's**
13 **Fund into AGCS. And roles changed and positions**
14 **changed -- not all of them, but mine did, from**
15 **an underwriting unit for a nonadmitted for IFC to**
16 **whatever the new title was at AGCS.**
17 Q Okay. And since that change in role of
18 sort of managing people, not managing people,
19 the part over the last -- since 2015, does that
20 mean you're actually doing frontline -- what I
21 call frontline underwriting?
22 **A Yes.**
23 Q Okay. As opposed to someone else doing it
24 and you're supervising it?
25 **A Yes.**

17

1   Q  Okay.  All right.  And does that include
2   underwriting for risk insured by Interstate, you
3   know, since 2015?
4      **A  Yes.**
5   Q  Okay.  And since 2015, if it's more than
6   two people, let me know and I'll break it up.
7   Who do you directly report to in underwriting at
8   Interstate for Interstate paper?
9      MR. SCHROEDER:  I mean, I object to the
10  form of the question because you said: "Who in
11  2015 do you report to," which --
12     MR. FRIEL:  Yeah, I'm not sure, but that's
13  okay.
14  Q  Basically since 2015 on Interstate paper,
15  who has been your direct report in underwriting?
16  If it's more than just a couple people, let me
17  know and I'll break it up a little bit.
18     **A  Who did I report to?**
19  Q  Yeah.
20     **A  Okay.  I reported to David Brown and**
21  **Brian Klepcick.**
22  Q  Sorry.  And give me the first name for
23  Brown, David?
24     **A  David.**
25  Q  David; and who is the second gentleman?

18

1      **A  Brian Klepcick.**
2   Q  Can you spell the last name.
3      **A  K-L-E-P-C-A -- C-I-C-K.**
4   Q  Got it.
5      **A  Yes.**
6   Q  Okay.  Do you currently report to
7   Mr. Klepcick?
8      **A  Mr. Klepcick is a dotted line.  You**
9   **have -- yes.**
10  Q  What you mean by "dotted line"?  Is --
11  sometimes yes, sometimes no, so it may be
12  depending on what risk you're underwriting?
13     **A  I'm trying to find the right word that**
14  **describes that ancillary relationship.  The**
15  **majority of the decisions were through and with**
16  **David Brown.**
17  Q  Okay.  And was Mr. Brown -- David Brown
18  your report with respect to the Interstate policy
19  that was ultimately issued to IRG that's the
20  subject of this litigation?
21     **A  Yes.**
22  Q  Okay.
23     **A  Sorry, yes.**
24  Q  Okay.  Got it.  And you said before we --
25  we went on the record, you currently reside and

19

1   work in Santa Fe, New Mexico, correct?
2      **A  Correct.**
3   Q  And you moved down there and worked down
4   there since 2020, two years?
5      **A  2021.**
6   Q  Okay.  Where were you before that?
7      **A  Sonoma, California.**
8   Q  And how long --
9      **A  Can I clarify?**
10  Q  Yeah.
11     **A  Live or work?**
12  Q  Work.
13     **A  Oh, Petaluma, California.**
14  Q  And that's in Sonoma County?
15     **A  Yes.**
16  Q  And how long did you work in Petaluma,
17  California?
18     **A  Four years.**
19  Q  Where were --
20     **A  In --**
21  Q  Sorry.
22     **A  Including the work-from-home COVID time.**
23  Q  Okay.  Where were you before Petaluma
24  working?
25     **A  Novato.**

20

1   Q  Reno?
2      **A  Novato, California.**
3   Q  Novato, N-O-V-A-T-O?
4      **A  Correct.**
5   Q  Sorry, got it.  Let's go back a little
6   bit.  Have you ever obtained education past high
7   school?
8      **A  Yes.**
9   Q  Okay.  College, university?
10     **A  Yes.**
11  Q  Where was that?
12     **A  University of Southern California.**
13  Q  Okay.  And did you graduate?
14     **A  Yes.**
15  Q  What year was that?
16     **A  1976.**
17  Q  Great; and what was your degree in?
18     **A  Bachelor of science.**
19  Q  Okay.  And is there something in science,
20  like, biology, chemistry?
21     **A  International relations.**
22  Q  Interesting, okay.  Other than a
23  bachelor's degree, any other formal academic
24  degrees since USC?
25     **A  No degrees.**

21

1    Q  Okay.  Certificates, like, in terms of
2  underwriting certificates, things like that,
3  through an association?
4    **A  No.**
5    Q  When did you go -- when did you first
6  start working in the insurance industry?
7    **A  1980.**
8    Q  And where was that?
9    **A  Royal Insurance, Royal Insurance.**
10   Q  Okay.  Was that within underwriting?
11   **A  Yes.**
12   Q  And what about lines?  How long were you
13  there for?
14   **A  Five years.**
15   Q  Okay.  What type of lines did you
16  underwrite at Royal?
17   **A  Property, inland marine and boiler**
18  **machinery.**
19   Q  Okay.
20      THE REPORTER:  Was that inland marine?
21      THE WITNESS:  Correct.
22  BY MR. FRIEL:
23   Q  Okay.  And where did you go after Royal?
24   **A  AIG.**
25   Q  And how long were you at AIG?

22

1    **A  About two years.**
2    Q  So roughly '87?
3    **A  Correct.**
4    Q  And were you also underwriting at AIG?
5    **A  Yes.**
6    Q  Okay.  Same lines, new lines?
7    **A  Property and inland marine.**
8    Q  Not -- not boiler machinery?  Okay.
9    **A  No.**
10   Q  And what about after AIG?
11   **A  Home Insurance.**
12   Q  I haven't heard that name in a long time,
13  yeah.  Was 20 years ago, I think they went under,
14  right?
15   **A  I'd have to really think back on the**
16  **dates.**
17   Q  A while?
18   **A  But it's over 20 years, I believe.**
19   Q  Yeah, I believe that's right.  And how
20  long were you at Home?
21   **A  I was at Home until our line of business**
22  **was assumed by Zurich.**
23   Q  Roughly do you have the year?
24   **A  Ten years.**
25   Q  Okay.  Late '90s?

23

1    **A  Correct.**
2    Q  Okay.  So Zurich takes over that book of
3  business?
4    **A  Correct.**
5    Q  And you then transition over to Zurich?
6    **A  Correct.**
7    Q  How long are you at Zurich?
8    **A  Zurich, would say 12 years.**
9    Q  So it takes you up to Allianz?
10   **A  No.**
11   Q  Is that right?  No?  Okay.  What's between
12  Zurich and Allianz?
13   **A  A start-up company called Pacific Select**
14  **Property.**
15   Q  All right.  Let's back up real quick
16  before we get there.  On Zurich, again,
17  underwriting?
18   **A  Yes.**
19   Q  Same property, inland marine, or did you
20  take on some others?
21   **A  Property, inland marine.**
22   Q  Okay.  And then you leave Zurich and you
23  join -- what's the startup?
24   **A  Pacific Select Property.**
25   Q  And tell me what Pacific Select Property

24

1  is.
2    **A  It is an earthquake-only carrier in**
3  **California, I believe.  If -- I don't know if**
4  **it's still in existence.**
5    Q  Were these what we call sort of
6  CAT bonds?
7    **A  No.**
8       THE REPORTER:  Like, for catastrophe, is
9  that what you're saying?
10      MR. FRIEL:  Yes, C-A-T, all caps.
11      THE REPORTER:  Okay.
12      MR. FRIEL:  But, yes, catastrophe.
13      THE REPORTER:  Okay.
14  BY MR. FRIEL:
15   Q  And were you an underwriter there with
16  Pacific Select?
17   **A  Yes.**
18   Q  How long were you there for?
19   **A  I believe it was four years.**
20   Q  And did you go from there to Allianz?
21   **A  Yes.**
22   Q  Okay.  Is it -- again, I didn't ask you
23  where you were in all these places.  But up until
24  your move work-wise to New Mexico, did all these
25  other positions -- were you working in California

25

1 for all these other employers and positions?
2 **A No.**
3 Q Okay. Which ones were not California?
4 **A Home Insurance.**
5 Q Okay. New York?
6 **A Yes.**
7 Q Okay. All right. Thank you for that.
8 I believe you actually had personal experience
9 with respect to the IRG underwriting; is that
10 right -- for underwriting Interstate policy that
11 was issued to IRG that's at issue in this case;
12 is that correct?
13 **A I'm not sure I understand the question --**
14 Q Yeah.
15 **A -- by "personal."**
16 Q Yeah. Did you actually do any
17 underwriting for the Interstate paper that was
18 issued to IRG that's at --
19 **A No.**
20 Q -- subject -- sorry -- subject of this
21 litigation?
22 **A No.**
23 Q Okay. Did anyone at Interstate, as far as
24 you know, do any underwriting of the Interstate
25 policy for IRG?

26

1 **A No.**
2 Q Okay. I will get back to that. I'm just
3 going to just take care of a few more things.
4 Am I right that you had some personal involvement
5 with respect to the claim process that was going
6 on with the IRG claim?
7 **A I'm not a claims person. I'm the**
8 **underwriting person.**
9 Q Okay.
10 **A So.**
11 Q I understand that. But my question was:
12 Do you recall if you -- do you recall having any
13 involvement at all with respect to the claim?
14 Maybe that's being on some e-mails between some
15 other folks relating to the IRG claim or whatever
16 it is?
17 **A Yes.**
18 Q Okay. All right. And we'll get to that,
19 too. All right.
20    MR. FRIEL: So let's mark our first
21 exhibit. I'll call this Hargan Number 1.
22 Off the record.
23    (Discussion off the record commencing at
24 9:26 a.m. and concluding at 9:26 a.m.)
25    (Exhibit 1 was marked for identification.)

27

1 BY MR. FRIEL:
2 Q Let me show you what's been marked as
3 Hargan Exhibit 1. Let me just ask a broad
4 question. Then we can go from there. You can
5 spend as much time as you like to look at it to
6 answer any questions, Mr. Hargan. Have you seen
7 this document before?
8 **A Yes.**
9 Q Okay. Again, I'm going to go and direct
10 you to a certain page. I'm sure your counsel will
11 instruct you as well. If you need time, take your
12 time. But I'm also telling you that if you need
13 any time to go back and look at any part of a
14 document, please do. I'm just -- you know, so
15 we're not here till 6:00, I'm just trying to --
16 focusing on certain areas. So I'm looking at page
17 four -- actually, the bottom of page three, top
18 of page four. And do you see on the bottom of
19 page three, has Topics For Examination, the
20 header?
21 **A Yes.**
22 Q And you turn the page, and it shows five
23 topics. Do you see that?
24 **A Yes.**
25 Q Okay. Did you review these topics before

28

1 today?
2 **A Yes.**
3 Q All right. What did you do to prepare for
4 your examination today? You spoke with counsel,
5 correct?
6 **A Yes.**
7 Q Okay. Did you speak with any other
8 counsel other than Mr. Schroeder?
9 **A Yes.**
10 Q Okay. Who is that?
11 **A Internal counsel.**
12 Q And who is the internal counsel?
13 **A Paul Tenner.**
14 Q T-E-N-O-R?
15 **A T-E-N-N-R.**
16    MR. SCHROEDER: E-R.
17    THE WITNESS: E-R, sorry.
18    MR. SCHROEDER: T-E-N-N-E-R.
19    THE WITNESS: Thanks.
20 BY MR. FRIEL:
21 Q Okay. Anyone -- any other counsel
22 outside, like Mr. Schroeder, or in-house, like
23 Mr. Tenner?
24 **A Yes, Mike.**
25    MR. SCHROEDER: Mitch Orpett.

29

1     THE WITNESS:  Well, oh, no, I was talking
2  internal.
3     MR. SCHROEDER:  Oh, okay.
4     THE WITNESS:  Mike -- and he's brand-new,
5  just took over.  I don't remember his last --
6     MR. SCHROEDER:  I don't know who he's
7  talking about.
8     THE WITNESS:  Yeah.
9  BY MR. FRIEL:
10    Q  So you think this Mike is an in-house
11  attorney?
12    A  He is in-house attorney, most definitely,
13  yes.
14    Q  Got it.  Got it.  Okay.  If you remember
15  his name later on, just let me know.
16    A  Yeah, I will.
17    Q  All right, no problem.  Other than
18  Paul Tenner and this Mike, anyone else in terms
19  of counsel, like, attorneys?
20    A  Mitch.
21    Q  Okay.  Mr. Schroeder's partner?
22    A  Correct.
23    Q  Fine.  Anyone else?
24    A  No.
25    Q  Okay.  So Paul Tenner, as far as you know,

30

1  is he counsel specifically for Interstate or is
2  it Allianz Global, do you know?
3     A  Allianz Global for AGCS.
4     THE REPORTER:  Can you say that acronym,
5  H, what, CS?
6     THE WITNESS:  AGCS.
7  BY MR. FRIEL:
8     Q  And that is?
9     A  Allianz Global --
10    Q  Corporate --
11    A  -- Corporate and Specialty.
12    Q  My memory.
13    A  Yes.
14    Q  Okay.  Same for this Mike, the other
15  lawyer?
16    A  Yes.
17    Q  Okay.  All right.  Other than those two
18  lawyers, did you speak with any non-lawyers at
19  Allianz?  When I say Allianz -- Interstate -- in
20  preparation for today's deposition?
21    A  No.
22    Q  Okay.  Did you look at any documents
23  before today in preparation for this deposition?
24    A  Yes.
25    Q  Okay.  Did you look at some documents

31

1  Mr. Schroeder provided you?
2     A  Yes.
3     Q  Okay.  Did you look at some documents that
4  you got on your own?
5     A  No.
6     Q  Okay.  And could you tell me approximately
7  how much time you spent reviewing those documents
8  Mr. Schroeder provided you?
9     A  Couple hours maybe.
10    Q  Okay.  Was that this week?
11    A  Yes.
12    Q  Was it yesterday?
13    A  Yes.
14    Q  Okay.  And other than that review --
15  document review session yesterday, fair to say,
16  you didn't do any other document review for this
17  examination?
18    A  Correct.
19    Q  Okay.  Approximately how long did you have
20  conversations?  Were these personal convers- --
21  were these in-person conversations with
22  Paul Tenner or Mike, the other lawyer, or were
23  these by phone?
24    A  By phone.
25    Q  Okay.  Were they together?

32

1     A  No.
2     Q  Okay.  Do you recall how long your phone
3  call -- was it one phone call with each, or was
4  it multiple phone calls?
5     A  Split that up.  You're asking about two
6  separate people.
7     Q  From Paul Tenner, do you think it was one
8  call, a couple calls?
9     A  Two calls.
10    Q  How about Mike?
11    A  One -- one brief call as he took over from
12  Paul.
13    Q  Okay.  Did Paul retire or just Mike took
14  over?
15    A  Mike took over that case.
16    Q  Okay.  That's fine.  All right, no
17  problem.  All right.  So if you go back into
18  Exhibit 1 under Topic One on page four, the topic
19  is "The underwriting of the Interstate policy,
20  including."  Do you see that?
21    A  Uh-huh.
22    Q  And --
23    A  Yes.
24    Q  -- it has A, B, C.  Do you see that?
25    THE REPORTER:  I'm sorry, A is what?

---

33

1 BY MR. FRIEL:
2   Q  And following it, it has three subparts:
3 A, B and C.  Do you see that?
4   **A  Yes.**
5   Q  Okay.  A few minutes ago you mentioned
6 that neither you, nor anyone else at Interstate
7 actually did any underwriting for this particular
8 policy, correct?
9   **A  Correct.**
10   Q  Okay.  So explain to me -- yeah, explain
11 to me for this policy, if there is no underwriting
12 -- let me ask -- let me back up, sorry.
13     Do you rely on outside broker or some
14 agent -- agency of some sort to do the
15 underwriting?
16   **A  Yes.**
17   Q  Okay.  All right.  And who is that?
18   **A  That would be the SRU unit at AmWINS.**
19     THE REPORTER:  What was the name of the
20 company, AmWINS?
21     THE WITNESS:  AmWINS, A-M-W-I-N-S.
22     MR. SCHROEDER:  All caps, I think.
23     THE WITNESS:  It's capital A, small M,
24 capital W, capital "I," capital N, capital S.
25     MR. SCHROEDER:  I stand corrected.

---

34

1 BY MR. FRIEL:
2   Q  Sorry, I may have missed it.  What is the
3 SRU?  What does that mean?
4   **A  I believe that's special risk unit.  It's**
5 **their MGA.**
6     MR. SCHROEDER:  You just love to use
7 acronyms.
8 BY MR. FRIEL:
9   Q  An MGA being a --
10   **A  Managing general agent.**
11   Q  Agent; and do you recall who with this
12 SRU unit at AmWINS actually did the underwriting
13 for this particular policy?
14   **A  No.**
15   Q  Did you speak with anybody at AmWINS to
16 prepare for this examination?
17   **A  No.**
18   Q  You didn't think it was necessary?
19   **A  No.**
20   Q  Why is that?
21   **A  The program has -- has been closed, and**
22 **the people involved are no longer there that I**
23 **know of.**
24   Q  So no one for you to actually pick up the
25 phone and talk to, correct?

---

35

1   **A  Correct.**
2   Q  When you say the program was closed,
3 what's the program that you're talking about?
4   **A  It was the program that IFC entered in**
5 **with AmWINS SRU to underwrite a book of business.**
6   Q  You said IFC, right, Interstate?
7   **A  Correct.**
8     MR. SCHROEDER:  Again with the acronyms.
9 BY MR. FRIEL:
10   Q  Do you recall when the program closed?
11   **A  I believe it was July 1 of 2018.**
12   Q  Do you recall when it started?
13   **A  I believe it was February of 2015.**
14   Q  So roughly three, three-and-a-half years
15 or so?
16   **A  Correct.**
17   Q  Okay.  Do you have the approximate number
18 of policies that SRU underwrote on behalf of
19 Interstate during this time period?
20   **A  The total time period?**
21   Q  Uh-huh, yes.
22   **A  I would be guessing.**
23   Q  Well, let's guess first, and then we'll go
24 from there.
25   **A  Three hundred, 400.**

---

36

1   Q  Okay.  Would all of those -- would all of
2 those three to four hundred -- I'm not locking you
3 into -- I'm just -- it's a number in the hundreds,
4 right?
5   **A  Correct.**
6   Q  Okay.  Doesn't really matter if it's 300
7 or 450, to be honest, or whatever; but it's more
8 than a few, correct?
9   **A  Correct.**
10   Q  Did you work on all of those?
11   **A  No.**
12   Q  Okay.  Did you work on any of them?
13   **A  No.**
14   Q  Who, as far as you know, at Interstate,
15 Allianz, was the -- sort of the lead liaison
16 between Interstate and AmWINS?
17   **A  I was.**
18   Q  For all -- all these deals in that
19 three-and-a-half-year period?
20   **A  Correct.**
21   Q  So I thought you said you had no
22 involvement with AmWINS on this, on these
23 policies?  Let me back up.  Let me ask.  Let me --
24 so as a -- the lead person with AmWINS on this
25 program, what did you do?

37

1     MR. SCHROEDER:  I object to the form of
2  the question.  He wasn't with AmWINS.  He's with
3  Interstate.
4     MR. FRIEL:  It's -- okay, whatever.  It's
5  fine.  I don't think it -- let me rephrase it.
6     Q  What did you do as the lead contact at
7  IRG -- at -- at Interstate with respect to the
8  SRU unit?
9     A  I managed the program on a portfolio
10 level.
11    Q  And what does that mean?  Can you explain
12 that.
13    A  I would do annual audits to ensure they
14 are following underwriting guidelines.  I would
15 take any referrals of anything outside of
16 underwriting guidelines and review and manage
17 the profitability of the program.
18    Q  So let's break those three up one by one,
19 and go through them.  Well, before we do that:
20 Who at the SRU unit did you deal with primarily?
21    A  Alison Oliphant.
22    Q  Anyone else in terms of -- was she the --
23 was she involved with the program the entire
24 three-plus years?
25    A  Yes.

38

1     Q  All right.  Other than Ms. Oliphant,
2  anyone else at AmWINS that you dealt with?
3     A  Yes.
4     Q  Was it more than a few people?
5     A  Yes.
6     Q  Okay.  But Ms. Oliphant was your primary
7  contact at SRU?
8     A  Correct.
9     Q  Okay.  When you say you -- part of your --
10 your role was to do these annual audits to ensure
11 compliance with underwriting guidelines, can you
12 explain what that means.
13    A  A standard underwriting audit of selecting
14 a segment of the book, reviewing the process on a
15 pre-prescribed basis to determine if they're
16 following the rules and process.
17    Q  And did your audits, at any time during
18 the life of this program, find deficiencies with
19 respect to SRU's compliance with underwriting
20 guidelines?
21    A  You rarely do an audit where you don't
22 find some deficiencies.  I have yet to do one
23 with a perfect score.
24    Q  So you did find certain deficiencies,
25 correct?

39

1     A  Yes.
2     Q  And was there any time in the -- in those
3  annual audits that one year was -- in terms of
4  number of deficiencies that were detected --
5  higher than sort of the other couple years?
6     A  No.
7     Q  Okay.  And could you give me -- start with
8  maybe some examples of some of those deficiencies
9  are within the program that you detected.
10    A  Mostly process; for the AmWINS program
11 there was never any high-risk deficiencies.
12    Q  Okay.
13    A  They passed all their audits.
14    Q  Okay.  And when you say "process," what do
15 you mean by "process"?
16    A  Timing of policy issuance, binders,
17 quotes.
18    THE REPORTER:  What was the last one,
19 binders and what?
20    MR. SCHROEDER:  Quotes.
21    THE WITNESS:  Quotes.
22    THE REPORTER:  Quotes, oh.
23    THE WITNESS:  Yes.
24 BY MR. FRIEL:
25    Q  Okay.  Anything else that you remember,

40

1  deficiencies in terms of process?
2     A  Quite honestly I don't remember really
3  any specific deficiencies.  I just wouldn't --
4  couldn't, in all good faith, say that they had a
5  perfect score.
6     Q  Okay.  And when you mention things like
7  policy issuance and binder issuance, does that
8  mean that maybe they weren't getting binders out
9  quickly enough?  And maybe just as an example:
10 You want to get it out within 30 days, or getting
11 it out maybe with a particular risk, like,
12 45 days, and you want to speed it up a bit?  Would
13 that be an example?
14    A  By the way, I'm not saying it happened.
15 I'm just saying:  Would that be an example of what
16 you're talking about with this process?
17    A  Generally, but not at all what you're
18 saying.
19    Q  Okay.  So tell me what it means when you
20 say policy issuance and binder issuance.
21    A  You would never issue a binder 30 days
22 after a binding, is my point.
23    Q  So what do you mean by -- so what did you
24 mean by "binder issuance"?
25    A  A binder -- so did they follow the

41

1 underwriting guidelines in which they would bind a
2 risk similar -- at the similar pricing and terms
3 per the agreement?
4    Q  Okay.  And as opposed to binder issuance,
5 policy issuance is a timing issue because that
6 oftentimes the policies don't come out or aren't
7 issued for weeks, if not months after policy
8 inception, correct?
9    A  Possibly.
10    Q  Okay.  So would one of the process
11 deficiencies be that maybe the underwriting
12 guidelines required SRU to get the policies issued
13 a little quicker next time?
14    A  Correct.
15    Q  Okay.  All right.  And did you work with
16 Ms. Oliphant with respect to these audits?
17    A  Yes.
18    Q  Okay.  Did any of your random -- I think
19 maybe these weren't random -- but you would do
20 selective -- out of the portfolio you would sort
21 of select certain ones to do the audit, correct?
22    A  Correct.
23    Q  And it would be random?
24    A  Correct.
25    Q  Okay.  By chance, did the IRG policy

42

1 come up in any audits?
2    A  I don't recall.
3    Q  Fine, okay.  So let's just go back to
4 number two in terms of what you did managing the
5 program.  You said you would take referrals for
6 anything outside the underwriting guidelines.
7 Do you recall that?
8    A  Correct.
9    Q  What do you mean by that?
10    A  If SRU had a request to do something
11 outside the underwriting guidelines, they had
12 the option to create a referral that would come
13 to me for approval or declination.
14    Q  Okay.  And did this occur during the life
15 of the program?  Would this be presented to you
16 for approval or declin-- you know, for approval?
17    A  Yes.
18    Q  So your answer -- I saw a little bit of
19 body language.  It seems to suggest it wasn't very
20 common?
21    A  It was not common.
22    Q  Can you give an approximate number, how
23 many times they would have come to you for this
24 sort of approval process during the life of the
25 program?

43

1    A  Maybe four or five times.
2    Q  Approved all of them, rejected all of
3 them, or sort of mixed bag?
4    A  I can't recall.
5    Q  Okay.  Do you recall sort of what the --
6 for these four or five, what the request was in
7 terms of going outside the guidelines?
8    A  Not really.
9    Q  Okay.
10    A  It's been quite a few years.
11    Q  That's okay.  When you say "not really,"
12 do you have sort of any sense of --
13    A  Yes.
14    Q  -- as an example?  Go ahead.  What is it?
15    A  Possibly using a lead that wasn't a
16 qualified lead.
17    Q  Okay.  So that being sort of the primary
18 lead carrier on the risk, correct?
19    A  Correct.
20    Q  So in the IRG --
21    A  Well --
22    Q  Go ahead.
23    A  The lead carrier that Allianz -- not
24 Allianz -- that AmWINS was placing with.
25    Q  Okay.  So in this program, am I right

44

1 then, based on what you just said, Zurich -- and
2 when I say Zurich, I'm also talking about -- let
3 me get you -- let's just do American Guarantee and
4 Liability Insurance Company.  Are you familiar
5 with that insurer?
6    A  No.
7    Q  Okay.  Are you familiar with Zurich?
8    A  Yes.
9    Q  Okay.  So you don't know whether this
10 American Guarantee and Liability is in the Zurich
11 affiliate or not?
12    A  No.
13    Q  Was Zurich a lead insurer on this program
14 with AmWINS?
15    A  Yes, but not the only lead.
16    Q  Okay.  I didn't ask that.
17    A  Okay.
18    Q  That's fair.  You're helping me because
19 that's going to be my next question.
20    A  All right, sorry.
21    Q  All right.  But Zurich was one of the
22 leads, correct?
23    A  Yes.
24    Q  Okay.  What other leads were there that
25 you recall on the program?

---

45

1      A   Would be best to define the qualified
2   lead, which would be carriers that had greater
3   lines than our ten percent line.
4      Q   Do you recall what some of those other
5   qualified leads were during the life of the
6   program?
7      A   AIG.
8      Q   Uh-huh.
9      A   Ironshore, Westchester.
10     Q   Westchester being part of Chubb, correct,
11  ACE?
12     A   Correct.
13     Q   Okay.  Any others you can recall?
14     A   There is quite a few.  How many more do
15  you want?
16     Q   Just, well --
17     A   Aspen.
18     Q   Okay.  So you said these are other
19  qualified leads that have a greater than ten
20  percent share in the risk, correct?
21     A   Correct.
22     Q   Okay.  Was there -- was there a situation
23  in the program where there was always one singular
24  primary lead with the majority of the risk, and
25  there could be others that have 12 percent or

---

46

1   20 percent?
2      A   Each account would be unique to itself.
3      Q   Okay, fine, okay.  Of these three/four
4   hundred in the portfolio, any sense of how many
5   of those involved Zurich as the lead?
6      A   No.
7      Q   So you couldn't say 20 percent,
8   50 percent, 80 percent?  You don't know?
9      A   No.
10     Q   Okay.  You couldn't even give a ballpark?
11     A   No.
12     Q   Fine, okay.  And for all of these three to
13  four hundred risks that were part of this program,
14  was Interstate's share ten percent for every
15  single one?
16     A   I believe so.  Qualify that:  Ten percent
17  share of AmWINS' portion of the risk.
18     Q   Explain that to me.
19     A   AmWINS is a wholesale broker.  Their
20  retail broker could also be placing portion --
21  part of the risk.  So AmWINS may not be placing
22  the entire risk.  So our ten percent share would
23  not be ten percent of the entire risk --
24     Q   Okay.
25     A   -- in those cases.

---

47

1      Q   But for the part that AmWINS is placing
2   through this program, the SRU unit, you would take
3   ten percent of that, correct?
4      A   Correct.
5      Q   So, for example, if they -- if AmWINS SRU
6   instructed the entire tower, call it $100 million
7   of total limits, you would take on ten percent?
8      A   Correct.
9      Q   Make it simple:  AmWINS places 80 million
10  of that hundred million, and its retail arm or
11  some other broker places the other 20 -- 20
12  million, you would take ten percent of 80 million,
13  correct?
14     A   Correct.
15     Q   Okay.  Got it.  I would imagine, there is
16  a fair amount of due diligence leading up to this
17  program before you entered into this with AmWINS
18  SRU, correct?
19     A   Correct.
20     Q   Okay.  And obviously there had to have
21  been a -- a comfort level reached by you and your
22  team that in terms of AmWINS' underwriting
23  quality, correct?
24     A   Correct.
25         THE REPORTER:  Underwriting quality, did

---

48

1   you say?
2          MR. FRIEL:  Quality.
3          THE REPORTER:  Oh.
4          MR. FRIEL:  Quality.
5          THE REPORTER:  Oh, quality, sorry, sorry.
6          MR. FRIEL:  Probably not the best word
7   but -- for that.
8      Q   Why did the program close down in July of
9   2018?
10     A   It generally wasn't profitable.
11     Q   Okay.  And it's your third role where you
12  assess the profitability of the program.  Was
13  there any particular year it was profitable or was
14  every year sort of not -- it was not profitable?
15     A   I don't recall.  Years with heavy
16  catastrophes would be least -- less profitable.
17     Q   Okay.  Were there a few major claims that
18  had disproportionate impact on the program, or
19  is it more sort of just an aggregate claim loss
20  history?
21     A   Yes.
22     Q   "Yes" to which one?
23     A   Ask the question again.
24     Q   Okay.  Was the profitability problem -- or
25  the lack of profitability in the program, was it

---

49

1 due to a few catastrophic claims, or was it more
2 a result of sort of an aggregate claim loss
3 history sort of across the portfolio?
4     MR. SCHROEDER: Object to the form.
5     THE WITNESS: You didn't change the
6 question.
7 BY MR. FRIEL:
8     Q I break it down.
9     **A So (inaudible).**
10    Q Were there a number of catastrophic losses
11 within the program's history?
12    **A Yes.**
13    Q Do you remember? And when you say --
14 when I say catastrophic and you answer the
15 catastrophic, can you quantify that?
16    **A I call catastrophic, any catastrophe**
17 **claim.**
18    Q And what is the catastroph- --
19 catastrophic claim? What do you define that as?
20    **A Hurricane, flood, wildfire, tornado, hail.**
21    Q So it's not based on the amount of loss
22 in terms of quantum of dollars. It's based on the
23 covered event, correct?
24    **A That's the way I was defining it.**
25    Q Yeah, okay. So IRG was a flood claim,

50

1 correct?
2     **A Correct.**
3     Q You would consider that a catastrophic
4 claim?
5     **A A catastrophe risk.**
6     Q A catastrophe risk, okay. But not all
7 catastrophe -- not all catastrophe risk are the
8 same in terms of claim dollars, correct?
9     **A Correct.**
10    Q Okay. Is there a certain level that you
11 sort of -- you sort of benchmark if it's over --
12 the loss -- covered loss is over 25 million, sort
13 of treat it differently than under 25? Do you
14 have some sort of benchmark like that?
15    **A I'm not sure on the question, if you're**
16 **asking if we handle claims differently due to the**
17 **size.**
18    Q No, it's a fair point. Thank you. Let
19 me go back to the earlier line of questioning.
20 Within these catastrophe risks that you mentioned
21 -- hail, storm, floods, hurricanes -- were there a
22 few of those that had an outsized negative impact
23 on the book of business?
24    **A Yes.**
25    Q Okay. And what was the quantum of covered

51

1 loss approximately in those that qualify as --
2 with the outsized impact?
3     **A I don't recall specifically for this, but**
4 **it would have been the larger hurricanes that**
5 **occurred during that period.**
6     Q We're talking excess of a hundred million
7 exposure for the -- for a particular program of a
8 risk, not just your share?
9     **A Well below that.**
10    Q 50?
11    **A Well below that.**
12    Q 25?
13    **A For what period or event?**
14    Q For the AmWINS' program of portfolio.
15    **A The entire portfolio?**
16    Q Uh-huh, yes.
17    **A On an annual basis? I guess I'm not**
18 **understanding your question.**
19    Q I'm just trying to get a sense, during the
20 life of this program, this three-plus years.
21    **A Uh-huh.**
22    Q Let me just say it in plain speak. Were
23 there a couple claims that just really stood out
24 in terms of the size of the covered loss that
25 really -- that had a significant impact on the

52

1 profitability?
2     **A Individual claims?**
3     Q Individual claims?
4     **A No.**
5     Q So it was more of an aggregate of the
6 claims in the entire -- across the entire
7 portfolio?
8     **A Correct.**
9     Q Okay. Was there any litigation between
10 Interstate and AmWINS with respect to the program
11 at any point?
12    **A Not to my recollection, no.**
13    Q Okay. If AmWINS in the -- passed all of
14 your audits for underwriting compliance, did
15 you come to some determination of why the
16 profitability didn't meet expectations?
17    **A Again, not sure I understand your**
18 **question, but the numbers pretty much speak for**
19 **themselves.**
20    Q The numbers being how much you paid out?
21    **A Loss ratios.**
22    Q Sure. But doesn't high quality
23 underwriting mitigate that loss, those loss
24 ratios?
25    **A Yes, it can. If you look back for the**

53

1 last six years, property has struggled in the loss
2 ratio areas.
3    Q So you think the -- the negative impact
4 in terms of the loss ratios in this program had
5 to do with more extrinsic factors, like Mother
6 Nature, just bad events like hurricanes and
7 storms, versus something to do with the
8 underwriting process?
9    A I think it had the -- a larger proportion
10 of the issue.
11    Q The extrinsic factors?
12    A Yes.
13    Q Underwriting had some impact on it?
14    A Yes.
15    Q Okay. And why is that "yes"?
16    A You -- you can't really separate the
17 underwriting from the results. I think it was
18 more of a pricing issue than an underwriting
19 issue. Underwrite selects risks and attempts to
20 price risk. And in soft markets that pricing is
21 usually inadequate to the losses that occur.
22    Q Okay. Simple parlance: AmWINS should
23 have been -- AmWINS should have been charging
24 higher premiums, correct?
25    A The industry should have been charging

54

1 higher premiums.
2    Q Which includes AmWINS, correct?
3    A AmWINS is the broker. SRU is the MGA.
4    Q SRU should have been charging higher
5 premiums for these risks, correct?
6    A Well, as -- as a portfolio, yes.
7    Q Okay. Is SRU, as far as you know, owned
8 entirely by AmWINS?
9    A I believe so. I'm not sure of their
10 ownership structure.
11    Q Is it fair to say, though, when you --
12 SRU is the MGA. Would you say -- would you view
13 SRU and AmWINS as being sort of together,
14 affiliated in some way?
15    A Yes.
16    Q Do you have a copy -- I take it there was
17 a -- on this program that we've been talking about
18 that was in effect for three-plus years, I am sure
19 there was some sort of written agreement between
20 Interstate and SRU/AmWINS, correct?
21    A Correct.
22    Q All right. And do you have access to a
23 copy of that agreement?
24    A Yes.
25    Q Okay. Was there only one -- was -- was

55

1 the agreement ever revised at any point during the
2 life of the program?
3    A You mean amended?
4    Q Amended.
5    A Yes.
6    Q Okay. Do you remember, once, twice, more
7 than that?
8    A At least twice.
9    Q Okay. Did you negotiate those amendments
10 with SRU?
11    A Yes.
12    Q Do you recall what those amendments
13 related to?
14    A The first one that I recollect, that
15 I remember is restricting certain classes of
16 business in attempt to improve the results.
17    Q So this would be doing a better job
18 picking your insureds, correct?
19    A Within the underwriting guidelines there
20 were ineligible occupancies, and we adjusted those
21 ineligible occupancies.
22    Q And I'm trying to put it in my plain
23 speak. You got a large industrial commercial
24 building with multiple tenants. There is a
25 certain occupancy level you want in the building

56

1 to take -- to insure that risk. Is that what
2 you're getting at?
3    A No.
4    Q So what are you talking about?
5    A I'm talking about the -- an NAIC code or
6 an SIC code for the entire risk as opposed to
7 individual occupants of a specific building.
8    Q Let me come clean. It means nothing to
9 me. So I want you to explain what you mean by
10 the codes, and entire risk versus some -- you
11 know, explain that, if you can.
12    A Sure. Most -- most all companies have
13 an SIC occupancy code. If you look up the SIC
14 codes, they will explain it as a real estate,
15 insurance, banking, manufacturing, all different
16 types of manufacturing, which -- which allow --
17 which is the -- which we would pull off, say,
18 Dun & Bradstreet, which would be a code.
19    THE REPORTER: Which would be a what?
20    THE WITNESS: We would pull out of
21 Dun & Bradstreet, which assigns SIC or NAIC
22 codes on the overall business of the insured.
23 BY MR. FRIEL:
24    Q And what type of businesses did you
25 identify that you wanted to move away from going

57

1  forward in the program with this amendment?
2  **A Predominantly residential housing.**
3  Q Okay. That was primarily what -- any
4  other type of business sectors that you want to
5  move away from?
6  **A That was added to the list that we had**
7  **already -- there already was a list of eligible**
8  **and ineligible.**
9  Q Okay, fair enough. And this amendment
10 just added to that list?
11 **A Correct.**
12 Q Do you recall anything else that was added
13 other than residential?
14 **A No.**
15 Q Okay. Manufacturing stayed on as
16 an eligible?
17 **A Manufacturing was always ineligible.**
18 Q Always ineligible, okay. And why is that?
19 **A The hazard involved in manufacturing.**
20 Q In terms of fire, explosions, things like
21 that, correct?
22 **A Correct.**
23 Q Okay. Do you know whether the IRG
24 building in South Bend, Indiana, that's the
25 subject of this case, does that fit within

58

1  manufacturing that's ineligible or is that another
2  category of business?
3  **A If it was manufacturing, it should have**
4  **been excluded, from what I've seen, that it's a**
5  **real estate schedule. It was an office building,**
6  **from my memory.**
7  Q So as far as you know, there was no
8  manufacturing going on at that -- at that
9  facility?
10 **A Correct.**
11 Q All right. You're aware there --
12 **A At that -- at that time.**
13 Q At that time?
14 **A Right.**
15 Q Yeah, because historically it was -- it
16 was a big production facility with Studebakers
17 and cars and all that, whether you know that or
18 not. Yeah, but "at that time," meaning when the
19 risk was undertaken and the policies were issued,
20 correct?
21 **A Correct.**
22 Q Yeah. Were you aware -- well, are you
23 aware that there are multiple tenants within this
24 building?
25 **A No.**

59

1  Q So as far as you know, there was no
2  manufacturing. As far as you know, there was
3  no manufacturing that was going on in the building
4  at the time that this risk was taken on, correct?
5  **A That's my assumption or it would not have**
6  **been eligible.**
7  Q Did there come a time at all, since the
8  policy incepted for IRG through the claims process
9  through today, that you've become aware that one
10 or more of the tenants was in the manufacturing
11 business?
12 **A No.**
13 Q Fine, okay. Going back to the program
14 agreement, you said there was at least two
15 amendments that you recall. We talked about the
16 first amendment adding to the ineligible business
17 list. Was the second amendment sort of the same
18 thing, another amendment to that list?
19 **A No, that would have been termination.**
20 Q Termination, okay. Did this
21 program with SRU/AmWINS, did it require Interstate
22 to follow form entirely to the lead insurer on any
23 particular risk?
24 **A No.**
25 Q Okay. So Interstate was free to issue

60

1  its own policy with different terms and conditions
2  that were controlled with respect to any
3  differences between the two policies, correct?
4  **A Correct.**
5  Q Okay. Was that true across the entire
6  portfolio?
7  **A Correct.**
8  Q Okay. And that's reflected in the program
9  agreement that you have a copy of?
10 **A Correct.**
11 Q Okay. All right. Let's go to what we'll
12 mark as Hargan 2.
13     (Exhibit 2 was marked for identification.)
14     MR. SCHROEDER: Are you going to want to
15 refer back to Exhibit 1?
16     MR. FRIEL: I don't think so. Off the
17 record.
18     (Discussion off the record commencing at
19 10:16 a.m. and concluding at 10:16 a.m.)
20 BY MR. FRIEL:
21 Q Okay. Let me show you what's been marked
22 as Hargan Exhibit 2. This is Bates numbered
23 IFCC 69 through 86. Do you see that, Mr. Hargan?
24 **A Yes.**
25 Q Okay. All right. Have you seen this

61

1  document before?
2      A Yes.
3      Q Okay. Fair to say that this is the
4  Allianz policy that was issued to IRG as part of
5  the SRU/AmWINS program?
6      A Yes.
7      Q Okay. All right. The policy number on
8  the "dec" page, first page in the upper left,
9  shows AMW as a prefix with number 150803.
10 Do you see that?
11     A Correct.
12        THE REPORTER: I'm sorry. Can you repeat
13 the number, 150 what?
14        MR. FRIEL: 150803.
15     Q Is it fair to say that the prefix AMW is
16 indicating AmWINS?
17     A Correct.
18     Q Okay. And at the top of the dec -- the
19 dec or declarations page -- dec page -- it says
20 General Declarations, Am- -- AmWINS Property.
21 Do you see that?
22     A Yes.
23     Q Okay. Is this sort of how all the
24 policies within the portfolio would be set up
25 on this sort of paper? Sorry, with this sort of

62

1  -- these markers with respect to AmWINS property
2  and the Am- --- the AMW policy prefix?
3      A Yes.
4      Q Okay. And it indicates in the upper right
5  corner that this is a new policy, not a renewal,
6  correct?
7      A Correct.
8      Q Okay. And couple lines below that it
9  indicates the issuer as Interstate Fire and
10 Casualty Company. Do you see that?
11     A Correct.
12     Q Okay. And this is IFC, and this paper
13 would be not admitted, correct?
14     A Correct.
15     Q Okay. And below on the first page of
16 the dec page, it indicates a total premium of
17 $293,000. Do you see that?
18     A Yes.
19     Q That -- that is a premium paid to -- for
20 this particular policy, correct? Let me back up,
21 bad question.
22        That $293,000 premium, is that the premium
23 that's going to Interstate, AmWINS?
24     A I see a service fee involved in that.
25 So not all of it is premium.

63

1      Q Okay. Taking out the premium -- I'm
2  sorry. Taking out the service fee, is the rest
3  premium?
4      A Correct.
5      Q Okay. Who is receiving that? Is that all
6  Interstate or are you splitting that somehow with
7  SRU? When I say SRU, I mean AmWINS as well.
8      A So there is brokerage commission, yes.
9      Q Okay. That would come off the 293-?
10     A Correct.
11     Q Okay. Do you recall what that commission
12 was with this program?
13     A It varied by account.
14     Q Okay. Okay, fair. Do you recall what the
15 range would be, if there was one?
16     A Zero to 15 percent, I believe we capped it
17 at 15 percent.
18     Q Why would it be zero for a particular
19 account?
20     A If the broker decided to write it for
21 no income, they could do that.
22     Q Okay. Did it happen often?
23     A No.
24     Q Yeah, I wouldn't think so. Okay. Have
25 you turn to page two of the dec page, sort of

64

1  right in the middle.
2      A Uh-huh.
3      Q Shows primary and excess co-insuring form,
4  and then schedule to primary and excess
5  co-insurance form. Do you see that?
6      A Yes.
7      Q Okay. If you turn to the next page, which
8  is the schedule to the co-insurance; part one
9  identifies -- you tell me if this is correct --
10 Interstate's share of the primary layer as of
11 3 million, as of 30 million; is that correct?
12     A Three million, part of 30 million, yes.
13     Q That's your ten percent share?
14     A Correct.
15     Q Okay. And then part two shows, I believe,
16 Interstate taking on 7 million, part of 70
17 million, excess of that 30-; is that correct?
18     A Correct.
19     Q And that's your ten percent share?
20     A Correct.
21     Q So in this particular program for IRG on
22 this policy, you have that ten percent risk at
23 the primary level that you co-share with other
24 underwriters, correct?
25     A Correct.

---

**65**

1    Q  And then you have that same ten percent
2  share in excess layer with other underwriters,
3  correct?
4    A  Correct.
5    Q  Okay.  And the policy period shows
6  April 15, 2016, to April 15, 2017.  Do you see
7  that?
8    A  Um.
9    Q  Under part three?
10    A  Yes.
11    Q  Okay.  So this is -- this policy
12  incepted about nine months or so after the -- nine
13  months into the program agreement with -- with
14  AmWINS, correct?
15    A  Okay.
16    Q  Okay.  I want you to turn to a couple
17  pages.  Actually, the policy form Bates number
18  would be at the bottom right, 73.  It's actually
19  the first page of the policy.  Under Section 1 at
20  the top it says:  "We insure your property."
21  Do you see that?
22    A  Yes.
23    Q  Okay.  And under 1A it says:  "This is
24  following form insurance, which means that this
25  insurance follows all the terms and conditions of

---

**66**

1  the lead insurance policy except as to any terms
2  and conditions of this policy that" -- and then
3  it goes into sub 1 and sub 2.  Do you see that?
4    A  Yes.
5    Q  So is this what you're basically saying
6  before, that you follow form; but if you have
7  differing terms and conditions, your terms and
8  conditions apply to your ten percent risk share?
9    A  Correct.
10    Q  Okay.  And there is nothing -- if I got
11  your testimony correct before:  There is nothing
12  in the program agreement with AmWINS that would
13  somehow override this or in any way?
14    A  Uh.
15    MR. SCHROEDER:  I object to the form when
16  you said "this" and you're pointing to something
17  in the document, which makes it an unclear
18  question.
19  BY MR. FRIEL:
20    Q  Fine.  Is it fair to say that your
21  testimony is that there is nothing in the program
22  agreements, or program agreement with AmWINS, that
23  overrides what's here in this Section 1A of the
24  policy?
25    A  There is nothing in the -- no, the program

---

**67**

1  agreement says (indicating) you have to use this.
2    Q  Okay.  They're consistent with one another
3  in terms of the program agreement and what is
4  reflected in 1A of the policy that we're looking
5  at?
6    A  Yes.
7    Q  Okay.  And you're aware, are you not,
8  that -- let me -- let me ask another question.
9  If you can go to page 7 of 11 of the policy form,
10  Bates number 79, under Section 21 do you see that,
11  several liability clause?
12    A  Yes.
13    Q  Okay.  It says:  "Our liability to you" --
14  which is IRG -- you, being IRG -- "under this
15  policy for covered losses are several and not
16  joint to the coinsurance."  Do you see that?
17    A  Yes.
18    Q  So that means if there is a loss -- you
19  tell me if this is correct.  This is an example.
20  If there is a loss and some other carriers pay a
21  portion of it, you know, you -- your policy may
22  have different language that doesn't require you
23  to make a payment; and you're not sharing their
24  risk, their percentage.  You know, if some
25  other carrier pays, that's on them.  Your

---

**68**

1  responsibilities are separate, independent,
2  correct?
3    A  Correct.
4    Q  Okay.  Okay.  Turning the page under the
5  exclusions section, 24; do you see that?
6    A  Yes.
7    Q  Under B, 24B, there is an exclusion for
8  pollution contamination.  Do you see that?
9    A  Yes.
10    Q  Are you aware of whether Interstate is
11  invoking this particular exclusion with respect
12  to the IRG claim?
13    A  We would be evoking this exclusion to
14  every policy this was issued on.
15    Q  With respect to the IRG claim, are you
16  aware or are you not, of whether Interstate is
17  relying on this particular exclusion to limit its
18  obligations to IRG?
19    A  I would say not limiting it to just that
20  one.
21    Q  Fine, but that one is something you're
22  relying on.  It's not exclusive?
23    A  Yes.
24    Q  Okay.  Are you also -- if you turn the
25  page, as far as you know -- relying on Exclusion C

69

1   under the header Asbestos, Dioxin or
2   Polychlorinated Biphenols, PCBs?
3       **A  Yes.**
4       Q  And underneath there, Exclusion D, Debris
5   Removal Exclusion, are you aware or not of whether
6   Interstate is relying on that particular
7   exclusion?
8       **A  Yes.**
9       Q  So they're relying on all three of these
10  exclusions, correct?
11      **A  Yes.**
12      Q  Did you help put together this particular
13  policy form?
14      **A  Yes.**
15      Q  Okay.  Is this policy form, was it drafted
16  specifically for this AmWINS program?
17      **A  Yes.**
18      Q  Okay.  Was this form used -- when I say
19  "form," of course, information on the dec pages
20  can vary from account to account; but the policy
21  terms and conditions and the policy form itself,
22  was this the form used for all the accounts in
23  the portfolio?
24      **A  I believe so, yes.**
25      Q  Okay.  Do you know a Salvatore Galati at

70

1   AmWINS?
2       **A  Do I know Salvatore Galati?**
3       Q  Yeah, or Sal?
4       **A  Yes, I've met Sal.**
5       Q  Okay.  Do you have an understanding of
6   what his role was with respect to the -- on the
7   AmWINS side?
8       **A  On this particular account?**
9       Q  That's a good question, fine, good
10  clarification.  Let's do just generally for the
11  portfolio, the entire program?
12      **A  No.**
13      Q  And what about this particular claim --
14      **A  No.**
15      Q  -- or policy?
16      **A  No.**
17      Q  Okay.  What recollection do you have of
18  your interactions with Sal with respect to the
19  program?
20      **A  I had -- I don't believe I had any**
21  **interaction with Sal as respects to this program.**
22      Q  Okay.  What about the entire program?  Not
23  just -- when you say "this program," you're not
24  talking about just IRG.  You're talking about the
25  Interstate AmWINS program?

71

1       **A  Correct.**
2       Q  Okay.  So you had -- your interactions
3   with Sal would have been outside of the program
4   agreement?
5       **A  Yes.**
6       Q  Okay.  All right.  Did this policy form,
7   during the life of the three-plus years of the
8   program, this Allianz/AmWINS property policy form,
9   did it ever change for any of the accounts?
10      **A  No.**
11      Q  Okay.  Those three exclusions that we just
12  looked at?
13      **A  Yes.**
14      Q  Are they on every single form that was --
15  policy form that was issued as part of this
16  program, as far as you can recall?
17      **A  Yes.  Again, I haven't looked at every**
18  **single policy issued in the program.**
19      Q  Fair enough.
20      **A  So I couldn't say if it's on all of them.**
21      Q  But you don't recall any specific policy
22  form it was taken out, one or more of those
23  exclusions, correct?
24      **A  No, I do not.**
25      Q  Okay.  All right.  In terms of the overall

72

1   program -- not just this IRG claim and policy --
2   would you ever have occasion to look at the lead
3   policies themselves?
4       **A  Yes.**
5       Q  Okay.  Would you do that every single
6   time?  Would it be your general practice within
7   that program that when AmWINS came to you with a
8   prospect and per their underwriting, that you
9   would actually get a copy of and actually review
10  -- you know, just a custom -- the lead policy?
11      **A  No.**
12      Q  So when would you do that?
13      **A  In an audit.**
14      Q  Okay.
15      **A  In a claim.**
16      Q  Okay, fair enough.  Did you have occasion
17  to look at the lead policy form in the IRG
18  program?
19      **A  I probably did.**
20      Q  Okay.
21      **A  Once the claim came in.**
22      Q  All right.  I'm going to show you what's
23  already been premarked, another exhibit from a
24  different deposition.  Thom- -- this is Thoman --
25  Thoman Number 1, trying to save paper here.

73

1  Let me show you what is the Zurich policy issued
2  to IRG.
3       MR. SCHROEDER: Just off the record.
4       (Discussion off the record commencing at
5  10:34 a.m. and concluding at 10:34 a.m.)
6  BY MR. FRIEL:
7       Q It's a big policy; they always are.
8  Let's break it up. Did you review this policy in
9  preparation -- yesterday, in preparation for
10 today's examination?
11      **A No.**
12      Q Okay. Do you recall looking at it now
13 that you have it in front of you, back at any time
14 during the claim or the underwriting?
15      **A Not during underwriting because I didn't**
16 **underwrite the account.**
17      Q Okay, fair enough. What about the claim?
18      **A I could have at the time of claim.**
19      Q But do you remember doing it?
20      **A No.**
21      Q Okay, fine. Okay. You can turn that
22 over. I may come back to it. I'm going to show
23 you what I'll mark as Hargan Number 3.
24      (Discussion off the record commencing at
25 10:35 a.m. and concluding at 10:36 a.m.)

74

1       (Exhibit 3 was marked for identification.)
2  BY MR. FRIEL:
3       Q Show you what's been marked as Hargan
4  Number 3. Take a look at that. Again, take
5  whatever time you need; but my first question is:
6  Have you seen this document before?
7       **A Not to my recollection.**
8       Q Okay. Do you agree with me, do you not,
9  that it appears to be an endorsement to the
10 Allianz AmWINS' policy that we looked at that's
11 marked as Hargan 2?
12      **A It appears to be, yes.**
13      Q Okay. Could you explain to me, if you
14 can, what is being captured by way of this
15 endorsement?
16      **A It appears it's a quarterly adjustment for**
17 **values and premium.**
18      Q And are you aware that -- that there would
19 be, with the IRG policy, probably like most of
20 the property policies that you've -- per the
21 program, that there would be a statement of
22 values that would be listing the schedule -- the
23 -- the scheduled locations covered by the policy?
24      **A I don't follow your question in that there**
25 **is definitely a statement of values, but define**

75

1  **"scheduled."**
2       Q Okay, fair. And if you look at this
3  Exhibit 3, it actually says under Number One --
4  actually, it's in the top part under Effective
5  Date and under the number -- paragraph, actually,
6  Number One. It says: "The statement of values
7  on file with the company." Do you see that?
8       **A Yes.**
9       Q All right. And then above that under
10 Effective Date has: "Varies, see SOV on file."
11 I assume that's statement of values, correct?
12      **A Correct.**
13      Q Okay. What is a statement of value?
14      **A A statement of values is a listing of the**
15 **locations that would be insured under the program,**
16 **under the policy.**
17      Q And that schedule would also provide
18 what's called TIV, correct, for each location?
19      **A That statement of values would include**
20 **TIV. You're mixing up schedule and statement of**
21 **values, and I have a definition to that.**
22      Q Okay. For statement of values, that has
23 the listing of the locations that would be
24 insured?
25      **A Correct.**

76

1       Q Each one of those locations for the
2  statement of values would actually have a TIV
3  assigned to it, correct?
4       **A Correct.**
5       Q And this endorsement is showing some
6  amendments or changes to the TIV, correct?
7       **A To the total TIV.**
8       Q To the total TIV, okay. You mentioned
9  schedule of locations as a separate document,
10 correct?
11      **A My definition of scheduled locations would**
12 **be a policy that listed every single location on a**
13 **schedule within the policy, which this policy did**
14 **not.**
15      Q Let's break that down a little bit. How
16 is a scheduled locations different than a
17 statement of values?
18      **A Semantics, I would say; but when you look**
19 **at policy structure, a scheduled policy lists on**
20 **the policy every location and its value; where**
21 **this was not a scheduled policy. It's a blanket**
22 **policy.**
23      Q And trying to interpret that answer;
24 you tell me if I've got it right. And a
25 blanket policy -- let me back up for a second.

77

1 A scheduled policy identifies specific locations
2 that are insured, correct?
3 **A And value.**
4 Q And value?
5 **A Correct.**
6 Q And if it's not on the list, it's not
7 insured, correct?
8 **A Correct. And it would only be insured for**
9 **the value scheduled as well.**
10 Q Correct, got that. Whereas a blanket
11 policy, it would cover -- or it could cover sites
12 or locations that aren't specifically listed in
13 any schedule, correct?
14 **A Only under specific coverage; if specific**
15 **coverage in the policy includes that.**
16 Q So things like newly acquired locations,
17 correct?
18 **A Correct.**
19 Q Things like unnamed miscellaneous
20 locations --
21 **A Correct.**
22 Q -- correct? Okay.
23 MR. SCHROEDER: You have to let him finish
24 the question.
25 THE WITNESS: Sorry, sorry.

78

1 MR. SCHROEDER: Even if the last word is
2 "correct."
3 BY MR. FRIEL:
4 Q And, again, with respect -- and this is a
5 blanket policy that we're looking at -- with?
6 **A I'm assuming so, due to this (indicating)**
7 -- having not read this policy (indicating).
8 Q Okay, yeah. And I'll represent to you
9 that the Zurich policy, Thoman Exhibit Number 1,
10 does have within it newly acquired locations, and
11 as well as unnamed miscellaneous locations. And
12 I believe you said a few minutes ago that the
13 statement of values for a blanket policy; that --
14 that form, which would be on file, would be part
15 of the policy, correct?
16 **A The statement of values on file is not**
17 **part of the policy.**
18 Q Okay.
19 **A Is it part of this policy (indicating)?**
20 Q I don't mean physically part of the
21 policy. Would you need to refer to the statement
22 of values in order to properly understand the
23 scope of coverage provided by the policy?
24 **A Yes.**
25 Q So it may not be physically attached, but

79

1 it's incorporated -- I don't want to call it the
2 legal terms. If you had a claim -- I know you're
3 not a claims person. But if a claim comes in,
4 I would imagine one of the first things that the
5 claims adjustor would do at Allianz, or any
6 insurance company, would go pull the statement of
7 values for a blanket policy to see if the location
8 that's in the claim is on that list, correct?
9 **A Correct.**
10 Q Okay. Okay. Helpful, thank you. All
11 right. That's it for 3. Let me show you what
12 we'll mark as Hargan 4.
13 (Exhibit 4 was marked for identification.)
14 BY MR. FRIEL:
15 Q Sorry, okay. Take as much time as you
16 need, but my first question will be probably for
17 every document I show you going forward; but have
18 you seen this document before?
19 **A No.**
20 Q Okay. Are you familiar with this form,
21 not what's in here in terms of the specific
22 information, but this sort of check request
23 coming from -- this check request coming from
24 this company called Peninsula Insurance Bureau?
25 **A Not really.**

80

1 Q Because it's on the claims side, correct?
2 **A Correct.**
3 Q Okay. So I want to bring your attention
4 to -- towards the top under Insurer. And it lists
5 AmWINS FFIC, and then in parens, (Allianz).
6 Do you see that?
7 **A Yes.**
8 Q Is that, I take it FFIC is -- what is
9 FFIC, if you know?
10 **A Fireman's Fund Insurance Company.**
11 Q Okay. So am I right that then this has
12 nothing to do with your program with AmWINS?
13 **A Say that again.**
14 Q You say it's Fireman's Fund?
15 **A Correct.**
16 Q This is not relating to Interstate,
17 correct?
18 **A Interstate is one of the carriers for**
19 **Fireman's Fund.**
20 Q And Fireman's Fund being the admitted
21 paid --
22 **A Fireman's Fund being the holding company**
23 **with admitted and nonadmitted carriers.**
24 Q Sorry, I got that. All right. So is
25 it -- based on what you're looking at, if you

81

1  can -- if you can answer the question by just
2  looking at this. Does this appear to be related
3  to your program within AmWINS with respect to IRG?
4  **A  Yes.**
5  Q  Okay. All right. That's fine. That's
6  it for that. Show you what we'll mark as
7  Hargan 5.
8  (Exhibit 5 was marked for identification.)
9  BY MR. FRIEL:
10 Q  Okay. Show you what's been marked as
11 Exhibit 5; has a Bates number IFCC 965. And while
12 you're doing that, the prior Exhibit 4, Bates
13 number is IFCC 928. All right. I'm quite certain
14 you haven't seen this particular check before; is
15 that fair?
16 **A  That's fair.**
17 Q  And I'm not showing it to you for that
18 purpose. What I am showing it to you, the
19 purpose is, the check is written -- the payer is
20 identified as AmWINS Allianz -- I'm not sure I'm
21 going to pronounce it right -- Nephila?
22 **A  Correct.**
23 Q  Art, and has a number. Do you see that?
24 **A  Yes.**
25 Q  It says:  Care of Peninsula Insurance

82

1  Bureau. Do you see that?
2  **A  Yes.**
3  Q  All right. Let's break that down. Do you
4  know who Peninsula Insurance Bureau is?
5  **A  Yes.**
6  Q  All right. Who are they?
7  **A  They are the TPA that handles the claims**
8  **for this program.**
9  Q  Okay. And are they a co- --- did they sign
10 on to the program agreement that we talked about a
11 little while ago this morning?
12 **A  No.**
13 Q  Do you have a separate agreement with them
14 with respect to their TPA responsibilities for
15 this program?
16 **A  Yes.**
17 Q  Okay. The check also identifies AmWINS --
18 do you see that -- and Allianz?
19 **A  Yes.**
20 Q  All right. Nephila, can you tell me who
21 that is?
22 **A  Nephila is an insurance-linked market.**
23 Q  Anything else?
24 **A  And that's the way I look at it.**
25 Q  Can you explain a little bit, what you

83

1  mean by an insurance-linked market?
2  **A  So they provide capital through a**
3  **reinsurance vehicle for predominantly catastrophe**
4  **perils -- perils.**
5  Q  Did they invest in all the accounts in the
6  portfolio with AmWINS or only certain of them?
7  **A  Define "invest."**
8  Q  Capital, you said they provide capital?
9  **A  Right.**
10 Q  Right. Through a reinsurance vehicle?
11 **A  Correct.**
12 Q  What is a reinsurance vehicle?
13 **A  It's a reinsurance treaty.**
14 Q  What's it called?
15 **A  That's what it's called.**
16 Q  Who is it between?
17 **A  It would be -- that reinsurance treaty**
18 **would be between ART and Nephila.**
19 Q  Okay. And who is ART?
20 **A  Allianz Risk Transfer.**
21 Q  Maybe you can -- if you can explain to me.
22 Interstate, as part of this program with AmWINS,
23 takes on ten percent of the AmWINS portion of a
24 risk, correct?
25 **A  As per the agreement, depending on all the**

84

1  specifics that go along with the agreement.
2  Q  Okay. How does then this Nephila Art
3  treaty, reinsurance treaty, come into that? How
4  does that all work?
5  **A  It's part of the reinsurance for that**
6  **program.**
7  Q  They're reinsuring your ten percent,
8  correct?
9  **A  They are reinsuring a portion of the**
10 **specific perils of the 10 percent.**
11 Q  Fine, thank you. What type of perils, if
12 you recall, did they reinsure?
13 **A  Catastrophe perils, natural perils.**
14 Q  Hurricane, flood, hail, right, et cetera?
15 **A  Et cetera.**
16 Q  They reinsure your portion of the risk
17 with respect to the IRG program; is that correct?
18 **A  Yes.**
19 Q  Based on this check being paid to
20 McLarens, which is an independent claims adjustor,
21 correct?
22 **A  Yes.**
23 Q  Was there a separate account set up to
24 make payments like this to the claims adjustor and
25 attorneys, for example, you know, supporting a

85

1  claim that -- that was sort of a separate entity
2  called AmWINS Allianz Nephila Art 201412579?
3      A  I don't know.
4      Q  Okay.  And did the reinsurance treaty
5  between Art and Nephila, was that in effect
6  beginning day one with the program on July 1st,
7  2015?
8      A  I'm not sure that's the date, July 1st,
9  2015.
10     Q  Okay, or the date when the program started
11 sometime in 2015, was this reinsurance treaty in
12 effect?
13     A  Yes.
14     Q  Okay.  Stay in effect all the way through
15 the end of the --
16     A  Yes.
17     Q  -- program?  I'm going to show you what
18 we'll mark as Hargan Number 6.
19     A  After this question can we get a "bio"
20 break?
21     Q  Yeah, that's fine.
22     MR. SCHROEDER:  Why don't we do it now --
23 BY MR. FRIEL:
24     Q  Can you make it?
25     MR. SCHROEDER:  -- before he shows you

86

1  the --
2      THE WITNESS:  Okay.
3  BY MR. FRIEL:
4      Q  It's totally -- if you can wait.  I don't
5  want to -- you can go, but it just relates to what
6  we were just talking about.
7      A  Okay.  No, let's do it.  That's fine.  I
8  can --
9      Q  I don't want to push you.
10     A  That's okay, as long as in the next five
11 minutes or so.
12     MR. FRIEL:  Mark it Exhibit 6.
13     THE WITNESS:  Like the water.
14     MR. FRIEL:  Yeah, I know.
15     (Discussion off the record commencing at
16 10:58 a.m. and concluding at 10:59 a.m.)
17     (Exhibit 6 was marked for identification.)
18 BY MR. FRIEL:
19     Q  So I'm showing you what has been marked
20 as 6.  There is no Bates number.  It's actually an
21 article off of the Web, and it's actually a bad
22 copy at the top.  I apologize.  There is some
23 overlapping type.  I just have a very quick
24 question for you on this.  This is an article
25 about Nephila Capital.  And if you go to the

87

1  second paragraph, which is the one that you can
2  actually read in full?
3      A  Uh-huh.
4      Q  It says:  "The arrangement, which had
5  been rumored in the market for some time, is
6  being likened to a follow-form" -- "follow-form
7  facility, whereby Nephila Capital will follow the
8  underwriting of property insurance covers brokered
9  through AmWINS.  Nephila is said to be taking
10 a ten percent share of property deals transacted,
11 with terms set by the lead underwriters in each
12 case."  Do you see that?
13     A  Yes.
14     Q  What is described here in this paragraph,
15 does this support what you just said about the
16 reinsurance treaty, or is this something
17 completely different, as far as you can tell?
18     A  This is a rumor.
19     Q  Okay.  Got that.  Forget the rumor.
20 Call it a rumor.  What about the rest?
21     A  So it is referring to a reinsurance treaty
22 that we have in Nephila on a very rumor basis.
23     Q  In a sense it's saying that Nephila is
24 taking a ten percent share because are they
25 reinsurance -- are they reinsuring -- is that

88

1  reinsuring the full ten percent, your risk?
2      A  No, as I described earlier, specific
3  perils.
4      Q  On specific perils?
5      A  On specific perils.
6      Q  They would reinsure the entire ten percent
7  risk that you take on?
8      A  For specific perils.
9      Q  Yeah, I said that.
10     A  Yes, I mean.
11     Q  Okay.
12     A  It's a -- it's a treaty.
13     Q  Fine, (inaudible) okay.  Take a break.
14 Thank you.
15     (A brief recess was taken commencing at
16 11:01 a.m. and concluding at 11:13 a.m.)
17 BY MR. FRIEL:
18     Q  We're back on the record, Mr. Hargan.
19 I show you what we'll mark as Hargan Number 7.
20     (Exhibit 7 was marked for identification.)
21 BY MR. FRIEL:
22     Q  Take a look at this document.  It's Bates
23 number IFCC 4002 to 4007.  I first want to just
24 direct your attention to one spot, and I'm going
25 to ask you some questions.  If you go to 4006,

89

1  the bottom right, you'll see the number.
2  **A** Yes.
3  **Q** Okay. On the middle of that page you'll
4  see an e-mail -- looks like it's from Jim Shea
5  with Peninsula dated 3/18/2018 at 5:20 p.m.
6  And the recipients are a number of folks,
7  including yourself. Do you see keith.hargan?
8  **A** Yes.
9  **Q** That's you?
10  **A** Yes.
11  **Q** Any reason to believe you did not receive
12  this e-mail?
13  **A** No.
14  **Q** Okay. Did you review this e-mail in
15  preparation for the exam today?
16  **A** No.
17  **Q** Okay. Let's go through a few names.
18  There is also Amanda Gress who is listed?
19  **A** Yes.
20  **Q** Who is Amanda Gress?
21  **A** Amanda Gress was the FFIC claims manager
22  **for the TPA in this program, so there -- so.**
23  **Q** Meaning she was the one who interfaced
24  with Peninsula?
25  **A** Correct.

90

1  **Q** Okay. And was that true for the life of
2  the program, as far as you recall?
3  **A** Yes.
4  **Q** Okay. Is Amanda Gress still at FFIC?
5  **A** No, no.
6  **Q** Why not?
7  **A** Because there is no FFIC; it's now AGCS.
8  **Q** Is she with -- is she with that Allianz
9  affiliate?
10  **A** Yes.
11  **Q** Okay. Allan Hull, do you see that?
12  **A** Yes.
13  **Q** All right. Who is Allan Hull?
14  **A** Allan Hull is Amanda's manager --
15  **Q** Okay.
16  **A** -- who manages all the TPAs for FFIC at
17  **that point.**
18  **Q** Is he still with the Allianz --
19  **A** Yes.
20  **Q** -- in some capacity?
21  **A** Yes.
22  **Q** Okay. Nephila is listed here as well.
23  Do you see that?
24  **A** Yes.
25  **Q** Is it customary to include them in -- as

91

1  far as you recall -- I know you're not a claims
2  person, but in the claims process?
3  **A** For this program, yes.
4  **Q** Sorry, for this program, of course.
5  David Brown, you mentioned before?
6  **A** Yes.
7  **Q** And he was your person you reported to?
8  **A** Correct.
9  **Q** Correct, okay. And it also has MGA as
10  an e-mail address, Operations@art-allianz.com?
11  **A** Yes.
12  **Q** Do you know where that's going or who is
13  receiving that?
14  **A** That is going to the operations team in
15  **Bermuda.**
16  **Q** Okay. And an e-mail from Mr. Shea, do
17  you remember who Mr. Shea is in terms of being
18  at Peninsula?
19  **A** Yes.
20  **Q** Okay. He writes at the bottom of that
21  page that we're looking at: "Hello, Amanda, the
22  broker has requested coverage for disposal of
23  hazardous wastes which are specifically excluded
24  within" -- "within policy." Do you see that?
25  **A** Yes.

92

1  **Q** "The majority of market has agreed to
2  pay." Do you see that?
3  **A** Yes.
4  **Q** Do you recall, looking back at this
5  e-mail, you know, beginning sometime around, you
6  know, mid-March of 2018, this issue surfacing
7  about certain carriers on the program -- including
8  you -- were not covering costs related to
9  hazardous cleanup because of certain exclusions
10  and getting pushback from -- from IRG's broker
11  for those, including yourself; you and a couple
12  other carriers, to change your -- to pay for that
13  hazardous cleanup cost?
14  **A** Could you kind of focus that question a
15  **little more for me.**
16  **Q** Sure, fine. Do you recall at any time
17  the issue coming up of Interstate denying coverage
18  with respect to the cost that would fall under one
19  or more of those sort of pollution contamination
20  exclusions?
21  **A** Yes.
22  **Q** Do you recall at any time IRG, probably
23  through its broker, requesting that Interstate pay
24  for that, those costs?
25  **A** I never had any communication with IRG.

93

1    Q  All right.  That wasn't my question.
2    A  Okay.
3    Q  My question was:  Do you recall at any
4  time during the life of this claim where -- and
5  whether you heard -- I don't care whether you
6  heard it from Amanda or David or anyone really.
7  IRG was trying to get payments from Interstate for
8  what -- what may have fallen under one or more of
9  the pollution contamination exclusions?
10    A  Yes.
11    Q  Can you tell me what you know about that.
12    A  They -- so we declined the claim due to
13  the exclusion.  It was clearly excluded in the
14  policy.  And they asked for us to take -- take
15  another look at it.
16    Q  And?
17    A  And we did.
18    Q  Did you?
19    A  Did I?  Yes.
20    Q  And did you come to a conclusion?
21    A  I came to the conclusion, it was excluded.
22    Q  Okay.  Did anyone disagree on your team
23  with that conclusion?
24    A  No.
25    Q  Okay.  So you took a second look at it.

94

1  You came back and said it's excluded, correct?
2    A  Correct.
3    Q  You personally did, correct?
4    A  Correct.
5    Q  And Interstate, as a corporation, did as
6  well, correct?
7    A  Correct.
8    Q  Okay.  Did there come another time where
9  there was another request to take another look at
10  it, and another round of review occurred?
11    A  Yes.
12    Q  And what happened with that?
13    A  I took it up the chain of command.
14  I had -- I have no authority to pay an excluded
15  claim.
16    Q  So when you say you took it up the chain
17  of authority, who did you reach out to?
18    A  The CUO for ART.
19    Q  The CEO?
20    A  CUO, chief underwriting officer.
21    Q  And who is that?
22    A  Richard Boyd was.
23    Q  And what did -- what did you say to
24  Richard?
25    A  I explained the situation.

95

1    Q  And you explained that you have exclusions
2  that apply to these costs?
3    A  Correct.
4    Q  And did you recommend that Interstate
5  not pay for them?
6    A  Yes.
7    THE REPORTER:  Mr. Boyd was with what
8  company?
9    THE WITNESS:  He's with ART, which is part
10  of Allianz.
11  BY MR. FRIEL:
12    Q  And what's his last name again?
13    A  Boyd.
14    Q  And what did Mr. Boyd say to you that you
15  recall?
16    A  That we would take it under advisement and
17  discuss it, and asked me what options there were.
18  And I gave him the options.
19    Q  And what were the options?
20    A  The options are post-loss policy
21  reformation or an ex-gratia payment.
22    THE REPORTER:  A what payment?
23    THE WITNESS:  Ex-gratia.
24    THE REPORTER:  Can you spell that.
25    THE WITNESS:  I believe it's E-X, dash,

96

1  G-R-A-T-I-A.
2  BY MR. FRIEL:
3    Q  So for the option of post-loss policy
4  reformation, that suggests to me that that option
5  would include actually going in and amending your
6  policy to take out those exclusions, correct?
7    A  Correct.
8    Q  Okay.  I take it, that option was not
9  followed or accepted?
10    A  No, it was not accepted.
11    Q  Okay.  You mentioned this ex-gratia
12  payment.  We'll get to that in a second.  Wouldn't
13  there be a third option, which is:  Don't reform;
14  don't pay ex-gratia; just don't pay?
15    A  Yes.
16    Q  Okay.  Did you present that option, the
17  third option?
18    A  Yes.
19    Q  Was this an in-person meeting with
20  Mr. Boyd?  Was it on the phone?
21    A  Phone.
22    Q  Okay.  Was it only one phone call?
23    A  I don't recall.  It could have been more
24  than one phone call.
25    Q  Do you recall any follow-up, any e-mails

97

1    with Mr. Boyd about this subject?
2    **A  Eventually I would have that in writing**
3    **since it's above my authority.**
4    Q  All right.  I don't believe I've seen that
5    communications.
6    MR. SCHROEDER:  They -- they don't exist.
7    MR. FRIEL:  They don't exist, or you just
8    didn't locate them?  You don't know which one,
9    I take it?
10    MR. SCHROEDER:  I believe it's the former.
11    There was a change in their e-mail system that
12    resulted in the loss of e-mails before a certain
13    date, which would include these e-mails.
14    MR. FRIEL:  Do you have that date cut-off,
15    David Schroeder?
16    MR. SCHROEDER:  Not off the top of my
17    head; I want to say it was August of '18.
18    MR. FRIEL:  We can follow up offline on
19    that.
20    Q  Looking at this exhibit and this e-mail
21    from -- from Jim Shea to you and others, it's
22    dated March 18, 2018.  Do you see that?
23    **A  Yes.**
24    Q  Okay.  Does this help you to recall
25    approximately the time you had this -- these --

98

1    this conversation or conversations with Mr. Boyd?
2    **A  Yes, a little bit, but I don't remember**
3    **the exact dates that those went through.**
4    Q  Okay, yeah.  Leave aside the exact dates.
5    Approximate dates, would it have been around this
6    time?  Would it have been a month or two later?
7    **A  Probably, you know, I would -- I would be**
8    **guessing in a sense.  It would be in the near --**
9    **in the near future of this.**
10    Q  Okay.
11    **A  Right.**
12    Q  Okay.  So there are a number of e-mails
13    if you go -- sort of work your way back to the
14    beginning of this e-mail string that continue
15    between Jim Shea and Amanda Gress.  Do you see
16    that?
17    **A  Yes, I'm looking at the first one here,**
18    **which is dated April 23rd --**
19    Q  Yeah.
20    **A  -- from Amanda which is saying --**
21    Q  Okay.
22    **A  -- that we're still declining coverage.**
23    Q  Yeah.
24    **A  So that would have been a month or so**
25    **after this, yes.**

99

1    Q  Did you have conversations with Amanda
2    about this?
3    **A  Yes.**
4    Q  E-mails with Amanda about this?
5    **A  Possibly.**
6    Q  Okay.  What about Alan Hull?
7    **A  So that's the usual, is Alan and Amanda**
8    **together.**
9    Q  Okay.  And I'm just noting, too -- going
10    to the first page, the one you just mentioned,
11    which is April 23; as far as I can tell, going --
12    working your way through the e-mail string,
13    through the e-mail that we first looked at, which
14    is on 4006 from Jim Shea --
15    **A  Uh-huh.**
16    Q  -- to Amanda, you and others.  I don't see
17    your name on the -- sort of the later e-mails.
18    **A  The earlier ones from -- right?**
19    Q  I think it's working --
20    **A  Which way?  It's working backwards from**
21    **the 23rd.**
22    Q  It's going from March to April, so.
23    **A  From the bottom up.**
24    Q  But, yeah, so I do want to point --
25    **A  Yes.**

100

1    Q  -- that out.  I don't see your name on
2    these --
3    **A  No.**
4    Q  -- on these e-mails.
5    **A  I don't either.**
6    Q  All right.  On the first page, though,
7    at the -- at the bottom with that understanding,
8    Shea writes to Amanda:  "The broker Salvatore
9    Galati has requested an update on status."
10    Do you see that?
11    **A  Yes.**
12    Q  All right.  I believe your testimony
13    before is:  You don't recall speaking to
14    Sal Galati, communicating with Sal Galati in any
15    way on this IRG claim, correct?
16    **A  No.**
17    Q  And I think you even said you don't recall
18    communicate -- don't recall communicating with
19    Sal Galati on any of the program claims?
20    **A  Correct.**
21    Q  Yeah, okay.  All right.  And this is not
22    refreshing your recollection, seeing his name in
23    the context of these e-mails?
24    **A  No.**
25    Q  Okay, fine.  What is an ex-gratia payment?

101

1    **A  An ex-gratia payment is when you make a**
2  **claims payment for business purposes.**
3    Q  And what type of business purposes?
4    **A  Depends on the circumstance.**
5    Q  Okay.  Let's take this circumstance.
6  Do you recall what the business -- next you --
7  this type of payment was made by Interstate
8  ultimately, correct?
9    **A  Correct.**
10    Q  To -- to IRG, correct?
11    **A  Correct.**
12    Q  Do you recall what the business purpose
13  was for that payment?
14    **A  The request from senior leadership at**
15  **AmWINS, and the relationship with AmWINS.**
16    Q  Do you recall why AmWINS wanted this
17  payment made for this claim to this insured?
18    **A  No.  They would like us to pay all the**
19  **claims, I mean.**
20    Q  But you don't pay all the claims, correct?
21    **A  Correct.**
22    Q  So what was it for this claim that got
23  Interstate to make this payment?
24    **A  The request by senior leadership at**
25  **AmWINS to review this one and make a business**

102

1  **consideration.**
2    Q  Did you make payments like that in the
3  program every time AmWINS made that request?
4    **A  No.**
5    Q  So why this one and not others?
6    **A  I don't remember any other requests.**
7    Q  Okay.  That seems a little different than
8  what -- all right.  So you think this is the only
9  request for AmWINS to pay an uncovered claim or
10  uncovered portion of the claim that you recall in
11  the program?
12    **A  Yes, this is the only ex-gratia claim**
13  **payment I remember in the program.**
14    Q  Do you remember who at AmWINS was -- who
15  the senior leadership was that was pushing this
16  at AmWINS?
17    **A  I spoke with Skip Cooper.**
18    Q  Hold on a second.  Who is Skip Cooper?
19    **A  I believe Skip was president of AmWINS at**
20  **that time.**
21    Q  Skip Cooper?
22    **A  Cooper.**
23    Q  Was that a telephone call?
24    **A  Yes.**
25    Q  More than one call?

103

1    **A  Probably two calls.**
2    Q  Do you know when they were?
3    **A  No, I don't recollect.**
4    Q  Would it have been around this time that
5  we're looking at, March, April, sort of mid-2018?
6    **A  It appears due to these e-mails, it would**
7  **have been late April, early May.**
8    Q  Okay.  Did he call you?  Did you call him?
9    **A  Not exactly sure, but -- but I'm pretty**
10  **sure he called me.  And then once the decision was**
11  **made, I called him.**
12    Q  Did you have this -- these two calls?
13  Did you have the first call with Skip Cooper, do
14  you think, before you reached out with the options
15  to Richard Boyd?
16    **A  Yes.**
17    Q  So you would have conveyed your
18  conversation, this request by Skip Cooper, in
19  your conversation with Richard Boyd, correct?
20    **A  Correct.**
21    Q  All right.  And then as part of that,
22  you also laid out these options to Mr. Cooper,
23  correct?
24    **A  To?**
25    Q  Sorry, to Mr. Boyd?

104

1    **A  Correct.**
2    Q  Okay.  What do you recall Mr. Cooper
3  telling you on that first phone call about why
4  he wanted Interstate to make this payment?
5    **A  Because of the difference of our coverage**
6  **in comparison to the panel.**
7        THE REPORTER:  Panel, P-A-N-E-L?
8        THE WITNESS:  Correct.
9  BY MR. FRIEL:
10    Q  Because you had these exclusions but not
11  everybody did?
12    **A  Correct.**
13    Q  But wouldn't that be true for other risks
14  that were being insur-- other accounts or risks
15  that are insuring the program?
16    **A  Yes.**
17    Q  Were there other times on other claims
18  in the program where the other carriers that you
19  co-shared risk with paid, and you didn't pay
20  because of differences in policy terms and
21  conditions?
22    **A  I don't handle the claims.**
23    Q  I know but --
24    **A  Right.**
25    Q  But you're doing this claim, right?

105

1     A  Only because of the -- because ex-gratia
2 or pol- -- post-law policy reformation is an
3 underwriting decision, not a claims decision.
4     Q  Did this come up at any other time on any
5 other account claim?
6     A  Not that I remember.
7     Q  And did you push back with Mr. Cooper and
8 say: Listen, I understand, Skip, you know. We
9 got differences, but that's the way we underwrote.
10 That's the way AmWINS -- that's how we -- that's
11 what our policy says?
12     A  Yes, I would have said that.
13     Q  Because if you want to cover pollution
14 claims, you would have -- would have had those
15 exclusions in the policy, right?
16     A  Correct. We would have left the
17 exclusions off if we wanted to cover pollution.
18     Q  Anyone else other than Skip that you
19 talked to at AmWINS about this?
20     A  Not that I recall.
21     Q  Okay. And then Skip said to you, what:
22 Just do me this one favor?
23     A  Once you start dealing with the
24 presidents, you know it's already over your head,
25 so. I had no authority. So the best I could do

106

1 was say: I can bubble this up.
2     Q  Did you make a recommendation to
3 Rich Boyd?
4     A  I laid out the options.
5     Q  But you didn't make a recommendation of
6 those options?
7     A  I made a recommendation that we do not do
8 post-loss policy reformation.
9     Q  What about ex-gratia payment?
10     A  I left that up to him.
11     Q  And I apologize if I missed it before.
12 Did he tell you what he wanted to do on that call,
13 and make that payment, that ex-gratia payment, or
14 did he call you back -- you know, call you back
15 and have a second conversation? This is Richard
16 Boyd.
17     A  He did not make the decision on the first
18 call.
19     Q  Okay. So at some point he reached back
20 out to you, said: I made the decision, right?
21     A  Correct.
22     Q  He said: I'm going to make -- we're going
23 to make the ex-gratia payment?
24     A  Correct.
25     Q  And then at that point you called

107

1 Stu Cooper?
2     A  Skip.
3     Q  Skip Cooper, sorry.
4     A  I probably called Amanda first. At some
5 point I called Skip.
6     Q  You said: We made a decision. I can tell
7 you that we're going to -- we're going to make the
8 ex-gratia payment?
9     A  Correct.
10     Q  Okay. Did Amanda or Skip or anyone
11 else at -- sorry, not Amanda. Did any -- did
12 Skip Cooper tell you anything other than the fact
13 that you have a difference in your policy terms
14 and conditions on these exclusions; and there's a
15 bit of a gap in the payments that we want you
16 to make these? Any other reason he gave to you
17 to make that payment?
18     A  No.
19     Q  Outside of the program with AmWINS in your
20 career, have you ever been involved with any other
21 ex-gratia payments?
22     A  Yes.
23     Q  Okay. At Allianz?
24     A  Define Allianz.
25     Q  All Allianz.

108

1     A  So that would include my time at
2 Fireman's Fund, which was part of Allianz, but not
3 with that name.
4     Q  Correct.
5     A  Yes.
6     Q  Are we talking, is this fairly common --
7     A  No.
8     Q  -- based on your experience?
9     A  (Witness shakes head.)
10     Q  Okay. So within Allianz, as, you know,
11 laid out by you, are we talking a handful of
12 ex-gratia payments?
13     A  At most, if you mean five.
14     Q  Okay. And you said you also spoke to
15 Amanda, correct?
16     A  Correct.
17     Q  And you spoke to her because she's the
18 one that ultimately was going to convey this to
19 IRG, possibly through the adjustor, McLarens?
20     A  The chain would be that I -- underwriting
21 approves and advises claims. And claims then
22 advises the insured, but in this case would go
23 through the TPA.
24     Q  Yeah, sorry, Peninsula?
25     A  Correct.

---

109

1    Q  Sorry, yeah.  Okay.  Did -- did Skip --
2  do you recall Skip ever telling you:  Hey, Keith,
3  we want to make this payment because you have
4  to follow form to our policy a hundred percent;
5  you can't deviate?
6    A  No.
7    Q  Do you recall anybody at AmWINS ever
8  making that point?
9    A  No.
10   Q  Do you recall anybody at Interstate making
11 that point?
12   A  No.
13   Q  Okay.  Are you aware that there were two
14 other insurers on the program that had what we
15 call pollutions/contamination type exclusions?
16   A  No.
17   Q  Okay.  Let -- so you don't recall anyone
18 ever informing you at any time that either Axis
19 or Ironshore -- other coparticipants in the IRG
20 policy -- had sort of pollution-type policy
21 exclusions in their policies?
22   A  I don't recall.
23   Q  And so you recall whether either one of
24 those insurers -- Axis, Ironshore -- had, like
25 Interstate, declined, and at least initially --

---

110

1  declined coverage for sort of the pollution
2  cleanup cost?
3    A  No, I -- I mean, that's -- that's the
4  claims handling side of it.  So I wouldn't have
5  looked at that.
6    Q  All right.  Again, my question is sort of:
7  I understand, but I'm just asking what you know
8  and don't know.  That's all.
9    A  Yeah.
10   Q  Whether you're an underwriter or claims
11 person or whatever your title is; so I take it
12 then, you're not aware of whether or not Axis
13 and/or Ironshore actually took the position that
14 their initial denials were incorrect because
15 their policies follow Zurich's pol- -- lead --
16 the lead Zurich policy exclusively.  And any
17 discrepancies between the two, the Zurich policy
18 controls?
19   MR. THOMASTON:  Object to the form; you
20 can answer.
21   THE WITNESS:  I -- I didn't see their
22 policies.  I didn't read their claims adjusting.
23 BY MR. FRIEL:
24   Q  You don't recall anybody ever telling you:
25 Amanda or --

---

111

1    A  That --
2    Q  -- David, anyone?
3    A  That -- recall that they did what?
4    Q  Did -- do you recall anybody telling you:
5  Hey, by the way, Keith, Ironshore and Axis just
6  reversed their coverage denials on hazardous
7  waste?
8    A  I don't -- I don't remember hearing that
9  others changed their position.
10   Q  Okay.  And I take it then, you don't
11 recall anybody ever telling you, not only did they
12 change their position, but they actually said
13 their initial positions were incorrect?
14   A  No.
15   Q  Okay.  All right.  Let me show you what
16 we'll mark as Hargan 8.
17   (Exhibit 8 was marked for identification.)
18 BY MR. FRIEL:
19   Q  Why don't you take a look at that,
20 Mr. Hargan, another series of e-mails?  Again,
21 let me just start off and bring your attention
22 to the second page of this string of e-mails.
23 A third of the way down, Amanda Gress, June 28th,
24 2018, to Jim Shea at Peninsula, copying you and
25 others; do you see your name there?

---

112

1    A  Yes.
2    Q  Okay.  Do you recall this e-mail?
3    A  Yes.
4    Q  Did you look at it before as part of your
5  preparation for today's examination?
6    A  I believe so.
7    Q  Okay.  So is it fair to say, looking at
8  this e-mail -- and, sorry, let me -- Bates number
9  is IFCC 3589 through 3592, starting with the
10 e-mail where you're copied on June 28th, 2018.
11 Am I -- am I correct in saying that you would
12 have had access to the e-mails that preceded that
13 e-mail?  So sort of work your way through the end
14 of the document.
15   A  So by -- to the end of the document, if
16 you mean going back to page 3591?  I see I was
17 not copied in on the June 27th e-mail.  So I would
18 not have seen that --
19   Q  How about this?
20   A  -- until it came through if this was all
21 in the same string and part.
22   Q  This is presented to us in this format,
23 you know.  We didn't do this.  So I'm working
24 under the assumption -- it's the way e-mails work,
25 just my own personal experience -- is that you

---

**113**

1 would have received this e-mail, based on
2 June 28th, 2018, which would have given you access
3 to the -- to the earlier e-mails?
4 **A Correct.**
5 Q Okay. That's fair, right?
6 **A Yes.**
7 Q Okay. But in contrast, the e-mail that
8 comes after that June 28th e-mail, the one that
9 begins on the first page of the attachment, you're
10 not on this. You didn't necessarily -- as far as
11 you can tell, you don't know whether you received
12 this at all, this particular one?
13 **A The one on the first page?**
14 Q Page, yeah.
15 **A I did not receive this.**
16 Q Yeah, okay. So just making it, sort of
17 the difference between --
18 **A Yeah.**
19 Q -- how these e-mail streams work. Okay.
20 Do you recall how the $360,000 -- let's classify
21 it, ex-gratia payment was -- was calculated?
22 **A I don't know exactly the full breakdown of**
23 **the claim, as far as all the damages that would**
24 **have accrued up to the various payments.**
25 Q Okay. You don't know exactly. But

---

**114**

1 generally what -- what -- as far as your
2 understanding, what is that payment representing,
3 coverage payment for what?
4 **A From my recollection there -- that there**
5 **was payment for all the nonhazardous portion of**
6 **the flood claim. So we paid a portion of the**
7 **flood claim, and denied the portion of that**
8 **hazardous cleanup. And this -- this ex-gratia**
9 **was to cover that portion that the insured**
10 **provided us at that period of time for that**
11 **portion of the claim.**
12 Q And that portion being the hazardous
13 portion, correct?
14 **A Correct.**
15 Q Okay. So does this indicate that if you
16 have a ten percent share of this program, that
17 those hazardous costs would have totaled
18 $3.6 million?
19 **A Yes.**
20 Q Okay. If you go to the next page,
21 there is an e-mail on the 27th of June from
22 Amanda Gress to Jim Shea.
23     And she writes: "Hi, Jim, I received
24 confirmation to move forward with an ex-gratia
25 payment for the denied portion of this claim due

---

**115**

1 to the pollution exclusion." Do you see that?
2 **A Yes.**
3 Q Okay. Just trying to get some timing
4 here: Does this sort of line out with the idea
5 that you called -- you know, you had your
6 conversation with Rich -- with Skip Cooper, and
7 then you had your conversation with your options
8 and recommendations with Richard Boyd. Richard
9 Boyd called you back, said: We're going to do it.
10 You called back Skip and you say: Call Amanda.
11 She says, "I received confirm-" -- I mean, I know
12 you -- she could be getting confirmation from
13 somebody else as well.
14     But does this sort of line up with, you
15 know, you told her, and probably it was sometime
16 around June 27th, 2018?
17 **A Yes.**
18 Q Okay. It says here on the second
19 paragraph of this June 27th e-mail -- I'm going
20 to just quickly paraphrase. But we're going to
21 pay this 360- for the excluded portion of the
22 claim as an ex-gratia payment or business
23 consideration. Do you see that?
24 **A Yes.**
25 Q All right. Do you recall anybody at

---

**116**

1 Interstate or at Peninsula telling IRG or its
2 adjustor or broker: What is -- what that means,
3 ex-gratia payment or business consideration?
4 Anything -- do you remember any more details about
5 what that means that was conveyed to IRG?
6 **A No.**
7 Q Okay. And I take it, is it -- is it your
8 position that this payment for $360,000 is not
9 an acknowledgement by Interstate that its pol- --
10 that its policy does, in fact, cover pollution and
11 contamination cleanup cost?
12 **A To make sure I answer this correctly:**
13 **It was not an acknowledgement of coverage**
14 **whatsoever.**
15 Q Or an admission of coverage, correct?
16 **A Or admission of coverage.**
17 Q It was a payment made out of the goodness
18 of Interstate's corporate heart, correct?
19 **A Correct.**
20 Q Okay. Okay. That's it for 8. So I'm
21 not going to show you this document, not because
22 I'm hiding anything. I'm trying to save a little
23 time. Looking at a time sheet from Peninsula
24 billing and invoice, that's all. There is a --
25 reference -- well, there is a reference

117

1  from Jim Shea in this billing invoice that he
2  received an e-mail from Amanda advising, they're
3  going to make this payment. But he, Jim Shea,
4  writes: Amanda Gress said that Interstate is
5  going -- I'm paraphrasing -- is going to issue
6  an -- what's called a -- this is quote: an
7  expression payment of $360,000. Have you ever
8  heard that term "expression payment" before?
9    **A No.**
10   Q So you have no idea whether she's using it
11  synonymously with ex-gratia or is it something
12  else?
13   **A Or that Jim made it up.**
14   Q Or, sorry, that Jim made it up, yes. But
15  from your experience you never heard this -- this
16  term "expression payment"?
17   **A No.**
18   Q Okay, fine. Okay. I'm going to show you
19  what's marked as Hargan 9.
20    (Exhibit 9 was marked for identification.)
21  BY MR. FRIEL:
22   Q All right. All right. I'm showing you
23  what has been marked as Hargan Number 9, Bates
24  number IFCC 4260 (sic) to 4263 (sic). And
25  just I'll point something out. You are listed

118

1  as one of the recipients of this document from
2  Peninsula Insurance Bureau dated August 2nd (sic),
3  2018 (sic). Do you see that?
4    **A Yes.**
5    Q All right. I'm going to guess, you did
6  look at this in preparation for today's
7  examination; is that correct?
8    **A No.**
9    Q Okay. Do you recall -- so Peninsula, as
10  you may know, issued a number of report -- maybe
11  let me ask you. Do you know that Peninsula issued
12  a number of status reports to FFIC Interstate
13  related to the claim?
14   **A Yes, that would be standard procedure.**
15   Q Okay. There are some of them -- and we'll
16  go through them, this one and others, where you
17  are listed as a recipient. And there are others
18  where you're not. They're just directed and it
19  just indicates Amanda Gress. Do you know why
20  your name is on some but not others?
21   **A Standard reports out would include, and**
22  **you would see generally the same participants.**
23  **If there is an interaction just between Amanda and**
24  **the PIB adjustor, there was -- there was times of**
25  **back and forth between the claims adjusting team**

119

1  **only and not the underwriting or the operations**
2  **team.**
3    THE REPORTER: PIB, did you say?
4    THE WITNESS: Correct, PIB, Peninsula
5  Insurance Bureau.
6  BY MR. FRIEL:
7    Q Okay. Looking this over, do you recall
8  getting this report dated August 2, 2018?
9    **A No, not really.**
10   Q Do you recall getting any reports from
11  PIB where they identify loss reserves or made
12  recommendation -- and/or made recommendations as
13  to the loss reserves?
14   **A I handle a lot of claims with PIB.**
15  **We have loss reserves on multiple different types**
16  **of claims and requests.**
17   Q Okay. Would that loss reserve
18  information -- or, you know, is it typical for
19  PIB to capture, as part of these -- the type of
20  reports that we're looking at with Number 9?
21   **A They could, yes.**
22   Q Okay. So you'll see that there is a
23  number of redactions; one on page one, a very
24  large redaction on page two, and another one on
25  page three. Do you see that?

120

1    **A Yes.**
2    Q Do you have any understanding of what
3  information would be in that redaction, in those
4  redactions?
5    **A No.**
6    Q Okay. Do you --
7    MR. SCHROEDER: Wait a minute. Your copy
8  is different than mine. You had a huge redaction
9  on the second --
10   MR. FRIEL: You have --
11   MR. SCHROEDER: -- on --
12   MR. FRIEL: You have August 2?
13   MR. SCHROEDER: The Bates number --
14   MR. THOMASTON: This is August 8th.
15   MR. SCHROEDER: Yeah, the Bates number
16  didn't match up either.
17   MR. FRIEL: He's got August 2nd?
18   MR. SCHROEDER: No, he has August 8th.
19   THE WITNESS: I have August 8th.
20   MR. FRIEL: Oh, jeez. Can I see that real
21  quick?
22   THE WITNESS: I don't know.
23   MR. SCHROEDER: Yes, he can see it.
24   MR. FRIEL: Okay. Well, you're on this
25  one. We'll use this one.

121

1    THE REPORTER: Do you want me to re-mark
2 something or --
3    MR. FRIEL: No, no, it's fine. I'm going
4 to make a note for myself.
5    MR. SCHROEDER: Do you want to use this
6 one to -- (indicating)? (Tenders document to
7 Mr. Friel.)
8    MR. FRIEL: Do you mind?
9    MR. SCHROEDER: No, I mean, I think I know
10 what questions you're going to ask, but, yeah.
11    MR. FRIEL: Okay. Sorry about that.
12    MR. SCHROEDER: When you said, there is a
13 huge redaction on the second page, I was, like:
14 No, there isn't.
15 BY MR. FRIEL:
16    Q Let me ask you. This question is going to
17 be an ongoing question as we go through a number
18 of these reports in a few minutes. Do you recall
19 in this particular claim, at least for these
20 reports that you were copied on, having any
21 follow-up where you recall getting in touch with
22 Amanda or somebody at PIB with respect to anything
23 that's in these reports?
24    A No.
25    Q Okay. Again, as we go through these

122

1 reports, if you -- if you see something that
2 refreshes your recollection, say: Oh, no, no,
3 I remember this, and I remember I had a
4 conversation with Amanda or somebody, you know,
5 David Brown or whatever; can you let me know?
6    A Yes.
7    Q Terrific, that's it for -- for 9.
8 Actually, let me go back to -- sorry, let's go
9 back to 9 real quick. On the second page they
10 make mention of -- at the top under the Adjustment
11 category, what they call "engaged counsel, Peter
12 Kanaris." Do you see that? Is that how you
13 pronounce it, Kanaris?
14    MR. THOMASTON: Yes, I believe so.
15    MR. FRIEL: Oh, I should be asking you.
16    MR. THOMASTON: Yes, it is.
17    MR. FRIEL: Sorry, yeah.
18    Q Do you remember having any -- do you know
19 who Peter Kanaris is?
20    A No.
21    Q Do you know who David Heiss is?
22    A No.
23    Q Do you recall at any time Interstate
24 hiring outside coverage counsel with respect to
25 this claim?

123

1    A No.
2    THE REPORTER: Was that Heiss, H-E-I-S-S?
3    MR. SCHROEDER: Yes.
4    MR. THOMASTON: Yes.
5    MR. FRIEL: Yes.
6    Q Okay. That's it for that exhibit.
7    MR. FRIEL: Make sure I get this one
8 right. All right. This will be Number 10.
9    (Discussion off the record commencing at
10 12:03 p.m. and concluding at 12:04 p.m.)
11    (Exhibit 10 was marked for
12 identification.)
13    (Mr. Schroeder leaves the deposition
14 proceedings.)
15    (Discussion off the record commencing at
16 12:04 p.m. and concluding at 12:04 p.m.)
17    (Mr. Schroeder returns to the deposition
18 proceedings.)
19    MR. FRIEL: Dave, we're all finished.
20 He'll just ask -- answer the last few questions.
21    MR. SCHROEDER: Yeah, yeah. Could you
22 read that section back for me, please. (Laughs.)
23    MR. FRIEL: (Laughs.) Okay. Thanks.
24    Q All right. If you look at Number 10,
25 again you'll see on this October 1st, 2018 report

124

1 by PIB --
2    MR. SCHROEDER: I don't have 10.
3    MR. THOMASTON: It's right here.
4    MR. SCHROEDER: Oh, I'm sorry.
5    MR. THOMASTON: That's okay.
6 BY MR. FRIEL:
7    Q You'll see that you're copied?
8    A Yes.
9    Q Do you recall specifically receiving this
10 report for this claim?
11    A No.
12    Q Okay. Again, there are a number of
13 redactions throughout this report on page one and
14 two. Any understanding, what information is in
15 that -- in those redactions?
16    A No.
17    Q Okay. Okay. That's it for 10. Again,
18 I just want to remind you, as we go through these,
19 if you remember maybe you had a conversation with
20 anybody or follow up, please let me know with
21 respect to any of these reports.
22    MR. FRIEL: Mark Exhibit 11.
23    (Exhibit 11 was marked for
24 identification.)
25 BY MR. FRIEL:

125

1    Q So on this Exhibit 11, you'll see that
2 you again are copied on it -- sorry -- dated
3 July 24, 2019. Do you see that?
4    A Yes.
5    Q All right. There is another person on it,
6 which I don't think we've seen the name before, a
7 David Kiel. Do you see that?
8    A Yes.
9    Q Do you know who David Kiel is?
10    A No.
11    Q Okay. And he's with AmWINS, right?
12    A Yes.
13    Q But you don't recall -- don't know who
14 he is; don't recall talking with him?
15    A No.
16    Q Okay. So you'll see throughout the report
17 in the Comments sections, they're talking about
18 this Peter Kanaris again, of a law firm called
19 Kanaris, Stubenvoll and Heiss. Do you see that?
20    A Yes.
21    Q All right. And that name comes up in a
22 couple other places towards the end as well.
23 Looking at it, do you remember having any
24 discussions with anybody about, you know, this
25 particular law firm at this time?

126

1    A No.
2    Q Okay. If you go to the second page,
3 talking about a -- some -- some issues being
4 identified by this law firm or these lawyers
5 at this law firm; talk about the $10 million --
6 right in the middle of the bullet points -- a
7 $10 million flood sub-limit? Do you see that?
8    A Yes.
9    Q Do you recall having any discussions with
10 anyone, either at Interstate or with TPA or
11 anyone, about the $10 million flood supplement for
12 this claim?
13    A No.
14    Q Okay. Okay. That's it, question on that
15 one.
16    MR. SCHROEDER: This pile is getting
17 shorter.
18    MR. FRIEL: Progress.
19    THE WITNESS: Chopping wood.
20 BY MR. FRIEL:
21    Q I'm going to show you what we'll mark as
22 12.
23    (Exhibit 12 was marked for
24 identification.)
25 BY MR. FRIEL:

127

1    Q Take a look at 12. I will tell you, the
2 first page is an e-mail. Sorry, it's Bates
3 number IFCC 1652 to 1654. They are consecutive
4 numbering, but they're two different documents.
5 One is an e-mail, which I don't believe you are
6 on, or two e-mails. And then the other is -- I
7 take it back. Sorry, they do go together, my
8 apologies. It's a string of e-mails. It's just
9 referencing a report. Sorry about that.
10    But if you look on the second page, you'll
11 see that you are one of the recipients of the
12 e-mail from Gary Pettit of PIB. Do you see that?
13    A Yes.
14    Q Okay, which is dated July 24th, 2019, all
15 right. Do you recall receiving this e-mail from
16 Gary Pettit?
17    A No.
18    Q Do you know who Gary Pettit is?
19    A Yes.
20    Q You dealt with Gary Pettit with the
21 program or -- yeah?
22    A He's one of the TPA adjustors. I don't
23 know that I ever dealt directly with him.
24    Q In the e-mail that you received from
25 Gary Pettit to Amanda Gress, I'm not going to

128

1 go through all the names. But if you could, the
2 recipients, and I think -- just go back through
3 my notes -- but are any of these folks who are
4 listed, as far as you know, attorneys, either
5 in-house or outside counsel?
6    A Not that I know; I don't know David Kiel.
7 So I'm not sure who he is.
8    Q All right. But in any case, he's with
9 AmWINS?
10    A Yes.
11    Q Right, okay.
12    A At least that's what it says.
13    Q Yes. But to the extent the other folks --
14 all of whom you know -- as far as you are aware,
15 none of them are attorneys, correct?
16    A I don't believe that Gary Pettit is an
17 attorney. He's the TPA adjustor. I don't know
18 if he's an attorney or not, but he didn't act in
19 that capacity.
20    THE REPORTER: He did or didn't?
21    THE WITNESS: He didn't act in that
22 capacity, yeah, no.
23 BY MR. FRIEL:
24    Q Okay. And no one else, as far as you --
25 as far as you know?

129

1    A  The rest of the names are the standard
2  names that are on most of these.
3    Q  Okay.  So the answer is "no"?
4    A  No.
5    Q  Okay.  And then going back to the first
6  page -- although you're not on it -- again, it's
7  Gary Pettit to Amanda.  You just mentioned that
8  Gary -- and I believe you said Amanda Gress, I
9  don't think you actually -- she's not an attorney,
10  correct?
11    A  No.
12    Q  Okay.  All right.  Thank you.
13    MR. FRIEL:  Let's go and mark this as 13.
14    (Exhibit 13 was marked for
15  identification.)
16  BY MR. FRIEL:
17    Q  Okay.  Another report from PIB dated
18  August 8th (sic), 2019; again, you're one of the
19  recipients.  Do you see that?
20    MR. SCHROEDER:  I think this is the
21  exhibit --
22    THE WITNESS:  This is a duplicate.
23    MR. FRIEL:  Oh, geez.
24    MR. SCHROEDER:  This is the one you got
25  wrong, remember?

130

1    MR. FRIEL:  Yes.  All right.  There it is,
2  popping up.
3    MR. SCHROEDER:  This is Exhibit -- already
4  Exhibit 9.
5    MR. FRIEL:  Yeah.  So let's -- let me take
6  that back, so we don't get confused.  I'll strike
7  this.
8    THE REPORTER:  Strike it?  All right.
9    MR. FRIEL:  Yeah, sorry about that.
10    MR. SCHROEDER:  So, yes, he remembers
11  that.
12    MR. FRIEL:  Ten minutes ago, all right.
13    Q  Can you take back what is Hargan --
14  sorry -- Number 9.  Sorry about that.
15    A  Take it?
16    Q  Just pull it again.  I want you to take a
17  look at it one more time.
18    A  Okay.  Okay.
19    Q  If you go to the second page, again, at
20  the top under Adjustment -- sorry, second page
21  under Adjustment towards the end, actually; it's
22  the last paragraph in that section.  It begins
23  with:  "If you are in agreement with." Do you
24  see that?
25    A  Yes.

131

1    Q  Okay.  A couple lines down, PIB -- I'm
2  trying to think if it's Gary Pettit.  Yeah,
3  Gary Pettit signed this.  Gary Pettit writes:
4  "Considering the underwriting considerations that
5  resulted in the (sic) ex-gratia payment being
6  issued" -- and he goes on with his sentence.
7    My question to you is:  Do you have any
8  understanding of what Mr. Pettit meant when he
9  wrote:  "Considering the," quote, "underwriting
10  considerations that resulted in an ex-gratia
11  payment being issued," close quote?
12    A  Not specifically, but my supposition is
13  that ex-gratias and post-loss policy reformations
14  are underwriting decisions and not claims
15  decisions, as I said earlier.
16    Q  So -- so if I hear your testimony right,
17  what you're saying is, it's your understanding
18  that this term "underwriting considerations" with
19  respect to ex-gratia, most likely would be dealing
20  with the issue of a possible post-loss policy
21  reformation?
22    A  No.
23    Q  Sorry, say -- give me your answer again.
24    A  No.
25    Q  What's your understanding?

132

1    A  My understanding is, I don't know exactly
2  what he meant; but -- but that anything to pay
3  a decline -- an excluded claim becomes an
4  underwriting decision.  Claims goes to
5  underwriting for the decision.
6    Q  Okay.  Thank you.
7    THE REPORTER:  Claims goes to
8  underwriting, what?
9    THE WITNESS:  For the decision.
10    MR. FRIEL:  Okay.  This will be 13.
11    (Discussion off the record commencing at
12  12:17 p.m. and concluding at 12:18 p.m.)
13    (Exhibit 13 was re-marked for
14  identification.)
15  BY MR. FRIEL:
16    Q  Take a look at that.  All right.  You see,
17  that is PIB report dated August 15, 2019.  Do you
18  see that?
19    A  Yes.
20    Q  All right.  And you're listed as one of
21  the recipients, agreed?
22    A  Yes.
23    Q  Okay.  I notice that your e-mail address
24  has changed at this time?
25    A  Yes.

133

1    Q  Okay.  On the second page -- again, I
2  believe this is Gary Pettit.  In the second --
3  under Adjustment header, the second paragraph,
4  Mr. Pettit writes to you and others:  "We have
5  provided a shared link to coverage counsel for
6  access to the PIB electronic claim file."
7  Do you see that?
8    A  Yes.
9    Q  Did you ever -- did you personally have --
10 ever have access to the PIB electronic claim file
11 with respect to this claim?
12   A  Yes.
13   Q  Broadly speaking, what do you recall
14 being -- with respect to this claim, being
15 contained on that electronic claim file?  Like,
16 type of documents, let's do categories.  These
17 type of reports (indicating), would they be in
18 there?
19   A  Yes.
20   Q  Correspondence, e-mails with -- between
21 PIB and the insured and insured's broker?
22   A  Yes, there could be.
23   Q  Okay.  Policies?
24   A  Yes.
25   Q  Okay.  Claim analysis?

134

1    A  Would be in these reports (indicating).
2    Q  Okay.  But outside these reports, no
3  other -- as you recall, no other claim analysis?
4    A  I'm not a claims expert.  So whenever I
5  looked into one of those files, I look specific --
6  for specific documents and not all the rest.
7    Q  Okay.  And then Mr. Pettit writes:
8  "Once we secure a copy of the Interstate Fire and
9  Casualty underwriting file for the policy, we will
10 forward same to coverage counsel."  Do you see
11 that?
12   A  Yes.
13   Q  Do you recall sending that underwriting
14 file to PIB, Gary Pettit?
15   A  I would not have sent it.
16   Q  Would it have been somebody else in your
17 department?
18   A  No.
19   Q  So how else would he have received a copy
20 of that underwriting file?
21   A  I would provide that to internal counsel.
22   Q  Who, in turn, would then provide it to
23 Gary Pettit possibly?
24   A  Possibly, I don't know why the
25 underwriting file would go to claims.

135

1    Q  Does your underwriting file, as far as you
2  recall for the IRG policy, does it contain any
3  communications between you and -- and AmWINS?
4    A  I don't know.
5    Q  It could?
6    A  It could.
7    Q  Okay.
8      MR. FRIEL:  All right.  So I think I'm
9  finished, but just give me a minute to --
10     MR. SCHROEDER:  Sure.
11     MR. FRIEL:  -- look at my notes.
12     MR. SCHROEDER:  While you're doing that,
13 do you have any questions?
14     MR. THOMASTON:  None.
15     MR. SCHROEDER:  I have none.
16 BY MR. FRIEL:
17   Q  Okay.  I have one quick -- really quick
18 follow-up.  I may have asked this question in a
19 slightly different form.  I just can't recall,
20 so my apologies in advance if I did.
21     But one of the topics in the deposition
22 notice under number two is:  "The negotiations
23 among IRG, AmWINS, and Interstate for the removal
24 of the pollution exclusion in the Interstate
25 policy."  My question to you on that topic is:

136

1  At any time during the life of the program
2  agreement with AmWINS -- the three-plus years it
3  was in place -- either leading up to the agreement
4  being, you know, initially executed and started,
5  and then through the life of the program, was
6  there any discussion between you and AmWINS or
7  any AmWINS affiliates, you know, about dropping
8  your pollution exclusions and your policies that
9  would be part of the program?
10   A  No.
11   Q  (Inaudible) you said negotiations.  Was
12 there any request ever made?
13     THE REPORTER:  I'm sorry.  Can you repeat
14 that.
15 BY MR. FRIEL:
16   Q  Was there ever any request made by AmWINS
17 or anyone else that you revise your policy form to
18 delete those pollution contamination exclusions?
19   A  Not to my recollection.
20   Q  Again, I know I probably asked this in a
21 slightly different form.  I'll just do it one
22 more time, so I make sure I got it right.  Is it
23 correct then, if I recall, that you don't recall
24 anyone at AmWINS telling you that your policy
25 exclusions on contamination and pollution don't

137

1 apply in the program? Let me back that up.
2     Do you recall anyone at AmWINS telling
3 you that those pollution contam- -- contam- --
4 contamination exclusions do not apply with respect
5 to the -- the policy issued -- policies issued --
6 your policy issued to IRG?
7     **A No.**
8     Q Do you ever recall anyone else other than
9 AmWINS -- like, IRG's broker or anyone else --
10 telling you that your policy exclusions don't
11 follow form; therefore, they're inapplicable with
12 respect to this account?
13     **A I had no contact with the insured or their**
14 **retail broker or their wholesale broker.**
15     Q And I didn't limit the question to them.
16 I said "them, plus anyone else"; AmWINS, the
17 broker, or anyone else?
18     **A I -- so ask it again. So you're making it**
19 **really broad. I want to make sure I say "yes" or**
20 **"no" correctly.**
21     Q (Inaudible) AmWINS -- did anyone else --
22 anyone ever tell you or anybody at Interstate
23 Allianz, that your policy exclusions in the IRG
24 program don't follow form; therefore, they're
25 inapplicable?

138

1     **A No, I --**
2     MR. SCHROEDER: I object to the form of
3 the question. How would he possibly know what
4 other people told other people at Interstate?
5     THE WITNESS: I was going to say.
6     MR. SCHROEDER: I mean, feel free to ask
7 him what he knows but --
8     MR. FRIEL: Yeah, fine.
9     Q So are you aware of anyone -- AmWINS,
10 IRG's broker, anyone -- making the point to you
11 that your policy exclusions don't follow form;
12 therefore, they don't apply?
13     **A No.**
14     Q Do you recall anyone telling you -- anyone
15 at Interstate telling you that someone told them
16 that, and they -- you know, that's, communication
17 was made to them and they told you about it?
18     **A No.**
19     Q Okay. Okay. All right. Was the SRU unit
20 the MGA in the program, your MGA?
21     **A Yes.**
22     Q Okay. I'm done.
23     MR. FRIEL: You're good?
24     MR. THOMASTON: Good.
25     MR. FRIEL: Okay.

139

1     MR. SCHROEDER: I'm good. We'll reserve
2 signature.
3     THE REPORTER: Okay. Are you ordering --
4 ordering the transcript?
5     MR. FRIEL: I am.
6     THE REPORTER: Okay.
7     MR. SCHROEDER: I'll take a copy.
8     THE REPORTER: Okay.
9     MR. THOMASTON: Not -- not for us.
10     THE REPORTER: Okay. What specifically
11 did you want to get: etran, condensed, full size?
12     MR. FRIEL: Yeah, condensed, full size.
13     THE REPORTER: Okay.
14     MR. SCHROEDER: I'll take the same.
15     THE REPORTER: Okay. Just PDF or ASCII?
16     MR. SCHROEDER: I like PDF.
17     MR. FRIEL: Yeah, PDF, same.
18     THE REPORTER: Do you want a copy of
19 exhibits attached PDF?
20     MR. FRIEL: Yes.
21     MR. SCHROEDER: Uh-huh, yes.
22     THE REPORTER: Regular delivery, is that
23 okay?
24     MR. FRIEL: Regular is fine.
25     THE REPORTER: He's doing regular

140

1 delivery. Is that okay with you?
2     MR. SCHROEDER: Yeah, that's fine.
3 There's no rush.
4     (Proceedings concluded at 12:31 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

141

CERTIFICATE OF COURT REPORTER

I, Beth A. Wakenight, Certified Shorthand
Reporter No. 084.003605, B.A., CSR, RPR, CRR, for
the County of Kane, State of Illinois, the officer
before whom the foregoing deposition was taken, do
hereby certify that the foregoing transcript is a
true and correct record of the testimony given;
that said testimony was taken by me
stenographically and thereafter reduced to
typewriting under my direction; that reading and
signing was requested; and that I am neither
counsel for, related to, nor employed by any of
the parties to this case and have no interest,
financial or otherwise, in its outcome.
Dated this 1st day of June, 2022.

*Beth A. Wakenight*
_____
BETH A. WAKENIGHT, CSR/RPR/CRR
CSR No. 084.003605

142

ACKNOWLEDGMENT OF DEPONENT
I, KEITH HARGAN, do hereby
acknowledge that I have read and examined the
foregoing testimony and the same is a true,
correct, and complete transcription of the
testimony given by me and any corrections appear
on the attached errata sheet signed by me.

_____  _____
(SIGNATURE)            (DATE)

## A

**a-m-w-i-n-s**
33:21
**about**
7:18, 10:19,
13:1, 21:12,
22:1, 22:10,
29:7, 32:5,
32:10, 35:3,
40:16, 44:2,
54:17, 56:4,
56:5, 59:15,
65:12, 70:13,
70:22, 70:24,
73:17, 82:10,
86:6, 86:25,
87:15, 87:20,
92:7, 93:11,
97:1, 99:2,
99:4, 99:6,
104:3, 105:19,
106:9, 112:19,
116:4, 121:11,
125:17, 125:24,
126:3, 126:5,
126:11, 127:9,
130:9, 130:14,
136:7, 138:17
**above**
75:9, 97:3
**academic**
20:23
**accepted**
96:9, 96:10
**access**
54:22, 112:12,
113:2, 133:6,
133:10
**account**
46:2, 63:13,
63:19, 69:20,
70:8, 73:16,
84:23, 105:5,
137:12
**accounts**
69:22, 71:9,
83:5, 104:14

**accrued**
113:24
**ace**
45:11
**acknowledge**
142:3
**acknowledgement**
116:9, 116:13
**acknowledgment**
142:1
**acquired**
77:16, 78:10
**acronym**
10:6, 30:4
**acronyms**
34:7, 35:8
**across**
49:3, 52:6,
60:5
**act**
128:18, 128:21
**action**
7:10
**actually**
9:11, 16:20,
25:8, 25:16,
27:17, 33:7,
34:12, 34:24,
65:17, 65:18,
72:9, 75:3,
75:4, 75:5,
76:2, 86:20,
86:21, 87:2,
96:5, 110:13,
111:12, 122:8,
129:9, 130:21
**added**
57:6, 57:10,
57:12
**adding**
59:16
**addition**
11:4
**address**
91:10, 132:23
**addressing**
14:11
**adjusted**
55:20

**adjusting**
110:22, 118:25
**adjustment**
74:16, 122:10,
130:20, 130:21,
133:3
**adjustor**
79:5, 84:20,
84:24, 108:19,
116:2, 118:24,
128:17
**adjustors**
127:22
**admission**
116:15, 116:16
**admitted**
12:13, 13:25,
14:11, 62:13,
80:20, 80:23
**advance**
135:20
**advised**
108:21
**advisement**
95:16
**advises**
108:22
**advising**
117:2
**affiliate**
44:11, 90:9
**affiliated**
11:5, 54:14
**affiliates**
12:3, 12:6,
136:7
**after**
21:23, 22:10,
40:22, 41:7,
65:12, 85:19,
98:25, 113:8
**again**
10:4, 12:3,
12:11, 13:6,
23:16, 24:22,
27:9, 35:8,
48:23, 52:17,
71:17, 74:4,

78:4, 80:13,
95:12, 110:6,
111:20, 121:25,
123:25, 124:12,
124:17, 125:2,
125:18, 129:6,
129:18, 130:16,
130:19, 131:23,
133:1, 136:20,
137:18
**agcs**
10:2, 10:7,
10:9, 12:10,
16:13, 16:16,
30:3, 30:6, 90:7
**agency**
33:14
**agent**
33:14, 34:10,
34:11
**aggregate**
48:19, 49:2,
52:5
**ago**
22:13, 33:5,
78:12, 82:11,
130:12
**agr**
11:21
**agree**
74:8
**agreed**
92:1, 132:21
**agreement**
41:3, 54:19,
54:23, 55:1,
59:14, 60:9,
65:13, 66:12,
66:22, 67:1,
67:3, 71:4,
82:10, 82:13,
83:25, 84:1,
130:23, 136:2,
136:3
**agreements**
66:22
**agrus**
12:8, 12:13

ahead
43:14, 43:22
aig
21:24, 21:25,
22:4, 22:10,
45:7
al
1:13
alan
99:6, 99:7
alison
37:21
allan
90:11, 90:13,
90:14
allianz
5:17, 5:20,
10:7, 10:8,
10:9, 10:10,
11:5, 11:20,
12:3, 12:6,
12:10, 12:15,
12:23, 12:24,
14:16, 16:11,
16:12, 23:9,
23:12, 24:20,
30:2, 30:3,
30:9, 30:19,
36:15, 43:23,
43:24, 61:4,
71:8, 74:10,
79:5, 80:5,
81:20, 82:18,
83:20, 85:2,
90:8, 90:18,
95:10, 107:23,
107:24, 107:25,
108:2, 108:10,
137:23
allow
56:16
allows
14:5
almost
8:4
along
84:1
already
57:7, 72:23,

105:24, 130:3
also
22:4, 27:12,
44:2, 46:20,
68:24, 75:17,
82:17, 89:18,
91:9, 103:22,
108:14
although
129:6
always
7:22, 45:23,
57:17, 57:18,
73:7
amanda
89:18, 89:20,
89:21, 90:4,
91:21, 93:6,
98:15, 98:20,
99:1, 99:4,
99:7, 99:16,
100:8, 107:4,
107:10, 107:11,
108:15, 110:25,
111:23, 114:22,
115:10, 117:2,
117:4, 118:19,
118:23, 121:22,
122:4, 127:25,
129:7, 129:8
amanda's
90:14
amended
55:3, 55:4
amending
96:5
amendment
57:1, 57:9,
59:16, 59:17,
59:18
amendments
55:9, 55:12,
59:15, 76:6
american
1:10, 4:1,
44:3, 44:10
among
135:23

amount
47:16, 49:21
amw
61:9, 61:15,
62:2
amwins
5:20, 33:18,
33:20, 33:21,
34:12, 34:15,
35:5, 36:16,
36:22, 36:24,
37:2, 38:2,
39:10, 43:24,
44:14, 46:17,
46:19, 46:21,
47:1, 47:5,
47:9, 47:17,
47:22, 51:14,
52:10, 52:13,
53:22, 53:23,
54:2, 54:3,
54:8, 54:13,
54:20, 59:21,
61:5, 61:16,
61:20, 62:1,
62:23, 63:7,
65:14, 66:12,
66:22, 69:16,
70:1, 70:7,
70:25, 71:8,
72:7, 74:10,
80:5, 80:12,
81:3, 81:20,
82:17, 83:6,
83:22, 83:23,
85:2, 87:9,
101:15, 101:16,
101:25, 102:3,
102:9, 102:14,
102:16, 102:19,
105:10, 105:19,
107:19, 109:7,
125:11, 128:9,
135:3, 135:23,
136:2, 136:6,
136:7, 136:16,
136:24, 137:2,
137:9, 137:16,

137:21, 138:9
analysis
133:25, 134:3
ancillary
18:14
annual
37:13, 38:10,
39:3, 51:17
another
11:19, 58:1,
59:18, 67:2,
67:8, 72:23,
93:15, 94:8,
94:9, 94:10,
111:20, 119:24,
125:5, 129:17
answer
27:6, 42:18,
49:14, 76:23,
81:1, 110:20,
116:12, 123:20,
129:3, 131:23
answered
10:17
any
8:7, 12:6,
20:23, 25:16,
25:24, 26:12,
27:6, 27:13,
28:7, 28:21,
30:18, 30:22,
31:16, 33:7,
36:12, 37:15,
38:17, 39:2,
39:11, 40:3,
41:18, 42:1,
43:12, 45:13,
46:4, 48:13,
49:16, 52:9,
52:11, 55:1,
57:3, 59:22,
60:2, 66:1,
66:13, 70:20,
71:9, 71:21,
73:13, 77:13,
79:5, 89:11,
92:16, 92:22,
92:25, 93:3,

96:25, 100:14,
100:19, 102:6,
105:4, 107:11,
107:16, 107:20,
109:18, 110:16,
116:4, 119:10,
120:2, 121:20,
122:18, 122:23,
124:14, 124:21,
125:23, 126:9,
128:3, 128:8,
131:7, 135:2,
135:13, 136:1,
136:6, 136:7,
136:12, 136:16,
141:13, 142:6
**anybody**
34:15, 109:7,
109:10, 110:24,
111:4, 111:11,
115:25, 124:20,
125:24, 137:22
**anyone**
25:23, 28:21,
29:18, 29:23,
33:6, 37:22,
38:2, 93:6,
93:22, 105:18,
107:10, 109:17,
111:2, 126:10,
126:11, 136:17,
136:24, 137:2,
137:8, 137:9,
137:16, 137:17,
137:21, 137:22,
138:9, 138:10,
138:14
**anything**
37:15, 39:25,
42:6, 57:12,
82:23, 107:12,
116:4, 116:22,
121:22, 132:2
**apologies**
127:8, 135:20
**apologize**
86:22, 106:11
**appear**
81:2, 142:6

**appears**
74:9, 74:12,
74:16, 103:6
**apply**
66:8, 95:2,
137:1, 137:4,
138:12
**appreciate**
8:24
**approval**
42:13, 42:16,
42:24
**approved**
43:2
**approves**
108:21
**approximate**
35:17, 42:22,
98:5
**approximately**
31:6, 31:19,
51:1, 97:25
**april**
65:6, 98:18,
99:11, 99:22,
103:5, 103:7
**area**
7:23
**areas**
27:16, 53:2
**aren't**
41:6, 77:12
**arm**
47:10
**around**
92:5, 98:5,
103:4, 115:16
**arrangement**
87:4
**art**
81:23, 83:18,
83:19, 84:2,
85:2, 85:5,
94:18, 95:9
**article**
5:27, 86:21,
86:24
**asbestos**
69:1

**ascii**
139:15
**aside**
98:4
**asked**
15:9, 93:14,
95:17, 135:18,
136:20
**asking**
8:10, 32:5,
50:16, 110:7,
122:15
**aspen**
45:17
**assess**
48:12
**assigned**
76:3
**assigns**
56:21
**association**
21:3
**assume**
75:11
**assumed**
22:22
**assuming**
78:6
**assumption**
59:5, 112:24
**attached**
5:12, 6:21,
78:25, 139:19,
142:7
**attachment**
113:9
**attempt**
55:16
**attempts**
53:19
**attention**
80:3, 88:24,
111:21
**attorney**
29:11, 29:12,
128:17, 128:18,
129:9
**attorneys**
29:19, 84:25,

**ascii**
139:15
**aside**
98:4
**audit**
38:13, 38:21,
41:21, 72:13
**audits**
37:13, 38:10,
38:17, 39:3,
39:13, 41:16,
42:1, 52:14
**august**
97:17, 118:2,
119:8, 120:12,
120:14, 120:17,
120:18, 120:19,
129:18, 132:17
**authority**
94:14, 94:17,
97:3, 105:25
**aware**
58:11, 58:22,
58:23, 59:9,
67:7, 68:10,
68:16, 69:5,
74:18, 109:13,
110:12, 128:14,
138:9
**away**
56:25, 57:5
**axis**
4:5, 109:18,
109:24, 110:12,
111:5

**B**
**b) (6**
1:20, 5:14
**b) (6)**
7:12
**bachelor**
20:18
**bachelor's**
20:23
**back**
14:14, 20:5,
22:15, 23:15,
26:2, 27:13,
32:17, 33:12,
36:23, 42:3,

50:19, 52:25,
59:13, 60:15,
62:20, 73:13,
73:22, 76:25,
88:18, 92:4,
94:1, 98:13,
105:7, 106:14,
106:19, 112:16,
115:9, 115:10,
118:25, 122:8,
122:9, 123:22,
127:7, 128:2,
129:5, 130:6,
130:13, 137:1
**background**
7:20, 9:1
**backwards**
99:20
**bad**
53:6, 62:21,
86:21
**bag**
43:3
**ballpark**
46:10
**banking**
56:15
**based**
44:1, 49:21,
49:22, 80:25,
84:19, 108:8,
113:1
**basically**
17:14, 66:5
**basis**
38:15, 51:17,
87:22
**bates**
5:18, 5:21,
5:23, 5:26,
5:28, 5:31, 6:2,
6:4, 6:7, 6:9,
6:12, 60:22,
65:17, 67:10,
81:11, 81:12,
86:20, 88:22,
112:8, 117:23,
120:13, 120:15,

127:2
**because**
17:10, 41:5,
44:18, 58:15,
73:15, 80:1,
87:24, 90:7,
92:9, 104:5,
104:10, 104:20,
105:1, 105:13,
108:17, 109:3,
110:14, 116:21
**become**
59:9
**becomes**
132:3
**been**
7:3, 7:20,
12:23, 12:24,
13:14, 15:18,
17:15, 27:2,
34:21, 43:10,
47:21, 51:4,
53:23, 53:25,
54:4, 54:17,
58:4, 59:6,
59:19, 60:21,
71:3, 72:23,
74:3, 81:10,
86:19, 87:5,
96:23, 98:5,
98:6, 98:24,
103:4, 103:7,
107:20, 117:23,
134:16
**before**
2:21, 7:20,
8:20, 10:17,
16:2, 18:24,
19:6, 19:23,
23:16, 27:7,
27:25, 30:23,
37:19, 47:17,
61:1, 66:6,
66:11, 74:6,
79:18, 81:14,
85:25, 91:5,
97:12, 100:13,
103:14, 106:11,

112:4, 117:8,
125:6, 141:6
**beginning**
15:22, 85:6,
92:5, 98:14
**begins**
113:9, 130:22
**behalf**
3:2, 3:9, 4:1,
13:12, 35:18
**being**
7:7, 7:23,
26:14, 34:9,
43:17, 45:10,
52:20, 54:13,
67:14, 74:14,
80:20, 80:22,
84:19, 87:6,
91:17, 104:14,
114:12, 126:3,
131:5, 131:11,
133:14, 136:4
**believe**
7:13, 14:17,
22:18, 22:19,
24:3, 24:19,
25:8, 34:4,
35:11, 35:13,
46:16, 54:9,
63:16, 64:15,
69:24, 70:20,
78:12, 89:11,
95:25, 97:4,
97:10, 100:12,
102:19, 112:6,
122:14, 127:5,
128:16, 129:8,
133:2
**below**
51:9, 51:11,
62:8, 62:15
**benchmark**
50:11, 50:14
**bend**
1:3, 57:24
**bermuda**
91:15
**best**
8:12, 8:19,

10:20, 45:1,
48:6, 105:25
**beth**
1:31, 2:21,
8:23, 141:3,
141:21
**better**
55:17
**between**
23:11, 26:14,
36:16, 52:9,
54:19, 60:3,
83:16, 83:18,
85:5, 98:15,
110:17, 113:17,
118:23, 118:25,
133:20, 135:3,
136:6
**big**
58:16, 73:7
**billing**
116:24, 117:1
**bind**
41:1
**binder**
40:7, 40:20,
40:21, 40:24,
40:25, 41:4
**binders**
39:16, 39:19,
40:8
**binding**
40:22
**bio**
85:19
**biology**
20:20
**biphenols**
69:2
**bit**
8:25, 9:19,
17:17, 20:6,
40:12, 42:18,
76:15, 82:25,
98:2, 107:15
**blanket**
76:21, 76:25,
77:10, 78:5,

| | | | |
|---|---|---|---|
| 78:13, 79:7 | **broker** | **c-i-c-k** | **capital** |
| **body** | 14:13, 33:13, | 18:3 | 5:27, 33:23, |
| 42:19 | 46:19, 46:20, | **calculated** | 33:24, 83:2, |
| **boiler** | 47:11, 54:3, | 113:21 | 83:8, 86:25, |
| 21:17, 22:8 | 63:20, 91:22, | **california** | 87:7 |
| **bonds** | 92:10, 92:23, | 19:7, 19:13, | **capped** |
| 24:6 | 100:8, 116:2, | 19:17, 20:2, | 63:16 |
| **book** | 133:21, 137:9, | 20:12, 24:3, | **caps** |
| 23:2, 35:5, | 137:14, 137:17, | 24:25, 25:3 | 24:10, 33:22 |
| 38:14, 50:23 | 138:10 | **call** | **capture** |
| **bottom** | **brokerage** | 16:21, 24:5, | 119:19 |
| 27:17, 27:18, | 63:8 | 26:21, 32:3, | **captured** |
| 65:18, 89:1, | **brokered** | 32:8, 32:11, | 74:14 |
| 91:20, 99:23, | 87:8 | 47:6, 49:16, | **care** |
| 100:7 | **brown** | 79:1, 87:20, | 26:3, 81:25, |
| **boyd** | 17:20, 17:23, | 96:22, 96:24, | 93:5 |
| 94:22, 95:7, | 18:16, 18:17, | 102:23, 102:25, | **career** |
| 95:13, 95:14, | 91:5, 122:5 | 103:8, 103:13, | 13:15, 13:17, |
| 96:20, 97:1, | **bubble** | 104:3, 106:12, | 107:20 |
| 98:1, 103:15, | 106:1 | 106:14, 106:18, | **carrier** |
| 103:19, 103:25, | **building** | 109:15, 115:10, | 11:11, 13:9, |
| 106:3, 106:16, | 55:24, 55:25, | 122:11 | 14:5, 14:9, |
| 115:8, 115:9 | 56:7, 57:24, | **called** | 24:2, 43:18, |
| **bradstreet** | 58:5, 58:24, | 7:2, 23:13, | 43:23, 67:25 |
| 56:18, 56:21 | 59:3 | 72:25, 75:18, | **carriers** |
| **brand-new** | **bullet** | 79:24, 83:14, | 10:14, 11:7, |
| 29:4 | 126:6 | 83:15, 85:2, | 12:9, 13:7, |
| **break** | **bureau** | 103:10, 103:11, | 14:4, 45:2, |
| 17:6, 17:17, | 79:24, 82:1, | 106:25, 107:4, | 67:20, 80:18, |
| 37:18, 49:8, | 82:4, 118:2, | 107:5, 115:5, | 80:23, 92:7, |
| 73:8, 76:15, | 119:5 | 115:9, 115:10, | 92:12, 104:18 |
| 82:3, 85:20, | **business** | 117:6, 125:18 | **cars** |
| 88:13 | 11:9, 13:8, | **calls** | 58:17 |
| **breakdown** | 13:10, 22:21, | 32:4, 32:8, | **case** |
| 113:22 | 23:3, 35:5, | 32:9, 103:1, | 25:11, 32:15, |
| **brett** | 50:23, 55:16, | 103:12 | 57:25, 87:12, |
| 4:8 | 56:22, 57:4, | **came** | 108:22, 128:8, |
| **brian** | 58:2, 59:11, | 72:7, 72:21, | 141:14 |
| 3:3, 7:8, | 59:16, 101:2, | 93:21, 94:1, | **cases** |
| 17:21, 18:1 | 101:3, 101:6, | 112:20 | 46:25 |
| **brief** | 101:12, 101:25, | **can't** | **casualty** |
| 32:11, 88:15 | 115:22, 116:3 | 9:6, 9:14, | 1:21, 3:10, |
| **bring** | **businesses** | 11:8, 43:4, | 5:16, 9:25, |
| 80:3, 111:21 | 56:24 | 53:16, 109:5, | 11:10, 12:5, |
| **broad** | C | 135:19 | 12:14, 13:11, |
| 27:3, 137:19 | **c-a-t** | **capacity** | 62:10, 134:9 |
| **broadly** | 24:10 | 90:20, 128:19, | **cat** |
| 133:13 | | 128:22 | 24:6 |

catastroph
49:18
catastrophe
24:8, 24:12,
49:16, 50:5,
50:6, 50:7,
50:20, 83:3,
84:13
catastrophes
48:16
catastrophic
49:1, 49:10,
49:14, 49:15,
49:16, 49:19,
50:3
categories
133:16
category
58:2, 122:11
cause
1:8
ceo
94:19
certain
14:10, 27:10,
27:16, 38:24,
41:21, 50:10,
55:15, 55:25,
81:13, 83:6,
92:7, 92:9,
97:12
certificate
141:1
certificates
21:1, 21:2
certified
2:22, 2:23,
141:3
certify
141:7
cetera
84:14, 84:15
chain
5:28, 5:31,
6:9, 94:13,
94:16, 108:20
chance
41:25

change
15:15, 16:6,
16:17, 49:5,
71:9, 92:12,
97:11, 111:12
changed
9:8, 15:17,
16:13, 16:14,
111:9, 132:24
changes
76:6
charge
14:5
charging
53:23, 53:25,
54:4
check
5:22, 5:25,
79:22, 79:23,
81:14, 81:19,
82:17, 84:19
chemistry
20:20
chicago
1:22, 2:10,
3:16, 4:12,
14:23
chief
94:20
choke
10:7
chopping
126:19
chubb
4:3, 45:10
circumstance
101:4, 101:5
claim
26:5, 26:6,
26:13, 26:15,
48:19, 49:2,
49:17, 49:19,
49:25, 50:4,
50:8, 68:12,
68:15, 70:13,
72:1, 72:15,
72:21, 73:14,
73:17, 73:18,

79:2, 79:3,
79:8, 85:1,
93:4, 93:12,
94:15, 100:15,
101:17, 101:22,
102:9, 102:10,
102:12, 104:25,
105:5, 113:23,
114:6, 114:7,
114:11, 114:25,
115:22, 118:13,
121:19, 122:25,
124:10, 126:12,
132:3, 133:6,
133:10, 133:11,
133:14, 133:15,
133:25, 134:3
claims
7:23, 26:7,
48:17, 49:1,
50:16, 51:23,
52:2, 52:3,
52:6, 59:8,
79:3, 79:5,
80:1, 82:7,
84:20, 84:24,
89:21, 91:1,
91:2, 100:19,
101:2, 101:19,
101:20, 104:17,
104:22, 105:3,
105:14, 108:21,
110:4, 110:10,
110:22, 118:25,
119:14, 119:16,
131:14, 132:4,
132:7, 134:4,
134:25
clarification
70:10
clarify
19:9
classes
55:15
classify
113:20
clause
67:11

clean
56:8
cleanup
92:9, 92:13,
110:2, 114:8,
116:11
clearly
93:13
close
48:8, 131:11
closed
34:21, 35:2,
35:10
co-insurance
64:5, 64:8
co-insuring
64:3
co-share
64:23
co-shared
104:19
code
56:5, 56:6,
56:13
codes
56:10, 56:14,
56:22
coinsurance
67:16
college
20:9
com
91:10
combined
12:10
come
41:6, 42:1,
42:12, 42:23,
52:15, 56:8,
59:7, 63:9,
73:22, 84:3,
93:20, 94:8,
105:4
comes
79:3, 113:8,
125:21
comfort
47:21

coming
79:23, 92:17
command
94:13
commencing
26:23, 60:18,
73:4, 73:24,
86:15, 88:15,
123:9, 123:15,
132:11
comments
125:17
commercial
55:23
commission
63:8, 63:11
common
42:20, 42:21,
108:6
communicate
100:18
communicating
100:14, 100:18
communication
92:25, 138:16
communications
97:5, 135:3
companies
10:2, 11:8,
56:12
company
1:12, 3:10,
4:2, 4:3, 4:4,
4:5, 4:6, 5:16,
9:24, 10:5,
10:6, 11:6,
23:13, 33:20,
44:4, 62:10,
75:7, 79:6,
79:24, 80:10,
80:22, 95:8
comparison
104:6
complete
142:5
completely
87:17
compliance
38:11, 38:19,

52:14
complicated
8:9
concluded
140:4
concluding
26:24, 60:19,
73:5, 73:25,
86:16, 88:16,
123:10, 123:16,
132:12
conclusion
93:20, 93:21,
93:23
condensed
139:11, 139:12
conditions
60:1, 65:25,
66:2, 66:7,
66:8, 69:21,
104:21, 107:14
confer
11:25
confirm
115:11
confirmation
114:24, 115:12
confused
130:6
confusing
8:8
consecutive
127:3
consider
50:3
consideration
102:1, 115:23,
116:3
considerations
131:4, 131:10,
131:18
considering
131:4, 131:9
consistent
67:2
contact
37:6, 38:7,
137:13

contain
135:2
contained
133:15
contam
137:3
contamination
68:8, 92:19,
93:9, 109:15,
116:11, 136:18,
136:25, 137:4
context
100:23
continue
98:14
contrast
113:7
controlled
60:2
controls
110:18
convers
31:20
conversation
98:1, 103:18,
103:19, 106:15,
115:6, 115:7,
122:4, 124:19
conversations
31:20, 31:21,
98:1, 99:1
convey
108:18
conveyed
103:17, 116:5
cooper
102:17, 102:18,
102:21, 102:22,
103:13, 103:18,
103:22, 104:2,
105:7, 107:1,
107:3, 107:12,
115:6
coparticipants
109:19
copied
112:10, 112:17,
121:20, 124:7,

125:2
copy
54:16, 54:23,
60:9, 72:9,
86:22, 120:7,
134:8, 134:19,
139:7, 139:18
copying
111:24
corner
62:5
corporate
1:20, 7:11,
10:8, 30:10,
30:11, 116:18
corporation
94:5
corrected
33:25
corrections
142:6
correctly
116:12, 137:20
correspondence
133:20
cost
92:13, 92:18,
110:2, 116:11
costs
92:8, 92:24,
95:2, 114:17
could
13:12, 13:13,
31:6, 39:7,
45:25, 46:20,
63:21, 73:18,
74:13, 77:11,
92:14, 96:23,
105:25, 115:12,
119:21, 123:21,
128:1, 133:22,
135:5, 135:6
couldn't
40:4, 46:7,
46:10, 71:20
counsel
7:15, 8:16,
8:19, 27:10,

28:4, 28:8,
28:11, 28:12,
28:21, 29:19,
30:1, 122:11,
122:24, 128:5,
133:5, 134:10,
134:21, 141:13
county
19:14, 141:5
couple
17:16, 31:9,
32:8, 39:5,
51:23, 62:8,
65:16, 92:11,
125:22, 131:1
course
69:19, 91:4
court
8:15, 141:1
cover
77:11, 105:13,
105:17, 114:9,
116:10
coverage
14:6, 77:14,
77:15, 78:23,
91:22, 92:17,
98:22, 104:5,
110:1, 111:6,
114:3, 116:13,
116:15, 116:16,
122:24, 133:5,
134:10
covered
49:23, 50:12,
50:25, 51:24,
67:15, 74:23
covering
92:8
covers
87:8
covid
19:22
create
42:12
crr
1:32, 141:4,
141:21

cs
30:5
csr
1:32, 141:4,
141:21, 141:22
cst
1:24
culbertson
4:9
cuo
94:18, 94:20
currently
18:6, 18:25
custom
4:3, 72:10
customary
90:25
cut-off
97:14

**D**

damages
113:23
dash
95:25
date
9:14, 15:22,
75:5, 75:10,
85:8, 85:10,
97:13, 97:14,
142:10
dated
6:12, 89:5,
97:22, 98:18,
118:2, 119:8,
125:2, 127:14,
129:17, 132:17,
141:16
dates
22:16, 98:3,
98:4, 98:5
dave
123:19
david
3:12, 7:15,
17:20, 17:23,
17:24, 17:25,
18:16, 18:17,

91:5, 93:6,
97:15, 111:2,
122:5, 122:21,
125:7, 125:9,
128:6
day
85:6, 141:16
days
40:10, 40:12,
40:21
deal
37:20
dealing
105:23, 131:19
deals
36:18, 87:10
dealt
38:2, 127:20,
127:23
debris
69:4
dec
61:8, 61:18,
61:19, 62:16,
63:25, 69:19
decided
63:20
decision
103:10, 105:3,
106:17, 106:20,
107:6, 132:4,
132:5, 132:9
decisions
18:15, 131:14,
131:15
declarations
61:19, 61:20
declin
42:16
declination
42:13
decline
132:3
declined
93:12, 109:25,
110:1
declining
98:22

defendant
3:9
defendants
1:15, 4:1
deficiencies
38:18, 38:22,
38:24, 39:4,
39:8, 39:11,
40:1, 40:3,
41:11
define
45:1, 49:19,
74:25, 83:7,
107:24
defining
49:24
definitely
29:12, 74:25
definition
75:21, 76:11
degree
20:17, 20:23
degrees
20:24, 20:25
delete
136:18
delivery
139:22, 140:1
denials
110:14, 111:6
denied
114:7, 114:25
denying
92:17
department
134:17
depending
18:12, 83:25
depends
101:4
deponent
142:1
deposed
7:20, 7:23
deposition
1:19, 2:1,
5:15, 30:20,
30:23, 72:24,

123:13, 123:17,
135:21, 141:6
**depositions**
7:18
**described**
87:14, 88:2
**describes**
18:14
**description**
5:13, 6:23
**designee**
1:20, 7:11
**details**
116:4
**detected**
39:4, 39:9
**determination**
52:15
**determine**
38:15
**development**
9:6
**deviate**
109:5
**difference**
104:5, 107:13,
113:17
**differences**
60:3, 104:20,
105:9
**different**
56:15, 60:1,
67:22, 72:24,
76:16, 87:17,
102:7, 119:15,
120:8, 127:4,
135:19, 136:21
**differently**
50:13, 50:16
**differing**
66:7
**diligence**
47:16
**dioxin**
69:1
**direct**
17:15, 27:9,
88:24

**directed**
118:18
**direction**
141:11
**directly**
17:7, 127:23
**director**
9:3, 9:4, 9:23,
12:7, 15:16,
15:18, 15:21
**disagree**
93:22
**discrepancies**
110:17
**discuss**
95:17
**discussion**
26:23, 60:18,
73:4, 73:24,
86:15, 123:9,
123:15, 132:11,
136:6
**discussions**
125:24, 126:9
**disposal**
91:22
**disproportionate**
48:18
**district**
1:1, 1:2
**division**
1:3
**document**
27:7, 27:14,
31:15, 31:16,
61:1, 66:17,
74:6, 76:9,
79:17, 79:18,
88:22, 112:14,
112:15, 116:21,
118:1, 121:6
**documents**
30:22, 30:25,
31:3, 31:7,
127:4, 133:16,
134:6
**doing**
16:10, 16:20,

16:23, 55:17,
73:19, 81:12,
104:25, 135:12,
139:25
**dollars**
49:22, 50:8
**done**
138:22
**dotted**
18:8, 18:10
**down**
8:17, 19:3,
48:8, 49:8,
76:15, 82:3,
111:23, 131:1
**drafted**
69:15
**dropping**
136:7
**due**
47:16, 49:1,
50:16, 78:6,
93:12, 103:6,
114:25
**duly**
7:3
**dun**
56:18, 56:21
**duplicate**
129:22
**during**
35:19, 38:17,
42:14, 42:24,
45:5, 51:5,
51:19, 55:1,
71:7, 73:14,
73:15, 93:4,
136:1

**E**

**e-mail**
5:28, 5:31,
6:9, 89:4,
89:12, 89:14,
91:10, 91:16,
92:5, 97:11,
97:20, 98:14,
99:12, 99:13,

112:2, 112:8,
112:10, 112:13,
112:17, 113:1,
113:7, 113:8,
113:19, 114:21,
115:19, 117:2,
127:2, 127:5,
127:12, 127:15,
127:24, 132:23
**e-mails**
26:14, 96:25,
97:12, 97:13,
98:12, 99:4,
99:17, 100:4,
100:23, 103:6,
111:20, 111:22,
112:12, 112:24,
113:3, 127:6,
127:8, 133:20
**e-r**
28:16, 28:17
**e-x**
95:25
**each**
14:6, 14:7,
32:3, 46:2,
75:18, 76:1,
87:11
**earlier**
50:19, 88:2,
99:18, 113:3,
131:15
**early**
103:7
**earthquake-only**
24:2
**education**
20:6
**effect**
54:18, 85:5,
85:12, 85:14
**effective**
75:4, 75:10
**either**
100:5, 109:18,
109:23, 120:16,
126:10, 128:4,
136:3

electronic
133:6, 133:10,
133:15
eligible
57:7, 57:16,
59:6
else
11:4, 16:23,
29:18, 29:23,
33:6, 37:22,
38:2, 39:25,
57:12, 82:23,
105:18, 107:11,
115:13, 117:12,
128:24, 134:16,
134:19, 136:17,
137:8, 137:9,
137:17, 137:21
else"
137:16
employed
141:13
employee
12:25
employers
25:1
end
85:15, 112:13,
112:15, 125:22,
130:21
endorsement
5:20, 74:9,
74:15, 76:5
engaged
122:11
engineered
14:22
enough
40:9, 57:9,
71:19, 72:16,
73:17
ensure
37:13, 38:10
entered
35:4, 47:17
entire
37:23, 46:22,
46:23, 47:6,

51:15, 52:6,
56:6, 56:10,
60:5, 70:11,
70:22, 88:6
entirely
54:8, 59:22
entity
85:1
errata
142:7
esquire
3:3, 3:12, 4:8
establish
14:9
estate
56:14, 58:5
et
1:13, 84:14,
84:15
etran
139:11
even
46:10, 78:1,
100:17
event
49:23, 51:13
events
53:6
eventually
97:2
ever
20:6, 55:1,
71:9, 72:2,
107:20, 109:2,
109:7, 109:18,
110:24, 111:11,
117:7, 127:23,
133:9, 133:10,
136:12, 136:16,
137:8, 137:22
every
46:14, 48:14,
68:14, 71:14,
71:17, 72:5,
76:12, 76:20,
79:17, 102:3
everybody
104:11

evoking
68:13
ex-gratia
95:21, 95:23,
96:11, 96:14,
100:25, 101:1,
102:12, 105:1,
106:9, 106:13,
106:23, 107:8,
107:21, 108:12,
113:21, 114:8,
114:24, 115:22,
116:3, 117:11,
131:5, 131:10,
131:19
ex-gratias
131:13
exact
98:3, 98:4
exactly
103:9, 113:22,
113:25, 132:1
exam
89:15
examination
5:4, 7:5,
27:19, 28:4,
31:17, 34:16,
73:10, 112:5,
118:7
examined
7:3, 142:3
example
14:23, 15:5,
40:9, 40:13,
40:15, 43:14,
47:5, 67:19,
84:25
examples
39:8
except
66:1
excess
51:6, 64:3,
64:4, 64:17,
65:2
excluded
58:4, 91:23,

93:13, 93:21,
94:1, 94:14,
115:21, 132:3
exclusion
68:7, 68:11,
68:13, 68:17,
68:25, 69:4,
69:5, 69:7,
93:13, 115:1,
135:24
exclusions
68:5, 69:10,
71:11, 71:23,
92:9, 92:20,
93:9, 95:1,
96:6, 104:10,
105:15, 105:17,
107:14, 109:15,
109:21, 136:8,
136:18, 136:25,
137:4, 137:10,
137:23, 138:11
exclusive
68:22
exclusively
110:16
executed
136:4
exhaustive
11:18, 12:4,
12:11
exhibit
26:21, 26:25,
27:3, 32:18,
60:13, 60:15,
60:22, 72:23,
74:1, 75:3,
78:9, 79:13,
81:8, 81:11,
81:12, 86:12,
86:17, 88:20,
97:20, 111:17,
117:20, 123:6,
123:11, 124:22,
124:23, 125:1,
126:23, 129:14,
129:21, 130:3,
130:4, 132:13

exhibits
139:19
exist
97:6, 97:7
existence
24:4
expectations
52:16
experience
25:8, 108:8,
112:25, 117:15
expert
134:4
explain
16:8, 33:10,
37:11, 38:12,
46:18, 56:9,
56:11, 56:14,
74:13, 82:25,
83:21
explained
94:25, 95:1
explains
8:5
explosions
57:20
exposure
51:7
expression
117:7, 117:8,
117:16
extent
128:13
extrinsic
53:5, 53:11

**F**

facility
58:9, 58:16,
87:7
fact
107:12, 116:10
factors
53:5, 53:11
fair
8:13, 8:21,
31:15, 44:18,
47:16, 50:18,

54:11, 57:9,
61:3, 61:15,
63:14, 66:20,
71:19, 72:16,
73:17, 75:2,
81:15, 81:16,
112:7, 113:5
fairly
108:6
faith
40:4
fall
14:19, 92:18
fallen
93:8
falls
10:10
familiar
44:4, 44:7,
79:20
far
25:23, 29:25,
36:14, 54:7,
58:7, 59:1,
59:2, 68:25,
71:16, 87:17,
90:2, 91:1,
99:11, 113:10,
113:23, 114:1,
128:4, 128:14,
128:24, 128:25,
135:1
favor
105:22
fe
19:1
february
35:13
fee
62:24, 63:2
feel
138:6
few
7:19, 26:3,
33:5, 36:8,
38:4, 43:10,
45:14, 48:17,
49:1, 50:22,

78:12, 89:17,
121:18, 123:20
ffic
80:5, 80:8,
80:9, 89:21,
90:4, 90:7,
90:16, 118:12
file
75:7, 75:10,
78:14, 78:16,
133:6, 133:10,
133:15, 134:9,
134:14, 134:20,
134:25, 135:1
filed
14:6, 14:7
files
134:5
financial
141:15
find
7:22, 18:13,
38:18, 38:22,
38:24
fine
7:14, 9:17,
13:24, 29:23,
32:16, 37:5,
42:3, 46:3,
46:12, 59:13,
66:20, 68:21,
70:9, 73:21,
81:5, 84:11,
85:21, 86:7,
88:13, 92:16,
100:25, 117:18,
121:3, 138:8,
139:24, 140:2
finish
8:20, 77:23
finished
10:17, 123:19,
135:9
fire
1:21, 3:9,
5:15, 9:25,
11:4, 11:10,
12:5, 12:13,

13:11, 57:20,
62:9, 134:8
fireman's
12:8, 12:9,
12:10, 12:24,
13:7, 14:16,
16:12, 80:10,
80:14, 80:19,
80:20, 80:22,
108:2
firm
7:8, 15:22,
125:18, 125:25,
126:4, 126:5
first
7:3, 17:22,
21:5, 26:20,
35:23, 55:14,
59:16, 61:8,
62:15, 65:19,
74:5, 79:4,
79:16, 88:23,
98:17, 99:10,
99:13, 100:6,
103:13, 104:3,
106:17, 107:4,
113:9, 113:13,
127:2, 129:5
fit
57:25
five
21:14, 27:22,
43:1, 43:6,
86:10, 108:13
flood
49:20, 49:25,
84:14, 114:6,
114:7, 126:7,
126:11
floods
50:21
focus
92:14
focusing
27:16
folded
16:12
folks
26:15, 89:6,

128:3, 128:13

**follow**
9:17, 40:25,
59:22, 66:6,
74:24, 87:7,
97:18, 109:4,
110:15, 124:20,
137:11, 137:24,
138:11

**follow-form**
87:6

**follow-up**
96:25, 121:21,
135:18

**followed**
96:9

**following**
33:2, 37:14,
38:16, 65:24

**follows**
7:4, 65:25

**foregoing**
141:6, 141:7,
142:4

**forget**
87:19

**form**
5:22, 14:5,
17:10, 37:1,
49:4, 59:22,
64:3, 64:5,
65:17, 65:24,
66:6, 66:15,
67:9, 69:13,
69:15, 69:18,
69:19, 69:21,
69:22, 71:6,
71:8, 71:14,
71:15, 71:22,
72:17, 78:14,
79:20, 109:4,
110:19, 135:19,
136:17, 136:21,
137:11, 137:24,
138:2, 138:11

**formal**
20:23

**format**
112:22

**former**
97:10

**forth**
118:25

**forward**
57:1, 79:17,
114:24, 134:10

**four**
19:18, 24:19,
27:17, 27:18,
32:18, 36:2,
43:1, 43:6,
46:3, 46:13

**franklin**
4:10

**free**
14:4, 59:25,
138:6

**front**
73:13

**frontline**
16:20, 16:21

**full**
12:8, 87:2,
88:1, 113:22,
139:11, 139:12

**fund**
12:8, 12:10,
12:24, 13:7,
14:16, 16:13,
80:10, 80:14,
80:19, 80:20,
80:22, 108:2

**future**
98:9

---

**G**

**g-r-a-t-i-a**
96:1

**galati**
69:25, 70:2,
100:9, 100:14,
100:19

**gap**
107:15

**gary**
127:12, 127:16,
127:18, 127:20,

127:25, 128:16,
129:7, 129:8,
131:2, 131:3,
133:2, 134:14,
134:23

**gave**
10:6, 95:18,
107:16

**geez**
129:23

**general**
4:4, 34:10,
61:20, 72:6

**generally**
13:10, 40:17,
48:10, 70:10,
114:1, 118:22

**gentleman**
17:25

**getting**
40:8, 40:10,
56:2, 92:10,
115:12, 119:8,
119:10, 121:21,
126:16

**give**
17:22, 39:7,
42:22, 46:10,
131:23, 135:9

**given**
113:2, 141:8,
142:6

**global**
10:7, 10:8,
10:11, 11:5,
12:16, 12:17,
30:2, 30:3, 30:9

**go**
7:19, 8:25,
9:7, 10:16,
14:14, 20:5,
21:5, 21:23,
24:20, 27:4,
27:9, 27:13,
32:17, 35:23,
37:19, 42:3,
43:14, 43:22,
50:19, 60:11,

67:9, 79:6,
84:1, 86:5,
86:25, 88:25,
89:17, 98:13,
108:22, 114:20,
118:16, 121:17,
121:25, 122:8,
124:18, 126:2,
127:7, 128:1,
128:2, 129:13,
130:19, 134:25

**goes**
66:3, 131:6,
132:4, 132:7

**going**
10:7, 10:16,
26:3, 26:5,
27:9, 43:7,
44:19, 56:25,
58:8, 59:3,
59:13, 60:14,
62:23, 72:22,
73:22, 79:17,
81:21, 85:17,
88:24, 91:12,
91:14, 96:5,
99:9, 99:11,
99:22, 106:22,
107:7, 108:18,
112:16, 115:9,
115:19, 115:20,
116:21, 117:3,
117:5, 117:18,
118:5, 121:3,
121:10, 121:16,
126:21, 127:25,
129:5, 138:5

**good**
40:4, 70:9,
138:23, 138:24,
139:1

**goodness**
116:17

**graduate**
20:13

**great**
20:17

**greater**
45:2, 45:19

**greatly**
8:23
**gress**
89:18, 89:20,
89:21, 90:4,
98:15, 111:23,
114:22, 117:4,
118:19, 127:25,
129:8
**grq**
1:6
**guarantee**
1:10, 4:1,
44:3, 44:10
**guess**
35:23, 51:17,
118:5
**guessing**
35:22, 98:8
**guidelines**
37:14, 37:16,
38:11, 38:20,
41:1, 41:12,
42:6, 42:11,
43:7, 55:19

**H**

**h-e-i-s-s**
123:2
**hagan**
7:7
**hail**
49:20, 50:21,
84:14
**handful**
108:11
**handle**
50:16, 104:22,
119:14
**handles**
82:7
**handling**
110:4
**happen**
63:22
**happened**
40:14, 94:12
**hargan**
1:19, 2:1, 5:3,

7:2, 26:21,
27:3, 27:6,
60:12, 60:22,
60:23, 73:23,
74:3, 74:11,
79:12, 81:7,
85:18, 88:18,
88:19, 89:7,
111:16, 111:20,
117:19, 117:23,
130:13, 142:2
**hate**
15:22
**hazard**
57:19
**hazardous**
91:23, 92:9,
92:13, 111:6,
114:8, 114:12,
114:17
**he'll**
123:20
**head**
97:17, 105:24,
108:9
**header**
27:20, 69:1,
133:3
**hear**
131:16
**heard**
22:12, 93:5,
93:6, 117:8,
117:15
**hearing**
12:1, 111:8
**heart**
116:18
**heavy**
48:15
**heiss**
122:21, 123:2,
125:19
**held**
2:1
**hello**
91:21
**help**
13:1, 69:12,

97:24
**helpful**
79:10
**helping**
44:18
**here**
7:7, 7:10,
8:18, 27:15,
66:23, 72:25,
79:21, 87:14,
90:22, 98:17,
115:4, 115:18,
124:3
**hereby**
141:7, 142:2
**herein**
7:2
**hey**
109:2, 111:5
**hi**
114:23
**hiding**
116:22
**high**
20:6, 52:22
**high-risk**
39:11
**higher**
39:5, 53:24,
54:1, 54:4
**highly**
14:18, 14:19,
14:21
**hinshaw**
4:9
**hired**
15:19
**hiring**
122:24
**historically**
58:15
**history**
48:20, 49:3,
49:11
**hold**
102:18
**holding**
80:22

**home**
22:11, 22:20,
22:21, 25:4
**honest**
36:7
**honestly**
40:2
**hours**
31:9
**housing**
57:2
**hpr**
14:17, 14:18,
15:14
**huge**
120:8, 121:13
**hull**
90:11, 90:13,
90:14, 99:6
**hundred**
35:25, 36:2,
46:4, 46:13,
47:10, 51:6,
109:4
**hundreds**
36:3
**hurricane**
49:20, 84:14
**hurricanes**
50:21, 51:4,
53:6

**I**

**idea**
115:4, 117:10
**identification**
26:25, 60:13,
74:1, 79:13,
81:8, 86:17,
88:20, 111:17,
117:20, 123:12,
124:24, 126:24,
129:15, 132:14
**identified**
81:20, 126:4
**identifies**
64:9, 77:1,
82:17

identify
56:25, 119:11
ifc
16:15, 35:4,
35:6, 62:12
ifcc
5:18, 5:21,
5:23, 5:26,
5:28, 5:31, 6:2,
6:4, 6:7, 6:9,
6:13, 60:23,
81:11, 81:13,
88:23, 112:9,
117:24, 127:3
illinois
1:22, 2:10,
2:25, 3:16,
4:12, 141:5
imagine
47:15, 79:4
impact
16:10, 48:18,
50:22, 51:2,
51:25, 53:3,
53:13
improve
55:16
in-house
28:22, 29:10,
29:12, 128:5
in-person
31:21, 96:19
inadequate
53:21
inapplicable
137:11, 137:25
incepted
59:8, 65:12
inception
41:8
include
17:1, 75:19,
90:25, 96:5,
97:13, 108:1,
118:21
includes
54:2, 77:15
including
19:22, 32:20,

89:7, 92:7,
92:11
income
63:21
incorporated
79:1
incorrect
110:14, 111:13
indemnity
4:4
independent
68:1, 84:20
indiana
1:2, 1:6, 57:24
indicate
114:15
indicates
62:4, 62:9,
62:16, 118:19
indicating
61:16, 67:1,
78:6, 78:7,
78:19, 121:6,
133:17, 134:1
individual
52:2, 52:3,
56:7
industrial
55:23
industry
21:6, 53:25
ineligible
55:20, 55:21,
57:8, 57:17,
57:18, 58:1,
59:16
information
69:19, 79:22,
119:18, 120:3,
124:14
informing
109:18
initial
110:14, 111:13
initially
13:16, 109:25,
136:4
inland
21:17, 21:20,

22:7, 23:19,
23:21
instruct
27:11
instructed
47:6
insur
104:14
insurance
1:12, 4:2, 4:3,
4:4, 4:5, 4:6,
21:6, 21:9,
22:11, 25:4,
44:4, 56:15,
65:24, 65:25,
66:1, 79:6,
79:24, 80:10,
81:25, 82:4,
87:8, 118:2,
119:5
insurance-linked
82:22, 83:1
insure
56:1, 65:20
insured
17:2, 56:22,
75:15, 75:24,
77:2, 77:7,
77:8, 101:17,
108:22, 114:9,
133:21, 137:13
insured's
133:21
insureds
55:18
insurer
44:5, 44:13,
59:22, 80:4
insurers
109:14, 109:24
insuring
104:15
interaction
70:21, 118:23
interactions
70:18, 71:2
interest
141:14

interesting
7:22, 20:22
interfaced
89:23
internal
28:11, 28:12,
29:2, 134:21
international
20:21
interpret
76:23
interstate
1:20, 3:9,
5:15, 9:25,
10:10, 11:4,
11:10, 12:5,
12:13, 13:5,
13:6, 13:11,
13:13, 17:2,
17:8, 17:14,
18:18, 25:10,
25:17, 25:23,
25:24, 30:1,
30:19, 32:19,
33:6, 35:6,
35:19, 36:14,
36:16, 37:3,
37:7, 52:10,
54:20, 59:21,
59:25, 62:9,
62:23, 63:6,
64:16, 68:10,
68:16, 69:6,
70:25, 80:16,
80:18, 83:22,
92:17, 92:23,
93:7, 94:5,
95:4, 101:7,
101:23, 104:4,
109:10, 109:25,
116:1, 116:9,
117:4, 118:12,
122:23, 126:10,
134:8, 135:23,
135:24, 137:22,
138:4, 138:15
interstate's
46:14, 64:10,

116:18
**invest**
83:5, 83:7
**invoice**
116:24, 117:1
**invoking**
68:11
**involved**
34:22, 37:23,
46:5, 57:19,
62:24, 107:20
**involvement**
26:4, 26:13,
36:22
**irg**
5:17, 6:25,
7:10, 18:19,
25:9, 25:11,
25:18, 25:25,
26:6, 26:15,
37:7, 41:25,
43:20, 49:25,
57:23, 59:8,
61:4, 64:21,
67:14, 68:12,
68:15, 68:18,
70:24, 72:1,
72:17, 73:2,
74:19, 81:3,
84:17, 92:22,
92:25, 93:7,
100:15, 101:10,
108:19, 109:19,
116:1, 116:5,
135:2, 135:23,
137:6, 137:23
**irg's**
5:14, 92:10,
137:9, 138:10
**ironshore**
4:6, 45:9,
109:19, 109:24,
110:13, 111:5
**ish**
13:20
**issuance**
39:16, 40:7,
40:20, 40:24,

41:4, 41:5
**issue**
25:11, 40:21,
41:5, 53:10,
53:18, 53:19,
59:25, 92:6,
92:17, 117:5,
131:20
**issued**
5:17, 6:24,
18:19, 25:11,
25:18, 41:7,
41:12, 58:19,
61:4, 68:14,
71:15, 71:18,
73:1, 118:10,
118:11, 131:6,
131:11, 137:5,
137:6
**issuer**
62:9
**issues**
126:3
**itself**
46:2, 69:21

**J**

**jeez**
120:20
**jim**
89:4, 97:21,
98:15, 99:14,
111:24, 114:22,
114:23, 117:1,
117:3, 117:13,
117:14
**job**
1:29, 55:17
**join**
23:23
**joint**
67:16
**july**
35:11, 48:8,
85:6, 85:8,
125:3, 127:14
**jump**
8:21

**june**
111:23, 112:10,
112:17, 113:2,
113:8, 114:21,
115:16, 115:19,
141:16

**K**

**k-l-e-p-c-a**
18:3
**kanaris**
122:12, 122:13,
122:19, 125:18,
125:19
**kane**
141:5
**keith**
1:19, 2:1, 5:3,
7:2, 89:7,
109:2, 111:5,
142:2
**key**
12:12
**kiel**
125:7, 125:9,
128:6
**kind**
92:14
**klepcick**
17:21, 18:1,
18:7, 18:8
**knew**
10:16
**know**
8:20, 17:3,
17:6, 17:17,
24:3, 25:24,
27:14, 29:6,
29:15, 29:25,
30:2, 34:23,
36:14, 42:16,
44:9, 46:8,
54:7, 56:11,
57:23, 58:7,
58:17, 59:1,
59:2, 67:21,
67:24, 68:25,
69:25, 70:2,

72:10, 79:2,
80:9, 82:4,
84:25, 85:3,
86:14, 91:1,
91:12, 92:5,
92:6, 93:11,
97:8, 98:7,
103:2, 104:23,
105:8, 105:24,
106:14, 108:10,
110:7, 110:8,
112:23, 113:11,
113:22, 113:25,
115:5, 115:11,
115:15, 118:10,
118:11, 118:19,
119:18, 120:22,
121:9, 122:4,
122:5, 122:18,
122:21, 124:20,
125:9, 125:13,
125:24, 127:18,
127:23, 128:4,
128:6, 128:14,
128:17, 128:25,
132:1, 134:24,
135:4, 136:4,
136:7, 136:20,
138:3, 138:16
**knows**
138:7

**L**

**lack**
14:9, 14:11,
48:25
**laid**
103:22, 106:4,
108:11
**language**
42:19, 67:22
**large**
55:23, 119:24
**larger**
51:4, 53:9
**last**
15:23, 15:25,
16:19, 18:2,

29:5, 39:18,
53:1, 78:1,
95:12, 123:20,
130:22
**late**
22:25, 103:7
**later**
13:15, 29:15,
98:6, 99:17
**laughs**
123:22, 123:23
**launch**
8:24
**law**
125:18, 125:25,
126:4, 126:5
**lawyer**
30:15, 31:22
**lawyers**
30:18, 126:4
**layer**
64:10, 65:2
**lead**
36:15, 36:24,
37:6, 43:15,
43:16, 43:18,
43:23, 44:13,
44:15, 45:2,
45:24, 46:5,
59:22, 66:1,
72:2, 72:10,
72:17, 87:11,
110:15, 110:16
**leadership**
101:14, 101:24,
102:15
**leading**
47:16, 136:3
**leads**
44:22, 44:24,
45:5, 45:19
**least**
48:16, 55:8,
59:14, 109:25,
121:19, 128:12
**leave**
23:22, 98:4
**leaves**
123:13

**left**
61:8, 105:16,
106:10
**legal**
79:2
**less**
48:16
**let's**
8:24, 8:25,
12:22, 14:14,
15:21, 20:5,
23:15, 26:20,
35:23, 37:18,
42:3, 44:3,
60:11, 70:10,
73:8, 76:15,
82:3, 86:7,
89:17, 101:5,
113:20, 122:8,
129:13, 130:5,
133:16
**level**
37:10, 47:21,
50:10, 55:25,
64:23
**liability**
1:11, 4:2,
44:4, 44:10,
67:11, 67:13
**liaison**
36:15
**life**
38:18, 42:14,
42:24, 45:5,
51:20, 55:2,
71:7, 90:1,
93:4, 136:1,
136:5
**likely**
131:19
**likened**
87:6
**limit**
68:17, 137:15
**limiting**
68:19
**limits**
47:7

**line**
18:8, 18:10,
22:21, 45:3,
50:19, 115:4,
115:14
**lines**
4:3, 14:13,
21:12, 21:15,
22:6, 45:3,
62:8, 131:1
**link**
133:5
**list**
11:18, 12:4,
12:8, 12:11,
57:6, 57:7,
57:10, 59:17,
59:18, 77:6,
79:8
**listed**
76:12, 77:12,
89:18, 90:22,
117:25, 118:17,
128:4, 132:20
**listen**
105:8
**listing**
74:22, 75:14,
75:23
**lists**
76:19, 80:4
**litigation**
18:20, 25:21,
52:9
**little**
7:19, 8:25,
9:19, 10:24,
13:15, 17:17,
20:5, 41:13,
42:18, 76:15,
82:11, 82:25,
92:15, 98:2,
102:7, 116:22
**live**
19:11
**llc**
1:6
**llp**
4:9

**locate**
97:8
**location**
75:18, 76:12,
76:20, 79:7
**locations**
74:23, 75:15,
75:23, 76:1,
76:9, 76:11,
76:16, 77:1,
77:12, 77:16,
77:20, 78:10,
78:11
**locking**
36:2
**long**
12:22, 19:8,
19:16, 21:12,
21:25, 22:12,
22:20, 23:7,
24:18, 31:19,
32:2, 86:10
**longer**
34:22
**look**
9:7, 27:5,
27:13, 30:22,
30:25, 31:3,
52:25, 56:13,
72:2, 72:17,
74:4, 75:2,
76:18, 82:24,
88:22, 93:15,
93:25, 94:9,
111:19, 112:4,
118:6, 123:24,
127:1, 127:10,
130:17, 132:16,
134:5, 135:11
**looked**
71:12, 71:17,
74:10, 99:13,
110:5, 134:5
**looking**
27:16, 67:4,
73:12, 78:5,
80:25, 81:2,
91:21, 92:4,

97:20, 98:17,
103:5, 112:7,
116:23, 119:7,
119:20, 125:23
**looks**
89:4
**loss**
48:19, 49:2,
49:21, 50:12,
51:1, 51:24,
52:21, 52:23,
53:1, 53:4,
67:18, 67:20,
97:12, 119:11,
119:13, 119:15,
119:17
**losses**
49:10, 53:21,
67:15
**lot**
119:14
**louder**
10:24
**love**
34:6

**M**

**machinery**
21:18, 22:8
**made**
101:7, 101:17,
102:3, 103:11,
106:7, 106:20,
107:6, 116:17,
117:13, 117:14,
119:11, 119:12,
136:12, 136:16,
138:17
**major**
48:17
**majority**
18:15, 45:24,
92:1
**make**
47:9, 67:23,
84:24, 85:24,
101:1, 101:23,
101:25, 102:2,

104:4, 106:2,
106:5, 106:13,
106:17, 106:22,
106:23, 107:7,
107:16, 107:17,
109:3, 116:12,
117:3, 121:4,
122:10, 123:7,
136:22, 137:19
**makes**
66:17
**making**
109:8, 109:10,
113:16, 137:18,
138:10
**manage**
15:24, 16:1,
16:2, 37:16
**managed**
37:9
**manager**
14:17, 15:8,
15:10, 89:21,
90:14
**manages**
90:16
**managing**
16:9, 16:18,
34:10, 42:4
**manufacturing**
56:15, 56:16,
57:15, 57:17,
57:19, 58:1,
58:3, 58:8,
59:2, 59:3,
59:10
**many**
42:23, 45:14,
46:4
**march**
97:22, 99:22,
103:5
**marine**
21:17, 21:20,
22:7, 23:19,
23:21
**mark**
26:20, 60:12,

73:23, 79:12,
81:6, 85:18,
86:12, 88:19,
111:16, 124:22,
126:21, 129:13
**marked**
6:19, 26:25,
27:2, 60:13,
60:21, 74:1,
74:3, 74:11,
79:13, 81:8,
81:10, 86:17,
86:19, 88:20,
111:17, 117:19,
117:20, 117:23,
123:11, 124:23,
126:23, 129:14
**markers**
62:1
**market**
14:10, 14:11,
82:22, 83:1,
87:5, 92:1
**markets**
12:12, 53:20
**match**
120:16
**math**
13:1
**matter**
36:6
**maybe**
26:14, 31:9,
39:8, 40:8,
40:9, 40:11,
41:11, 41:19,
43:1, 83:21,
118:10, 124:19
**mclarens**
84:20, 108:19
**mean**
16:20, 17:9,
18:10, 34:3,
37:11, 39:15,
40:8, 40:23,
40:24, 42:9,
55:3, 56:9,
63:7, 78:20,

83:1, 88:10,
101:19, 108:13,
110:3, 112:16,
115:11, 121:9,
138:6
**meaning**
58:18, 89:23
**means**
14:1, 38:12,
40:19, 56:8,
65:24, 67:18,
116:2, 116:5
**meant**
131:8, 132:2
**meet**
52:16
**meeting**
96:19
**memory**
9:12, 9:18,
9:21, 30:12,
58:6
**mention**
40:6, 122:10
**mentioned**
9:1, 10:13,
33:5, 50:20,
76:8, 91:5,
96:11, 99:10,
129:7
**met**
70:4
**mexico**
19:1, 24:24
**meyer**
2:4, 3:13
**mga**
34:5, 34:9,
54:3, 54:12,
91:9, 138:20
**mid**
103:5
**mid-march**
92:6
**middle**
64:1, 89:3,
126:6
**mike**
28:24, 29:4,

29:10, 29:18,
30:14, 31:22,
32:10, 32:13,
32:15
**miller**
3:4, 7:9
**million**
47:6, 47:9,
47:10, 47:12,
50:12, 51:6,
64:11, 64:12,
64:16, 64:17,
114:18, 126:5,
126:7, 126:11
**mind**
121:8
**mine**
16:14, 120:8
**minute**
120:7, 135:9
**minutes**
33:5, 78:12,
86:11, 121:18,
130:12
**miscellaneous**
77:19, 78:11
**missed**
34:2, 106:11
**mitch**
28:25, 29:20
**mitigate**
52:23
**mixed**
43:3
**mixing**
75:20
**month**
98:6, 98:24
**months**
41:7, 65:12,
65:13
**more**
17:5, 17:16,
26:3, 36:7,
38:4, 45:14,
48:19, 49:1,
52:5, 53:5,
53:18, 55:6,

59:10, 71:22,
92:15, 92:19,
93:8, 96:23,
102:25, 116:4,
130:17, 136:22
**morning**
7:8, 82:11
**most**
11:7, 29:12,
56:12, 74:19,
108:13, 129:2,
131:19
**mostly**
39:10
**mother**
53:5
**move**
24:24, 56:25,
57:5, 114:24
**moved**
12:9, 19:3
**much**
27:5, 31:7,
52:18, 52:20,
79:15
**multiple**
11:7, 13:7,
32:4, 55:24,
58:23, 119:15
**myself**
8:18, 121:4

**N**

**n-o-v-a-t-o**
20:3
**naic**
56:5, 56:21
**name**
7:8, 17:22,
18:2, 22:12,
29:15, 33:19,
95:12, 99:17,
100:1, 100:22,
108:3, 111:25,
118:20, 125:6,
125:21
**names**
11:8, 89:17,

128:1, 129:1,
129:2
**natural**
84:13
**nature**
53:6
**near**
98:8, 98:9
**necessarily**
113:10
**necessary**
34:18
**need**
11:18, 12:4,
27:11, 27:12,
74:5, 78:21,
79:16
**negative**
50:22, 53:3
**negotiate**
55:9
**negotiations**
135:22, 136:11
**neither**
33:6, 141:12
**nephila**
5:27, 81:21,
82:20, 82:22,
83:18, 84:2,
85:2, 85:5,
86:25, 87:7,
87:9, 87:22,
87:23, 90:22
**never**
8:6, 39:11,
40:21, 92:25,
117:15
**new**
16:16, 19:1,
22:6, 24:24,
25:5, 62:5
**newly**
77:16, 78:10
**next**
41:13, 44:19,
64:7, 86:10,
101:6, 114:20
**nine**
65:12

**non-lawyers**
30:18
**nonadmitted**
11:11, 11:13,
12:14, 13:9,
13:10, 13:13,
13:25, 14:2,
14:3, 14:4,
14:8, 16:15,
80:23
**none**
128:15, 135:14,
135:15
**nonhazardous**
114:5
**north**
4:10
**northern**
1:2
**note**
121:4
**notes**
128:3, 135:11
**nothing**
56:8, 66:10,
66:11, 66:21,
66:25, 80:12
**notice**
2:21, 5:14,
132:23, 135:22
**noting**
99:9
**novato**
19:25, 20:2,
20:3
**number**
5:13, 6:23,
26:21, 35:17,
36:3, 39:4,
42:4, 42:22,
49:10, 61:7,
61:9, 61:13,
65:17, 67:10,
72:25, 73:23,
74:4, 75:3,
75:5, 75:6,
78:9, 81:11,
81:13, 81:23,

85:18, 86:20,
88:19, 88:23,
89:1, 89:6,
98:12, 112:8,
117:23, 117:24,
118:10, 118:12,
119:20, 119:23,
120:13, 120:15,
121:17, 123:8,
123:24, 124:12,
127:3, 130:14,
135:22
**numbered**
60:22
**numbering**
127:4
**numbers**
9:15, 52:18,
52:20
**nw**
3:5

**O**

**oath**
7:3
**object**
17:9, 37:1,
49:4, 66:15,
110:19, 138:2
**obligations**
68:18
**obtained**
20:6
**obviously**
47:20
**occasion**
72:2, 72:16
**occupancies**
55:20, 55:21
**occupancy**
55:25, 56:13
**occupants**
56:7
**occur**
42:14, 53:21
**occurred**
51:5, 94:10
**october**
123:25

**office**
58:5
**officer**
94:20, 141:5
**offices**
2:2
**official**
9:5
**offline**
97:18
**often**
63:22
**oftentimes**
41:6
**oh**
15:4, 19:13,
29:1, 29:3,
39:22, 48:3,
48:5, 120:20,
122:2, 122:15,
124:4, 129:23
**oliphant**
37:21, 38:1,
38:6, 41:16
**once**
55:6, 72:21,
103:10, 105:23,
134:8
**one**
8:15, 8:17,
10:2, 10:14,
11:19, 11:22,
13:6, 13:8,
32:3, 32:7,
32:11, 32:18,
34:24, 37:18,
38:22, 39:3,
39:18, 41:10,
44:21, 45:23,
46:15, 48:22,
54:25, 55:14,
59:9, 63:15,
64:8, 67:2,
68:20, 68:21,
71:22, 75:3,
75:6, 76:1,
79:4, 80:18,
85:6, 87:1,

88:24, 89:23,
92:18, 93:8,
96:22, 96:24,
97:8, 98:17,
99:10, 101:25,
102:5, 102:25,
105:22, 108:18,
109:23, 113:8,
113:12, 113:13,
118:1, 118:16,
119:23, 119:24,
120:25, 121:6,
123:7, 124:13,
126:15, 127:5,
127:11, 127:22,
128:24, 129:18,
129:24, 130:17,
132:20, 134:5,
135:17, 135:21,
136:21
**ones**
25:3, 41:21,
99:18
**ongoing**
121:17
**only**
8:16, 44:15,
54:25, 77:8,
77:14, 83:6,
96:22, 102:8,
102:12, 105:1,
111:11, 119:1
**operations**
91:14, 119:1
**operations@art-a-**
**llianz**
91:10
**opposed**
16:23, 41:4,
56:6
**option**
42:12, 96:3,
96:4, 96:8,
96:13, 96:16,
96:17
**options**
95:17, 95:18,
95:19, 95:20,

103:14, 103:22,
106:4, 106:6,
115:7
**order**
14:8, 78:22
**ordering**
139:3, 139:4
**orpett**
2:4, 3:13,
28:25
**other**
8:16, 8:18,
10:2, 12:4,
12:6, 20:22,
20:23, 24:25,
25:1, 26:15,
28:7, 28:8,
28:21, 29:17,
30:14, 30:17,
31:14, 31:16,
31:22, 38:1,
39:5, 44:24,
45:4, 45:18,
47:11, 57:4,
57:13, 64:23,
65:2, 67:20,
67:25, 92:12,
102:6, 104:13,
104:14, 104:17,
104:18, 105:4,
105:5, 105:18,
107:12, 107:16,
107:20, 109:14,
109:19, 125:22,
127:6, 128:13,
134:3, 137:8,
138:4
**others**
23:20, 45:13,
45:25, 97:21,
99:16, 102:5,
111:9, 111:25,
118:16, 118:17,
118:20, 133:4
**otherwise**
141:15
**out**
40:8, 40:10,

40:11, 41:6,
41:20, 51:23,
52:20, 56:20,
63:1, 63:2,
71:22, 94:17,
96:6, 100:1,
103:14, 103:22,
106:4, 106:20,
108:11, 115:4,
116:17, 117:25,
118:21
**outcome**
141:15
**outside**
12:1, 28:22,
33:13, 37:15,
42:6, 42:11,
43:7, 71:3,
107:19, 122:24,
128:5, 134:2
**outsized**
50:22, 51:2
**over**
7:17, 7:19,
12:9, 15:15,
15:23, 16:6,
16:19, 22:18,
23:2, 23:5,
29:5, 32:11,
32:14, 32:15,
50:11, 50:12,
73:22, 105:24,
119:7
**overall**
56:22, 71:25
**overlapping**
86:23
**override**
66:13
**overrides**
66:23
**own**
31:4, 60:1,
112:25
**owned**
54:7
**ownership**
54:10

**P**

**p-a-n-e-l**
104:7
**pacific**
23:13, 23:24,
23:25, 24:16
**page**
5:4, 5:13,
6:23, 27:10,
27:16, 27:17,
27:18, 27:19,
27:22, 32:18,
61:8, 61:19,
62:15, 62:16,
63:25, 64:7,
65:19, 67:9,
68:4, 68:25,
89:3, 91:21,
99:10, 100:6,
111:22, 112:16,
113:9, 113:13,
113:14, 114:20,
119:23, 119:24,
119:25, 121:13,
122:9, 124:13,
126:2, 127:2,
127:10, 129:6,
130:19, 130:20,
133:1
**pages**
1:30, 65:17,
69:19
**paid**
52:20, 62:19,
80:21, 84:19,
104:19, 114:6
**panel**
104:6, 104:7
**paper**
13:13, 13:16,
14:3, 17:8,
17:14, 25:17,
61:25, 62:12,
72:25
**paragraph**
75:5, 87:1,
87:14, 115:19,

130:22, 133:3
**paraphrase**
115:20
**paraphrasing**
117:5
**parens**
80:5
**parent**
10:5, 10:6
**parlance**
53:22
**part**
10:9, 16:19,
27:13, 38:9,
45:10, 46:13,
46:21, 47:1,
61:4, 64:8,
64:12, 64:15,
64:16, 65:9,
71:15, 75:4,
78:14, 78:17,
78:19, 78:20,
83:22, 84:5,
95:9, 103:21,
108:2, 112:4,
112:21, 119:19,
136:9
**participants**
118:22
**particular**
10:3, 33:7,
34:13, 40:11,
48:13, 51:7,
59:23, 62:20,
63:18, 64:21,
68:11, 68:17,
69:6, 69:12,
70:8, 70:13,
81:14, 113:12,
121:19, 125:25
**parties**
12:1, 141:14
**partner**
29:21
**passed**
39:13, 52:13
**past**
20:6

**paul**
28:13, 29:18,
29:25, 31:22,
32:7, 32:12,
32:13
**pay**
67:20, 92:2,
92:12, 92:23,
94:14, 95:5,
96:14, 101:18,
101:20, 102:9,
104:19, 115:21,
132:2
**payer**
81:19
**payment**
67:23, 95:21,
95:22, 96:12,
100:25, 101:1,
101:2, 101:7,
101:13, 101:17,
101:23, 102:13,
104:4, 106:9,
106:13, 106:23,
107:8, 107:17,
109:3, 113:21,
114:2, 114:3,
114:5, 114:25,
115:22, 116:3,
116:8, 116:17,
117:3, 117:7,
117:8, 117:16,
131:5, 131:11
**payments**
84:24, 93:7,
102:2, 107:15,
107:21, 108:12,
113:24
**pays**
67:25
**pcbs**
69:2
**pdf**
139:15, 139:16,
139:17, 139:19
**peninsula**
79:24, 81:25,
82:4, 89:5,

89:24, 91:18,
108:24, 111:24,
116:1, 116:23,
118:2, 118:9,
118:11, 119:4
**people**
15:24, 16:1,
16:2, 16:9,
16:10, 16:18,
17:6, 17:16,
32:6, 34:22,
38:4, 138:4
**percent**
45:3, 45:20,
45:25, 46:1,
46:7, 46:8,
46:14, 46:16,
46:22, 46:23,
47:3, 47:7,
47:12, 63:16,
63:17, 64:13,
64:19, 64:22,
65:1, 66:8,
83:23, 84:7,
84:10, 87:10,
87:24, 88:1,
88:6, 109:4,
114:16
**percentage**
67:24
**perfect**
38:23, 40:5
**perils**
83:4, 84:10,
84:11, 84:13,
88:3, 88:4,
88:5, 88:8
**period**
9:17, 35:19,
35:20, 36:19,
51:5, 51:13,
65:5, 114:10
**person**
8:20, 26:7,
26:8, 36:24,
79:3, 91:2,
91:7, 110:11,
125:5

**personal**
25:8, 25:15,
26:4, 31:20,
112:25
**personally**
94:3, 133:9
**petaluma**
19:13, 19:16,
19:23
**peter**
122:11, 122:19,
125:18
**pettit**
127:12, 127:16,
127:18, 127:20,
127:25, 128:16,
129:7, 131:2,
131:3, 131:8,
133:2, 133:4,
134:7, 134:14,
134:23
**phone**
31:23, 31:24,
32:2, 32:3,
32:4, 34:25,
96:20, 96:21,
96:22, 96:24,
104:3
**physically**
78:20, 78:25
**pib**
5:22, 6:2, 6:4,
6:7, 6:12,
118:24, 119:3,
119:4, 119:11,
119:14, 119:19,
121:22, 124:1,
127:12, 129:17,
131:1, 132:17,
133:6, 133:10,
133:21, 134:14
**pick**
13:4, 34:24
**picking**
55:18
**pile**
126:16
**place**
136:3

**places**
24:23, 47:9,
47:11, 125:22
**placing**
43:24, 46:20,
46:21, 47:1
**plain**
51:22, 55:22
**plaintiff**
1:7, 3:2, 7:10
**please**
8:10, 27:14,
123:22, 124:20
**pllc**
3:4
**plus**
8:16, 137:16
**point**
16:3, 40:22,
50:18, 52:11,
55:1, 90:17,
99:24, 106:19,
106:25, 107:5,
109:8, 109:11,
117:25, 138:10
**pointing**
66:16
**points**
126:6
**pol**
105:2, 110:15,
116:9
**policies**
35:18, 36:23,
41:6, 41:12,
58:19, 60:3,
61:24, 72:3,
74:20, 109:21,
110:15, 110:22,
133:23, 136:8,
137:5
**pollution**
68:8, 92:19,
93:9, 105:13,
105:17, 110:1,
115:1, 116:10,
135:24, 136:8,
136:18, 136:25,

137:3
**pollution-type**
109:20
**pollutions**
109:15
**polychlorinated**
69:2
**popping**
130:2
**portfolio**
37:9, 41:20,
46:4, 49:3,
51:14, 51:15,
52:7, 54:6,
60:6, 61:24,
69:23, 70:11,
83:6
**portion**
46:17, 46:20,
67:21, 83:23,
84:9, 84:16,
102:10, 114:5,
114:6, 114:7,
114:9, 114:11,
114:12, 114:13,
114:25, 115:21
**position**
15:24, 110:13,
111:9, 111:12,
116:8
**positions**
16:13, 24:25,
25:1, 111:13
**possible**
131:20
**possibly**
41:9, 43:15,
99:5, 108:19,
134:23, 134:24,
138:3
**post-law**
105:2
**post-loss**
95:20, 96:3,
106:8, 131:13,
131:20
**practice**
72:6

pre-prescribed
38:15
preceded
112:12
predominantly
11:9, 57:2,
83:3
prefix
61:9, 61:15,
62:2
premarked
72:23
premium
62:16, 62:19,
62:22, 62:25,
63:1, 63:3,
74:17
premiums
53:24, 54:1,
54:5
preparation
30:20, 30:23,
73:9, 89:15,
112:5, 118:6
prepare
28:3, 34:16
present
96:16
presented
42:15, 112:22
president
102:19
presidents
105:24
pretty
52:18, 103:9
previously
6:19
price
53:20
pricing
41:2, 53:18,
53:20
primarily
37:20, 57:3
primary
38:6, 43:17,
45:24, 64:3,

64:4, 64:10,
64:23
prior
81:12
probably
13:17, 13:23,
48:6, 72:19,
74:19, 79:16,
92:22, 98:7,
103:1, 107:4,
115:15, 136:20
problem
29:17, 32:17,
48:24
procedure
118:14
proceedings
7:1, 123:14,
123:18, 140:4
process
26:5, 38:14,
38:16, 39:10,
39:14, 39:15,
40:1, 40:16,
41:10, 42:24,
53:8, 59:8, 91:2
product
9:6
production
58:16
professional
2:23
profitability
37:17, 48:12,
48:24, 48:25,
52:1, 52:16
profitable
48:10, 48:13,
48:14, 48:16
program
34:21, 35:2,
35:3, 35:4,
35:10, 36:25,
37:9, 37:17,
37:23, 38:18,
39:9, 39:10,
42:5, 42:15,
42:25, 43:25,

44:13, 44:25,
45:6, 45:23,
46:13, 47:2,
47:17, 48:8,
48:12, 48:18,
48:25, 51:7,
51:14, 51:20,
52:10, 53:4,
54:17, 55:2,
57:1, 59:13,
59:21, 60:8,
61:5, 63:12,
64:21, 65:13,
66:12, 66:21,
66:22, 66:25,
67:3, 69:16,
70:11, 70:19,
70:21, 70:22,
70:23, 70:25,
71:3, 71:8,
71:16, 71:18,
72:1, 72:7,
72:18, 74:21,
75:15, 80:12,
81:3, 82:8,
82:10, 82:15,
83:22, 84:6,
84:17, 85:6,
85:10, 85:17,
89:22, 90:2,
91:3, 91:4,
92:7, 100:19,
102:3, 102:11,
102:13, 104:15,
104:18, 107:19,
109:14, 114:16,
127:21, 136:1,
136:5, 136:9,
137:1, 137:24,
138:20
program's
49:11
progress
126:18
prompts
9:11
pronounce
81:21, 122:13

properly
78:22
property
14:21, 21:17,
22:7, 23:14,
23:19, 23:21,
23:24, 23:25,
53:1, 61:20,
62:1, 65:20,
71:8, 74:20,
87:8, 87:10
proportion
53:9
prospect
72:8
protected
14:18, 14:20
provide
14:6, 75:17,
83:2, 83:8,
134:21, 134:22
provided
31:1, 31:8,
78:23, 114:10,
133:5
pull
56:17, 56:20,
79:6, 130:16
purpose
81:18, 81:19,
101:12
purposes
101:2, 101:3
pursuant
2:21
push
86:9, 105:7
pushback
92:10
pushing
102:15
put
15:22, 55:22,
69:12

Q

qualified
43:16, 45:1,

45:5, 45:19
**qualify**
46:16, 51:1
**quality**
47:23, 47:25,
48:2, 48:4,
48:5, 52:22
**quantify**
49:15
**quantum**
49:22, 50:25
**quarterly**
74:16
**question**
8:11, 8:12,
10:16, 11:23,
17:10, 25:13,
26:11, 27:4,
37:2, 44:19,
48:23, 49:6,
50:15, 51:18,
52:18, 62:21,
66:18, 67:8,
70:9, 74:5,
74:24, 77:24,
79:16, 81:1,
85:19, 86:24,
92:14, 93:1,
93:3, 110:6,
121:16, 121:17,
126:14, 131:7,
135:18, 135:25,
137:15, 138:3
**questioning**
50:19
**questions**
8:7, 27:6,
88:25, 121:10,
123:20, 135:13
**quick**
23:15, 86:23,
120:21, 122:9,
135:17
**quicker**
41:13
**quickly**
40:9, 115:20
**quite**
8:9, 40:2,

43:10, 45:14,
81:13
**quote**
117:6, 131:9,
131:11
**quotes**
39:17, 39:20,
39:21, 39:22

### R

**random**
41:18, 41:19,
41:23
**range**
63:15
**rarely**
38:21
**rate**
14:4
**rates**
14:7
**ratio**
53:2
**ratios**
52:21, 52:24,
53:4
**rd**
98:18, 99:21
**re-mark**
121:1
**re-marked**
132:13
**reach**
94:17
**reached**
47:21, 103:14,
106:19
**read**
78:7, 87:2,
110:22, 123:22,
142:3
**reading**
141:11
**real**
23:15, 56:14,
58:5, 120:20,
122:9
**really**
22:15, 36:6,

40:2, 43:8,
43:11, 51:23,
51:25, 53:16,
79:25, 93:6,
119:9, 135:17,
137:19
**realtime**
2:24
**reason**
89:11, 107:16
**recall**
13:16, 15:17,
26:12, 32:2,
34:11, 35:10,
35:12, 42:2,
42:7, 43:4,
43:5, 44:25,
45:4, 45:13,
48:15, 51:3,
55:12, 57:12,
59:15, 63:11,
63:14, 71:16,
71:21, 73:12,
84:12, 90:2,
91:1, 92:4,
92:16, 92:22,
93:3, 95:15,
96:23, 96:25,
97:24, 100:13,
100:17, 100:18,
101:6, 101:12,
101:16, 102:10,
104:2, 105:20,
109:2, 109:7,
109:10, 109:17,
109:22, 109:23,
110:24, 111:3,
111:4, 111:11,
112:2, 113:20,
115:25, 118:9,
119:7, 119:10,
121:18, 121:21,
122:23, 124:9,
125:13, 125:14,
126:9, 127:15,
133:13, 134:3,
134:13, 135:2,
135:19, 136:23,

137:2, 137:8,
138:14
**receive**
89:11, 113:15
**received**
113:1, 113:11,
114:23, 115:11,
117:2, 127:24,
134:19
**receiving**
63:5, 91:13,
124:9, 127:15
**recess**
88:15
**recipient**
118:17
**recipients**
89:6, 118:1,
127:11, 128:2,
129:19, 132:21
**recollect**
55:14, 103:3
**recollection**
52:12, 70:17,
74:7, 100:22,
114:4, 122:2,
136:19
**recommend**
95:4
**recommendation**
106:2, 106:5,
106:7, 119:12
**recommendations**
115:8, 119:12
**record**
18:25, 26:22,
26:23, 60:17,
60:18, 73:3,
73:4, 73:24,
86:15, 88:18,
123:9, 123:15,
132:11, 141:8
**redaction**
119:24, 120:3,
120:8, 121:13
**redactions**
119:23, 120:4,
124:13, 124:15

**reduced**
141:10
**refer**
60:15, 78:21
**reference**
116:25
**referencing**
127:9
**referral**
42:12
**referrals**
37:15, 42:5
**referring**
87:21
**reflected**
60:8, 67:4
**reform**
96:13
**reformation**
95:21, 96:4,
105:2, 106:8,
131:21
**reformations**
131:13
**refresh**
9:18
**refreshes**
122:2
**refreshing**
100:22
**region**
14:17, 15:11
**registered**
2:22
**regular**
139:22, 139:24,
139:25
**reinsurance**
83:3, 83:10,
83:12, 83:13,
83:17, 84:3,
84:5, 85:4,
85:11, 87:16,
87:21, 87:25
**reinsure**
84:12, 84:16,
88:6
**reinsuring**
84:7, 84:9,

87:25, 88:1
**rejected**
43:2
**related**
55:13, 81:2,
92:8, 118:13,
141:13
**relates**
86:5
**relating**
26:15, 80:16
**relations**
20:21
**relationship**
18:14, 101:15
**rely**
33:13
**relying**
68:17, 68:22,
68:25, 69:6,
69:9
**remember**
9:5, 9:6, 9:14,
11:8, 11:19,
16:6, 29:5,
29:14, 39:25,
40:2, 49:13,
55:6, 55:15,
73:19, 91:17,
98:2, 102:6,
102:13, 102:14,
105:6, 111:8,
116:4, 122:3,
122:18, 124:19,
125:23, 129:25
**remembers**
130:10
**remind**
124:18
**removal**
69:5, 135:23
**renewal**
62:5
**reno**
20:1
**repeat**
61:12, 136:13
**rephrase**
8:12, 37:5

**report**
6:2, 6:4, 6:7,
6:12, 17:7,
17:11, 17:15,
17:18, 18:6,
18:18, 118:10,
119:8, 123:25,
124:10, 124:13,
125:16, 127:9,
129:17, 132:17
**reported**
1:31, 17:20,
91:7
**reporter**
2:22, 2:23,
2:24, 8:15,
10:23, 11:1,
11:13, 11:22,
15:1, 15:4,
21:20, 24:8,
24:11, 24:13,
30:4, 32:25,
33:19, 39:18,
39:22, 47:25,
48:3, 48:5,
56:19, 61:12,
95:7, 95:22,
95:24, 104:7,
119:3, 121:1,
123:2, 128:20,
130:8, 132:7,
136:13, 139:3,
139:6, 139:8,
139:10, 139:13,
139:15, 139:18,
139:22, 139:25,
141:1, 141:4
**reports**
118:12, 118:21,
119:10, 119:20,
121:18, 121:20,
121:23, 122:1,
124:21, 133:17,
134:1, 134:2
**represent**
7:9, 78:8
**representing**
114:2

**request**
5:22, 42:10,
43:6, 79:22,
79:23, 94:9,
101:14, 101:24,
102:3, 102:9,
103:18, 136:12,
136:16
**requested**
91:22, 100:9,
141:12
**requesting**
92:23
**requests**
102:6, 119:16
**require**
59:21, 67:22
**required**
41:12
**reserve**
119:17, 139:1
**reserves**
119:11, 119:13,
119:15
**reside**
18:25
**residential**
57:2, 57:13
**respect**
18:18, 25:9,
26:5, 26:13,
37:7, 38:19,
41:16, 52:10,
60:2, 62:1,
68:11, 68:15,
70:6, 70:18,
78:4, 81:3,
82:14, 84:17,
92:18, 121:22,
122:24, 124:21,
131:19, 133:11,
133:14, 137:4,
137:12
**respects**
70:21
**responsibilities**
68:1, 82:14
**responsibility**
14:12

rest
63:2, 87:20,
129:1, 134:6
restricting
55:15
result
49:2
resulted
97:12, 131:5,
131:10
results
53:17, 55:16
retail
46:20, 47:10,
137:14
retire
32:13
returns
123:17
reversed
111:6
review
27:25, 31:14,
31:15, 31:16,
37:16, 72:9,
73:8, 89:14,
94:10, 101:25
reviewing
31:7, 38:14
revise
136:17
revised
55:1
rich
106:3, 115:6
richard
94:22, 94:24,
103:15, 103:19,
106:15, 115:8
risk
12:17, 14:18,
14:19, 14:20,
17:2, 18:12,
34:4, 40:11,
41:2, 43:18,
45:20, 45:24,
46:17, 46:21,
46:22, 46:23,

50:5, 50:6,
50:7, 51:8,
53:20, 56:1,
56:6, 56:10,
58:19, 59:4,
59:23, 64:22,
66:8, 67:24,
83:20, 83:24,
84:16, 88:1,
88:7, 104:19
risks
14:21, 46:13,
50:20, 53:19,
54:5, 104:13,
104:14
role
15:20, 16:17,
38:10, 48:11,
70:6
roles
16:13
roughly
16:5, 22:2,
22:23, 35:14
round
94:10
royal
21:9, 21:16,
21:23
rpr
1:32, 141:4,
141:21
rule
5:14, 7:11
rules
7:18, 38:16
rumor
87:18, 87:19,
87:20, 87:22
rumored
87:5
run
8:9
rush
140:3

_____ S _____

s
22:25

said
15:8, 17:10,
18:24, 35:6,
36:21, 42:5,
44:1, 45:18,
59:14, 66:16,
78:12, 83:8,
87:9, 87:15,
88:9, 94:1,
100:17, 105:12,
105:21, 106:20,
106:22, 107:6,
108:14, 111:12,
115:9, 117:4,
121:12, 129:8,
131:15, 136:11,
137:16, 141:9
sal
70:3, 70:4,
70:18, 70:21,
71:3, 100:14,
100:19
salvatore
69:25, 70:2,
100:8
same
22:6, 23:19,
30:14, 50:8,
59:17, 65:1,
112:21, 118:22,
134:10, 139:14,
139:17, 142:4
santa
19:1
save
72:25, 116:22
saw
42:18
say
9:12, 15:2,
15:21, 15:23,
23:8, 30:4,
30:19, 31:15,
35:2, 38:9,
39:14, 40:4,
40:20, 43:11,
44:2, 46:7,
48:1, 49:13,

49:14, 51:22,
54:11, 54:12,
56:17, 61:3,
61:15, 63:7,
66:20, 68:19,
69:18, 70:23,
71:20, 76:18,
80:13, 80:14,
94:16, 94:23,
95:14, 97:17,
105:8, 106:1,
112:7, 115:10,
119:3, 122:2,
131:23, 137:19,
138:5
saying
24:9, 40:14,
40:15, 40:18,
66:5, 87:23,
98:20, 112:11,
131:17
says
61:19, 65:20,
65:23, 67:1,
67:13, 75:3,
75:6, 81:25,
87:4, 105:11,
115:11, 115:18,
128:12
scape
15:2
schedule
58:5, 64:4,
64:8, 74:22,
75:17, 75:20,
76:9, 76:13,
77:13
scheduled
74:23, 75:1,
76:11, 76:16,
76:19, 76:21,
77:1, 77:9
school
20:7
schroeder
3:12, 7:15,
7:17, 7:24, 8:1,
11:25, 15:9,

17:9, 28:8,
28:16, 28:18,
28:22, 28:25,
29:3, 29:6,
31:1, 31:8,
33:22, 33:25,
34:6, 35:8,
37:1, 39:20,
49:4, 60:14,
66:15, 73:3,
77:23, 78:1,
85:22, 85:25,
97:6, 97:10,
97:15, 97:16,
120:7, 120:11,
120:13, 120:15,
120:18, 120:23,
121:5, 121:9,
121:12, 123:3,
123:13, 123:17,
123:21, 124:2,
124:4, 126:16,
129:20, 129:24,
130:3, 130:10,
135:10, 135:12,
135:15, 138:2,
138:6, 139:1,
139:7, 139:14,
139:16, 139:21,
140:2
**schroeder's**
29:21
**science**
20:18, 20:19
**scope**
78:23
**score**
38:23, 40:5
**second**
10:15, 17:25,
59:17, 76:25,
87:1, 93:25,
96:12, 102:18,
106:15, 111:22,
115:18, 120:9,
121:13, 122:9,
126:2, 127:10,
130:19, 130:20,

133:1, 133:2,
133:3
**section**
65:19, 66:23,
67:10, 68:5,
123:22, 130:22
**sections**
125:17
**sectors**
57:4
**secure**
134:8
**security**
4:4
**see**
9:18, 27:18,
27:23, 32:20,
32:24, 33:3,
60:23, 61:10,
61:21, 62:10,
62:17, 62:24,
64:5, 65:6,
65:21, 66:3,
67:10, 67:16,
68:5, 68:8,
75:7, 75:10,
79:7, 80:6,
81:23, 82:1,
82:18, 87:12,
89:1, 89:4,
89:7, 90:11,
90:23, 91:24,
92:2, 97:22,
98:15, 99:16,
100:1, 100:10,
110:21, 111:25,
112:16, 115:1,
115:23, 118:3,
118:22, 119:22,
119:25, 120:20,
120:23, 122:1,
122:12, 123:25,
124:7, 125:1,
125:3, 125:7,
125:16, 125:19,
126:7, 127:11,
127:12, 129:19,
130:24, 132:16,

132:18, 133:7,
134:10
**seeing**
100:22
**seems**
42:19, 102:7
**seen**
27:6, 58:4,
60:25, 74:6,
79:18, 81:14,
97:4, 112:18,
125:6
**segment**
38:14
**select**
23:13, 23:24,
23:25, 24:16,
41:21
**selecting**
38:13
**selective**
41:20
**selects**
53:19
**semantics**
76:18
**sending**
134:13
**senior**
101:14, 101:24,
102:15
**sense**
43:12, 46:4,
51:19, 87:23,
98:8
**sent**
134:15
**sentence**
131:6
**separate**
32:6, 53:16,
68:1, 76:9,
82:13, 84:23,
85:1
**series**
111:20
**service**
62:24, 63:2

**session**
31:15
**set**
61:24, 84:23,
87:11
**seven**
15:23, 15:25
**several**
67:11, 67:15
**shakes**
108:9
**share**
45:20, 46:14,
46:17, 46:22,
51:8, 64:10,
64:13, 64:19,
65:2, 66:8,
87:10, 87:24,
114:16
**shared**
133:5
**sharing**
67:23
**shea**
89:4, 91:16,
91:17, 97:21,
98:15, 99:14,
100:8, 111:24,
114:22, 117:1,
117:3
**sheet**
116:23, 142:7
**shorter**
126:17
**shorthand**
2:22, 141:3
**should**
53:22, 53:23,
53:25, 54:4,
58:3, 122:15
**show**
27:2, 60:21,
72:22, 73:1,
73:22, 74:3,
79:11, 79:17,
81:6, 81:10,
85:17, 88:19,
111:15, 116:21,

117:18, 126:21
**showing**
76:5, 81:17,
81:18, 86:19,
117:22
**shows**
27:22, 61:9,
64:3, 64:15,
65:5, 85:25
**sic**
12:20, 56:6,
56:13, 56:21,
117:24, 118:2,
118:3, 129:18,
131:5
**side**
70:7, 80:1,
110:4
**sign**
82:9
**signature**
139:2, 142:10
**signature-tlndd**
141:19
**signed**
131:3, 142:7
**significant**
51:25
**signing**
141:12
**similar**
41:2
**simple**
47:9, 53:22
**since**
16:17, 16:19,
17:3, 17:5,
17:14, 19:4,
20:24, 59:7,
97:3
**single**
46:15, 71:14,
71:18, 72:5,
76:12
**singular**
45:23
**sites**
77:11

**situation**
45:22, 94:25
**six**
15:23, 15:25,
53:1
**size**
50:17, 51:24,
139:11, 139:12
**skip**
102:17, 102:18,
102:19, 102:21,
103:13, 103:18,
105:8, 105:18,
105:21, 107:2,
107:3, 107:5,
107:10, 107:12,
109:1, 109:2,
115:6, 115:10
**skyscrapers**
14:23, 15:3
**slightly**
135:19, 136:21
**small**
33:23
**soft**
53:20
**some**
7:18, 16:3,
23:20, 26:4,
26:14, 30:25,
31:3, 33:13,
33:14, 38:22,
39:8, 45:4,
47:11, 50:14,
52:15, 53:13,
54:14, 54:19,
56:10, 67:20,
67:24, 76:5,
86:22, 87:5,
88:25, 90:20,
106:19, 107:4,
115:3, 118:15,
118:20, 126:3
**somebody**
115:13, 121:22,
122:4, 134:16
**somehow**
63:6, 66:13

**someone**
7:23, 8:19,
16:23, 138:15
**something**
9:14, 12:16,
13:19, 20:19,
42:10, 53:7,
66:16, 68:21,
87:16, 117:11,
117:25, 121:2,
122:1
**sometime**
85:11, 92:5,
115:15
**sometimes**
18:11
**sonoma**
19:7, 19:14
**sorry**
10:19, 11:21,
15:1, 15:13,
17:22, 18:23,
19:21, 20:5,
25:20, 28:17,
32:25, 33:12,
34:2, 44:20,
48:5, 61:12,
61:25, 63:2,
77:25, 79:15,
80:24, 91:4,
103:25, 107:3,
107:11, 108:24,
109:1, 112:8,
117:14, 121:11,
122:8, 122:17,
124:4, 125:2,
127:2, 127:7,
127:9, 130:9,
130:14, 130:20,
131:23, 136:13
**sort**
9:18, 14:10,
16:18, 24:5,
33:14, 36:15,
39:5, 41:20,
42:24, 43:3,
43:5, 43:12,
43:17, 48:14,

48:19, 49:2,
49:3, 50:11,
50:12, 50:14,
54:13, 54:19,
59:17, 61:23,
61:25, 63:25,
79:22, 85:1,
92:19, 98:13,
99:17, 103:5,
109:20, 110:1,
110:6, 112:13,
113:16, 115:4,
115:14
**south**
1:3, 57:24
**southern**
20:12
**sov**
75:10
**speak**
10:23, 28:7,
30:18, 34:15,
51:22, 52:18,
55:23
**speaking**
8:20, 100:13,
133:13
**special**
34:4
**specialty**
4:6, 10:9,
12:16, 30:11
**specific**
40:3, 56:7,
71:21, 77:1,
77:14, 79:21,
84:10, 88:2,
88:4, 88:5,
88:8, 134:5,
134:6
**specifically**
30:1, 51:3,
69:16, 77:12,
91:23, 124:9,
131:12, 139:10
**specifics**
84:1
**speed**
40:12

**spell**
18:2, 95:24

**spend**
27:5

**spent**
31:7

**split**
32:5

**splitting**
63:6

**spoke**
28:4, 102:17,
108:14, 108:17

**spot**
88:24

**sru**
33:18, 34:3,
34:12, 35:5,
35:18, 37:8,
37:20, 38:7,
41:12, 42:10,
47:2, 47:5,
47:18, 54:3,
54:4, 54:7,
54:12, 54:13,
54:20, 55:10,
59:21, 61:5,
63:7, 138:19

**sru's**
38:19

**stand**
33:25

**standard**
38:13, 118:14,
118:21, 129:1

**starr**
4:2

**start**
21:6, 39:7,
105:23, 111:21

**start-up**
23:13

**started**
13:14, 14:15,
15:7, 35:12,
85:10, 136:4

**starting**
112:9

**startup**
23:23

**state**
2:24, 14:6,
14:7, 14:10,
141:5

**statement**
74:21, 74:25,
75:6, 75:11,
75:13, 75:14,
75:19, 75:20,
75:22, 76:2,
76:17, 78:13,
78:16, 78:21,
79:6

**states**
1:1, 11:16,
12:19, 12:20

**status**
100:9, 118:12

**stay**
85:14

**stayed**
57:15

**stenographically**
141:10

**still**
24:4, 90:4,
90:18, 98:22

**stood**
51:23

**stop**
10:15

**storm**
50:21

**storms**
53:7

**streams**
113:19

**street**
2:6, 3:5, 3:14,
4:10

**strike**
130:6, 130:8

**string**
98:14, 99:12,
111:22, 112:21,
127:8

**structure**
54:10, 76:19

**struggled**
53:1

**stu**
107:1

**stubenvoll**
125:19

**studebakers**
58:16

**sub**
66:3

**sub-limit**
126:7

**subject**
18:20, 25:20,
57:25, 97:1

**subparts**
33:2

**suggest**
42:19

**suggests**
96:4

**suite**
2:8, 3:15, 4:11

**supervising**
16:24

**supplement**
126:11

**support**
87:15

**supporting**
84:25

**supposition**
131:12

**sure**
7:14, 7:17,
8:10, 10:25,
17:12, 25:13,
27:10, 50:15,
52:17, 52:22,
54:9, 54:18,
56:12, 81:20,
85:8, 92:16,
103:9, 103:10,
116:12, 123:7,
128:7, 135:10,
136:22, 137:19

**surfacing**
92:6

**surplus**
4:2, 4:5, 14:12

**sworn**
7:3

**synonymously**
117:11

**system**
97:11

---

**T**

**t-e-n-n-e-r**
28:18

**t-e-n-n-r**
28:15

**t-e-n-o-r**
28:14

**take**
8:17, 23:20,
26:3, 27:11,
37:15, 42:5,
47:2, 47:7,
47:12, 54:16,
56:1, 74:4,
79:15, 80:8,
88:7, 88:13,
88:22, 93:14,
94:9, 95:16,
96:6, 96:8,
97:9, 101:5,
110:11, 111:10,
111:19, 116:7,
127:1, 127:7,
130:5, 130:13,
130:15, 130:16,
132:16, 139:7,
139:14

**taken**
59:4, 71:22,
88:15, 141:6,
141:9

**takes**
23:2, 23:9,
83:23

**taking**
63:1, 63:2,
64:16, 87:9,

87:24
**talk**
34:25, 126:5
**talked**
59:15, 82:10,
105:19
**talking**
29:1, 29:7,
35:3, 40:16,
44:2, 51:6,
54:17, 56:4,
56:5, 70:24,
86:6, 108:6,
108:11, 125:14,
125:17, 126:3
**team**
47:22, 91:14,
93:22, 118:25,
119:2
**telephone**
102:23
**tell**
8:10, 10:4,
12:5, 14:1,
23:25, 31:6,
40:19, 64:9,
67:19, 76:24,
82:20, 87:17,
93:11, 99:11,
106:12, 107:6,
107:12, 113:11,
127:1, 137:22
**telling**
27:12, 104:3,
109:2, 110:24,
111:4, 111:11,
116:1, 136:24,
137:2, 137:10,
138:14, 138:15
**ten**
13:17, 22:24,
45:3, 45:19,
46:14, 46:16,
46:22, 46:23,
47:3, 47:7,
47:12, 64:13,
64:19, 64:22,
65:1, 66:8,

83:23, 84:7,
87:10, 87:24,
88:1, 88:6,
114:16, 130:12
**tenants**
55:24, 58:23,
59:10
**tenders**
121:6
**tenner**
28:13, 28:23,
29:18, 29:25,
31:22, 32:7
**term**
117:8, 117:16,
131:18
**termination**
59:19, 59:20
**terms**
21:1, 29:18,
37:22, 39:3,
40:1, 41:2,
42:4, 43:7,
47:22, 49:22,
50:8, 51:24,
53:4, 57:20,
60:1, 65:25,
66:1, 66:7,
67:3, 69:21,
71:25, 79:2,
79:21, 87:11,
91:17, 104:20,
107:13
**terrific**
122:7
**test**
9:12, 9:21
**testified**
7:4
**testimony**
66:11, 66:21,
100:12, 131:16,
141:8, 141:9,
142:4, 142:6
**th**
111:23, 112:10,
112:17, 113:2,
113:8, 114:21,

115:16, 115:19,
127:14
**thank**
7:7, 11:1,
15:15, 25:7,
50:18, 79:10,
84:11, 88:14,
129:12, 132:6
**thanks**
28:19, 123:23
**themselves**
52:19, 72:3
**thereafter**
141:10
**therefore**
137:11, 137:24,
138:12
**thing**
59:18
**things**
21:2, 26:3,
40:6, 57:20,
77:16, 77:19,
79:4
**think**
8:23, 10:5,
15:8, 22:13,
22:15, 29:10,
32:7, 33:22,
34:18, 37:5,
41:18, 53:3,
53:9, 53:17,
60:16, 63:24,
99:19, 100:17,
102:8, 103:14,
121:9, 125:6,
128:2, 129:9,
129:20, 131:2,
135:8
**third**
48:11, 96:13,
96:17, 111:23
**thom**
72:24
**thoman**
6:24, 72:24,
72:25, 78:9
**thomaston**
4:8, 110:19,

120:14, 122:14,
122:16, 123:4,
124:3, 124:5,
135:14, 138:24,
139:9
**thought**
36:21
**three**
27:17, 27:19,
33:2, 35:14,
35:25, 36:2,
37:18, 46:3,
46:12, 64:12,
65:9, 69:9,
71:11, 119:25
**three-and-a-half**
35:14
**three-and-a-half**
**-year**
36:19
**three-plus**
37:24, 51:20,
54:18, 71:7,
136:2
**through**
5:18, 8:25,
18:15, 21:3,
37:19, 47:2,
59:8, 59:9,
60:23, 83:2,
83:10, 85:14,
87:9, 89:17,
92:23, 98:3,
99:12, 99:13,
108:19, 108:23,
112:9, 112:13,
112:20, 118:16,
121:17, 121:25,
124:18, 128:1,
128:2, 136:5
**throughout**
124:13, 125:16
**thru**
5:29, 5:32,
6:3, 6:5, 6:8,
6:10, 6:13
**thursday**
1:23

**till**
27:15
**time**
8:17, 9:17,
15:6, 19:22,
22:12, 27:5,
27:11, 27:12,
27:13, 31:7,
35:19, 35:20,
38:17, 39:2,
41:13, 58:12,
58:13, 58:18,
59:4, 59:7,
72:6, 73:13,
73:18, 74:5,
79:15, 87:5,
92:16, 92:22,
93:4, 94:8,
97:25, 98:6,
102:3, 102:20,
103:4, 105:4,
108:1, 109:18,
114:10, 116:23,
122:23, 125:25,
130:17, 132:24,
136:1, 136:22
**times**
42:23, 43:1,
104:17, 118:24
**timing**
39:16, 41:5,
115:3
**title**
9:5, 14:15,
15:6, 15:16,
16:16, 110:11
**titles**
15:17
**tiv**
75:18, 75:20,
76:2, 76:6,
76:7, 76:8
**today**
8:8, 28:1,
28:4, 30:23,
59:9, 89:15
**today's**
30:20, 73:10,

112:5, 118:6
**together**
31:25, 54:13,
69:12, 99:8,
127:7
**told**
115:15, 138:4,
138:15, 138:17
**took**
29:5, 32:11,
32:13, 32:15,
93:25, 94:13,
94:16, 110:13
**top**
27:17, 61:18,
65:20, 75:4,
80:4, 86:22,
97:16, 122:10,
130:20
**topic**
32:18, 135:25
**topics**
27:19, 27:23,
27:25, 135:21
**tornado**
49:20
**total**
35:20, 47:7,
62:16, 76:7,
76:8
**totaled**
114:17
**totally**
86:4
**touch**
121:21
**towards**
80:4, 125:22,
130:21
**tower**
47:6
**tpa**
5:22, 82:7,
82:14, 89:22,
108:23, 126:10,
127:22, 128:17
**tpas**
90:16

**transacted**
87:10
**transcript**
5:12, 6:21,
7:1, 139:4,
141:7
**transcription**
142:5
**transfer**
83:20
**transition**
16:9, 23:5
**treat**
50:13
**treaty**
83:13, 83:17,
84:3, 85:4,
85:11, 87:16,
87:21, 88:12
**tribler**
2:4, 3:13
**true**
60:5, 90:1,
104:13, 141:8,
142:4
**try**
8:19
**trying**
18:13, 27:15,
51:19, 55:22,
72:25, 76:23,
93:7, 115:3,
116:22, 131:2
**turn**
27:22, 63:25,
64:7, 65:16,
68:24, 73:21,
134:22
**turning**
68:4
**twice**
55:6, 55:8
**two**
8:15, 17:6,
19:4, 22:1,
30:17, 32:5,
32:9, 42:4,
59:14, 60:3,

63:25, 64:15,
98:6, 103:1,
103:12, 109:13,
110:17, 119:24,
124:14, 127:4,
127:6, 135:22
**type**
14:19, 21:15,
56:24, 57:4,
84:11, 86:23,
101:3, 101:7,
109:15, 119:19,
133:16, 133:17
**types**
56:16, 119:15
**typewriting**
141:11
**typical**
119:18

| U |
| --- |

**uh**
66:14
**uh-huh**
15:20, 32:21,
35:21, 45:8,
51:16, 51:21,
64:2, 87:3,
99:15, 139:21
**ultimately**
18:19, 101:8,
108:18
**um**
65:8
**unclear**
66:17
**uncovered**
102:9, 102:10
**under**
7:11, 10:10,
14:19, 22:13,
32:18, 50:13,
65:9, 65:19,
65:23, 67:10,
67:14, 68:4,
68:7, 69:1,
75:3, 75:4,
75:5, 75:9,

75:15, 75:16,
77:14, 80:4,
92:18, 93:8,
95:16, 112:24,
122:10, 130:20,
130:21, 133:3,
135:22, 141:11

**underneath**
69:4

**understand**
8:8, 8:11,
8:13, 25:13,
26:11, 52:17,
78:22, 105:8,
110:7

**understanding**
13:25, 51:18,
70:5, 100:7,
114:2, 120:2,
124:14, 131:8,
131:17, 131:25,
132:1

**undertaken**
58:19

**underwrite**
21:16, 35:5,
53:19, 73:16

**underwriter**
7:25, 8:1, 9:1,
9:23, 15:21,
24:15, 110:10

**underwriters**
64:24, 65:2,
87:11

**underwriting**
9:3, 9:4, 9:7,
12:7, 14:2,
15:16, 15:18,
16:15, 16:21,
17:2, 17:7,
17:15, 18:12,
21:2, 21:10,
22:4, 23:17,
25:9, 25:10,
25:17, 25:24,
26:8, 32:19,
33:7, 33:11,
33:15, 34:12,

37:14, 37:16,
38:11, 38:13,
38:19, 41:1,
41:11, 42:6,
42:11, 47:22,
47:25, 52:14,
52:23, 53:8,
53:13, 53:17,
53:18, 55:19,
72:8, 73:14,
73:15, 87:8,
94:20, 105:3,
108:20, 119:1,
131:4, 131:9,
131:14, 131:18,
132:4, 132:5,
132:8, 134:9,
134:13, 134:20,
134:25, 135:1

**underwrote**
35:18, 105:9

**unique**
46:2

**unit**
16:15, 33:18,
34:4, 34:12,
37:8, 37:20,
47:2, 138:19

**united**
1:1, 12:19,
12:20

**university**
20:9, 20:12

**unnamed**
77:19, 78:11

**until**
22:21, 24:23,
112:20

**update**
100:9

**upper**
61:8, 62:4

**usc**
20:24

**use**
12:12, 34:6,
67:1, 120:25,
121:5

**using**
13:16, 43:15,
117:10

**usual**
99:7

**usually**
53:21

**V**

**value**
75:13, 76:20,
77:3, 77:4, 77:9

**values**
74:17, 74:22,
74:25, 75:6,
75:11, 75:14,
75:19, 75:21,
75:22, 76:2,
76:17, 78:13,
78:16, 78:22,
79:7

**varied**
63:13

**varies**
75:10

**various**
113:24

**vary**
69:20

**vehicle**
83:3, 83:10,
83:12

**versus**
13:25, 53:7,
56:10

**view**
54:12

**W**

**wait**
86:4, 120:7

**wakenight**
1:31, 2:21,
141:3, 141:21

**want**
40:10, 40:12,
45:15, 55:25,
56:9, 57:4,

60:14, 65:16,
79:1, 80:3,
86:5, 86:9,
88:23, 97:17,
99:24, 105:13,
107:15, 109:3,
121:1, 121:5,
124:18, 130:16,
137:19, 139:11,
139:18

**wanted**
56:25, 101:16,
104:4, 105:17,
106:12

**washington**
2:6, 3:6, 3:14,
7:9

**waste**
111:7

**wastes**
91:23

**water**
86:13

**way**
8:6, 8:12,
40:14, 49:24,
54:14, 66:13,
74:14, 82:24,
85:14, 98:13,
99:12, 99:20,
100:15, 105:9,
105:10, 111:5,
111:23, 112:13,
112:24

**we'll**
26:18, 35:23,
60:11, 79:12,
81:6, 85:18,
88:19, 96:12,
111:16, 118:15,
120:25, 126:21,
139:1

**we're**
27:15, 51:6,
67:4, 78:5,
88:18, 91:21,
98:22, 103:5,
106:22, 107:7,

| | | | |
|---|---|---|---|
| 115:9, 115:20, 119:20, 123:19 | 15:24, 21:10, 39:9, 40:10, 49:11, 50:20, 55:19, 57:25, 58:23, 61:24, 72:6, 76:13, 78:10, 81:3, 91:24, 108:10 | 24:25, 99:12, 99:19, 99:20, 112:23 | 113:16, 113:18, 120:15, 121:10, 122:17, 123:21, 127:21, 128:22, 130:5, 130:9, 131:2, 138:8, 139:12, 139:17, 140:2 |

**we've**
54:17, 125:6
**web**
5:27, 86:21
**week**
31:10
**weeks**
41:7
**went**
7:17, 18:25, 22:13, 98:3
**weren't**
40:8, 41:19
**west**
2:6, 3:14, 14:17
**westchester**
45:9, 45:10
**western**
15:10
**whatever**
16:16, 26:15, 36:7, 37:4, 74:5, 110:11, 122:5
**whatsoever**
116:14
**whenever**
134:4
**whereas**
77:10
**whereby**
87:7
**whether**
44:9, 57:23, 58:17, 68:10, 68:16, 69:5, 93:5, 109:23, 110:10, 110:12, 113:11, 117:10
**wholesale**
46:19, 137:14
**wildfire**
49:20
**within**
11:5, 15:20,

**witness**
5:3, 7:2, 7:11, 7:25, 10:25, 11:2, 11:14, 11:25, 15:10, 21:21, 28:17, 28:19, 29:1, 29:4, 29:8, 30:6, 33:21, 33:23, 39:21, 39:23, 49:5, 56:20, 77:25, 86:2, 86:13, 95:9, 95:23, 95:25, 104:8, 108:9, 110:21, 119:4, 120:19, 120:22, 126:19, 128:21, 129:22, 132:9, 138:5
**wood**
126:19
**word**
18:13, 48:6, 78:1
**work**
13:12, 19:1, 19:11, 19:12, 19:16, 36:10, 36:12, 41:15, 84:4, 98:13, 112:13, 112:24, 113:19
**work-from-home**
19:22
**work-wise**
24:24
**worked**
19:3
**working**
19:24, 21:6,

**worry**
10:19
**wouldn't**
40:3, 63:24, 96:12, 104:13, 110:4
**write**
13:7, 13:10, 63:20
**writes**
91:20, 100:8, 114:23, 117:4, 131:3, 133:4, 134:7
**writing**
14:2, 97:2
**written**
54:19, 81:19
**wrong**
129:25
**wrote**
11:9, 131:9

| X |
|---|

**x**
1:5, 1:17

| Y |
|---|

**yeah**
7:13, 9:10, 11:24, 17:12, 17:19, 19:10, 22:13, 22:19, 25:14, 25:16, 29:8, 29:16, 33:10, 49:25, 58:15, 58:18, 58:22, 63:24, 70:3, 78:8, 85:21, 86:14, 88:9, 98:4, 98:19, 98:23, 99:24, 100:21, 108:24, 109:1, 110:9, 113:14,

**year**
16:5, 20:15, 22:23, 39:3, 48:13, 48:14
**years**
12:25, 13:17, 15:23, 15:25, 19:4, 19:18, 21:14, 22:1, 22:13, 22:18, 22:24, 23:8, 24:19, 35:14, 37:24, 39:5, 43:10, 48:15, 51:20, 53:1, 54:18, 71:7, 136:2
**yesterday**
31:12, 31:15, 73:9
**york**
25:5
**yourself**
89:7, 92:11

| Z |
|---|

**zero**
63:16, 63:18
**zurich**
6:24, 22:22, 23:2, 23:5, 23:7, 23:8, 23:12, 23:16, 23:22, 44:1, 44:2, 44:7, 44:10, 44:13, 44:21, 46:5, 73:1, 78:9, 110:16, 110:17
**zurich's**
110:15

**$**

**$10**
126:5, 126:7, 126:11
**$100**
47:6
**$2,126.70**
5:25
**$293,000**
62:17, 62:22
**$3.6**
114:18
**$360,000**
113:20, 116:8, 117:7

**0**

**0/1/18**
6:4
**00**
27:15
**00227**
1:9
**01**
1:24, 88:16
**03**
123:10
**04**
123:10, 123:16
**084.003605**
141:4, 141:22

**1**

**10**
6:4, 13:20, 13:21, 13:22, 13:23, 60:19, 73:5, 73:25, 84:10, 86:16, 123:8, 123:11, 123:24, 124:2, 124:17
**11**
6:7, 67:9, 88:16, 124:22, 124:23, 125:1
**111**
5:31

**117**
6:2
**12**
6:9, 23:8, 45:25, 123:10, 123:16, 126:22, 126:23, 127:1, 132:12, 140:4
**123**
6:4
**124**
6:7
**126**
6:9
**13**
6:12, 88:16, 129:13, 129:14, 132:10, 132:13
**132**
6:12
**142**
1:30
**1484**
6:8
**1487**
6:8
**15**
6:12, 63:16, 63:17, 65:6, 132:17
**150**
61:13
**150803**
61:9, 61:14
**151**
4:10
**16**
60:19
**1652**
6:9, 127:3
**1654**
6:10, 127:3
**17**
132:12
**18**
89:5, 97:17, 97:22, 132:12
**19**
1:23, 6:7, 6:12

**1976**
20:16
**1980**
21:7
**1a**
65:23, 66:23, 67:4
**1st**
85:6, 85:8, 123:25, 141:16

**2**

**20**
12:25, 22:13, 22:18, 46:1, 46:7, 47:11, 89:5, 97:22
**2001**
13:2, 13:3, 13:14, 14:15
**2002**
13:2
**20037**
3:6
**201**
2:12, 3:17
**2011**
13:20
**201412579**
85:2
**2015**
16:7, 16:12, 16:19, 17:3, 17:5, 17:11, 17:14, 35:13, 85:7, 85:9, 85:11
**2016**
65:6
**2017**
65:6
**2018**
35:11, 48:9, 89:5, 92:6, 97:22, 103:5, 111:24, 112:10, 113:2, 115:16, 118:3, 119:8,

**123:25**
**2019**
125:3, 127:14, 129:18, 132:17
**202**
3:7
**2020**
19:4
**2021**
19:5
**2022**
1:23, 141:16
**21**
1:9, 12:25, 67:10
**225**
2:6, 3:14
**23**
98:18, 99:11, 99:21
**2332**
6:5
**2334**
6:5
**24**
6:7, 68:5, 68:7, 125:3, 127:14
**2445**
3:5
**25**
50:12, 50:13, 51:12
**2500**
4:11
**2550**
2:8, 3:15
**26**
5:14, 26:24
**27**
112:17, 114:21, 115:16, 115:19
**28**
111:23, 112:10, 113:2, 113:8
**293**
63:9
**2nd**
118:2, 120:17

**3**

**30**
1:20, 5:14,
7:12, 40:10,
40:21, 64:11,
64:12, 64:17
**300**
36:6
**3000**
4:13
**3078**
5:21
**31**
140:4
**312**
2:12, 3:17,
4:13
**3160**
3:7
**34**
73:5
**35**
73:25
**3589**
5:31, 112:9
**3591**
112:16
**3592**
5:32, 112:9
**36**
73:25
**360**
115:21
**3:-cv--drl-mgg**
1:9

**4**

**400**
35:25
**4002**
5:28, 88:23
**4006**
88:25, 99:14
**4007**
5:29, 88:23
**4260**
117:24

**4263**
117:24
**4264**
6:13
**4266**
6:13
**4267**
6:3
**4269**
6:3
**447978**
1:29
**45**
40:12
**450**
36:7

**5**

**5**
81:11, 89:5
**50**
11:16, 46:8,
51:10
**58**
86:16
**59**
86:16

**6**

**6**
27:15
**60**
5:17
**60606**
2:10, 3:16,
4:12
**6400**
2:12, 3:17
**69**
5:18, 60:23

**7**

**70**
64:16
**704**
4:13
**72**
6:24

**73**
65:18
**74**
5:20
**760**
3:7
**79**
5:22, 67:10

**8**

**8/8/19**
6:2
**80**
46:8, 47:9,
47:12
**81**
5:25
**86**
5:18, 5:27,
60:23
**87**
22:2
**88**
5:28
**8th**
120:14, 120:18,
120:19, 129:18

**9**

**9**
1:24, 26:24
**90**
22:25
**928**
5:23, 81:13
**965**
5:26, 81:11

# EXHIBIT 5

# R.A. WEST ASSOCIATES, INC.

**EXPERT WITNESS REPORT**
of
**Robert A. West, CHMM, REM, CEM, CEI, CMI, CMS, CEC, CIPS, CAQS, CE&SCO**

**Indiana GRQ, LLC et al.**
**Plaintiff**
v
**American Guarantee and Liability Company, et al.**
**Defendants**

**Civil Action No. 3:21-CV-2270DRL-MGG**

**United States District Court, Northern District of Indiana**

PN1618101

Prepared by

R.A. West Associates, Inc.
2865 South Eagle Road, PMB 359
Newtown, PA 18940

for

**Hinshaw & Culbertson**
**151 N. Franklin Street, Suite 2500**
**Chicago, IL 60606**

dated

March 31, 2022



EXHIBIT
West-1
5/25/22

Submitted by:

Robert A. West, CHMM, REM, CEM, CEI, CMI, CMS, CIPS, CAQS, CE&SCO
President
**R.A. WEST ASSOCIATES, INC.**

*Introduction and Background*

The subject loss occurred on or about August 15, 2016. Water from heavy rainfall in the area overwhelmed surface water drainage capacities of this 1930s 2-story masonry and concrete industrial building complex on the southwest side of South Bend, Indiana.

Flood waters entered the underground tunnel complex housing six transformer substations containing eleven (11) transformers and steam and electrical power distribution systems feeding the compound of buildings used for military manufacturing purposes in the 1940s, including engine testing in concrete silos rising from the aforementioned tunnel and basement structures. Today this brownfield site is partially occupied by smaller offices and warehousing.

On October 18, 2016 as an introduction to the subject project, I along with representatives from JS Held and McLarens met with Messrs. Jerry Graf and Peter Yanson of Indiana GRQ, Inc. and other Indiana GRQ, Inc. personnel, Mr. Rich Hackel, OSC for the Indiana Department of Environmental Management (IDEM), Mr. Terry A. Barker of INSERV, the insured's environmental contractor, Mr. James R. Rosenall of GroAmerica, Mr. Noah Crittenden of BMS CAT and Mr. Steve Benson of Herrman & Goetz, Inc.

During the course of the subject project, R.A. West Associates, Inc. performed consulting services to McLarens Global and Charles Taylor Adjusting and the market carriers they represent in the subject claim.

R.A. West Associates, Inc. was tasked with the review of documentation listed in the herein attached "List of documents and other information considered in forming opinions" and rendering opinions regarding same.

This report addresses the expert report of B. Tod Delaney, Ph.D., P.E., BCEE dated February 15, 2022.

The following areas of B. Tod Delaney, Ph.D., P.E., BCEE opinions are rebutted as follows:

1) **Facts**

Dr. Delaney's statement of the facts in his report are not consistent with definition of spaces within the subject facility.

At the top of page 6 of Dr. Delaney's report he states "As the substations are located in the basement, PCB-containing dielectric fluid (askarel, see definition in Section 3.2.2 below) was released into the waters."

The six substations are located in the tunnel complex of this facility below the elevation of the basement and approximately 100 to 900 feet from the basement (see Attachment 1). Dr. Delaney's misrepresentation of these two distinct areas of the subject facility coupled with a disregard or ignorance of other facts, Herrman & Goetz emails, and the PCB sampling data, both chip and wipe samples, in this matter has misled him to the conclusion in the latter part of his statement quoted above, "PCB-containing was released into the waters". In addition, Dr.

Page | 3

Delaney states "The presence of PCBs was confirmed by testing after an oily sheen was detected in the water (see INSERV 2018), and the City mandated that IRG stop draining water from the building into the City's sewer system due to environmental concerns." The City of South Bend, IN mandated the collection of water being pumped out of the tunnels and substations in September/October of 2016. That mandate was not based upon INSERV data from 2018.

In the second paragraph on page 6, Dr. Delaney states "In addition, at least one (Transformer No. 11 in Substation 6) and possibly two, vertical oil level sight glasses on the back of the transformers had broken, allowing further release of transformer oil into the water." While Dr. Delaney correctly states transformer No. 11 in substation 6 was reported by Mr. Steve Benson of Herrman & Goetz, Inc. as having a broken sight glass, Mr. Benson never reported a second cracked sight glass. Moreover, the askarel fluid in transformer 11 in substation 6 is 1.6 times denser than water and, therefore, could not be displaced from the transformer tank by hypothetical water intrusion via the sight glass or any vents at the top of these units. Those transformers having fluids less dense than any intruding water would have to have lost tens of gallons of transformer fluid to have released enough PCBs to trigger TSCA. This calculation does not consider the pressure of building hydraulic head, spring loading of any transformer venting, or surface tension of the transformer fluid all of which make release of PCB fluid from these units less likely. In addition, Mr. Benson in this October 25, 2016, email states that all units are "full of fluid now" (transformer oil). He further indicates all transformers have fluid above the top of their radiators (see Attachment 2). This condition is unlikely if tens of gallons of fluid were given up by the four units having fluid with densities less than that of water,

In his last paragraph in section 3.1, Dr. Delaney cites water sampling data collected by INSERV and utility pipe insulation samples collected by Burns & McDonnell Engineering Co. (B&M) He fails to report that all water and pipe insulation samples contained less than 50 parts per million (ppm) of PCBs, making these materials in the instant condition unregulated by the Toxic Substances Control Act (TSCA) (see B&M email and INSERV data in Attachment 3).

On page 7 in second paragraph, Dr. Delaney explains the venting device construction of PCB fluid filled distribution transformers. However, he fails to note the most recent 6th Circuit Court of appeals decision regarding the "burping" function the devices were designed to perform and the resultant incidental PCB releases this activity causes (see Attachment 4). The PCB surface and core concentrations and their distribution found in the substations, tunnels and basement of the subject facility are good examples of this design function of these GE units (see Attachment 5).

In his last paragraph on page 11, Dr. Delaney state "no core or chip samples of porous concrete wall or floor surfaces were collected as is required by TSCA". In fact, under INSERV's management of this site in September of 2016 Eagle Processing collected concrete chip samples from Tunnel 1 Sub 3 floor, Tunnel 2 Sub 4 floor, Tunnel 2 Sub 5 floor, Tunnel 2 Sub 6 floor, and Tunnel 3 at its Intersection with the Main Tunnel. All of these samples were analyzed at BIO-CHEM Laboratories of Grand Rapids, MI and found to be unregulated under TSCA (see Attachment 6).

Mr. Peter Yanson of Indiana GRQ, Inc. signed the B&M December 21, 2016, (modified December 23rd) Cleanup Plan Development and Onsite Documentation/Sampling proposal

stating that "based on their knowledge of the site and available information that the ongoing work and that the cleanup is not regulated under the Toxic Substances Control Act (TSCA)." In addition, Mr. Justin Lichter approved B&M's Draft PCB Cleaning Plan without the need for chip samples (see Attachment 7) thereby approving the non-TSCA regulated approach determined by Mr. Yanson, of Indiana GRQ, Inc.

At the end of the last paragraph on page 11, Dr. Delaney appears to indicate that the Burns & McDonnell Insulation Removal Requirements drawing he has inserted at the top of page 12 of his report is subject to TSCA regulations. However, that drawing is part of the B&M report regarding the necessary cleanup/removal under Indiana Department of Environmental Management (IDEM), state regulations for porous and nonporous media under a non-TSCA incidental PCB remediation (see B&M reports on the same).

In section 3.5 at the bottom of page 13, Dr. Delaney states that the Indiana Department of Environmental Management (IDEM) "does not have more stringent requirements than those stated in TSCA". In fact, for "low occupancy" areas such as the tunnels, substations, and basement of the subject facility IDEM's <10 ppm PCB requirement is more stringent than TSCA's lowest criteria in such areas, less than or equal to 25 ppm PCB. Indiana GRQ's tunnel and substation PCB cleanup was completed under IDEM's Industrial/Commercial Direct Contact screening level at less than or equal to 9.9 ppm for sediment/debris or 9.9 ug/100 cm$^2$ for wipe samples.

2) **Opinions**

I disagree with Dr. Delaney initial statement in this section of his report that "One or more PCB Transformers located in the substation vaults released PCBs during the Event". There is no physical evidence that this is the case. In fact, the Mr. Justin Lichter, representative of IRG issued a February 2, 2017 email that indicates Dr. Delaney's statement is false. More than half of the subject transformers contained PCB oil at the time of their disposal having a density greater than water, thereby, virtually eliminating the displacement/overflow release scenario Dr. Delaney proposes.

I disagree with Dr. Delaney's opinion expressed in his second paragraph on page 16 that "Many of the transformers were energized at the time of the incident. The insured has stated that much of this equipment was not energized and had not been so for a long period of time as their tenant's power needs didn't warrant the excess capacity the system was capable of producing. In addition, Mr. Steve Benson of Herrman & Goetz, Inc. did not report arcing or visible tank or containment failure in any of these units. Furthermore, Mr. Benson did not report two sight glasses as cracked, only that one askeral filled larger transformer. Due to the relative density of askarel fluid to water, overflow discharge through a sight glass is unlikely. Sight glasses are made of thick glass and commonly crack with age. However, because they are near the top of each unit so they can detect low fluid conditions, direct communication between the fluid inside the unit and the outside environment even in a cracked condition is rare as this would cause catastrophic failure. Fourteen inches of "head space", the volume above the functioning level of PCB oil/fluid in the larger units is not uncommon given the size of their tanks.

I disagree with Dr. Delaney's opinion expressed in the fourth paragraph on page 16 of his report.

Page | 5

While there were no non-PCB transformers at the subject facility, those that were retrofilled with transformer fluid not containing PCBs to reduce the concentration of PCBs in the transformer fluid also did not show signs of arcing or visible tank or containment by Mr. Benson's observations or mine.

I disagree with Dr. Delaney's fifth paragraph opinion on page 16 of his report. The presence of water in an older, less operated, less maintained transformer such as those found at the subject property is not uncommon. During cool down after operating for a period of time condensation of humid air in the head space of such units can occur. This causes condensed water will build up on top of an askarel fluid in the unit.

I disagree with all of Dr. Delaney's opinions in subsection 4.2 as they are all predicated upon the instant PCB cleanup being subject to TSCA regulations when the owner's/insured's own determination and actions coupled with the facts as described above do not.

I disagree with Dr. Delaney's statement at the bottom of page 20 that "The cleanup at the Facility did not involve the removal and disposal of any PCB-contaminated porous surfaces." The B&M designed tunnel pipe insulation abatement and PCB cleanup involved the removal of porous PCB contaminated surfaces.

I disagree with all of Dr. Delaney's opinion as expressed in subsections 4.3 and 4.4 of his report as they are predicated upon the subject PCB cleanup being regulated by TSCA.

I am incorporating here my November 9, 2018, White Paper Analysis (see Attachment 8) which responds to the insured's anonymously written white paper of September 28, 2018. It is limited by the information available to me at that time but states my understanding of the reasoning used by the insured to determine and proceed with this project as a non-Toxic Substances Control Act (TSCA) regulated PCB cleanup in 2016. In my opinion this approach was appropriate for the work associated with the subject loss and the Cleanup Plan prepared by B&M.

The above opinions are based upon files reviewed as well as my experience, training, education and all materials referenced in my initial reports and the materials referenced herein.

I intend to update this report as necessary should additional discovery become available.

## LIST OF DOCUMENTS AND OTHER INFORMATION
## CONSIDERED IN FORMING OPINIONS

1. INSERV documents
2. Burns and McDonnell documents
3. Information provided by Herrman & Goetz
4. Information provided by Indiana GRQ
5. Information provided by Indiana Department of Environmental Protection
6. Email among the parties
7. Data collected and analyzed in connection with this work
8. Field inspection, observations and photography

## EXPERT'S PREVIOUS TESTIMONY

Mr. West has been qualified as a witness in various courts as an expert in environmental property damage assessment, remedial investigation, remedial design, remedial action, closure and post-closure assessment and documentation, environmental contamination cleanup project cost estimation, and electrical circuitry failure analysis. Mr. West has not been precluded from testifying as an expert in any court. Mr. West's testimony in the last four years is as follows:

Christine Mattson v Nationwide Mutual Insurance Company
Civil Action No., January Term, 2013, No. 01846
Philadelphia County Court of Common Pleas

Duty Free World, Inc. v Hartford Underwriters Insurance Company
Case No. 1:14-cv-23784 – Williams
Southern District of Florida

Daniel & Heidi Wilkinson v Nationwide Insurance Company
Court of Common Pleas, Philadelphia County

Eichenbaum, Dwayne & Robyn v SFF&CC, et al.
Civil Action – Case ID No. 131200383 - 38-1X24-133 (2013-21859 – PA)
Court of Common Pleas, Philadelphia County

Aspen Specialty Insurance Company, et al. v 4 NYP Ventures LLC
Civil Action No. – 13 Civ. 3367 (PAC)
US District Court for the Southern District of New York

Pacific Indemnity Company v Consolidated Edison, Inc., et al.
United States District Court for the Southern District of New York

Tere Villamil and Villa Componetes, Inc. v Sentinel Insurance Company, Limited and The Hartford Financial Services Group, Inc.
Civil Action No. – 3:17-cv-01566-FLW-DEA
US District Court of District of New Jersey

Louis Guzman vs. The Clorox Company,
Civil Action No. RG16839051
Superior Court of the State of California, County of Alameda, Unlimited Civil Division

Clorox Services Company vs. Veolia ES Technical Solutions, LLC
Civil Action No. 3:21-CV-00057-SK
United States District Court, Northern District of California

## EXPERT'S COMPENSATION

Personnel Related Costs: Fees for our services will be based upon the time worked on the project by professional, technical, and clerical personnel according to the following hourly schedule.

**Principal**                                    **$245.00**

The above rates are portal to portal except where otherwise indicated. Travel time for any outbound and return trip combination shall not exceed six (6) hours at the above rates.

## EXPERT TESTIMONY & OVERTIME RATES

A premium of one hundred percent (100%) will be added to the hourly rates for expert testimony of R.A. WEST ASSOCIATES, INC. personnel.

**EXHIBIT A**

# CURRICULUM VITAE – ROBERT A. WEST

| | |
|---|---|
| **NAME:** | Robert A. West, CHMM, REM, CEM, CEI, CMI, CMS, CEC, CIPS, CAQS, CE&SCO |
| **PRESENT TITLE:** | President, R.A. West Associates, Inc. |
| **HOME ADDRESS:** | 1663 Wrightstown Road, Newtown, PA 18940 |
| **OFFICE ADDRESS:** | 2110 South Eagle Road, Suite 359, Newtown, PA 18940 |
| **CITIZENSHIP:** | USA |
| **DATE OF BIRTH:** | January 9, 1954 |
| **PLACE OF BIRTH:** | Celina, Ohio |
| **MARITAL STATUS:** | Married:  Maureen 1975<br>Children:  Emily 1987 |
| **EDUCATION:** | 1972 - 1977    BS in Chemistry - University of Cincinnati |

## OTHER COURSE WORK COMPLETED

1978 - 1979    MS in Analytical Chemistry - Rutgers University
                       (19 credits)
1985              University of Toledo - Industrial Wastewater Pretreatment

## PROFESSIONAL POSITIONS

2002 to present Fellow of the Institute of Hazardous Materials Management
2016 to present Distinguished Diplomate of the Institute of Hazardous Materials Management

## REGISTRATIONS AND CERTIFICATIONS

1. Certified Hazardous Materials Manager - Masters Level # 3757
2. Certified Environmental Inspector, Certified Environmental Manager, Certified Mold Inspector, Certified Mold Specialist, Certified Environmental Consultant    # 9085
3. Registered Environmental Manager #5613
4. OSHA 1910.120 HAZWOPER (40-hour course)
5. Certified Infrastructure Preparedness Specialist # 01695
6. Incident Command System, ICS 00100 Certified by FEMA
7. National Incident Management System, NIMS 00700 Certified by FEMA
8. Certified Environmental and Safety Compliance Officer, CESCO 242883258

**SPECIALTY LICENSES**

1. AHERA Certified Asbestos Inspector - PA license # 011421 - 2000
2. City of Philadelphia Asbestos Investigator License # 3632-000125 - 2000
3. New York State Asbestos Inspector # AH 97-17051 - 2000
4. New Jersey DEP UST - Closure and Subsurface Evaluator - License # 0021619 - Reg. # 0021619 – 2000
5. New York State Mold Assessor License - # 01168

**MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES**

1. American Society of Testing and Materials (ASTM) – Member # 000121105
2. National Association of Environmental Professionals (NAEP) - General Member # 02393
3. National Association of Hazardous Waste Generators - Associate Member
4. Hazardous Materials Control Resources Institute (HMCRI) - Member # 020388
5. Environmental Assessment Association (EAA) - Member # 9085
6. International Union of Pure and Applied Chemists (IUPAC) - Member
7. American Chemical Society (ACS) - General Member # 0568592G
8. American Society of Safety Engineers – Member # 45806
9. Institute of Hazardous Materials Managers – Member # 03757
10. Water Environment Federation – Member # 1686502
11. International Code Council – Member # 5140102
12. National Fire Protection Association – Member # 960139

**PROFESSIONAL COMMITTEES**

1993 - 1994   IHMM - NJ - Professional Development Committee
1994 - 1997   IHMM - NJ - Programs Committee
1997 -1998   ACHMM - NJ President Elect
1998 – 1999   ACHMM – NJ President
1994 - 1998   ASTM - E51 - Standardization of Environmental Claims Handling - Co-Vice Chairman
1998 – present ASTM – E50 – Environmental Assessment, Risk Management and Corrective Action
2012 – present ASTM – E60 - Sustainability
2003 – present ASTM – E 47 - Biological Effects and Environmental Fate
2000 - 2003   AHMP, former ACHMM – Chapter Development Committee – Chairman
2003 - 2007   AHMP, former ACHMM – Chapter Development Committee – Member
2008 - 2012   AHMP, former ACHMM – Chapter Development Committee – Chairman & Member
2013 - 2018   Institute of Hazardous Materials Management – Board Member
2013 – present ASTME50.02 –E2418-06 Task Group – Standard Guide for Readily Observable Mold and Conditions Conducive to Mold in Commercial Buildings
2013 – present NJDEP - Catastrophic Storm Event Technical Guidance Document Committee
2018 – 2019   Institute of Hazardous Materials Management – Chairman of the Board of Directors
2019 – present Institute of Hazardous Materials Management – Immediate- Past Chairman of the

Board of Directors
2019 – present Hazardous Materials Society – Chairman of the Board of Directors
2008 – 2011    AHMP, former ACHMM – Chapter Development Committee – Member, Chairman
2013 – 2015    NJDEP - Catastrophic Storm Event Technical Guidance Document Committee
2020 – present ASTM - PFAS Task Group 2 AC421

## AWARDS, HONORS, AND LETTERS OF APPRECIATION/COMMENDATION

1985    American Electroplaters Society - Certificate of Appreciation, April 16, 1985
1988    The Purchasing Management Association of Maryland - Letter of Gratitude, April 5, 1988
1993    Who's Who Worldwide - Letter of Nomination, September 7, 1993
1988    University of Toledo - Letter of Appreciation, March 2, 1988
1990    EPICS International and Specialty Technical Publishers - Letter of Commendation, February 1, 1990
1993    Property Claim Services - Letter of Appreciation, October 19, 1993
1994    Property Claims Services - Letter of Appreciation, February 18, 1994
2001    Champion of Excellence – Academy of Certified Hazardous Materials Managers
2002    IHMM – Fellow of the Institute
2002    Champion of Excellence – Academy of Certified Hazardous Materials Managers
2003    Champion of Excellence – Academy of Certified Hazardous Materials Managers
2005    Champion of Excellence – Academy of Certified Hazardous Materials Managers
2006    Champion of Excellence – Academy of Certified Hazardous Materials Managers
2007    Champion of Excellence – Academy of Certified Hazardous Materials Managers
2008    Champion of Excellence – Academy of Certified Hazardous Materials Managers
2009    Champion of Excellence – Academy of Certified Hazardous Materials Managers
2010    Champion of Excellence – Alliance of Hazardous Materials Professionals
2013    NREP – 20 years of Professional Environmental Certification
2016    IHMM – Distinguished Diplomate

## TEACHING RESPONSIBILITIES

1988    "Developing Environmental Regulations", University of Toledo sponsored Industrial Wastewater Pretreatment Seminar, San Juan, Puerto Rico
2010    "Legal and Regulatory Perspectives" and "The Environmental Protection Act" - Institute of Environmental and Hazardous Materials Management - Bangalore Institute of Technology sponsored Indo-US Seminar on Hazardous Waste and Hazardous Materials Conference, Bangalore, India
2020    "Principles of Hazardous Materials and Environmental Management" and "Chemical Storage and Handling" – AME Engineering College and SJ College of Engineering sponsored Indo-US Seminar on Hazardous Waste and Hazardous Materials Conference, Bangalore and Mysore, Karnataka State, India

## PUBLICATIONS

### Abstracts

West, RA; RCRA/Superfund Procedures, A Generator's and TSDF Operator's Guide to Environmental Cleanup.  University of Toledo Industrial Wastewater Pretreatment Seminar, February 10, 1988.  San Juan, Puerto Rico.

### Literature

West, RA; Hazardous Materials Management Desk Reference 3rd Edition, Volume III: Management Practices, Chapter 42, Loss Control – Alliance of Hazardous Materials Professionals, 2013

West, RA; Managing Hazardous Materials, 2015 Vol. 5, No. 1, Chapter 24, Remediation Technologies

## LECTURES BY INVITATION

| | |
|---|---|
| 1985 | "Secure Landfill Construction", American Electroplaters Society, Philadelphia Chapter, Philadelphia, PA, April 16, 1985 |
| 1988 | "Rotary Kiln Incineration Technology for Hazardous Waste", Innovative Technologies Seminar sponsored by Hazardous Waste Treatment Council for EPA upper-level personnel, Washington, D.C., Spring of 1988 |
| 1988 | "Mobile Rotary Kiln Incineration Technology for Hazardous Waste", Hazardous Waste Treatment Council sponsored RCRA/SARA Conference, October 26-27, 1988 |
| 1989 | "Waste Stabilization and Vapor Extraction Technologies", EPA ARCS Contractors Roadshow - EPA Regions 1 and 2, March 28 through 31, 1989 |
| 1990 | "Managing Effective Compliance: Challenges for Industry and Government", Toxics Compliance in Texas sponsored by EPICS International and Specialty Technical Publishers, Austin, TX, January 11, 1990 |
| 1990 | "Selling Your Hazardous Waste Services", Hazardous Waste Business '90 sponsored by World Information Systems, Boston, MA, March 26, 1990 |
| 1992 | "Innovative Technology Development", sponsored by Institute of Hazardous Materials Management at Rutgers, The State University, New Brunswick, NJ, August 25, 1992 |
| 1993 | "First Party Pollution Losses; Getting the Job Done", sponsored by Property Claim Services, Cherry Hill, NJ, October 8, 1993 |
| 1993 | "How and When to Hire an Environmental Consultant", seminar for The Ætna Casualty and Surety Company, Atlantic City, NJ, December 6, 1993 |
| 1994 | "First Party Pollution Losses; Getting the Job Done", sponsored by Property Claim Services, Framingham, MA, February 16, 1994 |
| 1995 | Underground Storage Tank Regulations in Pennsylvania@, Prudential Insurance Co., Horsham, PA, March 2, 1995 |
| 1995 | Environmental Loss Seminar - General Adjuster Property Training Seminar@, The |

|      | Ætna Casualty and Surety Co., Lisle, IL, August 18, 1995 |
|------|---|
| 1995 | Environmental Loss Seminar - General Adjuster Property Training Seminar@, The Ætna Casualty Surety Co., Dallas, TX, September 15, 1995 |
| 1995 | Underground Storage Tank Regulations in Pennsylvania@, The Maryland Insurance Group, Timonium, MD, October 18, 1995 |
| 2004 | "H & S Update – an Insurance Perspective", ACHMM National Conference, The Riviera Hotel and Casino, Las Vegas, NV, August 1, 2004 |
| 2007 | "Risk Assessment, Contingency Planning and Resilience", CHMM-MI Conference, The Yazaki-North America Learning Center, Canton, MI, March 1, 2007 |
| 2008 | "Contamination Issues and Property Claims", AIHA, ASSE, and ACHMM-NJ 2008 Fall Professional Development Conference, Middlesex Fire Academy, Sayreville, NJ, October 30, 2008 |
| 2009 | "Fortuitous Fire Losses - Are You Prepared?", NJ ASSE and ACHMM: NJ Chapters, 2009 Fall Professional Development Conference, Middlesex Fire Academy, Sayreville, NJ, November 4, 2009 |
| 2009 | "Contamination Issues and Property Claims", FM Global, Cleveland Office February 2, 2009 |
| 2009 | "Storage Tank Hazards & Cleanup", Philadelphia Loss Conference Valley Forge, PA, January 20, 2009 |
| 2016 | "Setting Standards for Hazardous Materials Management", UAE Mission to the US on Hazardous Materials Management, Meridian House, Washington D.C., April 22, 2016 |