UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

INDIANA GRQ, LLC,

            Plaintiff,

      v.                                              CAUSE NO. 3:21-cv-227 DRL

AMERICAN GUARANTEE AND LIABILITY
INSURANCE COMPANY *et al.*,

            Defendants.

## OPINION AND ORDER

Indiana GRQ, LLC owns a facility in South Bend, Indiana used for commercially-leased tenant and warehouse space—originally a manufacturing site for Studebaker vehicles and jet engines during World War II. Indiana GRQ sued seven insurance companies after flooding caused significant environmental and electrical damage to the facility. The storm set a new South Bend record for rainfall. The insurers paid part of the owner's claimed losses and eventually denied other coverage. Indiana GRQ alleges breach of contract and bad faith and requests declaratory relief. Three partial summary judgment motions now pend—one each by Indiana GRQ, Interstate Fire & Casualty Company (Interstate), and the remaining six insurers. The court grants Indiana GRQ's motion and finds that the loss here remains subject to the $30 million flood coverage limit, not the $10 million sublimit, and otherwise denies the motions—save for a few bad faith theories.

## BACKGROUND

Indiana GRQ's facility was covered under a multisite, multistate insurance policy with total limits of $500 million.[1] Certain properties are identified in a separate statement of values (SOV) for coverage

---

[1] Indiana GRQ is a corporate affiliate of Industrial Realty Group, LLC and Industrial Realty Advisors, LLC (collectively IRG). IRG procured the insurance policy and handled the insurance claim for Indiana GRQ. Though IRG representatives communicated and interacted with the insurers, it acted for Indiana GRQ. For purposes of

purposes, and Indiana GRQ's South Bend facility appears on the list. The policy insured loss caused by flooding. The first layer of flood coverage was $30 million and was shared by American Guarantee and Liability Insurance Company, Interstate Fire & Casualty Company, Starr Surplus Lines Insurance Company, Chubb Custom Insurance Company, General Security Indemnity Company of Arizona, Axis Surplus Insurance Company, and Ironshore Specialty Insurance Company.

On August 15, 2016, heavy rain (7.69 inches) flooded the facility and caused damage. Indiana GRQ reported the claim. At the time of the loss, Indiana GRQ had eleven electrical transformers in six substations. Several were damaged. When flooded, the electrical transformers released chemical compounds called polychlorinated biphenyls (PCBs) into the floodwater. Indiana GRQ began to evaluate, repair, and replace the damaged electrical equipment. The company removed all six substations, replaced a transformer, and relocated one substation. The site also required environmental remediation.

The insurers retained Micah Thoman as their independent adjuster. Stuart Stromeyer assisted. In October 2016, Mr. Thoman inspected the South Bend facility to determine the scope of damage and to create a preliminary remediation plan. Within six weeks of the loss, the adjusters determined that the facility was partially located in a Federal Emergency Management Agency defined special flood hazard area (SFHA). The policy had a $10 million SFHA sublimit.

In November 2016, the insurers sent a letter notifying Indiana GRQ that this sublimit may apply to the South Bend facility instead of the $30 million flood limit. This same letter, labeled as a reservation of rights, reiterated that the insurers "expressly reserve all of their collective rights, privileges, and defenses under the Policies and at law, including the right to amend the above Reservation of Rights."

From October 2016 into 2019, the adjusters continued to adjust the loss and work with Indiana GRQ, various consultants, and the insurers. During part of this time, Mr. Thoman conducted "weekly,

_____

this motion, the court will refer to IRG's actions and communications with the insurers as conduct by Indiana GRQ unless context otherwise requires. No one questions that IRG acted for Indiana GRQ.

if not daily, discussions" with Indiana GRQ and the insurers about the progress of the claim, an appropriate environmental workplan, and costs submitted by Indiana GRQ. Settlement negotiations were also ongoing throughout the adjustment period.

On October 18, 2017, within a section of a report entitled "Requested Settlement Consideration," Mr. Thoman wrote, "[w]e are in agreement with the [Indiana GRQ] in that this Loss can and will drag on due to its very nature of Seepage and Pollution, Clean-up and Contaminant loss situation." In March 2018, Mr. Thoman's status report said that "we have continued in our efforts to discuss a potential early settlement with the insured."

Throughout the claim's adjustment, the parties reached impasse on environmental remediation and electrical repair. Indiana GRQ asserted that the environmental remediation must comply with the requirements of the Toxic Substance Control Act (TSCA) because of the PCB levels in the floodwater; whereas, the insurers disagreed, believing the environmental work plans developed by Indiana GRQ's consultant would appropriately address the PCB presence. Separately, the insurers expressed frustration at the pace of the electrical repairs and alleged that Indiana GRQ changed its mind in its desire to have "like for like" transformer replacement. This was allegedly shared at a May 16, 2018 meeting with Mr. Thoman and Indiana GRQ representatives when they also discussed a potential resolution of the claim. From this meeting, Indiana GRQ agreed to provide information about additional electrical and environmental costs the company was requesting.

On September 13, 2018, the insurers sent a letter to Indiana GRQ indicating that they had yet to receive additional information on the claim and warned the company that its failure to provide this information could result in their file's closure. On March 7, 2019, the insurers sent another letter requesting a final settlement demand and meeting as well as informing Indiana GRQ that under the policy "any added property related repairs, replacements, or clean-ups that are contemplated moving forward will each be valued at Actual Cash Value (ACV)" because of a two-year limitation.

In May 2019, the insurers dispatched another letter to Indiana GRQ, labeled again a reservation of rights, that largely quoted policy provisions but with limited commentary. The letter quoted Section 6.13.05 that required suit within twelve months "after the date of direct physical loss or damage to Covered Property or to other property as set forth herein." The insurers offered no context for quoting this provision other than to refer Indiana GRQ to it.

In July 2019, Indiana GRQ submitted additional information for coverage. Then, on August 23, 2019, the insurers sent a letter to Indiana GRQ denying coverage for several reasons. The insurers said several exclusions applied and the flood had not caused all the property damage. The insurers disputed the scope of work. And the insurers believed that Indiana GRQ "breached the contractual suit limitation, time-barring the New Claims," and "the two-year time limit to complete replacement expired long ago."

Before then, the insurers paid Indiana GRQ $2,682,315.13. Indiana GRQ submitted proof of loss in December 2017, and the insurers paid $421,630.00; in March 2018, Interstate made a payment of $360,000.00; in May 2018, the insurers paid $764,000.13 after proof of loss; and another was submitted in May 2018 (specific to Axis) with $36,685.00 paid.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020). With crossmotions, each party receives

the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A. *Choice-of-Law.*

Courts honor reasonable choice of law stipulations in contract cases "regardless of whether such stipulations were made formally or informally, in writing or orally." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). "Courts do not worry about conflict of laws unless the parties disagree on which state's law applies." *Id.* When "neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits." *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587 n.1 (7th Cir. 2012).

The parties previously agreed to Indiana law pursuant to this court's practice of ensuring no choice-of-law issues before reaching summary judgment briefing [ECF 84 at 2]. Indiana GRQ filed its partial summary judgment motion using Indiana law. Six insurers did the same in their joint motion. In an about-face, Interstate marched to a different, and mixed, tune. Interstate joined the other insurers in using Indiana law on certain issues but moved separately for partial summary judgment arguing Ohio law. The court expects parties to meet their agreements.

Interstate contends Ohio law should govern its pollution exclusions. Whether that could be true in another case given the policy's multisite coverage, *see, e.g., Nat'l Union Fire Ins. Co. v. Standard Fusee Corp.*, 940 N.E.2d 810, 814 (Ind. 2010), Interstate already set the course of this litigation with the seven other parties. Interstate's argument for Ohio law contravenes its stipulation.[2] In addition, Interstate cannot mix both Indiana and Ohio law in addressing the same claim. The law doesn't permit such *dépeçage. See id.* at 814-15; *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004). The court thus enforces the stipulated choice of law—Indiana law. *See Auto-Owners*, 580 F.3d at 547.

B.   *The Insurance Policy's Twelve-Month Limitation Period.*

All insurers contend that Indiana GRQ's contract action is time-barred by the insurance policy's twelve-month limitation period. The policy prohibits any suit "for the recovery of any claim" unless the insured "has fully complied" with all the policy's provisions [ECF 16-12, § 6.13.05]. The policy requires any suit to commence within twelve months "after the date of direct physical loss or damage to Covered Property or to other property as set forth herein" [*id.*]. The loss here occurred on August 15, 2016. Indiana GRQ filed suit on June 18, 2020—approximately forty-six months later.

No one disputes that the suit began outside the twelve-month period. Indiana GRQ instead argues that the insurers waived this defense, or the law should estop the insurers from exercising it. Indiana GRQ insists that these doctrines—waiver and estoppel—present factual questions properly reserved for the jury on this record.

Though disfavored, Indiana enforces contractual provisions that shorten the time to commence an action if "reasonable time is afforded, except [when] there is fraud, duress, and the like," *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009), or when it contravenes a statute or public policy, *Brunner v. Econ. Preferred Ins. Co.*, 597 N.E.2d 1317, 1318 (Ind. Ct. App. 1992). "Provisions limiting actions on an

---

[2] In addition to its signed stipulation, Interstate previously argued that "Indiana has the most significant relationship with this dispute" and "Indiana law should apply to this lawsuit" when successfully advocating for the case's transfer from Ohio to Indiana.

insurance policy to twelve months have been upheld as valid and enforceable; consequently, actions on a policy that are brought after the expiration of such limitation periods will be barred." *United Techs. Auto. Sys. v. Affiliated FM Ins. Co.*, 725 N.E.2d 871, 874 (Ind. Ct. App. 2000). Such a provision prevents undue delay in pursuing a claim of loss. *Auto-Owners Ins. Co. v. Cox*, 731 N.E.2d 465, 467 (Ind. Ct. App. 2000).

An insurer may waive such a provision or be estopped from asserting it, *Huff v. Travelers Indem. Co.*, 363 N.E.2d 985, 991 (Ind. 1977)—either expressly or impliedly, *Cox*, 731 N.E.2d at 467. Waiver or estoppel may "result from acts of [an] insurer causing [the] insured or claimant under the policy to delay bringing suit until after the time provided for in the policy." *Huff*, 363 N.E.2d at 991; *Summers v. Auto-Owners Ins. Co.*, 719 N.E.2d 412, 415 (Ind. Ct. App. 1999). If the insurer's conduct causes the insured to "reasonably believe" that the company won't insist on the suit's timeliness, the insurer "may no longer raise the limitation period as a defense." *Cox*, 731 N.E.2d at 468 (emphasis omitted). To permit otherwise would "allow the insurer to lull an insured into not pressing his rights and then deny liability on the basis of the limitation period." *Id.* Whether an insurer has waived the limitations period is usually a question of fact. *Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 381 (Ind. Ct. App. 2004).

The next aspect of Indiana law—whether notice of an insurer's desire to enforce the provision is required—has become slightly muddled here. Deferentially, given that this federal court sits in diversity to comment on Indiana law, the court endeavors to parse out the core principles. The insurers hold tightly to two federal cases from this district. In deciding how the Indiana Supreme Court may rule, the court must consult and follow decisions of the state's highest court and intermediate appellate courts first. *In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746, 751 (7th Cir. 2018). Only in the absence of state authority need the court examine decisions from other jurisdictions. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007). Indiana law grounds the court today.

Generally, an insurer need not inform an insured of his responsibilities under the policy. *Summers*, 719 N.E.2d at 416. The insured can read the contract—not least a sophisticated party like Indiana GRQ.

The insurers (and at times courts) start and end there, citing to *Auto-Owners Ins. Co. v. Hughes*, 943 N.E.2d 432, 435 (Ind. Ct. App. 2011), which in turn quotes longstanding precedent from *Statesman Ins. Co. v. Reibly*, 371 N.E.2d 414, 416 n.4 (Ind. Ct. App. 1978). *See also Trzeciak v. State Farm Fire & Cas. Co.*, 809 F. Supp.2d 900, 909 (N.D. Ind. 2011) (citing *Hughes* and *Reibly*). An insurance company generally has neither a duty to inform an insured of his responsibilities under the policy nor an obligation to tell the insured that the carrier intends to assert a time limitation on suit. *Hughes*, 943 N.E.2d at 435; *see also Summers*, 719 N.E.2d at 416 (reciting the same language from *Reibly*).

But one must keep reading the law. *Summers* says an exception exists when "an insurance carrier does not deny coverage or liability, *and* proceeds to negotiate with the insured toward settlement of the claim." *Summers*, 719 N.E.2d at 416. In these circumstances, "the law will imply a waiver of the contractual limitation for the bringing of suit, unless and until the insurer puts the insured on notice that litigation is necessary if he desires to pursue the claim further." *Id.* Several Indiana cases after *Reibly* also apply this exception, including one just nine months after *Reibly, see Schafer v. Buckeye Union Ins. Co.*, 381 N.E.2d 519, 523 (Ind. Ct. App. 1978), and one from the Indiana Supreme Court, *see Huff,* 363 N.E.2d at 992 ("Once notice was given and *no objection was raised to the mode of documentation and liability was not denied* until long after the twelve-month period, then the insurer has waived his right to insist on [the] provision"). *See also Cox*, 731 N.E.2d at 468 ("unless the insurer otherwise places the insured on notice that suit must be brought to pursue the claim further," a lack of denied coverage and ongoing settlement negotiations constitute waiver); *Summers*, 719 N.E.2d at 416-17 (same); *Interstate Auction, Inc. v. Cent. Nat'l Ins. Grp., Inc.*, 448 N.E.2d 1094, 1102-03 (Ind. Ct. App. 1983) (same).

Through this lens, Indiana GRQ points out that the insurers made payments, continued to adjust the claim, and engaged in settlement negotiations—both within and after the contractual limitation period (which would have otherwise run on August 15, 2017). For instance, in late 2016, Mr. Thoman retained experts to assist with the adjustment of the loss and worked with Indiana GRQ's environmental

consultant (Burns & McDonnell). Around this time, he recommended two advance payments, and at least one was made on this record within the initial year after the loss. In February 2017, Indiana GRQ provided a "substantial amount of cost documentation" and requested "assistance once again in funding a portion of [its] loss to date." This precipitated McLarens' recommendation for a second advance. In June 2017, Mr. Thoman reported to be in "essentially daily discussions" and "working closely with" Indiana GRQ regarding the loss, proposed work plans, and outstanding claim documentation and costs.

By October 2017, Indiana GRQ had submitted expenditures in excess of $3.8 million and three additional quotes about outstanding loss. Mr. Thoman reported that they agreed with Indiana GRQ that the loss "can and will drag on due to its very nature" of seepage, pollution, and clean-up. A reasonable juror could conclude that the insurers had not denied the claim and continued to negotiate a settlement; indeed, a reasonable juror could find that the parties understood that adjusting this claim would necessarily exceed the one year that the policy anticipated for suits, just given the nature of the flood damage and remediation. Following the first year after the loss, additional partial payments were made. The insurers' independent adjuster still was in "weekly if not daily" discussions with Indiana GRQ about the claim in late 2017 and 2018. Settlement negotiations were ongoing into 2019. Coverage wasn't denied until August 2019. To a reasonable jury, that could effectuate a waiver, unless the insurers put Indiana GRQ on notice of their intention to insist on the timing requirement. But that didn't seem to happen.

The insurers argue that "well-established law" and "Indiana courts" have concluded that negotiations after the contractual time limitation won't effectuate a waiver. They cite two cases. First, one unpublished district decision begins with a discussion of Indiana law, including *Huff* and *Summers*, but then pivots to a circuit case that hinged on federal law—not Indiana law—to enforce a time limitation notwithstanding ongoing settlement negotiations. *See Thomas v. Am. Fam. Mut. Ins. Co.*, 2008 U.S. Dist. LEXIS 92440, 11 (N.D. Ind. Nov. 13, 2008) (citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d

869, 875 (7th Cir. 1997) (citing federal law under ERISA and referencing one Wisconsin case)). This wouldn't be the first time federal and Indiana law differed. Indiana law matters today.

Second, the insurers cite to *Brunner*, 597 N.E.2d at 1319, and contend that an insured's state of mind is "irrelevant concerning the application of a contractual suit limitation." But this discussion in *Brunner* pertains to whether the insured's *knowledge of the loss* triggers the limitation period, rather than the date the damaged occurred. *See id.* at 1319-20. No one is debating today whether Indiana GRQ missed the suit deadline because it just never knew of the flood damage. That isn't the issue at all. The issue is whether the insurers paid before and after the time period, engaged in settlement negotiations before and after the time period, and denied coverage only after the time ran—and thereby waived the policy's limitation period. *See Cox*, 731 N.E.2d at 468.

The court assumes good intentions by the insurers, but a closer read reveals that their pitch as "well-established" by "Indiana courts" misapprehends the law. *See, e.g., Monee Nursery & Landscaping Co. v. Int'l Union of Operating Eng'rs, Loc. 150*, 348 F.3d 671, 677 n.4 (7th Cir. 2003). This is particularly true given the wealth of Indiana cases counter their suggestion. *See Huff*, 363 N.E.2d at 992; *Schafer*, 381 N.E.2d at 523; *Cox*, 731 N.E.2d at 467-68; *Summers*, 719 N.E.2d at 416-17; *Interstate Auction*, 448 N.E.2d at 1103.

From the date of loss until May 2019, there was no mention of the contractual limitation period. For instance, in the November 2016 reservation of rights letter, the insurers listed numerous policy provisions—the limitation period wasn't one of them. Not until May 2019 did the insurers cite the limitations period from the policy in a letter. Even then, the insurers never expressed an intention to enforce that provision given the ongoing negotiations. One might jump to think that a reasonable jury could read the May 2019 letter as expressing such an intention, but then the letter invites yet more discussion: "Once you have fully presented your claim and the Insurers have had an opportunity to complete their review, the Insurers will be in a better position to evaluate the scope of coverage." The insurers asked Indiana GRQ to forward additional information for "further evaluation" on a "without

prejudice" basis. By this time, the insurers had not denied coverage and continued to negotiate with the insured toward settlement; and, by law, the insurers still had not put Indiana GRQ "on notice that litigation is necessary if [it] desire[d] to pursue the claim further." *Summers*, 719 N.E.2d at 416. Even the August 2019 letter denying coverage didn't seem to view the May 2019 letter as starting the clock.

Indeed, even in July 2019, Indiana GRQ continued to correspond and offer claim information. On this record, every letter issued by the insurers to Indiana GRQ (November 2016, September 2018, November 2018, March 2019, May 2019, and August 2019) included a general statement reserving their rights under the policy. The insurers argue they should not be foreclosed from asserting their rights under the policy. They might not be but for their conduct. Merely because they have once and again reserved a right doesn't mean that through their affirmative conduct that they cannot then waive it. A blanket reservation of rights wasn't express notice that the insurers now intended to rely on a limitations period in the policy and put Indiana GRQ on the clock, and Indiana law says so. *See id.*; *see also Schafer*, 381 N.E.2d at 521, 523; *28th St. Superior Hosp., Inc. v. Cincinnati Ins. Co.*, 2022 U.S. Dist. LEXIS 26854, 13-14 (N.D. Ind. Feb. 15, 2022) ("Not until this denial [of coverage] did [insured] have reason to believe that its claim would not be paid" after more than three years of negotiations.).

The insurers argue that *Schafer* is inapplicable because here the insurers eventually denied coverage when the insurer in *Schafer* never did. *See Schafer*, 381 N.E.2d at 521. The timelines are different. In *Schafer*, the insurers' conduct resulting in waiver mostly occurred before the twelve-month limitation period ran. *Id.* The parties were in settlement negotiations until approximately two months before the deadline, and then correspondence continued about copies of depositions. *Id.* The deadline ran, and the insured filed suit almost a year later. *Id.* It wasn't determinative in *Schafer* that coverage was *never* denied but that coverage wasn't denied before the expiration date, and that the insured wasn't clearly advised that the insurer was unwilling to change its position respecting the claim before expiration. *Id.* at 521, 523.

Here, adjusting and settlement negotiations started within the first year and continued years past the expiration date with no denial of coverage, or a communication that litigation was necessary. On this record, denial of coverage didn't occur until August 2019—over two years after the contractual limitation expired.[3] *See, e.g., Huff,* 363 N.E.2d at 992 (when "liability was not denied until long after the twelve-month period, then the insurer has waived his right to insist on either provision") (emphasis omitted). Based on the insurers' conduct before their denial, Indiana GRQ had no reason to file suit until this point and reasonably believed that the limitation provision wouldn't be enforced years after its expiration, so a reasonable jury could say. Indiana GRQ filed suit on June 18, 2020—within the twelve months after the insurers had denied coverage and put the company on notice.[4]

Based on this record, the court must deny the insurers' motion on timeliness. A reasonable jury could find that the insurers, through their conduct, created a reasonable belief by Indiana GRQ that the limitation provision would not be enforced. The insurers made payments, continued to adjust the claim, and engaged in settlement negotiations within and after the original contractual limitation period ran; and, with that, coverage wasn't denied until August 2019. Under such circumstances, a reasonable juror could say they waived the contractual limitation period, "unless and until [they put] the insured on notice that litigation [was] necessary" in August 2019. *Summers*, 719 N.E.2d at 416.

Rule 56 permits the court to enter summary judgment for a non-movant (Indiana GRQ) after notice and a reasonable chance to respond. Fed. R. Civ. P. 56(f)(1). Indiana GRQ has not requested summary judgment on this issue, so the court will afford the parties the opportunity to brief whether the court should enter summary judgment for Indiana GRQ on the timeliness issue (simultaneous

---

[3] In the insurers' reply, they say they "consistently advised [Indiana GRQ] of its coverage position and issued written correspondence which denied portions of the claim;" however, based on the evidence they cite, this seemingly only refers to the August 2019 letter.

[4] Because the court finds that a reasonable jury could find the insurers waived their right to enforce this provision, it need not address Indiana GRQ's additional defense of equitable tolling.

submissions for each side not to exceed four pages and not to expand the summary judgment record, given the briefing to date). Meanwhile, the court denies the insurers' summary judgment motion.

C. *Recovery Limit Applicable to the Flood at the South Bend Facility.*

Both Indiana GRQ and six insurers[5] request the court rule in their favor on whether the $30 million flood limit or the $10 million SFHA sublimit applies to this loss. A $30 million limit generally applies to a flood in the annual aggregate, but a $10 million sublimit applies to "Locations with any part of the legal description within a Special Flood Hazard Area (SFHA) and not otherwise listed herein" [ECF 16-12, § 2.03.06].[6] Indiana GRQ argues for the $30 million coverage limit, whereas the six insurers argue for the $10 million sublimit.

No one disputes that the South Bend facility is covered by the policy or that it is partially located within a SFHA. The debate lies with another requirement of the sublimit—whether "not otherwise listed herein" refers to the SOV (the statement of values) and incorporates the properties listed there. The SOV identifies the South Bend facility as one property, so (as framed by the parties) if this policy incorporates the SOV then the $30 million limit ostensibly applies, whereas if the policy has not incorporated the SOV then the South Bend facility has not been listed and the $10 million sublimit would apply.

An insurance policy is a contract and subject to rules of construction. *State Farm Mut. Auto. Ins. Co. v. Jakubowicz*, 56 N.E.3d 617, 619 (Ind. 2016); *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005). A contract's interpretation is generally a question of law, *Song v. Iatarola*, 76 N.E.3d 926, 933 (Ind. Ct. App. 2017), controlled by the parties' intent as expressed by clear contractual language, *City of Jeffersonville v. Env't Mgmt. Corp.*, 954 N.E.2d 1000, 1008 (Ind. Ct. App. 2011). "When confronted with a

---

[5] Interstate does not join the other insurers in this argument.

[6] The court eliminates any bold print within the policy for readability today. Doing so has no effect on the policy's interpretation.

dispute over the meaning of insurance policy terms, Indiana courts afford clear and unambiguous policy language its plain, ordinary meaning." *Erie Indem. Co. v. Est. of Harris*, 99 N.E.3d 625, 630 (Ind. 2018).

The court interprets "policy terms from the perspective of the ordinary policyholder of average intelligence." *Ind. Farmers Mut. Ins. Co. v. Weaver*, 120 N.E.3d 280, 284 (Ind. Ct. App. 2019); *accord Erie Indem.*, 99 N.E.3d at 630; *Frankenmuth Mut. Ins. Co. v. Fun F/X II, Inc.*, 601 F. Supp.3d 330, 337 (N.D. Ind. 2022), *aff'd*, __ F.4th __, 2023 U.S. App. LEXIS 4829 (7th Cir. Feb. 28, 2023). The court's job is "to ascertain and enforce the parties' intent as manifested in the insurance contract," *Berkshire Hathaway Homestate Ins. Co. v. Basham*, 113 N.E.3d 630, 634 (Ind. Ct. App. 2018), to interpret a contract "so as to harmonize its provisions, rather than place them in conflict," and to look at the contract as a whole, *Dunn*, 836 N.E.2d at 252.

Mere disagreement between the parties about a provision's meaning won't render a provision ambiguous. *G&G Oil Co. of Ind. v. Cont'l W. Ins. Co.*, 165 N.E.3d 82, 87 (Ind. 2021). Only when intelligent policyholders could honestly disagree about the policy's meaning will the court find its terms ambiguous, else the court applies the plain and ordinary meaning of the policy's terms. *See id.*; *Erie Indem.*, 99 N.E.3d at 630. If ambiguity exists, an insurance contract will be interpreted to favor the insured to further the policy's basic purpose of indemnity.[7] *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985); *Zeller v. AAA Ins. Co.*, 40 N.E.3d 958, 962 (Ind. Ct. App. 2015). Construction against the insurer is "driven by the fact that the insurer drafts the policy and foists its terms upon the customer." *Stevenson v. Hamilton Mut. Ins. Co.*, 672 N.E.2d 467, 471 (Ind. Ct. App. 1996).

"[E]xceptions, limitations and exclusions must be plainly expressed in the policy." *Am. Family Life Assurance Co. v. Russell*, 700 N.E.2d 1174, 1177 (Ind. Ct. App. 1998). Indiana GRQ contends that the policy incorporates the SOV. An agreement may incorporate content through "a clear and explicit

---

[7] Indiana applies the rule of *contra proferentem* without regard to the insured's sophistication. *See Hess v. Biomet, Inc.*, 2021 U.S. Dist. LEXIS 134861, 7 (N.D. Ind. July 20, 2021) (Indiana law makes no exception for sophisticated parties under the rule of *contra proferentem*.).

expression of intent to be bound by the auxiliary content." *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 754-55 (Ind. 2018). "Mere reference to another contract is not enough." *Id.* at 755. "And simply attaching a document is neither necessary nor sufficient for incorporation." *Id.*

When "a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties. However, if in a written contract, a reference is made to another writing for a particularly designated purpose, the other writing becomes a part of the contract only for the purpose specified, and is foreign to the contract for all purposes other than the one specified." *I.C.C. Protective Coatings v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1036 (Ind. Ct. App. 1998) (citing 17A Am. Jur. 2d, *Contracts* § 399 at 426-27).

The insurance policy repeatedly incorporates the SOV by reference:

- The policy provides coverage for an Insured Location (otherwise called in the policy a Location). The policy defines an Insured Location to include those "[l]isted on a Schedule of Locations on file with Company; per statement of values dated 03/01/2016" [ECF 16-12, § 2.01.01]—that is, the SOV.

- Aside from flood coverage, the policy covers property damage "at scheduled locations on file with the Company per statement of values dated 3/01/2016" [*id.* § 2.03.06].

- The deductible section incorporates "the most current Statement of values on file with the company as of the date of loss, for the Location where the direct physical loss or damage occurred, per Location" [*id.* § 2.05.05.02.02.02.01].

There is thus no doubt that the insurance policy incorporates the SOV as auxiliary content at times. *See Care Grp. Heart*, 93 N.E.3d at 754-55. Indeed, the policy would prove ineffectual without the SOV. This case is no different than *I.C.C. Protective Coatings* where a contract incorporated a letter and bidding document by defining labor and materials in reference to the "specification outlined in [the] quotation of June 9, 1994" and identified material rates as "outlined in [the] letter of June 17, 1994." *I.C.C. Protective Coatings*, 695 N.E.2d at 1036 (emphases omitted).

Saying the policy plainly incorporates the SOV falls just short of answering today's question. The policy may incorporate the SOV for certain purposes but not others. The question is whether this policy

incorporated the SOV within the $10 million sublimit. Both sides argue the plain language of the sublimit. The court returns to the policy's language to apply its plain meaning so as not to render any words, phrases, or terms ineffective or meaningless. *See Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307, 1316 (Ind. Ct. App. 1991). Flood coverage, otherwise $30 million, shifts to a sublimit of $10 million:

> as respects Locations with any part of the legal description within a [SFHA] and not otherwise listed herein.

[ECF 16-12 § 2.03.06]. The parties largely engage on the battleline of what the phrase "not otherwise listed herein" means. The language is clear, but the court starts earlier within the sublimit than the phrase of concern to the parties.

To begin, the $10 million sublimit applies to "Locations" [ECF 16-12, § 2.03.06]. The policy defines a Location (in part) to mean those properties "specified in the Schedule of Locations" [*id.* § 7.28.01]. The policy further defines an Insured Location as just such a Location "[l]isted on a Schedule of Locations on file with [the] Company; per statement of values dated 03/01/2016" [*id.* § 2.01.01]. In other words, the SOV is this Schedule of Locations. The policy emphasizes later that a Scheduled Location means just that—a "Location scheduled on this Policy" [*id.* § 7.48]. Thus Locations means (as relevant here) those properties on the SOV.[8]

That said, there is no doubt that the $10 million sublimit refers initially to the South Bend facility—it was both a Location (and Insured Location) listed on the SOV and within a SFHA. Now the question is what the conjunctive phrase "and not otherwise listed herein" means and whether this phrase removes the South Bend facility from the operation of this sublimit. With a conjunctive, both conditions are required. *See Estabrook v. Mazak Corp.*, 140 N.E.3d 830, 835 (Ind. 2020) (quoting *Dague v. Piper Aircraft*

---

[8] This policy's express definitions of Location and Insured Location thus distinguish this case from the insurers' lead case, *Opry Mills Mall Ltd. P'Ship v. Arch Ins. Co.*, 2018 Tenn. App. LEXIS 40, 20-24 (Tenn. Ct. App. Jan. 26, 2018), in which the word "location" remain undefined in contrast to a clear definition for "High Hazard Flood Locations." To note, *Opry Mills* was later designated as "not for citation," meaning that under the Tennessee Supreme Court's rules that the opinion "has no precedential value" and could not be cited "by any litigant in any brief." Tenn. Sup. Ct. Rule 4(E).

*Corp.*, 418 N.E.2d 207, 211 (Ind. 1981) ("and" is conjunctive); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("With the conjunctive list, all [] things are required.").

As written, this policy subjects only unlisted flood-hazard properties to a $10 million sublimit. That interpretation only makes sense, and gives meaning to all words within the policy, so long as the policy contemplates Locations that might not be listed. And it does. The policy explains that a Location might also include a property "not so specified in the Schedule of Locations" and gives examples of what types of property that would be [ECF 16-12, §§ 7.28.02-7.28.03.02]. Likewise, the policy provides coverage for Insured Locations beyond just those listed on the SOV—namely those covered as "Miscellaneous Unnamed Locations" [*id.* §§ 2.01, 2.01.02]. A Miscellaneous Unnamed Location is a Location "owned, leased or rented by the Insured, but not specified in the Schedule of Locations" [*id.* § 7.31]. The policy thus explains quite clearly what it views as listed and what is "not otherwise listed." The South Bend facility was listed in the policy, so the $10 million sublimit does not apply to it.

The parties had the freedom to contract and could have written a different policy, but this policy provides $30 million flood coverage for those properties that Indiana GRQ and the insurers specified, thereby agreeing to underwrite that risk for the properties they knew about, and reserved the $10 million sublimit for those properties that the parties had not specified or listed. The insurers would invite the court to delete the phrase "and not otherwise listed herein" because only that edit would cause the South Bend facility (and other properties listed in the SOV—the Statement of Locations) to be captured by this provision. The court cannot rewrite the policy. *See B&R Oil Co., Inc. v. Stoler*, 77 N.E.3d 823, 829 (Ind. Ct. App. 2017). The court need only apply the policy's plain language today, so the court grants summary judgment for Indiana GRQ on this argument and finds that the policy affords $30 million in flood coverage for this property.

D. *Actual Cash Value (ACV) or Replacement Cost Value (RCV) for Electrical Equipment.*

All insurers[9] ask the court to declare that Indiana GRQ is limited to actual cash value for any further expenditures for the company's electrical system. Indiana GRQ argues the opposite and contends it should receive replacement cost value. Actual cash value is "pure indemnity[]. Its purpose is to make the insured whole but never to benefit him because a [flood] occurred. Replacement cost coverage, on the other hand, reimburses the insured for the full cost of repairs, if he repairs or rebuilds the [structure], even if that results in putting the insured in a better position than he was before the loss." *Seeber v. Gen. Fire & Cas. Co.*, 19 N.E.3d 402, 409 (Ind. Ct. App. 2014) (citation omitted).

The policy says when actual cash value kicks in. "If there is direct physical loss of or damage to Covered Property for which repair, rebuilding or replacement has not started within two (2) years from the date of direct physical loss or damage, the Company will not be liable for more than the actual cash value of the property destroyed" [ECF 16-12, § 6.22.02]. The two-year period here lasted from August 15, 2016 to August 15, 2018.

The court again is guided by the policy. *See Jakubowicz*, 56 N.E.3d at 619. The insurers argue that Indiana GRQ cannot recover replacement costs until the repairs are completed, pointing to the fact that no repairs or replacements occurred since May 2018. The insurers refer to electrical costs and repair generally, without parsing out individual items or costs. Indiana GRQ asserts that all the policy requires is that it start the repair and replacement. The facts Indiana GRQ tenders as proof of its start of repairs before the limitation period ran remain undisputed. Thus, the dispute today is really whether the repair and replacement had to start or be completed before August 15, 2018.

The insurers point to several cases asserting that "it is well settled in Indiana that an insured cannot recover replacement cost unless and until the insured actually repairs the property first;" however, every one of their cases dealt with a policy that seemingly required completion of repair and replacement

---

[9] Interstate joins this argument.

before receiving replacement cost value. *See Schweitzer v. Am. Fam. Mut. Ins. Co.*, 16 N.E.3d 982, 990 (Ind. Ct. App. 2014) (Insured "did not complete the replacement . . . as required by the policy in order to receive replacement coverage."); *Emps. Mut. Cas. Co. v. Skoutaris*, 453 F.3d 915, 918-19 (7th Cir. 2006) (insured could receive actual cash value to begin reconstruction but couldn't receive replacement cost value until all repairs or replacements were made); *see, e.g., Novogroder Cos., Inc. v. Hartford Fire Ins. Co.*, 2012 U.S. Dist. LEXIS 118785, 23-24 (N.D. Ind. Aug. 21, 2012) (applying Illinois law) (policy requiring damaged property to be "actually repaired, rebuilt, or replaced"); *Williams v. Am. Fam. Mut. Ins. Co.*, 2008 U.S. Dist. LEXIS 69607, 12-16 (S.D. Ind. Sept. 15, 2008).

So this point perhaps isn't so well-settled for a policy that has been written differently. The court appreciates adversarial creativity and zeal, but this policy plainly says "started"—not "completed." The policy's language could not be clearer. The insurers admit that some repair and replacement occurred before May 2018 in their statement of facts [ECF 113 ¶¶ 68, 80; ECF 124 ¶ 112]. The insurers offer no other argument on this front, including whether the start of repairs or replacements must be parsed among covered property, or whether they paid replacement cost value for any repairs or replacements started within the two-year period, so the court denies the insurers' summary judgment motion.

E.   *Bad Faith.*

All insurers[10] request summary judgment on Indiana GRQ's bad faith claim. The insurers argue that the parties' good faith disputes about coverage don't amount to bad faith, nor does a mere disagreement about damages. Indiana GRQ asserts that genuine issues of material fact exist and thus this question must be decided by a jury.

Indiana law has long recognized a legal duty, implied in all insurance contracts, for the insurer to deal in good faith with its insured. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). "To prevail on a bad faith claim, the plaintiff must prove the insurer (1) made an unfounded refusal to pay policy

---

[10] Interstate joins this bad faith argument and adds additional argument in its brief.

proceeds; (2) caused an unfounded delay in making payment; (3) deceived the insured; or (4) exercised an unfair advantage over the insured to pressure the insured into settling its claim." *Brandell v. Secura Ins.*, 173 N.E.3d 279, 284 (Ind. Ct. App. 2021). "Poor judgment and negligence do not amount to bad faith; there must also be the additional element of conscious wrongdoing." *Id.* (citing *Colley v. Ind. Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998) ("A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will.")).

A claim for bad faith will not arise every time an insurance claim is denied. *Hickman*, 622 N.E.2d at 520. "That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana." *Id.* On the other hand, an insurer that "denies liability knowing that there is no rational, principled basis for doing so has breached its duty." *Id.* There must be clear and convincing evidence that "the insurer had knowledge that there was no legitimate basis for denying liability." *Indiana Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1093 (Ind. Ct. App. 1992).

Indiana GRQ advances five points: (1) the insurers acted deceptively about the PCB levels; (2) the insurers improperly withheld their cost assessments of the loss; (3) the insurers hired Indiana GRQ's remediation consultant; (4) Interstate labeled its $360,000 payment as *ex gratia*; and (5) the insurers improperly pressured Indiana GRQ to settle its claim. The court addresses each in turn.

First, Indiana GRQ alleges the insurers (and their representatives) knew about PCB sampling indicating levels more than 50 parts per million (ppm) as part of the remediation of contaminated floodwaters on its property, yet the insurers withheld this information and refused to cover remediation compliant with the Toxic Substance Control Act (TSCA). Indiana GRQ worries that the presence of PCB levels more than 50 ppm would trigger the TSCA cleanup threshold warranting remediation in accordance with its mandate.

To be clear, whether the PCB levels were in fact over the TSCA threshold or whether TSCA compliant remediation was required aren't today's questions. The question is whether there was a good

faith dispute over whether the insured had a valid claim or whether the insurer denied liability knowing there was no rational and principled basis for denial. *See Hickman*, 622 N.E.2d at 520. Though the parties disagree about the conclusions to be drawn from the PCB sample levels and the proper remediation plan, Indiana GRQ hasn't presented evidence on which a reasonable jury could rely to find bad faith on this front, even construing all facts and reasonable inferences in its favor. *See Speedway*, 28 F.4th at 820.

No one disputes that samples with elevated levels were detected. The insurers argue—and Indiana GRQ seems not to present evidence to contradict the point—that that these "samples occurred at a substantial distance from the flood impact and were totally unrelated to the August 15, 2016 loss." In short, the insurers didn't believe there was a "causal connection" between the elevated PCB levels and the flooded transformers in the substations from the August 2016 rain [ECF 122-3 at 99-101]. Their environmental specialist (Robert West) so testified, explaining that the elevated PCB levels were located "900 feet away from the most distal [] and 300 feet away from the most immediate" substation where Indiana GRQ alleges the PCBs originated [*id.*]. He further testified that the elevated PCB data point was "not among the data points that show causal connection with a transformer release" and it was "unlikely the transport mechanism would include moving that concentration [of PCB levels] from a substation to a tunnel down 900 feet or at least 100 feet down into the basement, finds its way into a sump, and concentrate in that sump in a small patch of scum material, if you will." Even Indiana GRQ's environmental consultant (Burns & McDonnell) found that, despite elevated PCB levels, "[a]ll wastewater generated will be presumed to be PCB-impacted, non-TSCA waste (below 50mg/kg) and shall be managed accordingly until it can be properly characterized for disposal."

Indiana GRQ argues the insurers were not truthful when they denied knowing about elevated levels of PCBs during the investigation and remediation of the site. However, Indiana GRQ hasn't pointed to any evidence of the insurers keeping this information from them or making untruthful statements about the levels, just the insurers' insistence that non-TSCA remediation was sufficient.

Without deciding whether the insurers' decision not to cover TSCA compliant remediation was correct, Indiana GRQ hasn't shown that the insurers denied this coverage knowing there was no rational and principled basis for denial. *See Hickman*, 622 N.E.2d at 520. This was a good faith dispute about coverage. *See id.*; *Indiana Ins. Co.*, 590 N.E.2d at 1093.

Second, Indiana GRQ alleges the insurers deceived it by playing down and withholding the true remediation costs revealed by their internal costs assessments. Indiana GRQ says the insurers insisted that the total insurable loss was $3.68 million, but reports from McLarens to the insurers placed cost estimates between $6.1 million and $13 million. Indiana GRQ alleges that withholding the true cost estimates constituted bad faith.

In October 2016, McLarens estimated the total gross loss was $13 million. By December 2016, its loss estimate decreased to $10 million. In February and September 2017, its estimated loss fell in the range of $6.5 million; and, in December 2017, March 2018, and October 2018, it projected the total gross loss to be $6.1 million. For now, Indiana GRQ isn't disputing that the damage amount constitutes bad faith (though it views the amount as inaccurate). Instead, the company contends that the insurers withheld true remediation costs and thereby deceived it and refused, without a sound or rationale basis, to pay the total amount of policy proceeds. *See Brandell*, 173 N.E.3d at 284.

The insurers contend that Indiana GRQ is alluding to their loss reserves, but the numbers Indiana GRQ cites are McLarens' estimated losses from the flood. The insurers thereafter generally state that the estimates don't consider the "plethora of coverage issues discussed herein." This vague and nonspecific response to the difference in cost and withholding this information from Indiana GRQ isn't compelling. If by plethora of coverage issues, the insurers mean the arguments they present on the policy today, a reasonable jury could conclude that the policy's plain language was rather self-evident—for instance, could an insurer in good faith really contend that "started" means "completed"? The argument on the $10 million sublimit likewise doesn't seem to explain why payment remained yet lower at $3.68 million

given the McLarens estimates or why they would be withheld; the coverage limit cannot be the good faith justification for withholding estimates that fell below that sublimit. And all of the McLarens estimates preceded any conclusion that the insurers should deny coverage because of the policy's time limitations, so that good faith debate about its enforcement or its waiver in August 2019, albeit a fair argument and just unavailing on this record, *see Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40-43 (Ind. Ct. App. 2002), would not justify earlier conduct by the insurers between October 2016 and October 2018. The insurers did not even cite the time limitation until May 2019.

The insurers also vaguely contend Indiana GRQ hasn't been "shorted" when Indiana GRQ hasn't spent any money on TSCA compliant remediation or electrical repair since 2018. However, the court has already decided that Indiana GRQ need not have completed their repair and replacement by August 15, 2018 to receive replacement cost value. This argument also doesn't explain the difference between the estimated loss amounts and those communicated to Indiana GRQ. The court isn't imposing a duty to disclose every estimate an insurer receives; however, there is a duty to not make an unfounded refusal to pay policy proceeds, cause an unfounded delay, and deceive the insured. Today, a reasonable jury could say the insurers haven't responded with a rational and principled basis for withholding the true cost estimates and paying Indiana GRQ a lower amount. The court thus must deny summary judgment on this bad faith theory.

Third, Indiana GRQ argues that the insurers deceived it by hiring its remediation consultant (Jeff Pope of Burns & McDonnell) to assist the insurers. Indiana GRQ calls this bad faith. Mr. Pope was hired as an environmental consultant for Indiana GRQ. He conducted testing at the site and produced an extensive report for Indiana GRQ. He produced an environmental remediation plan that Indiana GRQ signed. Mr. Pope testified that the insurers (through McLarens) retained him after his work for Indiana GRQ ceased and he stopped receiving payment.

Mr. Thoman (the McLarens adjuster for the insurers) testified that the insurers hired Burns & McDonnell (namely, Mr. Pope) because "they had an intimate knowledge of the complexity of what was happening on site" [ECF 122-1 at 52]. He also said he couldn't recall another claim where insurers hired the insured's previous consultant [*id.*]. Mr. Pope said he was retained for only one meeting. He participated in a call with the insurers "to prepare [their] best estimates for the physical damage and seepage and pollution" and to discuss "opening a potential settlement" with Indiana GRQ [*id.* 18-19].

Thomas Lovisa, the main vendor performing the site remediation, testified this was "odd," but it strikes as far more disturbing. "Courts have been quick to find a confidential relationship in situations where the [consultant] previously worked for the opposing party," particularly when that consultant acquires confidential information during the course of representation. *Thompson, I.G., L.L.C. v. Edgetech I.G., Inc.*, 2012 U.S. Dist. LEXIS 126808, 9-11 (E.D. Mich. Sept. 6, 2012).

On this record, a reasonable jury could find that hiring the very consultant who once worked for Indiana GRQ on this same issue of remediation now to undermine the company's efforts for additional remediation payments was in bad faith—an exercise of an unfair advantage over the insured to pressure the insured toward a settlement. *See id.*; *Koch Refin. Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996) (flipflopping insurer and consultant provided basis for disqualification); *Wang Lab'ys., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991) (viewing this flipflop retention of a proposed expert as "clear" case of concern); *see also Brandell*, 173 N.E.3d at 284. The court thus must deny summary judgment on this bad faith theory.

Fourth, Indiana GRQ argues the insurers acted deceitfully by calling Interstate's $360,000 payment *ex gratia*—a mere favor rather than a contractual obligation. Interstate joined the lead policy and agreed to be part of the quota share policy accepting 10 percent of the risk. In addition, Interstate issued a separate policy that contained exclusions not included in the lead policy—relevant today, three distinct

pollution exclusions. As a result, Interstate declined the contamination and pollution remediation portion of Indiana GRQ's claim.

The two sides dispute whether Interstate's exclusions are enforceable. Indiana GRQ argues that the lead policy forecloses such exclusions. Two other insurers initially declined environmental remediation claims under similar pollution exclusions but realized later that the exclusions seemed inconsistent with the lead policy and paid the remediation costs. Interstate declined to reform its policy and stood firm that its exclusions applied, but it paid $360,000 *ex gratia* as a business decision at the request of AmWins (a wholesale insurance broker) and to preserve that relationship.[11] This is nothing more than a good faith dispute about coverage and Interstate's decision not to reform its policy. This will not provide a basis for recovery in tort. *See Hickman*, 622 N.E.2d at 520.

Fifth, Indiana GRQ argues that the insurers improperly pressured it to settle its claim. The company says the insurers desired a quick settlement. The claim's adjustment occurred for years, and the insurers wanted to enter into a settlement to put this thing to bed. Indiana GRQ has not explained how the insurers' desire to settle was improper or presented evidence to draw reasonable inferences of its impropriety for a bad faith claim. The law promotes agreements in settlement as much as it favors the freedom to enter into other contracts.

Indiana GRQ says the insurers attempted to exclude its broker (Jeff Pikel) from the May 2018 settlement negotiations as he had concerns about entering an agreement. Mr. Stromeyer, one of the adjusters for the insurers, testified as much [ECF 122-1 at 19]. This testimony doesn't demonstrate that the insurers walked their talk or took any actual action to exclude him. Nevertheless, the company's

---

[11] IRG's chief financial and operating officer, Mark Miley, worked with both a retail insurance broker—the DeHayes Group—and a wholesale insurance broker—AmWins—to procure the 2016-2017 property insurance program. Interstate's property coverage provided to Indiana GRQ was part of a larger program between Interstate and AmWins. Interstate had hundreds of other insureds in the AmWins program.

broker was present at the May 2018 negotiation. A mere preference not to work with a broker isn't enough for a reasonable jury to find bad faith.

Next, Indiana GRQ says the insurers threatened to close their file in thirty days if it didn't provide requested information. On September 13, 2018, the insurers sent a letter to Indiana GRQ following up on the May 2018 meeting. The letter memorialized that Indiana GRQ agreed to submit more data, including its total claim to date and the additional expenses it sought to recover. The letter bemoaned that it had been "almost four (4) months since our May 16, 2018 meeting and nothing further has been seen from your office, despite statements that were made periodically to us wherein a final claim will be forthcoming. . . . If this information is not received over the course of the next 30 days, we will assume you are no longer interested in pursuing your claim. . . . At that time, we will close our file."

The insurers characterize this as an "idle threat" [ECF 124 ¶ 135]. They say it was intended to get Indiana GRQ to comply with overdue information requests, to give them the company's final numbers, and to conclude the claim. Their public adjuster testified that the letter's purpose was to "get [Indiana GRQ] to move, to try to bring this thing to a conclusion," to get "their final numbers" and "demand," and because the insurers couldn't "get the [insured] to give [them] what [they] need[ed] to wrap this loss up." Self-characterizing this letter as a "threat," even if idle, is worrying; but on this record the insurers weren't exercising an unfair advantage to pressure a settlement. *See Brandell*, 173 N.E.3d at 284. Outside an allegation, Indiana GRQ hasn't explained how this was improper or presented evidence to support an inference of bad faith, particularly given its sophistication, its prior commitment to provide information, and the time that had passed since its promise. At most, this was pressure to provide information, not to settle. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (quotations and citation omitted). A reasonable jury could not find that this letter reflected "dishonest purpose, moral obliquity, furtive design, or ill will" used to pressure settlement. *See Colley*, 691 N.E.2d at 1261.

Last, Indiana GRQ claims that the insurers used Indiana GRQ's financial situation as leverage to force a settlement. They point to testimony when the public adjuster for the insurers suggested to Interstate that they keep the $360,000 *ex gratia* payment in its "back pocket" to bring out later in negotiations to resolve the loss. The adjuster also testified that Interstate promptly rejected the suggestion and decided to issue the payment as quickly as possible, so even if this was improper a suggestion alone, without action, doesn't amount to bad faith.

F.  *Interstate's Pollution Exclusions Under Indiana Law.*

Interstate[12] argues certain pollution exclusions in its policy bars Indiana GRQ's environmental coverage claims. The lead policy doesn't contain any of these exclusions, and the parties debate which should apply. The court need not delve into that today because Interstate concedes that under Indiana law none of the exclusions would be enforceable [ECF 116 at 11 ("[U]nder Indiana law, the exclusion would be deemed ambiguous and unenforceable due to PCBs not being listed as a 'contaminant or pollutant.'")]. *See State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 849-51 (Ind. 2012); *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 975 (Ind. 2005); *Freidline*, 774 N.E.2d at 40. Indiana law governs, so the court denies Interstate's partial summary judgment motion.

CONCLUSION

Accordingly, the court GRANTS Indiana GRQ's partial summary judgment motion [ECF 105] and finds the $10 million sublimit inapplicable, DENIES insurers' summary judgment motion except as to precise bad faith theories stated herein [ECF 110], and DENIES Interstate's partial summary judgment motion [ECF 117]. The court AFFORDS the parties until April 5, 2023 to brief whether the court should enter summary judgment for Indiana GRQ on the timeliness issue (simultaneous submissions, one a side, not to exceed four pages and not to expand the summary judgment record).

---

[12] The other insurers don't join Interstate's argument.

SO ORDERED.

March 22, 2023                                    _s/ Damon R. Leichty_____
                                                 Judge, United States District Court