**IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| INDIANA GRQ, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 3:21-cv-00227-DRL-MGG |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN GUARANTEE AND | ) | |
| LIABILITY INSURANCE COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF INDIANA GRQ, LLC'S MOTION TO
EXCLUDE DEFENDANT INSURERS' EXPERT WITNESSES**

Plaintiff Indiana GRQ, LLC ("IRG") moves to exclude the expert reports and expert testimony of Defendant Insurers' experts, Robert West, Gerald Provencher, Chaz Mello, and Paul Christoferson. None of these expert opinions meet the requirements of Fed. R. Evid. 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

Defendant Insurers' handling of experts mocks the confidentiality of mediations, as two of Defendant Insurers' experts formed their opinions from a review of IRG's confidential mediation materials. This was not a simple mistake or error of judgment – it was intentional. Mr. West personally participated in mediation of this matter. He reviewed IRG's confidential mediation statements and was personally involved in confidential settlement talks. Similarly, Defendant Insurers provided Mr. Provencher with IRG's confidential mediation materials for preparation of his expert report and opinion. This blatant breach of confidentiality tainted the opinions of Messrs. West and Provencher, rendering both opinions inadmissible in this proceeding.

Misconduct aside, none of Defendant Insurers' experts meet the requirements of *Daubert* or Rule 702 of the Federal Rules of Evidence because their opinions are not based "on sufficient

facts or data" and are not "the product of reliable principles and methods." Fed. R. Evid. 702. In addition, Defendant Insurers' experts have not "reliably applied the principles and methods to the facts of the case" in such a way that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." *Id*. With the exception of Mr. Provencher, all of Defendant Insurers' witnesses were part of their "claim adjustment team" – and their expert reports do little more than reiterate the Insurers' rendition of the facts.

To be clear, Defendant Insurers' expert witnesses, again with the exception of Mr. Provencher, are legitimate fact witnesses and have been identified as such. Their expert reports, though, offer nothing more than disagreement about the facts, personal observations, and unsubstantiated and unsupported theories about what could have happened – oftentimes while admitting that they had no idea what the true facts really were. These personal observations are not expert opinions. Under these circumstances, disqualification of their expert testimony is fully warranted.

## **LEGAL STANDARD**

As this Court noted in *Constructora Mi Casita v. Nibco, Inc*., "[e]xpert opinions must be reliable and helpful. 448 F. Supp. 3d 965, 970 (N.D. Ind. 2020). As the Supreme Court instructed in *Daubert*, the Court "decides the testimony's reliability and fitness before the jury ever hears it." *Daubert*, 509 U.S. at 597 (1993).

A proffered expert must also meet the requirements of both the Federal Rules of Evidence and the test set forth in *Daubert*. The four requirements of an expert witness, as noted by the court in *Constructora,* 448 F. Supp. 3d at 970, are:

(1) the witness is 'qualified as an expert by knowledge, skill, expertise, training, or education', (2) the testimony is "based on sufficient facts or data," (3) the testimony is 'the product of reliable principles and methods,' and (4) the witness has 'reliably applied the principles and methods to the facts of the case' in such a way that the

testimony will 'help the trier of fact to understand the evidence or to determine a fact in issue.' Fed. R. Evid. 702.

The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

An opinion witness must have credentials or experience that truly denotes the individual as an expert in the relevant field. According to *Daubert*:

> Experts draw their truths from specialized "experience confessedly foreign in kind to [the jury's] own." Hon. Learned Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 HARV. L. REV. 40, 54 (1901). Scientific knowledge may come from professional degrees or use of the scientific method. Other knowledge may presuppose that a person has spent significant time gaining hands-on experience without need of formal education or laboratory work. However obtained, the expert's qualifications must provide a foundation for him to answer the specific question at hand.

*Daubert*, 509 U.S. at 590. An expert's knowledge cannot be "subjective belief or unsupported speculation." *Id.*

The expert witness's opinion must also rest on a solid factual basis and employ reliable principles and methods:

> An opinion witness must next have a sound factual basis before being declared an expert. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Even if eminently qualified, an expert cannot offer opinions based solely on his or her say-so (what lawyers call *ipse dixit*). See *Kumho Tire*, 526 U.S. at 157, 119 S.Ct. 1167; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Expert testimony must be based on sufficient and known facts. *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786; Fed R. Evid. 703*; see, e.g.*, *Wasson v. Peabody Coal Co*., 542 F.3d 1172, 1176 (7th Cir. 2008) (evidence of one sale was insufficient basis to calculate an average of sales over twenty years); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904-05 (7th Cir. 2007) (excluding expert testimony because the "mere existence of a temporal relationship" was an unreliable basis to show a causal relationship between medication and symptoms).

*Constructora,* 448 F. Supp. 3d at 970. The standard for reliable principles and methods is derived from Rule 702:

Expert testimony must also originate from reliable principles and methods. Fed. R. Evid. 702. Scientific testimony may be validated if the theory or technique can be or has been tested, if it has been subjected to peer review and publication, if it has a known or potential error rate, and if it enjoys general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786. These concerns may or may not bear on technical or experience-based opinions, appreciating that the analysis remains ever nimble to meet their substance, and so long as the witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of [the] expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167; *accord Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007).

*Constructora,* 448 F. Supp. 3d at 970-71.

The expert's opinion must also be tied to the facts of the case and the issues presented:

Expert opinion must last fit the case. Opinions must be tied to case facts and issues. *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. The court must determine whether an expert's "reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 593, 113 S.Ct. 2786. The opinion must help the jury decide an issue of consequence. Expert testimony that "does not relate to any issue in the case is not relevant, and ... non-helpful." Id. at 591, 113 S.Ct. 2786. A court should exclude testimony unless it speaks, without confusing or misleading the jury, on a relevant issue that the jury must decide. See Fed. R. Evid. 403 and 702; see, e.g., *Hartman v. EBSCO Indus.*, 758 F.3d 810, 819 (7th Cir. 2014) (excluding testimony as unhelpful because expert's opinion on alternate design did not assist the jury to decide causation*); Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 897 (7th Cir. 2011) (excluding testimony as unhelpful because parties agreed to issue). This is what is commonly called fit. See *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786.

*Constructora,* 448 F. Supp. 3d at 971.

## ARGUMENT

### A.    Robert West Should be Disqualified as an Expert

Mr. West, an industrial hygienist, should be disqualified because he personally and actively participated on behalf of the Insurers in the parties' confidential mediation.    In addition, his testimony is inconsistent with the facts and – according to his own admission – he lacks any credentials in the area of his proposed testimony.

4

1.  Mr. West Participated in the Confidential Mediation in this Matter and Should Be
    Disqualified as a Result

Mr. West's role in IRG's confidential mediation with Defendant Insurers cannot be disputed.  Indeed, he had a leading role in the confidential mediation of this matter.   He attended mediation and had access to and reviewed IRG's confidential mediation briefs, along with a confidential PowerPoint presentation presented by IRG's counsel.  *See* **Exhibit A** (O'Neil Dec. at ¶ 6).  The information provided was confidential and was to be used for settlement purposes only. *Id*. at ¶ 2.  At mediation, the parties engaged in open discussion and had private meetings with the mediator, and Mr. West was a part of these discussions and meetings.  *Id*. at ¶ 4-5.  As with any mediation, there were confidential settlement discussions, and the free exchange of confidential information.  The parties agreed that the mediation undertaken in an effort to resolve the disputed coverage would be confidential.  **Exhibit B (**Mediation Agreement at ¶ 7).

Indiana law places a high degree of confidentiality in the mediation process.  *See* IND. R. ALTER. DISP. RES. 2.11(a)(1) ("Mediation sessions shall be confidential and closed to all persons other than the parties of record, their legal representatives, and persons invited or permitted by the mediator"); IN CODE § 4-21.5-3.5-27 (2017)(a) ("Matters discussed during mediation are confidential and privileged"); *Horner v. Carter*, 981 N.E.2d 1210, 1211 (Ind. 2013) ("Indiana policy strongly favors the confidentiality of all matters that occur during mediation") (citing IND. R. ALTER. DISP. RES. 2.11(a)(1)); *Vernon v. Acton*, 732 N.E.2d 805, 810 (Ind. 2000) (extending confidentiality of statements and conduct at mediation to oral settlement agreements not reduced to writing); *Bank of Am., N.A. v. Cartwright*, No. 3:21-CV-184-DRL-MGG, 2022 WL 4368525, at *5 (N.D. Ind. Sept. 6, 2022), *report and recommendation adopted*, No. 3:21-CV-184 DRL-MGG, 2022 WL 4366654 (N.D. Ind. Sept. 21, 2022) (Leichty, J.) (adopting report and recommendation that explained Indiana's treatment of mediation materials as confidential and inadmissible and that

recommended sealing document because it contained confidential mediation material).  A federal court addressing a breach of contract claim such as this one must follow Indiana law on mediation confidentiality.  *Doe v. Archdiocese of Milwaukee*, 772 F.3d 437, 440 (7th Cir. 2014).

Across the board, courts strike experts from testifying if that expert reviewed confidential mediation and the confidential mediation materials.  *See Albert D. Seeno Construction Company v. Aspen Insurance UK Limited,* No. 17-cv-03765-SI, 2020 WL 6118497 (N.D. Cal. October 16, 2020) (striking expert who reviewed opposing party's confidential mediation materials); *Irwin Seating Co. v. IBM*, No. 1:04-CV-568, 2006 WL 3446584, at *3, 20 (W.D. Mich. Nov. 29, 2006) (same); *Tanger Grand Rapids, LLC v. Nederveld, Inc.,* No. 1:18-CV-1125, 2021 WL 5861532, at *3 (W.D. Mich. Aug. 4, 2021) (same); *Maury Microwave. Inc. v. Focus Microwaves, Inc.,* No. CV1003902MMMJCGX, 2012 WL 12877985, at *16, n. 129 (C.D. Cal. July 30, 2012) (same).

Indeed, even the law firm representing certain of the Insurer Defendants in this matter has opined about the dangers of permitting expert witnesses to review mediation materials.  In an article entitled, "Taking The Easy Road Could Get Your Expert Disqualified," an attorney at Hinshaw & Culbertson explained that while mediation briefs might seem like "the most comprehensive summaries of the case," due to their protected status "**taking this short cut could get your expert disqualified**, costing you and your client more in the long run."  Kendra L. Basner, *Taking the Easy Road Could Get Your Expert Disqualified*, THE BAR ASSOCIATION OF SAN FRANCISCO, December 20, 2016, available at https://www.sfbar.org/blog/taking-the-easy-road-could-get-your-expert-disqualified/ (emphasis added).

Given Mr. West's prominent role in the confidential mediation, he should be disqualified from offering expert testimony in this matter.  Defendant Insurers knew this risk when they permitted Mr. West to participate in the mediation, and they knew full well of this risk when they

concluded that his knowledge of confidential settlement information would be beneficial to their case. "There is no adequate way to assess the impact the mediation briefs had on" Mr. West's final report or how he may have shaped his "evaluations consciously or unconsciously in response." *See Seeno Construction Company,* 2020 WL 6118497 at *5. Striking Mr. West's testimony may be a "harsh remedy, but not an unfair one." *Irwin Seating Co. v. IBM*, at *4, 2006 WL 3446584. Defendant Insurers put Mr. West at risk "by infusing [him] with knowledge to which [he was] not entitled." *Id.*

At this juncture, "[t]here is no adequate way to assess the impact the mediation briefs had on" Mr. West's final report or how his receipt of confidential mediation materials may have shaped his "evaluations consciously or unconsciously in response." *Seeno Construction Company*, 2020 WL 6118497, at *5. Stated otherwise, there is no way for this bell to be unrung.

2. Mr. West Should Be Disqualified from Offering Expert Opinions on the Application of the Toxic Substances Control Act Because His Opinions are Not Tied to the Facts of this Case

Mr. West's lead opinion appears to be that the remediation of PCB contamination at the Facility is not governed by the Toxic Substances Control Act ("TSCA"). *See* **Exhibit C** (West Expert Report at 6); **Exhibit D** (West Dep. Tr. at 148). These opinions have been rendered moot and unreliable because the United States Environmental Protection Agency ("EPA") has since confirmed that cleanup at the facility will be governed by TSCA standards. **Exhibit E** (EPA email). "It is 'the settled practice' to rely on representations by government officials," *Harris v. Bowser* (citing *Committee in Solidarity with People of El Salvador v. Sessions*, 929 F.2d 742, 744 (D.C. Cir. 1991)). Further it is "well-settled case law . . . requir[ing] a court to presume that government officials will conduct themselves properly and in good faith. . . ." *Id.* (citing *In re Navy Chaplaincy*, 850 F. Supp. 2d 86, 94 (D.D.C. 2012)). Representations by EPA officials that TSCA standards

apply to the remediation of PCBs at the Facility must be credited, and they are diametrically opposed to Mr. West's opinion.

At best, Mr. West's opinions on the inapplicability of TSCA are simply outdated. As such, they are incorrect, unreliable, and unhelpful to the jury. "If it is shown that the assumptions underlying an expert's opinions are incorrect, the expert's opinions likely become unreliable and unhelpful to the jury" they should not be offered to the jury. *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 567 F.Supp.3d 248 (D.D.C. 2021). As such, Mr. West should be disqualified from offering any opinions related to the application of TSCA to cleanup of this site.

3. Mr. West's Opinions that the PCBs at the Facility were Not Released in the Flood are Moot as the Defendant Insurers Have Already Admitted Coverage for Such Contamination by Paying for PCB Cleanup at the Site

Mr. West's opinion that the PCB contamination at the Facility was not a result of the Flood releasing PCBs from the transformers is irrelevant to the current issues presented in this case and for that reason is inadmissible. Since October of 2016, Defendant Insurers have paid for remediation of PCBs at the site. None of their reservation of rights ever claimed that the PCB contamination was not a result of the Flood of August 15-16, 2016. By their actions and by their words, Defendant Insurers have acknowledged that the contamination was caused by the Flood. Nor have Defendant Insurers ever asserted that they have a right to recoup the monies already paid by them for PCB remediation. Defendants have waived any right to claim the contamination was not caused by the Flood, and any opinion now expressed by Mr. West that the PCB contamination was not caused by the Flood is moot in light of Defendant Insurers' actions. *See Huff v. Travelers Indem. Co.*, 363 N.E.2d 985 (Ind. 1977) (an insurer may effect a waiver if "[t]he conduct or acts on the part of the insurer or its authorized agents" create a reasonable belief on the part of the insured that the company will not change its position).

Mr. West's proposed expert testimony on what caused the release of PCBs is simply irrelevant. The parties agree that the insurance policies cover this PCB remediation – the only question is what this remediation will cost.

4. Mr. West Admits That He Lacks Sufficient Credentials to Opine on the Normal Operation of Transformers or the Release and Transport of PCBs as a Result of the Flood

Mr. West sponsors several opinions suggesting that PCB contamination discovered after the Flood was not the result of the release of PCB bearing oil during the Flood. Instead, he opines that PCBs were present in the Facility prior to the Flood based on normal operations at the Facility. See **Exhibit C** (West Report at 5); **Exhibit D** (West Dep. Tr. at 97-98). In support of these opinions, Mr. West posits two theories of PCB escape from the transformers – "burping" and "vaporization" – but neither of these theories rely on any expertise of Mr. West or "reliable principles and methods," the bedrock requirements of admissible expert testimony. Similarly, Mr. West offers opinions regarding the possible release of PCBs from the transformers due to the Flood. In particular, he notes that the Flood broke at least one transformer sight glass but claims that oil could not have escaped through that broken glass. But he also repeatedly admits that he lacks the expertise to support such opinions.

Mr. West freely admits that he is not qualified to evaluate the transformers at issue here, but he still offers his opinions. For example, Mr. West opines that the presence of PCBs in the tunnels and vaults at the facility was the result of normal operation of the transformers over time because the transformers can "burp" PCBs, *i.e.* allow PCB vapor to escape from pressure relief valves. In support of his "burping" theory, Mr. West's sole citation of support is a Sixth Circuit opinion in *American Premier Underwriters, Inc. v. General Electric Company*, 14 F.4th 560 (6th Cir. 2021). However, that case addressed transformers built into mobile rail cars which, unlike

IRG's stationary transformers, are regularly subject to bumping and jostling as the rail cars move along the tracks. Mr. West cites no authority to support the claim that the transformers at the Facility burped PCB oils.

When asked whether there were differences between the transformers at issue in the Sixth Circuit case, Mr. West admitted that he had no idea whether his burping theory applies to the transformers at issue here. Mr. West testified:

> Q. Is it fair to say that in the railway car transformers, burping would be more of a common event in terms of the operation of the transformer versus the IRG transformers?
>
> A. I don't know that there is any studies on that at all. That would be an electrical engineer that would give you that opinion, not me.

**Exhibit D** (West Dep. Tr. at 111). The relevance of Mr. West's opinions depends on whether the transformer at the Facility operate similarly to transformers used in rail cars. On this, he acknowledges that he has no idea whether his burping theory applies. This is exactly the kind of junk science that should be excluded from testimony.

Mr. West's admitted lack of knowledge regarding transformers and their propensity to leak PCBs is not limited to burping rail car transformers. He also freely admits that he lacks knowledge regarding whether PCBs can leak from broken transformer sites glasses:

> Q. No oil could have escaped that cracked sight glass?
>
> A. So I'm not an electrical engineer, I don't do those kinds of inspections….

**Exhibit D** (West Dep. Tr. at 45). Asked to clarify, Mr. West stated:

> Q. Do you have an expert opinion whether, based on your observations of the crack, any oil could even get out of that particular crack?
>
> A. I'm not an engineer, I'm not an electrical engineer, I don't do those evaluations….

**Exhibit D** (West Dep. Tr. at 45).

Despite this lack of knowledge, Mr. West opined that no PCB bearing oil escaped from the transformers during the Flood.  **Exhibit D** (Dep. Tr. at 138).  Even as to the normal operation of the transformers, Mr. West admits a lack of knowledge:

> Q.    And could there be a scenario number three, where maybe in the full capacity scenario, where the oil is above the top of the sight glass, maybe even before you get to the headboard, where it indicates that you're at really full capacity?
>
> A.    I'm not an electrical engineer, so I don't know these things particularly….

**Exhibit D** (West Dep. Tr. at 67).

Mr. West also proffered opinions regarding the distance that PCBs can travel in water, stating that traveling 900 feet was unlikely.  **Exhibit D** (West Dep. Tr. at 92).  But he provides no authority for any such claim and has no published and accepted scientific studies showing how PCBs travel in a flood.  Moreover, Mr. West testified that PCBs can attach themselves to wood or other debris, or can be contained in scum mixtures floating on top of flood water, but offered no reason why these elements cannot travel 900 feet.[1]  **Exhibit D** (West Dep. Tr. at 91).

Mr. West's testimony on transformer operation and the release and the transport of PCBs is simply not reliable or helpful expert testimony.  Expert testimony requires the testimony is "the product of reliable principles and methods," and the witness has "reliably applied the principles and methods to the facts of the case" in such a way that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Scientific testimony may be validated if the theory or technique can be or has been tested, if it has been subjected to peer review and publication, if it has a known or potential error rate, and if it enjoys general acceptance in the relevant scientific community.  Mr. West's opinions are not based on principles

---

[1] These admissions about PCB transport undercut his repeated but simple statements that PCB bearing oil is denser than water.  The density is irrelevant when the contaminant can travel by other means.

or methods, have no evidence of being tested or accepted in the scientific community. His opinions about the release of PCBs and the transport of those PCBs are speculation at best and are therefore inadmissible.

**B.    The Court Should Exclude Mr. Provencher's Opinions Because They Are Irrevocably Tainted by His Review of IRG's Confidential Mediation Materials**

Defendant Insurers proffer Mr. Provencher as an expert in insurance claims-handling in an effort to avoid IRG's bad faith claim. However, just as with Bob West, Mr. Provencher's opinions are tainted by his improper review of IRG's confidential mediation materials. As such, IRG respectfully submits that the Court should bar Mr. Provencher's opinions as well. Indeed, the California federal district court in *Albert D. Seeno Construction Company* specifically excluded an insurer's bad faith expert on the basis that he had reviewed the insurer's confidential mediation materials. 2020 WL 6118497, at *5; *see also Irwin Seating,* WL 3446584, at *3, 20; *Tanger,* 2021 WL 5861532, at *3; *Maury Microwave,* 2012 WL 12877985, at *16, n. 129. The same result should occur here.

Mr. Provencher's expert report listed 10 categories of documents he reviewed in "preparation of [his] opinion," the ninth of which was "Insured's Mediation Statement and Exhibits." **Exhibit F** (Provencher Report at 2). At his deposition, Mr. Provencher confirmed that the list of documents he included in his report accurately reflected what he reviewed and relied upon for his opinion:

> Q:    Please turn to page 2 of this report. At the top of this page, you write: In preparation of this opinion, I have reviewed the following documents, colon. And you have an enumerated list of documents here.
>
> A:    Yes, sir.
>
> Q:    Am I correct in assuming that this is the full scope of the documents you reviewed in preparing this report?

A:      Yes, sir.

*       *       *

Q:      But you did review every one of the things you listed here?

A:      Yes, sir.

*       *       *

Q:      And this is what you relied upon, these things?

A:      Yes, sir.

**Exhibit G** (Provencher Dep. at pp. 55:10-19; 57:17-19; 69:9-11).  And Mr. Provencher was

unequivocal that he specifically reviewed the parties' mediation statements and exhibits:

Q:      And how about the mediation statements that you have in the third-to-the-
        last bullet here? You reviewed those, correct?

A:      Yes, sir.

Q:      And there was one mediation statement from the insurers that you reviewed,
        correct?

A:      Yes, sir.

Q:      Along with the exhibits?

A:      Yes, sir.

Q:      And there was one mediation statement from the insured that you reviewed;
        is that correct?

A:      I believe so. That's what it says.

Q:      Along with the exhibits thereto?

A:      Yes, sir.

**Exhibit G** (Provencher Dep. at p. 60:7-20).  Mr. Provencher's agreement that he had read and

relied upon IRG's mediation statement, and the colloquy that followed, led to the following

admission by counsel for certain of the Insurer Defendants as to how Mr. Provencher obtained those documents:

MR. HEISS: Objection. Ben, look, come on with the dramatics here. You know he wasn't at the mediation. If you want to make a point -- the materials were provided by me. If you want to make a point, make a point. You know damn well he wasn't at the mediation. Come on.

MR. MASSARSKY: Well, Mr. Heiss, as much as I appreciate the speaking objection, I'm going to keep asking the question –

MR. HEISS: It's not a speaking objection, Ben. You're unfairly asking questions that have nothing to do with the substance of his opinions. And you know he wasn't at the mediation, so why ask him if he was there?

MR. MASSARSKY: Because, Mr. Heiss, I'm setting up a foundation. You provided him documents you shouldn't have given him, and I'm going to establish he shouldn't have received, shouldn't have reviewed them, and that that impacts his opinion. That's not your fault, Mr. Provencher. But I am going to continue to ask these questions, which are appropriate.

**Exhibit G** (Provencher Dep. at pp. 61:25; 62:1-21). A short time later after the parties returned from a break, counsel for IRG made the following statement on the record:

MR. MASSARSKY: So now that we're back on the record, I think, Mr. Heiss, we're making or have made our position fairly clear that we think that the consideration of mediation statements is a significant problem. We object to that and to the impact it has on Mr. Provencher's opinion. I don't think you're surprised to hear that, but I want to make sure that's clear on the record before we move on.

**Exhibit G** (Provencher Dep. at p. 69:15-23).[2]

And just as in *Albert D. Seeno Construction Company*, Mr. Provencher was privy, improperly, to IRG's factual and legal arguments as to coverage and Insurer Defendants' bad faith

---

[2] In stark contrast to Insurers' actions, IRG did not provide any of its expert witnesses with any confidential mediation materials. O'Neil Dec. at ¶ 8.

conduct and later opined on that very subject in his expert report. And even worse than in *Albert D. Seeno Construction Company*, where the expert there claimed he had reviewed but not relied upon the insured's mediation materials, 2020 WL 6118497, at *5, here Mr. Provencher expressly acknowledged that he reviewed IRG's mediation materials and relied upon them in crafting his opinion. **Exhibit G** (Provencher Dep. at pp. 55:10-19; 57:17-19; 60:7-20; 69:9-11). Furthermore, Insurer Defendants can make no arguments as to accident or mistake, for it was clear from Mr. Provencher's deposition that this improper breach of confidentiality was purposefully done by one of Insurer Defendants' counsel. **Exhibit G** (Provencher Dep. at pp. 61:25; 62:1-21). Mr. Provencher's opinions are therefore tainted and IRG respectfully requests this Court to exclude them.

**C.**     **Chaz Mello Has No Relevant Expertise and Does Not Offer Any Expert Opinions**

Defendant Insurers put forward Mr. Mello as an expert to address IRG's property damage claim, but Mr. Mello's expert report and testimony fail the requirements of *Daubert* because they are factual in nature rather than expert opinion testimony, *i.e.*, he presents his personal observations of facts under the cloak of being an expert. Even if it could be considered expert testimony, Mr. Mello's opinions do "not relate to any issue in the case" and are not relevant or helpful. *Daubert* at 591. For these reasons, his opinions are not admissible.

1.     Mr. Mello's Proffered Testimony is Not Expert Opinion

Mr. Mello served as part of the Defendant Insurers' claim adjustment team and was primarily responsible for a claim-tracking spreadsheet that captured data about costs submitted and costs approved. This spreadsheet, as it was created during the claims handling process, is attached to his expert report as Appendix 3, which is his sole contribution to the expert report he co-authored with his colleague, Mr. Christoferson. **Exhibit H** (Mello/Christoferson Expert

15

Report).[3] This spreadsheet was not created as part of an expert's review process or based on scientific inquiry, but instead is simply a summary of the cost data he was provided as part of his engagement with the Insurers to evaluate IRG's claim in order to determine how much the Insurers were going to pay IRG. **Exhibit J** (Christoferson Dep. Tr. at 50:13-15). He also describes the number of site visits made by JS Held to the Facility and restates the totals in the claims spreadsheet, totals generated during the claims handling process, not as a part of any expert analysis or review. **Exhibit H** (Mello Report at p. 3).

Another example of Mr. Mello mischaracterizing facts as expert opinion is the following observation he provides in his report:

> a.     As instructed by McLarens Claims Services (MCS), JSH reviewed submitted scopes and costs as received, and continuously provided updated recommendations in efforts to keep the Insured, MCS and JSH on the same page for current recommendations of scopes and costs throughout the duration of the project.

*Id*. This is simply a description of what Mr. Mello did as an employee of JS Held during the claims handling period.

His opinions and testimony show no indicia that they are "the product of reliable principles and methods" or that the witness has "reliably applied the principles and methods to the facts of the case." Nothing in this summary reflects expert opinion or the application of any specialized knowledge to the facts of the case. As such, Mr. Mello should not be entitled to testify as an expert about his role as part of the claims handling team or his work product in that role.

---

[3] As a proposed expert, Mr. Mello is a co-author of a report that addresses IRG's claim for coverage of damaged electrical equipment at the Facility, but he disclaims any expertise in electrical equipment or electrical claims. **Exhibit I** (Mello Dep. Tr. at 14 ("I am not an expert in electrical equipment")). Mr. Mello testified that his expertise is in "buildings.' **Exhibit I (**Mello Dep. Tr. at 9). He has never testified as an expert before.

2. Mr. Mello's Proffered Testimony is Not Relevant to Any Aspect of the Current Dispute

Mr. Mello's spreadsheet of IRG's claim identifies agreed costs and non-agreed costs and breaks those costs down between hazardous and non-hazardous costs, but there is no dispute at issue regarding JS Held's review of submitted costs, their updated recommendations, or any of the data captured on Mr. Mello's spreadsheet. In addition, there are no issues or disputes in this matter regarding the categorization of costs on the claims spreadsheet. Lacking any relevance to the current dispute, Mr. Mello's expert testimony is neither helpful nor relevant. As such, Mr. Mello's testimony as an expert is irrelevant to the current dispute and his testimony should be barred.

IRG's lawsuit is about the Defendant Insurers' breach of contract and bad faith in: (1) refusing to pay for environmental remediation after their attempt at "early settlement" failed (see **Exhibit K** (Thoman email re early settlement)), (2) failing to pay for the replacement cost of the Flood-damaged electrical transformers located below grade in the Facility, and (3) bad faith in addressing these issues. Mr. Mello's spreadsheet does not address any of these claims and his opinions, which are merely restated conclusions from the spreadsheet, similarly do not address the claims at issue. Instead, the spreadsheet addresses two topics – the difference in costs submitted versus those approved and a split between hazardous and non-hazardous costs. Neither of these topics, even it expert in nature, are relevant.

Mr. Mello's spreadsheet identifies four categories of costs: Agreed Differences, Differences for Non-Loss Related Scopes of Work, Current Differences Requiring Clarification, and Current Differences for Work Not Performed. **Exhibit H** (Mello Report at 7). None of this relates to expert testimony, and none of this is in dispute. Agreed Differences are by definition agreed. There is no dispute that certain costs were disallowed by Defendant Insurers. There is no dispute that certain work requires clarification or that IRG did not pursue its claim for the

17

Defendant Insurers' characterization of some costs as work was not performed. The difference in costs between those submitted and those approved and paid are irrelevant to the present dispute.

The hazardous non-hazardous split is also irrelevant. This split in costs originated in the fact that several Defendant Insurers originally claimed that exclusions in their policies applied to hazardous claim costs. This split is no longer relevant. Two insurers abandoned such arguments and a third, Interstate, pursuant to the law of this case, lost its right to claim that its exclusions are valid. ECF 128 at 28. The hazardous/non-hazardous distinction in incurred costs has no relevance to the current claims, and even if it were relevant, a claims handler cannot offer an expert opinion as to his own actions as a claims handler. *See Beyers v. Consolidated Insurance Company*, Case No. 1:19-cv-01601-TWP-DLP, 2021 WL 1061210 (S.D. Ind. 2021) (claims adjustor not qualified as expert in roofing materials); *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co*., No. 1:05-CV-207, 2007 WL 1850858 (N.D. Ind. 2007) (opinion testimony based on review of discovery on claims processing not reliable and not admissible).

Mr. Mello's opinions do not go beyond repeating the conclusions of his claims tracking spreadsheet. These are factual assertions and not expert opinions. There are no "principles and methods" identified or relied upon and no application of those principles and methods to the facts of the case. Moreover, these opinions are irrelevant to the current claims. The testimony of Mr. Mello falls far short of the expert testimony standards inherent in Rule 702, with the further flaw of being irrelevant to the case at hand. For these reasons Mr. Mello's expert testimony should be barred from trial.

**D.      Mr. Christoferson's Opinions Are Either Factual Statements or Opinions Lacking Sufficient Factual Basis**

Mr. Christoferson is the electrical contractor hired by the insurers to adjust the electrical component of the claim. His role was to provide a valuation for the damaged electrical equipment.

IRG has no issue with him testifying about what it would cost to replace the damaged electrical equipment, but this is not the subject of his expert testimony.

Defendant Insurers proffer Mr. Christoferson as an expert in electrical claims but, just like Mr. Mello, his opinions are statements of fact derived solely from his role during the claims adjusting process. To the extent Mr. Christoferson attempts to rebut IRG's electrical equipment expert Ken Kutchek, Mr. Christoferson provides no facts or industry standards to support any of his challenges.

Mr. Christoferson's expert report identified 11 so-called opinions. Several are simple statements of fact, and the remaining opinions, are repeated statements that Mr. Kutchek's opinions are "are not factual." None of these are expert opinions.

1. Several of Mr. Christoferson's Opinions are Statements of Fact and Not Expert Opinions

Mr. Christoferson's first two so-called opinions are descriptions of his inspection of the Facility's electrical system after the August 15, 2016, Flood. As stated in Mr. Christoferson's report under the heading Electrical Opinions, his first two state as follows:

> The electrical system inspection and scope production originally included all systems operational or non-operational at the time of the event. The repair scope was to be derived from this overall scope.

> The inspection(s) completed of the primary power systems in the building revealed that they were of the 1941 era and that half of them had been taken off-line before the loss event occurred. The existing operational systems had already been supplemented with other newer equipment.

**Exhibit H** (Christoferson Report at 2). These self-described opinions describe the scope of the inspection and the general statements about the overall age of the system. While potentially admissible as factual observations based on his role in the claims adjustment team, these are not expert opinions as they do not represent the application of accepted methods to facts which assist the trier of fact with respect to a matter at issue in the trial. The age of the system is not at issue.

The operational status is also not at issue, as Mr. Christoferson admits that his cost estimates were not based on the operational status of the equipment. **Exhibit H** (Christoferson Report at 3) (Opinion J).

  2. Mr. Chirstoferson's Efforts to Contradict IRG's Expert Ken Kutchek Lack Factual
    Bases and are Irrelevant

The next seven opinions listed by Mr. Christoferson's expert report are responses to Mr. Kutchek's expert report. These statements are either commentary on facts at the Facility or statements confirming that he has no factual basis to contradict Mr. Kutchek. Either way, they are not expert opinions admissible in this action. Mr. Christoferson identifies his opinions as follows:

> C. The Robson Forensic Report (RFR) by Kenneth Kutchek P.E. describes an overall operational 1941 era system that was fully functional at the time of the loss event and was merely 'turned-off' because the tenants did not need that much power. This is not factual.

> D. The RFR states in their findings that MCS "initially acknowledged the original electrical system capacity and the need to replace all six (6) sub-stations" in their entirety. This is not factual.

> E. The RFR states in their findings that IRG lost 92% or 10,800 KVA in electrical system capacity as a result of the loss event. This is not factual.

> F. The RFR states that IRG has lost the redundancy of multiple electrical substation sources. This is not factual.

> G. The RFR states that MCS now considers the temporary power solution that was installed during the post-event period to be the permanent replacement. This is not factual.

> H. The RFR provided a cost for replacement of the six (6) substations based on the JSH Rough Order-of-Magnitude (ROM) estimate amount which is incorrect.

> I. The RFR states that the switchgear and transformers within the six (6) underground substations that were originally manufactured and installed sometime in the 1941 era still had "useful life expectancy." This is not factual.

Each of these opinions lacks the required attributes under Rule 702 and *Daubert*. Opinion C is irrelevant, as even the Insurers did not use the operating condition of the transformers in setting their replacement cost value. **Exhibit H (**Christoferson Report) (Opinion J). As to Opinion

D, Christoferson takes issue with the statement that McLarens acknowledged the need to replace

all six substations, when in testimony he clarifies that his employer JS Held reached that conclusion

and told McLarens this conclusion. Again, it is a distinction without a difference, as Mr. Kutchek's

point was that Defendant Insurers and their agents initially agreed that all six substations required

replacement. Mr. Christoferson's opinion does not contradict this testimony.

With respect to Opinions E and F, Christoferson's testimony makes clear that he lacked

sufficient facts to reach any conclusions on capacity or redundancy:

> We were never given plans and documents that showed their total capacity. We --
> we were never given any of that to make any of our own calculations, and we -- I
> mean, it was never part of our scope to -- to calculate their capacity or redundancy
> or anything of those matters.

**Exhibit J** (Christoferson Dep. Tr. at 77-78). Mr. Christoferson provided more detail with respect

to his redundancy opinion:

> The redundancy factor of the system is being replaced, yes, if it existed at the time.
> We don't even know if it existed at the time because we didn't – I didn't inspect all
> of those systems and all of those conduits and all of those wires to even verify
> whether they were there or not. So I guess I can't answer the redundancy question
> fully because I never inspected the redundant system.

*Id*. at 81.

Opinions G, H and I suffer from the same lack of data. Mr. Christoferson takes issue with

an aspect to Mr. Kutchek's expert report, but his disputes are either based on no factual support,

factual disagreement, or address minor, irrelevant wording differences. For Opinion G, for

example, when asked about his opinion regarding why he thought that Mr. Kutcheck was factually

wrong, he admitted that he never checked to see if the facts were true or not:

> Q.    Opinion G, "The RFR states that MCS, McLarens Claim Services, considers the
> temporary power solution that was installed during the post-event period to be the
> permanent replacement." You say, "That is not factual." What's your basis for
> saying that that is not a factual statement?
>
> A.    Well, I don't believe that MCS would consider a temporary solution as the
> permanent repairs. I think that's just a -- I think it speaks for itself.

Q.    But you haven't had any conversations with MCS or any other independent
      adjuster involved at the site about that question –

A     No.

*Id*. at 83-84.

With respect to Opinions H and I, when discussing the Rough Order of Magnitude estimates or the useful life of the equipment, Mr. Christoferson's issue is with the description of the data rather than the data itself. This court has already ruled that IRG is entitled to Replacement Cost Valuation, so depreciation of electrical equipment is no longer an issue. Expert testimony must be based on sufficient and known facts, not speculation about what third parties thought of a fact.

Mr. Christoferson's opinions, to the extent they are expert opinions at all, lack data to challenge IRG's expert's conclusions. They are merely disagreements of fact, and resolving factual disagreements is not the role of an expert. This is consistent with Mr. Christoferson's work as part of the claims adjustment team. His opinions are not an expert review of the facts based on "reliable principles and methods" reliably applied to the facts of the case. Further, several of his opinions are irrelevant to the issues before the Court. When probed on these opinions, Mr. Christoferson repeatedly testified that he did not have facts contradicting Mr. Kutchek, because IRG did not provide them to him during the claims handling process. The irrelevancy of certain opinions and the acknowledged "lack of data" in Mr. Christoferson's possession reveals that his opinions lack a sufficient basis of known facts that render his opinions inadmissible.

## CONCLUSION

For the reasons stated herein, Defendant Insurers should be barred from presenting opinion testimony as noted herein for designated experts Robert West, Gerald Provencher, Chaz Mello, and Paul Christoferson.

DATED this 17th day of April, 2023                    Respectfully submitted,

/s/ *Mark E. Miller*
Mark E. Miller
Brian G. Friel
Benjamin W. Massarsky
William T. O'Neil
MILLER FRIEL, PLLC
2445 M Street NW, Suite 910
Washington, DC  20037
Tel: (202) 760-3160
Fax: (202) 459-9537
millerm@millerfriel.com
frielb@millerfriel.com
massarskyb@millerfriel.com
oneilw@millerfriel.com

/s/ *Clint A. Zalas*
Clint A. Zalas
LEE, GROVE and ZALAS
54391 30th Street
South Bend, Indiana 46635
Tel: (574) 232-5923
Fax: (574) 232-5942
cazalas@lgzlegal.com

*Attorneys for Plaintiff Indiana GRQ, LLC*

## **CERTIFICATE OF SERVICE**

I, Benjamin W. Massarsky, hereby certify that on April 17, 2023, a copy of the foregoing was served electronically on the parties listed below:

Peter E. Kanaris
David E. Heiss
Hinshaw & Culbertson LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60606
dheiss@hinshawlaw.com
pkanaris@hinshawlaw.com

Jennifer J. Kalas
Hinshaw & Culbertson, LLP
322 Indianapolis Blvd.
Suite 201
Schererville, IN 46375
Tel: (219) 864-4521
Fax: (219) 864-5052
jkalas@hinshawlaw.com

Mitch Orpett
David Schroeder
Tribler Orpett & Meyer P.C.
225 West Washington, Suite 2550
Chicago, IL 60606
maorpett@tribler.com
deschroeder@tribler.com

/s/ *Benjamin W. Massarsky*
Benjamin W. Massarsky