UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| INDIANA GRQ, LLC, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:21-cv-227 DRL |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY *et al.*, | |
| Defendants. | |

OPINION AND ORDER

Indiana GRQ, LLC owns a facility in South Bend, Indiana used for commercially-leased tenant and warehouse space. Indiana GRQ sued seven insurance companies after flooding caused significant environmental and electrical damage to the facility. The insurers paid part of the owner's claimed losses and eventually denied other coverage.

On March 22, 2023, the court ruled on three partial summary judgment motions. The court granted Indiana GRQ, LLC's motion and otherwise denied the other motions, save for certain bad faith theories. Interstate Fire & Casualty Company asks the court to reconsider its decision specific to the enforceability of the policy's polychlorinated biphenyls (PCB) exclusion, saying it never intended to concede this point under Indiana law. The court grants the motion only in part.

DISCUSSION

The court has inherent power to revisit an interlocutory order. *See* Fed. R. Civ. P. 54(b) (interlocutory orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities"); *see also Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012) (same); *White v. Gerardot*, 509 F.3d 829, 833 (7th Cir. 2007) (denial of summary judgment is interlocutory). A motion for reconsideration may be appropriate when the court misunderstood a party, decided an issue outside those presented, or erred in apprehension, or when a significant change in the law has occurred

or significant new facts have been discovered. *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). A reconsideration motion is not a vehicle to rehash soundly rejected arguments. *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014).

Interstate requested partial summary judgment based on three exclusions in its policy: an absolute pollution exclusion, a debris removal exclusion, and a PCB exclusion. The court held that the company conceded these exclusions were unenforceable under Indiana law. Interstate argues against this concession.

As to the absolute pollution exclusion, Interstate said as follows at summary judgment: "Thus, if Indiana law is applicable to the 'absolute pollution exclusion' in the Interstate policy, [Indiana] GRQ's claim for remediation of PCB contamination would not be excluded by it because PCBs are not mentioned in the definition of 'pollutants' in that exclusion" [ECF 116 at 11]. As to the debris removal exclusion, Interstate similarly said: "Under Ohio law, this exclusion would be enforceable . . . whereas under Indiana law, the [debris removal exclusion] would be deemed ambiguous and unenforceable due to PCBs not being listed as a 'contaminant or pollutant'" [*id.*].

There is nothing to revisit on these two fronts. Interstate argues that, because these statements were originally made by the company only in its choice of law section, the court should not have relied on these statements in addressing these two exclusions. Words matter, and the court isn't limited in its consideration by mere section dividers. In addition, Interstate argued in its substantive section that these exclusions should be enforced under Ohio law. Without argument that these exclusions should be enforced under Indiana law—the law that mattered—Interstate presented nothing but its concession for the court to use in deciding the motion as to these two exclusions.

That said, the court went too far to carry this concession over to the PCB exclusion. The court appreciates Interstate bringing this issue to its attention and now addresses this argument's substance. Indiana GRQ's facility was covered under a multisite, multistate insurance policy. Coverage was shared

2

by seven insurers, including Interstate. This quota share program had a lead policy. The lead policy lacked a PCB exclusion. Interstate issued a separate policy that contained one:

> This is following form insurance, which means that this insurance follows all the Terms and Conditions of the Lead Insurance Policy <u>except</u> as to any Terms and Conditions of this Policy that: (1) differ from any term or condition contained in the Lead Insurance Policy; or (2) is not contained in the Lead Insurance Policy.
>
> * * *
>
> If the following perils or insurance coverages are <u>not</u> excluded in the Lead Insurance Policy, the following exclusionary language does apply to the insurance we provide under this Policy, and this insurance will not apply to any Covered Loss or any payments of any kind that may arise out of:
>
> (1) Asbestos, dioxin or polychlorinated biphenols (hereinafter all referred to as "Materials") removal from any good, product or structure unless the asbestos is itself damaged by fire, lightning, aircraft impact, explosion, riot, civil commotion, smoke, vehicle impact, windstorm or hail, vandalism, malicious mischief, leakage or accidental discharge from automatic fire protective system. (2) Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating such Materials . . . .

[ECF 112 at 74, 81-82 (bold type omitted)].

Based on this policy language, Interstate denied the contamination and pollution remediation portion of Indiana GRQ's claim.[1] Interstate twice declined to reconsider its coverage position and reform its policy. Today Interstate adheres to its coverage position that the PCB exclusion is enforceable. Indiana GRQ argues that the exclusion is not enforceable because Interstate agreed to follow the lead policy in all respects and because a latent ambiguity exists.

An insurance policy is a contract and subject to rules of construction. *State Farm Mut. Auto. Ins. Co. v. Jakubowicz*, 56 N.E.3d 617, 619 (Ind. 2016); *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005). A contract's interpretation is generally a question of law, *Song v. Iatarola*, 76 N.E.3d 926, 933 (Ind. Ct. App. 2017), controlled by the parties' intent as expressed by clear contractual language, *City of*

---

[1] Interstate also says it denied the claim based on the exclusions they conceded were not enforceable under Indiana law.

3

*Jeffersonville v. Env't Mgmt. Corp.*, 954 N.E.2d 1000, 1008 (Ind. Ct. App. 2011). The court must "ascertain and enforce the parties' intent as manifested in the insurance contract," *Berkshire Hathaway Homestate Ins. Co. v. Basham*, 113 N.E.3d 630, 634 (Ind. Ct. App. 2018), interpret a contract "so as to harmonize its provisions, rather than place them in conflict," and look at the contract as a whole, *Dunn*, 836 N.E.2d at 252. Mere disagreement between the parties about a provision's meaning or implementation won't render it ambiguous. *G&G Oil Co. of Ind. v. Cont'l W. Ins. Co.*, 165 N.E.3d 82, 87 (Ind. 2021).

When an ambiguity is patent, meaning it arises within the document, the court may not consider extrinsic evidence in resolving the ambiguity. *Ohio Cas. Group of Ins. Co. v. Gray*, 746 F.2d 381, 383 (7th Cir. 1984) (citing *Graham v. Anderson*, 454 N.E.2d 870, 872 (Ind. Ct. App. 1983)). No one argues a patent ambiguity exists. There is no language in the lead policy that contradicts the PCB exclusion in Interstate's policy, nor is there any designated evidence that Interstate agreed to follow the lead policy in all respects. Its policy indeed says the opposite.

A latent ambiguity "arises not upon the face of the instrument by virtue of the words used but emerges in attempting to apply those words in the manner directed in the instrument." *Graham*, 454 N.E.2d at 872; *see Weinreb v. Mae*, 993 N.E.2d 223, 232 (Ind. Ct. App. 2013). "The terms of the instrument are clear but cannot be applied because they do not fit the factual circumstances to which they are addressed." *Ohio Cas.*, 746 F.2d at 383. In Indiana, "extrinsic evidence—both circumstantial and direct evidence of intention—has been held admissible to establish the existence of a latent ambiguity and also to resolve it." *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 534 (Ind. 2006).

Indiana GRQ tries to identify a latent ambiguity, but none exists. No ambiguity arises upon implementation nor is it really the policy's implementation that creates an ambiguity that Indiana GRQ might advance. In truth, Indiana GRQ just disagrees with Interstate's policy, Interstate's refusal to reform its policy, and the result these produce.

4

First, Indiana GRQ argues that the nature of the quota share program and the importance of strict adherence to the lead policy creates a latent ambiguity. Indiana GRQ points to testimony from one claim adjuster (Stuart Stromeyer) who said, "It's rare [to have a quota share program with different form policies]. It has happened, but it's rare." In response to why a quota share program would want uniform policy terms, he testified, "It's common sense. You would want . . . your policy or your coverage all to say the same thing, working within the one limit. You wouldn't want one company[] [to] say, no, we're not going to do this on this, you would expect everything to be uniform."

This testimony falls short of creating a latent ambiguity. How these quota share programs might normally work has no bearing on otherwise clear language about how this program will work. This testimony doesn't elucidate how the policy terms fail to fit the factual circumstances today, nor does it reveal how the parties would have understood this policy to apply to this situation. In short, this testimony isn't evidence of a latent ambiguity.

Indiana GRQ says "every witness" testified as to the importance of strict adherence to following the form of the lead policy but never designates testimony that supports this point. At summary judgment, Indiana GRQ cited testimony from Keith Hargan (Interstate's underwriting director and corporate designee) for the proffered fact that Interstate agreed that its policy would follow form of the lead policy, but the testimony said more than that—namely, that Interstate followed the lead policy except as to its differing terms [ECF 112, Ex. 4 at 66 ("Q. So is this what you're basically saying before, that you follow form; but if you have differing terms and conditions, your terms and conditions apply to your ten percent risk share? A. Correct."); *see also* ECF 112, Ex. 4 at 59-60]. This too doesn't show a latent ambiguity—particularly when it coincides with the very language of Interstate's policy and leaves no unanswerable question in application. *See Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 544 (7th Cir. 2000) (facts outside the four corners of the contract that "make you scratch your head").

5

Second, Indiana GRQ argues that two other defendants, Axis Surplus Insurance Company and Ironshore Specialty Insurance Company, also included pollution exclusions in their policies but decided to provide coverage anyway. Axis issued an endorsement deleting these exclusions. Ironshore called its initial denial of coverage for pollution and PCB-related costs erroneous. Indiana GRQ argues that Axis's and Ironshore's decisions to follow the lead policy also create a latent ambiguity.

The conduct of other insurers speaks to their conduct. On this record, it has no bearing on Interstate's separate policy or otherwise creates a latent ambiguity for the jury to resolve. *See Simon Prop. Group, L.P. v. Mich. Sporting Goods Distribs.*, 837 N.E.2d 1058, 1071 (Ind. Ct. App. 2005) (factfinder resolves latent ambiguity). It remains unclear how Axis's and Ironshore's independent decisions impact the implementation of Interstate's policy. That Interstate paid $360,000 as a business decision at the request of the wholesale insurance broker and to preserve its relationship likewise creates no latent ambiguity in the policy's language or its implementation. *See Weinreb*, 993 N.E.2d at 232.

This conclusion is particularly true when Indiana GRQ hasn't pointed to what specific language proves to be ambiguous as applied. Indiana GRQ's extrinsic evidence doesn't provide clarification. Implementation of these provisions seems clear. This isn't a case with two ships named Peerless, *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 484 (7th Cir. 2006) (citing *Raffles v. Wichelhaus*, 2. H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864)), multiple Harrison Townships in different Indiana counties, *Skinner v. Harrison Twp.*, 18 N.E.2d 529, 530-31 (Ind. 1888), or with a nephew named John but no cousin named John, *Univ. of S. Ind.*, 843 N.E.2d at 534.

Interstate wanted exclusions that the lead policy lacked. Interstate's policy is clear and says when it will follow the lead policy and when it will not in the event of certain pollution (contaminants). Just because Indiana GRQ thinks a quote share program works better with uniform terms doesn't mean that this one was designed that way, that a latent ambiguity exists, or that the court can rewrite the policy vis-

6

à-vis Interstate or invite the jury to do so. Based on the arguments today, the PCB exclusion is not ambiguous.

From this vantage point, Interstate argues that its PCB exclusion bars Indiana GRQ's remediation claim as a matter of law. At summary judgment, Interstate provided little evidence or argument on what Indiana GRQ's remediation claim encompassed and why the PCB exclusion met the substance of this claim, but for certain Interstate explained that much of the claim involved PCBs as contaminants to which the exclusion would plainly apply. Indiana GRQ suggested that there might be carve outs but seemed not to identify precisely what those exceptions might be.

The reconsideration arguments tackle this issue. Today Interstate argues that Indiana GRQ's remediation claim involves the removal of PCBs, and adds asbestos to that, and almost exclusively from the basement walls where the transformers that leaked the contaminants were housed. In response—both in the original summary judgment briefing and now on reconsideration—Indiana GRQ alludes to the possibility of contaminants other than PCBs and asbestos, but neither before nor now cites any evidence of these other contaminants. Such an unsupported argument, under the summary judgment standard, cannot then prevail over the plain language of this pollution exclusion.

Indiana GRQ advances a better argument that the PCB exclusion pertains only to the "removal" of PCBs and asbestos from the facility, but not their "containment." On this score, Indiana GRQ designates evidence that the pollution remediation will not only involve removal of PCBs and asbestos, but encapsulation. To be clear, the court sees on this record no difference in Indiana GRQ's dilution of PCBs to an acceptable level and "removal" because, after all, the work plans the company cites indicates that this will result from cleaning—*i.e.*, removing PCBs to get to this diluted level. But Indiana GRQ also identifies certain costs related solely to encapsulation—in this industry, a term of art that means the containment or neutralization of contaminants rather than their removal. Interstate offers no argument that "removal" should be interpreted more broadly (either because of a definition within the policy or

7

otherwise) than its plain meaning to cover encapsulation techniques. *See West Bend Mut. Ins. Co. v. United States Fid. & Guar. Co.*, 598 F.3d 918, 922 (7th Cir. 2010) (Indiana law interprets insurance exclusions narrowly); *see also PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 723 (Ind. Ct. App. 2004).

Accordingly, Interstate's PCB exclusion is not ambiguous and it bars, as against Interstate, Indiana GRQ's remediation costs specific to the removal of PCBs and asbestos from any good, product, or structure. Because Indiana GRQ has designated facts of pollution remediation costs specific to encapsulation or containment, which fall outside contaminant removal within the meaning of the Interstate policy's exclusion, Indiana GRQ may pursue this limited claim against Interstate at trial.

This understood, Interstate had a rationale and principled basis for its coverage position, so Indiana GRQ cannot pursue a bad faith claim against Interstate based on any failure to provide its insured with the McLarens cost estimates for the property. *See Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993); *Brandell v. Secura Ins.*, 173 N.E.3d 279, 284 (Ind. Ct. App. 2021); *Indiana Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1093 (Ind. Ct. App. 1992). Indiana GRQ's bad faith claim will rise or fall against Interstate solely as to the retention of Indiana GRQ's former expert.

## CONCLUSION

Accordingly, the court GRANTS IN PART and DENIES IN PART the motion to reconsider [ECF 129].

SO ORDERED.

April 28, 2023                              *s/ Damon R. Leichty*
                                            Judge, United States District Court