UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

INDIANA GRQ, LLC

Plaintiff,

v.

AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY *et al.*,

Defendants.

CAUSE NO. 3:21-cv-227 DRL

## OPINION AND ORDER

On April 17, 2023, Indiana GRQ, LLC[1] and the insurers filed separate motions *in limine*. Both sides objected. The court heard argument on these requests at the final pretrial conference on May 1, 2023, and now rules.

### STANDARD

The court has broad discretion to rule on motions *in limine*. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002); *see also Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Evidentiary rulings ordinarily should not be made until trial when the court can resolve admissibility issues in proper context. The court thus excludes evidence *in limine* only when it is "clearly inadmissible on all potential grounds." *United States v. Jackson*, 535 F. Supp.3d 809, 813 (N.D. Ind. 2021). If admissible on one ground or another, the court will defer ruling on admissibility until trial. *See id.* Even when the court issues an order *in limine*, the order remains preliminary and subject to the court's revision at trial. *See Farfaras v. Citizens Bank & Trust*, 433 F.3d 558, 565 (7th Cir. 2006).

---

[1] In previous orders, the court referred to the plaintiff as Indiana GRQ. Moving forward toward trial, the parties plan to use its parent's name—IRG—so the court follows suit here.

A.     *Agreed Requests (IRG Issues 1, 4, and 5 and Insurers Issue 7).*

The parties reached an agreement on IRG issues 1 (barring argument that the policy doesn't provide coverage), 4 (evidence of pollution exclusions), and 5 (insurers' independence) as outlined in the notice provided to the court [ECF 178]. It is not the court's practice to enter an order *in limine* when the parties agree, so the court denies the motion as moot on these issues. The court expects the parties to adhere to all agreements.

In addition, the insurers ask the court to quash Stuart Stromeyer's trial subpoena, a now-retired McLarens adjuster. Whether a proper *in limine* request or in truth a motion to quash that should have been filed separately, the parties filed a joint motion to withdraw Mr. Stromeyer's trial subpoena and the motion to quash. The court grants the parties' motion to withdraw Mr. Stromeyer's trial subpoena and denotes insurers' issue 7 as withdrawn [ECF 153].

B.     *Actual Cash Value Versus Replacement Cost Value (IRG Issues 2 and 3).*

IRG seeks to exclude evidence of depreciation (issue 2) and argument that it must complete a replacement to receive replacement cost value (issue 3). The court denied the insurers' summary judgment motion seeking to limit IRG to actual cash value for expenditures related to the company's electrical system. The insurers argued that IRG had not "completed" repair or replacement of the damaged electrical system within two years and could thus receive only actual cash value. The court found this position inconsistent with the policy language, which said repair and replacement must be "started" within the two-year period, not "completed," to receive replacement cost value.[2]

At summary judgment, the court never decided which repairs would trigger replacement cost value versus actual cash value, and never held when the policy would direct the insurers to make

---

[2] "If there is direct physical loss of or damage to Covered Property for which repair, rebuilding or replacement has not started within two (2) years from the date of direct physical loss or damage, the Company will not be liable for more than the actual cash value of the property destroyed" [ECF 16-12, § 6.22.02]. The two-year period here lasted from August 15, 2016 to August 15, 2018.

payments. The court denied summary judgment because a factual issue existed whether IRG had started certain repairs within the two-year window, so the jury would need to decide whether, among the damage to the electrical system or other covered property, IRG should receive actual cash value or replacement cost value. IRG treats the court's summary judgment ruling as dispositively in its favor—that IRG must receive replacement cost value—but IRG never moved for summary judgment on this issue and the court never granted it. The court left this issue to the jury.

This motion reveals a new issue, slightly different than that raised at summary judgment, about how or when the insurers must pay IRG replacement cost value—whether that be before or after the repairs are complete. Both sides argue new policy provisions—namely §§ 6.22, 6.22.01, 6.22.01.02, and 6.22.01.03. For instance:

> 6.22.01.  . . . Replacement Cost shall be the cost to repair, rebuilt or replace the damaged property (without deduction for depreciation) with materials of like kind, quality and capacity at the same or another site, but no more than the lesser of:
>
>> 6.22.01.01. The cost to repair;
>>
>> 6.22.01.02. The cost to rebuild or replace on the same or another site with materials of equivalent size, kind, quality and capacity;
>>
>> 6.22.01.03. The necessary cost actually expended in repairing, rebuilding or replacing on the same or another site, but not exceeding the operating capacity that existed at the time of the loss; or
>>
>> 6.22.01.04. The Limits of Liability applicable to the lost or damaged property.

The insurers plan to argue that § 6.22.01.03 applies because IRG has not repaired or replaced any property except for one transformer, so IRG may receive only what it has "actually expended." IRG argues that § 6.22.01.02 should apply.

IRG packages in this motion *in limine* what in truth is summary judgment argument. Now is not the time for summary judgment. *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 562-63 (6th Cir. 2013) (motion *in limine* not a substitute for summary judgment); *Smith v. Nexus RVs*, 2021 U.S. Dist. LEXIS 61538, 11 (N.D. Ind. Mar. 31, 2021) (same); *see also* 21 Charles A. Wright *et al.*, Fed. Prac. & Proc.

§ 5037.18 (2d ed. 2023). Motions *in limine* are designed to narrow evidentiary issues for trial, not resolve factual disputes or weigh evidence. The jury will decide when IRG receives actual cash value or replacement cost value among covered property. *See, e.g., Schweitzer v. Am. Family Mut. Ins. Co.*, 16 N.E.3d 982, 990 (Ind. Ct. App. 2014) (parsing actual cash value and replacement cost among property, including antenna separate from other dwelling losses).

To the extent necessary, the insurers asserted the valuation provisions as defenses. Actual cash value has not been eliminated as a potential issue at trial. Actual cash value under this policy accounts for depreciation, *see Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 357 (Ind. 1982), so the court cannot say depreciation evidence is inadmissible on all grounds. Whether repair or replacement of covered property was started within the two-year window, whether IRG should receive actual cash value or replacement cost value for covered property, and whether the insurers' interpretation of the policy proves illogical or inconsistent with the law as IRG now argues these points—these are all issues for trial. The court won't decide summary judgment arguments today. The court denies IRG's motion *in limine* on issues 2 and 3.

C.   *Historical Non-PCB Contamination (IRG Issue 6)*.

IRG seeks to exclude evidence or argument on historical non-PCB environmental contamination at the South Bend facility. IRG says, before the August 2016 flood, no PCB-related issues were observed on the property and previous environmental reports reflected no PCB contamination. IRG argues that the South Bend facility's environmental history is irrelevant to today's claims, *see* Fed. R. Evid. 401, and unfairly prejudicial because it could be used to discredit IRG's reputation and imply that the South Bend facility was an environmental threat before the flood, *see* Fed. R. Evid. 403. IRG also contends that this evidence would confuse the issues for the jury. *See id.*

The insurers argue that the South Bend facility's environmental history is relevant to IRG's ability to prove causation—that the August 2016 flood, and not prior environmental problems, caused

the losses here. The insurers say they have an expert (Robert West) who will testify that there were PCBs on the property before the August 2016 flood.[3] They also say they should be allowed to rebut Justin Lichter's (IRG's vice-president) knowledge that no PCBs pre-dated the flood given that he just joined the company in 2015.

IRG's environmental remediation claim concerns only PCBs and asbestos. The historical presence of PCBs or asbestos on the property before the flood remains relevant, and the court cannot call such evidence unduly prejudicial, *see United States v. Loughry*, 660 F.3d 965, 969 (7th Cir. 2011), much less say any such prejudice or risk of confusion would substantially outweigh its probative value at this preliminary stage, *see* Fed. R. Evid. 403. The presence of other contaminants or pollution is another story. The insurers have not established how their historical presence would contribute to the remediation claim today, so this evidence has no probative value, and its risks of confusion and unnecessarily delaying a trial are patent and overweight. The court thus denies IRG's motion on issue 6 as it concerns historical PCBs and asbestos and grants the motion as it concerns any other contaminant. *See* Fed. R. Evid. 401-402, 403.

D.      *Disclosure of Gerald Provencher (IRG Issue 7).*

IRG seeks to exclude Gerald Provencher as an expert witness because the insurers failed to include him on their trial witness list by the deadline of April 3, 2023. Ten days later, on April 13, 2023, the insurers added Mr. Provencher to their witness list. IRG argues this prevented it from objecting to Mr. Provencher and his testimony; however, IRG filed a timely motion to exclude his testimony. The company never explains what objections this short delay prevented it from asserting. The insurers say Mr. Provencher was timely disclosed as a Rule 702 witness; IRG deposed him

---

[3] This testimony remains subject to a motion to exclude under Rule 702. Neither IRG nor the insurers discuss any asbestos-related remediation predating the August 2016 flood.

approximately one year ago; IRG had his report for thirteen months; and IRG will have time to prepare for his crossexamination.

Exclusion of Mr. Provencher would be an "unjustified" sanction "considering the harmless nature of [the party's] failure to comply" with the court's order. *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000). Given all the prior disclosures and access, given its prompt correction, and given IRG's *Daubert* motion without prejudice, the court finds the omission to be harmless. The court denies IRG's motion on issue 7.

E.      *Use of the Term "Independent Adjuster" (IRG Issue 8).*

IRG seeks to preclude the insurers from referring to Micah Thoman and Stuart Stromeyer with McLarens and Charles Taylor as "independent adjusters." The company argues the term "independent" is misleading, highly prejudicial, and factually incorrect because the adjusters were hired by the insurers and not neutral parties. The insurers argue "independent adjusters" is a term of art in the insurance industry and indeed factually correct because it is their job title. The risk of any prejudice in using their job title is minimal at best, *see* Fed. R. Evid. 403, and frankly it is a working reality of the industry that these individuals use such job titles. Whether IRG wants to devote any of its allotted trial time to crossexamination or explaining what it views to be a misnomer, the company has examination and argument at its disposal. The court denies IRG's motion on issue 8.

F.      *IRG's Financial Condition or Sophistication (IRG Issue 9).*

IRG seeks to exclude any evidence or reference to its financial condition or sophistication because it is not relevant to the issues presented, *see* Fed. R. Evid. 401, and is "potentially prejudicial," *see* Fed. R. Evid. 403.

As to financial condition, IRG says it would be improper for the insurers to imply that IRG didn't need the insurance proceeds to remediate PCB contamination or to replace its electrical equipment. The insurers have no intention to present evidence of IRG's finances or net worth. They

say they would introduce such evidence only if IRG opens the door by saying the company could not afford repairs. IRG says it doesn't plan to make this argument. It thus appears this issue is moot, and the court will deny it as such and only address the issue if one side or another opens the door.

As to IRG's business sophistication, the insurers contend that IRG put its sophistication at issue by arguing that the insurers pressured the company into settling. To be clear, the only theory that remains as to improperly pressuring settlement is that the insurers hired Jeff Pope from Burns & McDonnell as a turncoat consultant. IRG originally hired Mr. Pope as its environmental consultant. He conducted testing at the site and produced an extensive report for IRG. Mr. Pope testified that the insurers (through McLarens) retained him after his work for IRG ceased and he stopped receiving payment. Micah Thoman (the McLarens adjuster for the insurers) testified that the insurers hired Mr. Pope) because he "had an intimate knowledge of the complexity of what was happening on site." Mr. Pope said he was retained for only one meeting. He participated in a call with the insurers "to prepare [their] best estimates for the physical damage and seepage and pollution" and to discuss "opening a potential settlement" with IRG.

The insurers say they intend to argue that IRG was sophisticated and had ample resources to refrain from being unduly pressured into taking any unwanted action. They argue IRG's ability to consult insurance brokers about policy interpretation, get feedback concerning the flood deductible, and overall experience with this insurance program are relevant to their defense. IRG's size, sophistication, and ability to consult with brokers on these topics would seem to have little relevance to the company's ability to withstand pressure from the insurers' conduct—namely hiring an insured's consultant to assist the insurers in advancing a settlement. Nevertheless, "potentially prejudicial" is not enough to render evidence inadmissible, *see* Fed. R. Evid. 403, and an order preventing the insurers from mentioning IRG's "sophistication" in all its forms lacks the level of clarity demanded of an order *in limine*. *See United States v. Marr*, 760 F.3d 733, 740 (7th Cir. 2014) ("A terse motion *in limine* is not

specific enough to meet the requirements of Fed. R. Evid 103(a).") (emphasis added). Any Rule 401 or 403 objection must be assessed within the context of trial. The court thus denies IRG's motion on issue 9—as moot to its financial condition, and outright as to its sophistication.

G.    *Undisclosed Damages (Insurers Issue 1).*

The insurers seek to exclude recently disclosed damage computations for electrical equipment and environmental remediation. A party must provide "a computation of each category of damages claimed." Fed. R. Civ. P. 26 (a)(1)(A)(iii). Parties must supplement their disclosures throughout the case "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1); *see Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 514-15 (7th Cir. 2011). When a party fails to comply with Rule 26(a), Rule 26(e), or other discovery, the party may not use undisclosed evidence at trial unless the failure is substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The following factors guide the substantial justification or harmless determination: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

This issue requires some background. In IRG's initial disclosures (June 2021), the company alleged a loss of $10,474,422 for electrical equipment and $11,165,010 for environmental damage. IRG supplemented its disclosures in May 2022. The total losses for these two categories remained the same. Discovery closed in June 2022. IRG tendered a second supplement in May or July 2022 that maintained these same claims for damages.[4] For a case that began in June 2020, IRG always maintained its total damages in the ballpark of $21.6 million.

---

[4] The court notes that the original supplemental disclosure and the second supplemental disclosure are both dated May 10, 2022, but the second supplement contains other disclosures than the original. One might assume

At summary judgment, the court decided the $30 million limit applied, not a $10 million sublimit. Just days later, on March 24, 2023, IRG supplemented its disclosures to increase its damage computation by over $15 million, alleging an additional $1,103,405 ($10,474,422 to now $11,577,827) for electrical loss and an additional $14,312,203 ($11,165,010 to now $25,478,213) for environmental loss. The disclosure offered no rhyme or reason for the increase—just a disclosure of new numbers. Trial was less than two months away (May 16, 2023), and the parties soon would begin (if not already) final pretrial disclosures leading to the final pretrial order and trial.

The insurers argue they would be substantially prejudiced by allowing IRG to increase its damage computation by over $15 million (to a total of roughly $37.1 million) less than two months before trial as they have no ability to conduct discovery or defend against the new computation. IRG bifurcates its defense of the new numbers. For electrical damages, IRG contends the newly disclosed number—an additional $1,103,405—results merely from inflation. To its response to the motion *in limine*, the company attaches a report that shows how it calculates this new number. Inflation is certainly something the jury may consider, *K Mart Corp. v. Beall*, 620 N.E.2d 700, 707 (Ind. Ct. App. 1993) ("awareness of general inflation … is within the zone of discretion given the trier of facts when assessing damages"), and inflation's operation would in truth be no surprise to either side. No one needs an economist, actuary, or other expert to assess inflation reasonably. *See id.* Though the exact amount for inflation was not known until the new disclosure, for sophisticated parties such as these it could reasonably be anticipated using current inflation rates, and the insurers have had adequate time to ready for any crossexamination of cost increases due to inflation. Though the latest disclosure was not substantially justified, it is in this limited respect harmless. *See* Fed. R. Civ. P. 37(c)(1).

---

that both were actually served in May 2022, or that the latter one's service date was just not updated. The timing differential doesn't matter today.

The same cannot be said for the drastic (non-inflationary) increase of $14.3 million in the environmental claim. More than doubling damages in a supplemental disclosure—after expert analysis, after discovery has ended, after repeated disclosure of lower numbers over the course of two years (in this district post-transfer), and without supported explanation of the differential—cannot on this record be called substantially justified or harmless. Calling it such turns IRG's "duty to supplement [its] initial damages disclosures into an opportunity and even a right to hold back [its] real damages theories and computations until nearly the eve of trial. That is not what Rule 26(e) and 26(a)(3) do. Rule 26(e) was intended to ensure prompt disclosure of new information, not to allow parties to spring late surprises on their opponents under the guise of a 'supplement' to earlier disclosures." *Barlow v. GMC*, 595 F. Supp.2d 929, 935-36 (S.D. Ind. 2009). "In other words, the duty to supplement cannot be transformed into a right to ambush just before trial." *Id.* at 936.

This is especially true when the court ordered the parties to supplement under Rule 26(e) every six weeks until trial. From the time of the scheduling order (May 21, 2021) until IRG's eventual disclosure (March 24, 2023), this means that IRG had 16 ordered moments for supplemental disclosure. Choosing only the last of these ordered moments to disclose this measurable increase in damages was not substantially justified. *See* Fed. R. Civ. P. 37(c)(1). IRG says its delayed disclosure was because of the court's summary judgment ruling that the $30 million policy limit applies. But damage computations greater than $10 million have always been IRG's position, despite the flood limit; and one cannot use an undecided issue of law as an excuse to forego disclosure, particularly when IRG intended to argue for the higher limit all along.

Alternatively, IRG argues that its delayed disclosure was harmless—namely, it didn't cause prejudice or surprise to the insurers because the newly-disclosed computations were known to the insurers since 2019 and the insurers engaged in discovery on these higher estimates. This argument too requires a bit of unpacking.

In June 2019, Hull & Associates (IRG's consultant) created a report for environmental remediation at the South Bend facility. The report provided two options for remediation: $23 million (option 1) and $37 million (option 2). The differential depended on the level of cleanup—whether under continued use standards pursuant to Toxic Substances Control Act (TSCA) (the lower number) or under PCB remediation waste standards pursuant to this law (the higher number). The report was sent to IRG (through IRG vice-president, Justin Lichter) and the insurers.

In August 2019, the insurers denied coverage for environmental remediation in part because they disagreed with the Hull report. In June 2020, IRG submitted a proof of loss claiming $11,165,010 for environmental remediation ($10,869,510 plus $295,500 of required assessment activities). IRG attached two tables provided by Hull for the numbers in the proof of loss. In September 2020, the insurers sought to transfer this case from Ohio to Indiana, and they acknowledged in briefing that IRG received estimates for costs ranging from $23 million to $37 million, citing to the Hull report. In June 2021, near the start of discovery and despite any prior higher estimates, IRG said in its initial disclosures that the total environmental loss was $11,165,100—consistent with its June 2020 claim.

Discovery proceeded accordingly. In February 2022, IRG served the insurers with a proposed expert report (B. Tod Delaney) that reviewed the work plan outlined in the Hull report and generally agreed with the report's cost estimates, albeit with some alteration and additional comment. Dr. Delaney, a Ph.D. professional engineer, offered his own environmental cost estimates—$11.4 million for cleanup to a low-occupancy standard and $25.2 million for cleanup to an unrestricted use standard—noting the fundamental unknown about the owner's intended future use. Dr. Delaney included the 2020 Hull tables as appendices to his report.

In March 2022, the insurers deposed Justin Lichter (IRG's vice-president) and asked about the Hull report. Mr. Lichter was asked about the two remedial options in the Hull report. He was briefly

asked about option 2 that estimated $37 million in cleanup costs. Mr. Lichter remained unsure at that time whether the more expensive remediation option would be needed ("No, I'm not saying that.").

In May 2022, IRG supplemented its disclosures and reiterated that it was still seeking just $11,165,010 in environmental damages—not the higher option. On the heels of this supplemental disclosure, approximately one month later in June 2022, the insurers deposed Dr. Delaney about his report and review of the Hull estimates. The insurers asked Dr. Delaney which of his two cost estimates was correct based on the appropriate remediation standard: a low-occupancy standard cleanup (costing $11.4 million) or an unrestricted use standard cleanup (costing $25.2 million). Dr. Delaney responded, "I believe that is in the purview of the owner because the owner is the one who is going to know what they want to do in the future, and it's their risk from what they may want to do in the future." He was then asked what standard IRG intended to use; he said, "I've had no discussion with anybody in management." Dr. Delaney could not opine as to the higher number's applicability.

From there, the insurers asked Dr. Delaney about the $11.4 million estimate and why his minimum estimate was slightly higher than the Hull report. The court reviewed the pages IRG cited at oral argument but saw no measurable or specific questioning from the insurers about Dr. Delaney's $25.2 million cost estimate. Whether one debates this move as strategically risky, consistently throughout discovery IRG disclosed and then reaffirmed that it was seeking only the lower cost in environmental remediation, and its expert confirmed that it was the company's choice of use.

Discovery closed June 17, 2022. Following summary judgment proceedings, on March 24, 2023, and for the first time, IRG increased the maximum amount of environmental damages to $25,478,213. The disclosure came with no explanation for the increase. Though estimates in the $25 million range had been offered by the Hull report and Dr. Delaney, the Hull report and Dr. Delaney also gave estimates close or identical to the computation IRG repeatedly disclosed (approximately $11 million). IRG had the minimum and maximum cost estimates from the Hull report in 2020 and Dr.

Delaney's estimates in early 2022. The company could have identified another number for its environmental damages if it wanted; and its obligation was to do so in a timely manner. *See* Fed. R. Civ. P. 26(e). This isn't the usual case of "additional or corrective information" being otherwise made known to the other parties. *Id.* Though the basis for a higher number may have been there, that higher number hinged on the company's choice of future use; and repeatedly the company disclosed to the insurers that its intended use was a use that corresponded to the lower damages figure. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006) (noting that "much greater detail" is necessary for damages computations produced at later points in the proceedings).

Under these circumstances, it wasn't unreasonable for the insurers to rely on IRG's repeated representation—particularly when IRG continued to assert the lower remediation figure even after two separate reports and declined to promptly correct the number even after the company's retained expert testified that the right number depended on its choice of use. Awaiting the eve of trial was prejudicial, not harmless.

Rule 26 computation disclosures are aimed at assisting, not hindering the discovery and settlement process. *Tovar Snow Professionals, Inc. v. ACE Am. Ins. Co.*, 2021 U.S. Dist. LEXIS 196112, 10 (N.D. Ill. Oct. 12, 2021) (quoting *Jones v. Wal-Mart Stores*, Inc., 2016 U.S. Dist. LEXIS 40426, 9 (D. Nev. Mar. 28, 2016). ("a plaintiff must provide enough information that the defendant may 'understand the contours of its potential exposure and make informed decisions regarding settlement and discovery'"). It helps to frame proportionality. *See* Fed. R. Civ. P. 26(b)(1). More than doubling the damages exposure would necessarily have invoked additional discovery, different questioning in depositions, and pinning of witnesses to a position, in particular Mr. Lichter, and exploring the basis for this position. The higher number not only frames a new case but presupposes a different type of remediation work. Alternatively, the harm would come in preventing the insurers from reopening these depositions to explore the basis for these new figures or the basis for the new use. It would now

disrupt the trial. Settlement negotiations also revolve around demands and counters; and that process cannot be meaningfully pursued when the numbers being exchanged revolve around the wrong claimed damages. *See also* Fed. R. Civ. P. 26(a) advis. comm. n. (1993) (damages among that "certain basic information that is needed in most cases to prepare for trial or make an informed decision about settlement"). The insurers likewise report having reinsurers, and their notice and position with their reinsurers understandably could be jeopardized by the lack of disclosure of higher claimed damages.

To the extent IRG suggests that the belated damages disclosure was harmless because the insurers knew about estimates in the $25 million range and could have questioned IRG's witnesses regarding this higher amount, this argument falls short under today's circumstances. "The onus was not on the insurers to seek out a damages computation," *Pittsfield Dev., LLC v. City of Chic.*, 2021 U.S. Dist. LEXIS 2582651, 25-26 (N.D. Ill. Nov. 15, 2021), and ask if IRG was certain it was seeking the lower damage computation, *see Clayman v. Starwood Hotels & Resorts Worldwide*, 343 F. Supp.2d 1037, 1047 (D. Kan. 2004) (rejecting similar argument trying to excuse Rule 26 non-disclosure of damages). Rule 26 requires a damage computation—not just a damages figure, but a computation—with a disclosure of all non-privileged evidence on which the computation is based. IRG repeatedly disclosed it was only seeking approximately $11 million in environmental damages—indicating to the insurers that it was seeking the lower standard of remediation. Nothing on this record gave the insurers cause to question IRG's consistent and repeated commitment to the lower estimate. Dr. Delaney's expert report may have done so at one point, but not when IRG continued to assert the lower estimate with that report in hand and then left that measurably in place even after Dr. Delaney's deposition.

IRG shifts too much of its burden on the insurers under today's circumstances. A computation isn't without meaning in this process of disclosure. *See Morris v. BNSF Ry. Co.*, 969 F.3d 753, 766 (7th Cir. 2020) ("Complying [with Rule 26's disclosure requirements] should be a priority—not something brushed off as tedious or unimportant so long as the information disclosed late can somehow be

unearthed like a needle in a haystack within a prior discovery production."); *Pittsfield Dev.*, 2021 U.S. Dist. LEXIS 258261 at 30-33 (offering a witness to testify about damages wasn't a substitute for an affirmative damages computation, particularly one offered eight months after discovery closed); *Tovar Snow*, 2021 U.S. Dist. LEXIS 196112 at 4 ("Regardless of what documents [the plaintiff] has disclosed, it 'must provide a computation synthesizing these documents in a timely manner so that the defendant has the opportunity to conduct discovery on that point.'"); *Baca v. State of California*, 2015 U.S. Dist. LEXIS 175009, 5 (N.D. Cal. Jan. 20, 2016) (rejecting argument that failure to provide damages computation was harmless because the information was in documents already in defendants' possession, because "a party cannot avoid its obligation to provide a damage calculation merely by producing records ostensibly containing such information").

The "whole point of [] the discovery mechanisms listed in Rule 26 was to ensure that trials would no longer be 'carried on in the dark.'" *See Morris*, 969 F.3d at 765 (quoting *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). Until the eve of trial, IRG kept the insurers in the dark about another $14 million that the company now wants to claim today. The delayed disclosure of the environmental damage computation is not substantially justified or harmless on this record. *See* Fed. R. Civ. P. 37(c)(1). The lesser sanction of providing additional discovery is not warranted when that would reopen the discovery floodgates on the eve of trial. The real flood occurred in August 2016, and the suit has pended long enough. The court grants the insurers' motion on issue 1 and excludes evidence and argument as to the newly disclosed maximum environmental damages.

H.      *Undisclosed Witnesses (Insurers Issue 2).*

The insurers argue that IRG untimely disclosed nine witnesses. IRG first disclosed these witnesses in its March 2023 disclosure supplement. Rule 26 requires parties to provide the name and contact information of "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses,

unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). Parties who do not identify a witness as required may not use the witness "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The determination of whether a Rule 26(a) violation is justified or harmless "is entrusted to the broad discretion of the district court." *David*, 324 F.3d at 857.

In *David*, 324 F.3d at 857, one party learned that the opposing party's witness was to testify about certain subject matter "only days before trial." The party complained that no supplement to Rule 26 disclosures or interrogatories had been made. *Id.* The court of appeals affirmed the district court's decision to admit the testimony, noting that the witness had been disclosed for eighteen months, the party learned the subject matter of the witness's testimony before trial, and the party was able to directly rebut the witness's testimony at trial. *Id.* at 858. Thus, there was no prejudice. *Id.*

The insurers seek to exclude testimony from Jeff Pikel and Adam Breden because the insurers say they were not disclosed until IRG's March 2023 disclosure supplement. In June 2022, the insurers disclosed witnesses, including Mr. Pikel and Mr. Breden. In IRG's May 2022 disclosure it listed as potential witness "[a]ll persons identified by Defendants." To be fair, one might say this doesn't meet the substance of the disclosure requirement to list "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses," Fed. R. Civ. P. 26(a)(1)(A)(i), if in fact IRG knew it too would need these witnesses at trial; but to say that the insurers must guess at what Mr. Pikel and Mr. Breden will testify about is a stretch too far, especially when the insurers planned on calling these witnesses in the first place. These witnesses will not disrupt trial, and any delayed disclosure is harmless. *See* Fed. R. Civ. P. 37(c)(1); *David*, 324 F.3d at 857.

In addition, the insurers express concern that Mr. Pikel was an untimely disclosed expert witness. He worked for the DeHayes Group, an insurance broker, who was involved in the claim's

adjustment. IRG says Mr. Pikel is a fact witness, not an expert witness. This distinction can only be made in the context of trial, so the court denies the motion as to Mr. Pikel and Mr. Breden.

The next two witnesses are Marcus McNeill and Ben Rosolowski. Neither were formally disclosed until March 2023—nine months after discovery closed and after summary judgment. IRG argues its delayed disclosure of Mr. McNeill and Mr. Rosolowski is harmless because both witnesses were well-known to the insurers throughout the claim's adjustment, and the insurers had already taken nine out of their ten allotted depositions.

Mr. McNeill, an IRG general maintenance employee, showed the insurers around the facility and was discussed in Dr. Delaney's deposition. IRG says Mr. McNeill was only recently identified as a witness because of the unavailability of Jerry Graf due to serious health issues (the site manager during the flood). IRG says it only found out two months ago that Mr. Graf would be unavailable for trial. His unavailability shouldn't have been a surprise to IRG since Mr. Graf's health concerns prevented the insurers from deposing him before the close of discovery in June 2022. Mr. McNeill reported to Mr. Graf during the relevant time frame. Just because the insurers interacted with Mr. McNeill during the claim's adjustment doesn't mean that IRG's decision to call him at trial isn't a surprise to the insurers. This is especially true when the insurers couldn't depose Mr. Graf or Mr. McNeill. Additionally, the insurers' deposition limit, otherwise changeable by motion for good cause, doesn't allow a delayed disclosure. Mr. McNeill's delayed disclosure isn't harmless or substantially justified. The insurers would have to resort to guesswork for Mr. McNeill's testimony at trial, and little time remains before trial (particularly with the court's approach in a moment as to Mr. Rosolowski). Mr. McNeill is excluded. *See* Fed. R. Civ. P. 37(c)(1).

Mr. Rosolowski, an electrical contractor with the CPI Group, prepared IRG's cost estimates for damaged electrical equipment. Everyone knew that there were two overriding themes to this claim—environmental and electrical. IRG relied on these cost estimates in its June 2020 proof of loss.

IRG alleges that the insurers interacted with Mr. Rosolowski during the claim's adjustment (before litigation began) and that Mr. Rosolowski was mentioned numerous times in other depositions. IRG concedes its nondisclosure was an oversight. It was not substantially justified.

IRG says Mr. Rosolowski's involvement in the claim adjustment should've put the insurers on notice that IRG would call Mr. Rosolowski on trial, and the depth of his role seems to underscore this point. IRG also says Mr. Rosolowski's name was brought up numerous times during other IRG witness depositions. The insurers haven't explained why Mr. Rosolowski's delayed disclosure as a fact witness is prejudicial to them, how they would have conducted discovery differently, or if they would've deposed Mr. Rosolowski. Though the court is dismayed at IRG's oversight, the insurers present a soft case of prejudice for him as a fact witness. *See David*, 324 F.3d at 857. Unlike Mr. McNeill, the insurers won't have to engage in sheer guesswork to know Mr. Rosolowski's testimony. In September 2018, he provided an electrical evaluation to the insurers that was discussed in a McLarens report. The insurers even asked for additional information and received it. Mr. Rosolowski's cost estimates were also included in IRG's June 2020 proof of loss to the extent he has fact testimony that undergirds his findings there.

To cure any lingering prejudice, the court will order that, before May 17, 2023, and at the insurers' election, IRG must make Mr. Rosolowski available for deposition to occur at a reasonably convenient location. The insurers must make this election by noon on May 11, 2023, and afford no less than 24 hours for the deposition to occur, though the court expects counsel to cooperate in facilitating this deposition, if elected by the insurers.

The insurers also express concern about Mr. Rosolowski testifying as an expert witness without proper disclosure and report production. IRG says Mr. Rosolowski's testimony will be limited to his factual involvement in IRG's claim, starting in 2018 when the insurers asked Mr. Rosolowski to provide them with electrical cost estimates for the South Bend facility. If Mr. Rosolowski's testimony

will be limited to fact testimony or lay opinion testimony, then there is nothing impermissible under Rules 602 and 701 after a deposition.

However, testimony of cost estimates and valuation based on specialized knowledge, designed to aid the factfinder, will fall within Rule 702. *See Trs. of the Chi. Painters & Decorators Pension v. Royal Int'l Drywall & Decorating*, 493 F.3d 782, 787-88 (7th Cir. 2007) (drywall installation rates and cost estimating in the construction industry are based on specialized knowledge). In *Compania Administradora de Recuperacion v. Titan Int'l, Inc.*, 533 F.3d 555, 559 (7th Cir. 2008), a lay witness attempted to value tires based on his generalized knowledge of the global tire market through experiences in the tire business. The district court's exclusion of the witness was affirmed because his proffered testimony was Rule 702 testimony, not lay testimony based on personal knowledge. *Id.* at 560-61. A "[v]aluation attempt [] based on [] special experience in the tire industry, not on [] personal knowledge of the goods in question . . . falls within the purview of Rule 702." *Id.* at 561. For example, if Mr. Rosolowski was a mere compiler, he may well be a fact witness; but if he was utilizing specialized knowledge and is now being offered to assist the trier of fact, he would present Rule 702 testimony.

Mr. Rosolowski may testify as to facts based on his personal knowledge, but any testimony based on specialized knowledge will be excluded for failure to disclose him as an expert witness. *See Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 743 (7th Cir. 1998). The court has not been provided IRG's formal expert disclosure, so perhaps a lingering question remains; but IRG has not established to the court that he was disclosed as a Rule 702 witness in accordance with the court's scheduling order, nor established substantial justification or harmlessness to evade the otherwise automatic and mandatory exclusionary rule. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). Such a disclosure is quite meaningful in permitting the other side to meet the substance of that disclosure in discovery and counter expert disclosures. It affords the opportunity for challenge under Rule 702 and *Daubert*. And an expert deposition is an altogether different task than a fact deposition, particularly now on the

eve of trial. Under the circumstances today, affording that deposition is not a cure as it is for Mr. Rosolowski's fact testimony. Only because IRG assures the court that his testimony will not stray into Rule 702 matters does the court view his nondisclosure as a fact witness as curable.[5]

Last, the insurers seek to exclude Edwin Wickman, Ian Ostrowski, Lacey Lord, Quentin Gudeman, and Joseph Wallwork. All have knowledge "concerning bids to restore certain pre-loss electrical functioning" at the South Bend facility. IRG says they would be offered to lay the foundation for bids for subcontractor work compiled in Mr. Rosolowski's proposal. IRG says the insurers have had these bids since the June 2020 proof of loss. Custodial or foundational witnesses alone would seem on their face unnecessary and a waste of the jury's time if the insurers stipulate that these bids were submitted; and, in fact, IRG advises that it has made this very proposal. Because that remains a topic of discussion between the two sides and because the deposition of Mr. Rosolowski may factor into this issue, the court denies the motion at this time and defers this subject to be re-raised at trial.

I.      *Undisclosed Exhibits (Insurers Issue 3).*

Over the past month or so, IRG has on certain occasions, including in its supplemental disclosure, produced new documents. The insurers allege these documents hadn't been produced before March 24, 2023—more than nine months after the close of discovery (June 2022) and without any notice. The insurers allege the documents fall into four categories: (1) photographs and blueprints of the South Bend location; (2) repair documents; (3) March-April 2023 communications with the Indiana Department of Environmental Management (IDEM) and the United States Environmental Protection Agency (EPA); and (4) reproduced documents.

First, the issue about the photographs arises because IRG may have overproduced (reproduced) photographs at this late stage that it produced before and because the insurers had not

_____

[5] The insurers, if they elect this deposition, may nonetheless want to be prudent and explore whether Mr. Rosolowski's testimony will be based on specialized knowledge to develop a record for the court's decision on this point at trial.

by the time the motion *in limine* was due sorted out which may be new and which are not. No additional clarity was given at the final pretrial conference. The insurers argue that the photographs aren't relevant because the parties stipulate that a flood occurred, *see* Fed. R. Evid. 401; but that stipulation doesn't deprive IRG from providing pertinent context for its story, and the photographs may bear on the jury's assessment of damages. In addition, the insurers have not specifically identified the photographs of concern to enable the court's consideration of their motion or to enter any order, so the court denies the motion as to this issue. As for the blueprints, IRG no longer wishes to use them. Blueprints disclosed in March and April 2023 are excluded, the court denies the issue as moot.

Second, the insurers make the same generalized argument about prejudice for the repair documents—namely IRG had the documents in its possession before discovery closed and could have disclosed them earlier. The insurers don't provide any real explanation for how this is prejudicial. Only one repair document from 2018 is attached to their motion, which outlined Elite Electrical's pricing for electrical work. The insurers haven't articulated prejudice or harm here. There are other repair documents that IRG says are updated versions of previously disclosed documents with adjustments for inflation. Inflation, as common a principle as that is, militates against a finding of prejudice. The court denies the insurers' motion on this issue.

Third, the insurers seek to exclude recent emails among IRG, IDEM, and the EPA about whether the Toxic Substances Control Act (TSCA) is implicated in the environmental remediation. The insurers capture these emails as "eleventh hour" communications (between March 28, 2023 and April 3, 2023) that were belatedly disclosed and contain hearsay. The insurers say IRG had very little communication with the EPA and, now on the eve of trial, IRG tries to commence a process with the EPA to determine the TSCA's applicability. IRG provides evidence of communications dating to at least June 13, 2022 with the EPA. The emails IRG seeks to admit are from late March 2023.

IRG only recently disclosed these emails because they were only recently produced. The emails are dated between March 28-30, 2023 and IRG produced them to the insurers on April 3, 2023 just days later. Even still, it is hard to say this delayed disclosure was substantially justified. The court struggled to get a cogent answer from IRG as to why communications with the EPA only began in June 2022 when the loss occurred in 2016. IRG said it wasn't paying much attention to whether the insurers reported the remediation efforts to the EPA. When IRG realized the insurers' had not reported to the EPA, IRG reached out.

The earliest evidence of communication produced to the court was a meeting with IDEM, the EPA, and IRG on June 13, 2022—five days before discovery closed. In October 2022, a memorandum summarizing the June 2022 meeting was produced "in response to [the EPA representative's] request for a brief history as it relates to the release of polychlorinated biphenyls." The report was sent to IRG, IDEM, and the EPA, but not the insurers. June and October 2022 were two very clear opportunities for IRG to disclose ongoing communications with IDEM and the EPA. The disclosure of the October 2022 report would have made the insurers aware of these ongoing discussions and the IDEM and EPA representatives, Mark Nance and Peter Ramanauskas respectively. Disclosure nine months after these communications began was not substantially justified; and awaiting the input of these agencies until the eve of trial, after discovery closed and after expert reports, on an issue that IRG intended to pursue likewise was not substantially justified. *See* Fed. R. Civ. P. 37(c)(1).

The delayed disclosure of these emails is also prejudicial and would significantly lengthen and complicate the trial. Their introduction, particularly when offered for their truth that TSCA-compliant remediation will be required, would impose on the insurers at the eleventh hour a massive task of catch-up. IRG says the company isn't calling the authors of these emails (Mark Nance from IDEM and Peter Ramanauskas from EPA) to testify. The court seriously doubts IRG's ability to lay a proper foundation for these exhibits, particularly when the insurers will have no opportunity to crossexamine

the authors of the most damning statements. That inability to crossexamine is prejudicial outside of IRG's theories of admissibility. The insurers say Mark Nance and Peter Ramanauskas didn't otherwise come up during discovery. The late engagement of these agencies on the subject of the TSCA—apparently contributed by IRG's nondisclosure of certain earlier communications to its attorneys—prejudicially deprives the insurers of the ability to explore how these emails occurred, why they occurred, what justification they may have, and whether counter-opinions could be marshaled. IRG has left no real tools in the insurers' toolbelt.

These emails create surprise and prejudice on behalf of the insurers that cannot be cured this late in the game—not even through crossexamination. Keeping the insurers updated as to these newly produced reports and communications back June and October 2022 may have lessened any surprise and prejudice on the eve of trial, but that is not what occurred. Accordingly, these belatedly disclosed emails with IDEM and EPA are not harmless or substantially justified, so they are excluded. *See* Fed. R. Civ. P. 37(c)(1).

Fourth, there are nine documents (listed on page 16 of IRG's response) IRG says it disclosed before March 2023 and just reproduced them as a cautionary measure. It says the documents are duplicative of previous disclosures. There is no delayed disclosure or harm here. IRG also listed seven documents (also on page 16, footnote 3) that it produced in March 2023 but no longer intends to rely on them at trial. It withdraws these exhibits.

J.     *Communications about Loss Reserves (Insurers Issue 4).*

The insurers seek to exclude evidence of loss reserves. At the final pretrial conference, the insurers clarified that they don't seek to exclude the rough order of magnitude or the loss estimates that form the basis of IRG's bad faith claim. The insurers only seek to exclude communications from McLarens regarding how loss reserves should be handled. IRG agreed to the redaction of any McLarens communications about loss reserves. The court grants insurers' motion as to issue 4, only

as to communications about loss reserves, not the rough order of magnitude or loss estimates, and expects the parties to coordinate redaction of loss reserve information or advice.

       K.     *Use of the Word "Settlement" (Insurers Issue 5).*

The insurers seek to exclude use of the word "settlement" when discussing attempts to bring the insurance claim to a resolution during adjustment. *See* Fed. R. Evid. 408. Rule 408 is not an "absolute ban" on all evidence regarding settlement negotiations. *Bankcard Am., Inc. v. Universal Bancard Sys.*, 203 F.3d 477, 484 (7th Cir. 2000). Throughout the claim's adjustment, the insurers, the insurers' adjusters, and IRG use the terms "settlement" or "settle" in letters and reports to discuss bringing the insurance claim to a close. "Settle," "adjust," and "resolve" are used interchangeably in evidence and testimony. Any concern the insurers have about the connotation of the word "settlement" can be ameliorated during direct and crossexamination. There, any context may be provided. The court denies insurers' motion as to issue 5.

       L.     *Financial Condition of Insurers (Insurers Issue 6).*

The insurers seek to exclude evidence of the insurers' individual and collective financial condition. The insurers argue that this evidence is highly prejudicial and is designed to show that the insurers can satisfy any verdict regardless of liability. IRG argues Indiana law allows the jury to consider a defendant's financial condition when deciding the amount of punitive damages. IRG's bad faith claim puts punitive damages at issue. Indiana's Model Civil Jury Instructions instruct the jury to consider the "defendant's financial condition," and the insurers included this in their proposed jury instructions. The insurers' financial condition, individually or as a collective, is admissible for punitive damages. The court denies insurers' motion as to issue 6.

       M.     *Issues Resolved at Summary Judgment (Insurers Issue 8).*

The insurers seek to exclude testimony and evidence on legal issues resolved by the court at summary judgment: (1) the non-applicability of the $10 million sublimit; (2) the two-year time limit

on actual cash value recovery; and (3) bad faith theories disposed of at summary judgment. Issues resolved at summary judgment have no place at trial, especially one already brimming with complex facts and claims. The insurers' request to exclude evidence about the two-year time limit on actual cash value recovery is vague, and issues surrounding recovery are still in dispute. The request about the coverage limit or sublimit likewise is vague and eludes precise restriction in an order *in limine*, including how that might bear on the bad faith claim, if at all. The court denies this motion in these respects as non-specific, undeveloped, and requiring the court to await the context of trial in any event.

Last, the court was clear in its summary judgment order what bad faith theories remained: the withholding of cost estimates and hiring IRG's consultant to pressure settlement. The court granted summary judgment in favor of the insurers on the remaining theories and IRG cannot now revive those or cobble together new ones. IRG's argument that its opposition to the insurers' motion for summary judgment "was not meant to be exhaustive" is unconvincing. Summary judgment is the "put up or shut up" moment when IRG had to show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). That time has passed. IRG has two bad faith theories remaining for trial, and that is all.

CONCLUSION

Accordingly, the court DENIES IRG's motion *in limine* [ECF 144] as to issues 2, 3, 7, 8, and 9 as to IRG's sophistication; DENIES AS MOOT the motion as to issues 1, 4, 5, and 9 as to IRG's financial condition; and GRANTS IN PART and DENIES IN PART issue 6. The court GRANTS the insurers motion *in limine* [ECF 137] as to issues 1, 2 concerning Marcus McNeill, 3 concerning emails with IDEM, EPA, and IRG disclosed in March and April 2023, 4, and 8 as it concerns bad faith theories disposed of by the court at summary judgment; DENIES AS MOOT the motion as to issue 3 concerning blueprints; DENIES the insurers' motion as to issues 2 concerning all other witnesses, 3 concerning the other documents of concern, 5, 6, and 8 concerning all other issues. The

court GRANTS the joint motion to withdraw Stuart Stromeyer's trial subpoena [ECF 153] and DENOTES issue 7 of the insurers' motion *in limine* as withdrawn.

That said, the court ORDERS the parties and their counsel not to offer at trial testimony, evidence, or argument before the jury concerning:

- the presence of contaminants or pollution other than PCBs and asbestos (IRG issue 6);

- the additional $14,312,203 in claimed environmental damages (insurers issue 1);

- emails with IDEM, EPA, and IRG disclosed in March and April 2023 (insurers issue 3);

- loss reserves or communications about loss reserves (insurers issue 4);

- bad faith theories disposed of at summary judgment (insurers issue 8).

The court EXCLUDES at trial the additional $14,312,203 in environmental damages (insurers issue 1) and testimony from Marcus McNeill (insurers issue 2).

The court ORDERS that, before May 17, 2023, and at the insurers' election to be made by noon on May 11, 2023 and at no less than 24 hours' notice, IRG must make Ben Rosolowski available for deposition to occur at a reasonably convenient location. The court expects counsel to cooperate in facilitating this deposition, if elected by the insurers.

SO ORDERED.

May 10, 2023                                  *s/ Damon R. Leichty*
                                              Judge, United States District Court