UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| INDIANA GRQ, LLC<br><br>    Plaintiff,<br><br>  v.<br><br>AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY *et al.*,<br><br>    Defendants. | CAUSE NO. 3:21-cv-227 DRL |

OPINION AND ORDER

Indiana GRQ, LLC (IRG) seeks to exclude testimony of the insurers' opinion witness, Robert West, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The court grants IRG's motion only in part.

STANDARD

A witness may testify in the form of an expert opinion when (1) the witness is "qualified as an expert by knowledge, skill, expertise, training, or education;" (2) the testimony is "based on sufficient facts or data;" (3) the testimony is "the product of reliable principles and methods;" and (4) the witness has "reliably applied the principles and methods to the facts of the case" in such a way that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Although analysis under Rule 702 remains at all times flexible, *Daubert*, 509 U.S. at 594, the fundamental considerations of what makes expert opinion admissible are well understood, *see Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp.3d 965, 970-71 (N.D. Ind. 2020).

In short, the Federal Rules of Evidence strike a balance between two competing concerns: the apprehension for the free-for-all admission of unreliable theories that might baffle juries and a "stifling and repressive scientific orthodoxy" that might inhibit new truths or legitimate cases. *Daubert*, 509 U.S. at 596. While preserving that balance, the *Daubert* analysis is not a substitute for crossexamination,

contrary and compelling evidence, thoughtful jury instructions, and other methods inherent in federal trials to challenge shaky evidence. *Id.*; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

The court needn't conduct an evidentiary hearing here. No party has requested one. The briefing, proffered report, exhibits, and deposition testimony also permit the court to rule. *See, e.g.*, *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998); *Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n.3 (7th Cir. 1998).

DISCUSSION

The court recently ruled on summary judgment and reconsideration motions that provide the background for this case. *See Indiana GRQ, LLC v. Am. Guar. & Liab. Ins. Co.*, 2023 U.S. Dist. LEXIS 49026 (N.D. Ind. Mar. 23, 2023); *Indiana GRQ, LLC v. Am. Guar. & Liab. Ins. Co.*, 2023 U.S. Dist. LEXIS 74222 (N.D. Ind. Apr. 28, 2023). IRG retains two claims for trial—contract and bad faith.

Mr. West performed consulting services for McLarens and Charles Taylor (retained independent adjusters) and the insurers. He currently serves as the President of R.A. West Associates, Inc—an environmental consulting firm that specializes in insurance-related environmental issues investigation and management. He has eighteen years of experience in this line of work. Since 2002, he has served as a Fellow of the Institute of Hazardous Materials Management and, since 2016, as Distinguished Diplomate of the Institute of Hazardous Materials Management. He has a bachelor's degree in chemistry and has earned nineteen credits toward a master of science in analytical chemistry. He has various registrations and certifications as a hazardous and environmental inspector and manager. He is a member of several professional organizations, including the American Society of Testing and Materials, American Chemical Society, National Association of Environmental Professional, National Association of Hazardous Waste

Generators, Hazardous Materials Control Resources Institute, American Society of Safety Engineers, and Environmental Assessment Association.

The insurers offer Mr. West as both a fact and opinion witness. He is generally expected to opine that the Toxic Substances Control Act (TSCA) is not implicated by the remediation work expected at the site and that the PCBs released from the transformers were not a result of the August 2016 flood. His report also addresses the report of Dr. B. Tod Delaney.

### A. *Testimony about the TSCA's Applicability.*

IRG argues that Mr. West's opinion should be excluded as unreliable in light of the Environmental Protection Agency's (EPA) March 28, 2023 email saying, "Based on my understanding of the PCB sources of the release to the basement containing high concentrations (> 500 ppm), yes, I would say that cleanup of residual PCB is subject to the TSCA requirements at 761.61." The court has excluded these belatedly disclosed emails from trial, rendering IRG's argument moot. Even if these emails weren't excluded, contradictory statements and conclusions by witnesses are the exact questions of fact tasked to the jury to determine. This is no less true when the EPA representative who wrote the email wasn't disclosed as a witness and won't be present to testify.

IRG also argues that Mr. West's opinions are outdated, thus unreliable and unhelpful, because of this EPA email. Expert testimony must originate from reliable principles and methods. Fed. R. Evid. 702(c). *Daubert* helps "to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996); *accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Aside from arguing merely that Mr. West's opinions are incorrect, IRG hasn't pointed to any unreliable principles or methods or the absence of sufficient facts or data for this opinion. Differing conclusions alone don't show that Mr. West's opinion is unreliable or unhelpful. *See* Fed. R. Evid. 702; *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (analysis focuses on methods, not conclusions).

B.    *Release of PCBs from Transformers.*

IRG argues that Mr. West's opinion that the PCB contamination at the facility was not a result of the flood isn't helpful to the jury because the insurers already paid for PCB remediation at the site. An opinion must aid the jury to understand the evidence or decide an issue of consequence—what the law commonly calls fit. *See* Fed. R. Evid. 702(a). Within the *limine* context, the insurers agreed not to introduce evidence or offer arguments that the policies foreclosed coverage, except Interstate's pollution exclusion and scope of damages. Mr. West's opinion will aid the jury with the questions of scope.

IRG also contends that Mr. West lacks sufficient credentials and proper methods to opine on the release and movement of PCBs and the normal operations of the facility's transformers. Mr. West concludes that the PCB contamination discovered after the flood was not caused by the flood. He says the facility's transformers (with PCB-based oils) were intact after the flood—save for a cracked sight glass on the eleventh transformer. He opines that PCBs could not have come through this cracked sight glass. Instead, he explains the presence of PCBs on the property through PCB volatilization (vaporizing) and through "burping" of this PCB vapor by the transformers during normal operation.

1.    *Ability of PCBs to Travel Through the Cracked Sight Glass.*

Mr. West says the PCBs could not have moved through the cracked sight glass on the eleventh transformer during the flood. For this conclusion, Mr. West relies on (1) the scientific principles that PCBs are denser than water and are not miscible (capable of being mixed) and (2) the crack being small enough to avoid seepage. As support, he cites his own personal observations of the transformers and the facility, his knowledge and experience with hazardous chemicals, and Steve Benson's (Herrman & Goetz, Inc.) inspection of the transformers.

Mr. West explains that the density of Pyranol dielectric oil (used in the transformers) is 13.5 pounds per gallon, or approximately 1.6 times denser than water. Such information would be readily available or calculable from the product's material safety data sheet or other published information. It is

4

well known that a denser substance will sink in water. Though IRG calls this principle of density irrelevant, Mr. West utilizes it to illustrate why the PCBs would unlikely escape through a small crack toward the top of a transformer. Mr. West's combination of scientific principles and chemical knowledge provides a credentialed and reliable basis for this opinion. *See Kumho Tire*, 526 U.S. at 141 (noting flexibility of the admissibility analysis).

Mr. West also relied on information from Mr. Benson (an electrical specialist), which he may do without merely parroting his separate opinion. *See United States v. Truitt*, 938 F.3d 885, 891 n.1 (7th Cir. 2019); *see also* Fed. R. Evid. 703. From his inspection, Mr. Benson found that only one (the eleventh) transformer had a cracked sight glass. He said there was a layer of water over the PCB oil in the transformer. Mr. Benson reported that all the units were full of fluid upon his inspection after the flood. This information lends additional reliability to Mr. West's methodology. *See Daubert*, 509 U.S. at 592; *Walker v. Soo Line R.R.*, 208 F.3d 581, 588 (7th Cir. 2000) ("courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable").

Mr. West also personally observed the cracked sight glass on the side but near the top of the transformer in October 2016. He saw that the sight glass was cracked but intact and not broken out. He says PCB dielectric fluid is thick, so it would prove difficult to leak out of this crack, though he relies on Mr. Benson's opinion that it could not. Mr. West observed some oil staining on the containment platform under the transformer but no drippage stains from the sight glass. In short, he says the PCB fluid's existence below the layer of water—due to its density—would make it unlikely to have drained out of the cracked sight glass near the top of the transformer. Any concern about his principles, methodology, or data here goes to weight, not admissibility, and can be challenged on crossexamination. *See SCCI Hosps. of Am., LLC v. Home-Owners Ins. Co.*, 517 F. Supp.3d. 942, 954 (N.D. Ind. 2021).

2. *Transformers' Distance from High Levels of PCBs.*

Mr. West opines that the location of the concentrated PCB sampling (716 parts per million on a sump in the basement) in comparison to the transformers' locations makes the causal connection with the transformers unlikely. In his report, he says the substations with the transformers are in the facility's tunnel complex below the basement's elevation and approximately 100 to 900 feet from the basement. He explains that he looks for a "consistent pattern of distribution" or "contiguous process of release" of the substance to determine a causal connection. He says high levels of PCBs weren't present in the vaults containing the transformers or the tunnels, and chip samples from the transformer stations failed to demonstrate a connection.

Mr. West based his opinion on the various PCB samples taken throughout the facility and concluded a lack of connection because of the distal locations of the transformer and the high PCB sample. This opinion is also based on his experience looking for consistent patterns of distribution. He explained the link between his data and his conclusion. *See United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). IRG doesn't question the reliability of the samples, and any weight to be given his opinion and method of looking for a pattern distribution is the jury's job.

3. *Ability of PCBs to Travel by Water to the Basement Sump.*

Mr. West opines that it is unlikely that any PCBs that may have leaked from the transformers could travel the distance between the transformers and the basement sump. Given the concentration level, he says debris unlikely carried the PCBs there for this "would include moving that concentration from a substation to a tunnel down 900 feet or at least 100 feet down into the basement, find[] its way to a sump, and concentrate in that sump in a small patch of scum material."

Mr. West observes that PCBs, notwithstanding their greater density, are lipophilic—meaning they like oils, not water—and will tend to aggregate as oils or float with debris materials. He says the high sample of PCBs (716 ppm) came from scum (organic matter) in the sump. IRG challenges his conclusion

6

that these PCBs unlikely traveled 900 feet as unsupported by published or accepted scientific studies, but this is but one of many factors adjudging the validity of an expert's methodology, *see Daubert*, 509 U.S. at 593-94; and, on this record, it has less bearing on this method's reliability.

Mr. West's opinion is based on more—particularly his method of looking for consistent patterns of distribution or some contiguous process of release, a method he calls common in environmental sciences. But here, according to his opinion, no such pattern of distribution appeared contiguously to make this theory of debris distribution along a distance of three football fields as likely. He calls it remote given that reality. IRG argues that Mr. West has offered no reason why PCBs could not travel 900 feet in debris; but, in truth, he offers a recognized method and data to back the opinion up.

    4.    *The Distribution of PCBs from Transformer Burping and PCB Volatilization.*

IRG challenges Mr. West's opinion that PCB dielectric fluid volatilized and condensed in debris particles or cooler surfaces over the course of time and then were further distributed by the flooding of water settling on surfaces to be remediated. Mr. West says, when dielectric fluid rises to 316 degrees Celsius, it volatilizes (creates vapor). He theorizes that these transformers could heat 300 to 500 degrees and then release PCB-based vapor through their vents. He says all transformers are designed to release atomized or vaporized air, including PCBs. He calls this a design parameter of General Electric or Westinghouse transformers, the kind at issue here, to ensure any air expansion doesn't break certain parts of the transformer. This release of air from a transformer is called "burping."

Mr. West says the presence of PCBs in the facility is most likely from volatilization and transformer burping. As support, he notes that, throughout the 300-400 foot tunnels and on insulation wrapping pipes in these tunnels, low PCB levels were detected (less than 50 ppm). He opines that these low PCB levels, and consistently over hundreds of feet, are more likely the result of distribution through vaporization rather than distribution by water.

7

IRG challenges Mr. West's qualifications as a chemist to opine about the design features and operation of transformers. Knowledge can be developed in myriad ways. It just cannot be "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. No matter some seeming fluency in deposition testimony about the transformers, the fact remains that the insurers offer little defense to this argument about his lack of credentials. Mr. West repeatedly recalls in testimony that he isn't an electrical engineer. Specialized knowledge may presuppose that a person has spent significant time gaining hands-on experience without need of formal education or industrial work, but the insurers offer no record that Mr. West has done so.

The insurers advance one thing—citing *Am. Premier Underwriters, Inc. v. GE*, 14 F.4th 560 (6th Cir. 2021)—which is anything but a credential. This case concerned the environmental remediation of PCBs at four railyards as a result of burping liquid-cooled transformers, designed and manufactured by General Electric in the 1930s and 1940s. The transformers, used on electrical railcars, generated a great deal of heat and caused Pyranol to escape as part of their natural function. Mr. West attached this opinion to his report but admits he never read it. He instead read an attorney's summary from a subscription service.

Mr. West says the point of citing this case was just to show that burping can occur, but he offers no credentials (or factual basis) to say burping occurs or occurred with the specific transformers at IRG's facility. His report remains devoid of any information about IRG's particular transformers, and the insurers cite none that served as the basis for his knowledge.[1] *American Premier* concerned liquid-cooled transformers on electrical railcars, whereas Mr. West concedes that IRG had bigger, thermal fluid cooled, units. On this record, he speculates that they would operate similarly; but, when asked whether burping would be more common in the railcar type, he confesses that would require an electrical engineer's expertise.

---

[1] At one point, Mr. West cites attachment five in a sentence that mentions in passing the "design function of these GE units," but this attachment concerns the PCB samples found in the facility by Burns & McDonnell otherwise discussed in that same sentence, not any source material on IRG's transformers.

Mr. West says he has not personally worked on PCB releases from transformers. Knowing that transformers often have pressure relief devices isn't enough. His opinion assumes certain heat levels by IRG's transformers, but he cites no basis for his numbers other than his say-so. He says burping would be a necessary function of any transformer; perhaps that is so, but the insurers offer no experience with transformers, no training with transformers, no prior study or investigation of transformers, and no other hands-on or field knowledge to support Mr. West. He once edited—not wrote—a chapter in a publication that involved PCB releases from transformers; but again there is no development on this record that this occurred because of burping or involved the dynamics that Mr. West wants to say occurred with IRG's types of transformers. The insurers never cite any other report or electrical engineer on which Mr. West relies for this opinion. Indeed, although he assumes some venting component, he admits he never verified these transformers actually had such a feature. Mr. Benson provides some electrical opinions that aid Mr. West, but not on this front.

However obtained, qualifications must provide a foundation for an expert to answer the specific question. *See, e.g., Gayton v. McCoy*, 593 F.3d 610, 617-18 (7th Cir. 2010) (allowing physician to opine about effects of vomiting on body but not pharmacological effects of drugs on heart). The insurers bear the burden of establishing the admissibility of Mr. West's opinions. *See Varlen*, 924 F.3d at 459. Perhaps these transformers burp too, perhaps their operation could occur at the requisite temperature to volatilize PCBs, but Mr. West cannot say it—not on this scant record and not by the insurers merely advancing his say-so.[2] On this precise point, the insurers merely recite Mr. West's deposition saying all transformers burp, but more is needed than just his say-so. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that

---

[2] As a chemist, Mr. West could opine about the requisite temperature for volatilizing PCBs, but he cannot say these transformers reached this temperature to make his opinion "fit" this case. The question isn't whether some transformers can burp, but whether these did burp because they reached requisite temperatures and with that functionality that would release PCB-based vapor.

is connected to existing data only by the *ipse dixit* of the expert"); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term").

IRG also argues that this burping theory lacks reliable principles and methods. Expert testimony must originate from reliable principles and methods. Fed. R. Evid. 702(c). *Daubert* helps "to make sure that when [experts] testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen*, 78 F.3d at 318; *accord Kumho Tire*, 526 U.S. at 152. Mr. West offers nothing reliable by way of a method or recognized principles here, just his say-so. Nor has he validated this theory—no testing of these transformers (or other units of this or similar type), no studies or publications that discuss this so-called universal dynamic or the heat load or output of transformers, and no general acceptance of this burping theory by electrical engineers or other relevant field. *See Daubert*, 509 U.S. at 593-94. The burden rested with the insurers—they have not met it for this opinion.

## CONCLUSION

Accordingly, the court GRANTS IN PART and DENIES IN PART IRG's motion to exclude Robert West's opinions [ECF 146], excluding for trial his opinions only as outlined in this order.

SO ORDERED.

May 14, 2023

*s/ Damon R. Leichty*
Judge, United States District Court