UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

INDIANA GRQ, LLC,

Plaintiff,

v.                                                              CAUSE NO. 3:21-CV-227 DRL

AMERICAN GUARANTEE AND LIABILITY
INSURANCE COMPANY *et al.*,

Defendants.

<u>OPINION AND ORDER</u>

Indiana GRQ, LLC (sometimes called IRG) owns a facility in South Bend used for commercially-leased tenant and warehouse space. IRG sued seven insurance companies after flooding caused significant electrical and environmental damage to the facility. The storm set a new South Bend record for rainfall. A market of seven insurers paid a small part (about $2.68 million) of the owner's claimed losses (over $24 million more) and eventually denied other coverage. IRG sued for breach of contract and bad faith.

After an eight-day trial, a jury found American Guarantee and Liability Insurance Company, Starr Surplus Lines Insurance Company, Chubb Custom Insurance Company, General Security Indemnity Company of Arizona, Axis Surplus Insurance Company, Ironshore Specialty Insurance Company, and Interstate Fire & Casualty Company liable for breaching their insurance policy. The jury found all seven insurers liable for electrical damages and all but Interstate liable for environmental damages under a contract theory. The jury also said all seven insurers acted in bad faith. The jury awarded over $112 million—over $24 million in total compensatory damages, and then $12.5 million in punitive damages against each of the seven insurers.

After the verdict, the insurers flooded the docket with post-trial motions. Certain insurers[1] renewed their Rule 50 motion or alternatively asked for a new trial or alteration of the judgment. Interstate joined this motion and filed one of its own. Ironshore also filed a motion asking the court to set aside judgment under Rule 60(b)(1). IRG filed motions for prejudgment interest, attorney fees, and costs. The court now denies all motions and upholds the jury's verdict, except (1) under Rule 59 to amend the judgment to apportion the electrical damages among the seven insurers according to their contractually-fixed percentages of coverage, (2) to award prejudgment interest, and (3) to award certain costs.

RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW

A. *Standard.*

Rule 50(b) allows a party that brought a motion for judgment as a matter of law pursuant to Rule 50(a) during trial to renew the motion after the jury's verdict. Fed. R. Civ. P. 50(b). The court's ruling on the motion may "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).

"According to our civil justice system, as enshrined in the Seventh Amendment to the Constitution, the jury is the body best equipped to judge the facts, weigh the evidence, determine credibility, and use its common sense to arrive at a reasoned decision." *Massey v. Blue Cross-Blue Shield*, 226 F.3d 922, 925 (7th Cir. 2000). The court will not overrule a jury verdict lightly, and only then if it concludes that "no rational jury could have found for the plaintiff." *Waite v. Bd. of Trs. of Ill. Cmty. Coll. Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005) (citation omitted); *see also Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008). "This is obviously a difficult standard to meet." *Waite,* 408 F.3d at 343.

In analyzing a Rule 50(b) motion, the court "construes the evidence strictly in favor of the party who prevailed before the jury." *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012). The court reviews the entire record, but "it must disregard all evidence favorable to the moving party that the jury

---

[1] "Certain insurers" each time excludes Interstate.

is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). "The court does not make credibility determinations or weigh the evidence." *Passananti*, 689 F.3d at 659. "[T]he question is not whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence" to reach its verdict reasonably. *Massey*, 226 F.3d at 924.

B.   *Damages for Electrical Equipment.*

IRG had eleven transformers (in six substations) at the site. After the flood, and specifically in 2017, IRG replaced one transformer, though others needed replacement. The insurers paid IRG only for what the company expended to replace this one transformer. They denied coverage for the remainder.

The insurers renew their Rule 50(a) motion that they have already paid the "necessary cost actually expended in repairing, rebuilding or replacing" on the same site—their view of replacement cost under the policy [Ex. 45 § 6.22.01.03]. They say this sum is all the replacement cost IRG may receive because that is all the replacement the company performed and because no other replacement or repair work was started within the two-year period after the loss [*id.* § 6.22.02]. From there, the insurers argue alternative positions—either IRG must receive $0 for further electrical losses, or it must receive at most actual cash value of $2,194,702 (per testimony from Paul Christoferson).

Actual cash value is "pure indemnity[]. Its purpose is to make the insured whole but never to benefit him because a [flood] occurred. Replacement cost coverage, on the other hand, reimburses the insured for the full cost of repairs, if he repairs or rebuilds the [structure], even if that results in putting the insured in a better position than he was before the loss." *Seeber v. Gen. Fire & Cas. Co.*, 19 N.E.3d 402, 409 (Ind. Ct. App. 2014) (citation omitted). The court is guided by the policy. *See State Farm Mut. Auto. Ins. Co. v. Jakubowicz*, 56 N.E.3d 617, 619 (Ind. 2016).

The policy starts with a general proposition—that the loss amount will be based on § 6.22.01's replacement cost, "unless a specific valuation applies" [Ex. 45 § 6.22.01]. The insurers pass over this exception and jump to the replacement cost valuation in § 6.22.01 that leads to their point that electrical

damages (over and above what they paid already) should be $0. But they jump too fast, for the policy has several specific valuation provisions for a variety of items—raw materials, branded merchandise, improvements, to name a few [*id.* § 6.22.04]—and for purposes here, non-repairable electrical equipment [*id.* § 6.22.04.09]. There the policy requires the insurers to pay the "cost to replace non-repairable electrical or mechanical equipment [] with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages, represents an improvement in function, or forms part of a program of system enhancement" [*id.*].

Both in opening and closing, IRG argued that its transformers were destroyed in the flood—*i.e.*, they could not be repaired. A reasonable jury could say the transformers were in good working condition before the flood [Tr. 341]. An electrician responsible for monthly maintenance work at the Studebaker Business Center since 1979 (Steve Benson) testified that the transformers were destroyed and non-salvageable after the flood [Tr. 346 ("Q. Were the transformers usable after the flood or were they completely damaged? A. No, they couldn't be salvaged. Q. Say it again? A. They could not be salvaged. Q. So they were completely gone? A. They were gone.")]. Even McLarens (the adjusters for all the insurance carriers [Tr. 1127]) believed that the transformers could not be salvaged and supervised "replacing each damaged substation" at the start [Ex. 55 at 2592; Ex. 124 at Zur1705]. All transformers were removed from the facility [Tr. 499-500, 531, 796, 1022].

IRG's broker discussed the destroyed transformers with the insurers [Tr. 701]. Representatives of the insurers testified and seemed to understand the transformers were covered and destroyed but assumed that IRG had no desire to replace its lost power [Tr. 1122, 1163-64, 1166]. IRG adduced evidence of a conservative cost to replace the "lost equipment" of $11,577,827 [Tr. 778, 793; Exs. 12, 262]—exactly what the jury awarded. The insurers cite no evidence today that IRG's electrical equipment was repairable to take this case outside the specific valuation in § 6.22.04.09. A reasonable jury thus had

a sufficient evidentiary basis to award replacement costs for the electrical equipment under § 6.22.04.09, and outside the operation of what the insurers preferred as a replacement cost valuation in § 6.22.01.

Most replacement cost provisions require an insured to have completed replacement work before receiving replacement cost, *see, e.g., Schweitzer v. Am. Fam. Mut. Ins. Co.*, 16 N.E.3d 982, 990 (Ind. Ct. App. 2014), but the insurers here wrote their replacement cost provisions differently. Nothing within § 6.22.04.09 requires actual expenditures for IRG to recover replacement cost; it plainly just isn't written that way. *See Erie Indem. Co. v. Est. of Harris*, 99 N.E.3d 625, 630 (Ind. 2018) (plain language controls).

And another provision within the policy, as a gloss on § 6.22.04.09, isn't written that way either. "If there is direct physical loss of or damage to Covered Property for which repair, rebuilding or replacement has not *started* within two (2) years from the date of direct physical loss or damage, the Company will not be liable for more than the actual cash value of the property destroyed" [Ex. 45 § 6.22.02 (emphasis added)]. The two-year period here lasted from August 15, 2016 to August 15, 2018. The record establishes for a reasonable jury that IRG started replacement work, not least by replacing the one transformer in 2017 and removing the other transformers right after the 2016 flood. And the insurers offer nothing within the policy or any legal authority that requires the jury to parse out for replacement cost, under this provision as written or alternatively under § 6.22.04.09,[2] electrical equipment transformer by transformer, or switch gear by switch gear, or bolt by bolt—particularly when the record establishes for a reasonable jury that this was a fully integrated electrical system (a "Cadillac") designed for redundancy and reliability [Tr. 354, 456, 467-69, 484, 495].

This record and these points suffice to deny the Rule 50(b) motion on this issue. Nevertheless, the court addresses the thrust of the insurers' alternative argument, albeit briefly. Even if the court were

---

[2] Section 6.22.04.09 permits the recovery of the "cost to replace" electrical equipment without requiring commencement or completion. It is not written to afford replacement cost based only on actual expenditures. Even were the court to read § 6.22.02 as an additional requirement to § 6.22.04.09, the record again establishes that replacement work on the electrical equipment had started within the operative period.

to entertain the alternative replacement cost provision that the insurers prefer, the court continues to view, as illusory and non-sensical, the insurers' interpretation that, because IRG spent no money other than for replacement of one transformer, the additional replacement cost under § 6.22.01 would be $0. Under the insurers' opening interpretation, this policy would seem to permit the insurers to pay $0 whenever an insured had not begun any repair or replacement work [Ex. 45 § 6.22.01.03], no matter the policy's seeming allowance for the cost of replacement without that work [*id.* § 6.22.01.02] or even when this work had started [*id.* § 6.22.02]—a pitting of provisions that reads these provisions less than harmoniously, *see Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 252 (Ind. 2005), and without construing any lingering ambiguities against the insurers, *see Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985). The court denies the Rule 50(b) motion accordingly.

C. *Damages for Environmental Remediation.*

Certain insurers renew their Rule 50 motion regarding environmental damages. First, they argue that IRG presented no evidence of any enforcement of the Toxic Substances Control Act (TSCA) or directive from a regulatory agency that IRG needed to comply with TSCA in removing the polychlorinated biphenyls (PCBs) onsite. They say IRG's remediation claim was based on speculation that the Environmental Protection Agency (EPA) might take action to enforce TSCA in the future.

At the start, these insurers leave something to be desired in their briefing, not just before at the Rule 50(a) stage but now at Rule 50(b) review—namely, what "enforcement" means in their policy. They offer neither definition nor legal authority. It matters. The policy's decontamination provision requires not just a law regulating contamination (including pollutants) to be in force, but the "increased cost of decontamination" to be "a direct result of *enforcement* of such law" [Ex. 45 § 5.02.07 (emphasis added); *see also id.* § 7.09]. Even without definition, the insurers argue that the trial record lacked evidence of any formal enforcement action, order, or correspondence from the EPA demanding or suggesting that IRG must comply with TSCA. In fairness, IRG offers no definition of this term either, and just invites the

court to adhere to one of its Rule 50(a) rulings that no explicit directive was necessary for the jury to find that damages could include a TSCA-related expense or cleanup cost.

The court once more starts with the policy's plain language, *see Erie Indem.*, 99 N.E.3d at 630, and endeavors to determine how the Indiana Supreme Court might define the term, *see BMD Contractors, Inc. v. Fid. & Deposit Co. of Md.*, 679 F.3d 643, 648 (7th Cir. 2012), though the court has not been offered any developed Indiana law on this point. Enforcement means the act of compelling compliance with a law. *See Enforcement*, Black's Law Dictionary (11th ed. 2019) ("the act or process of compelling compliance with a law, mandate, command, decree, or agreement"); *Enforcement*, Oxford English Dictionary (last visited March 6, 2024) ("the enforcing or compelling the fulfilment of (a law, demand, obligation)"). Most courts have interpreted "enforcement" within similar provisions of insurance policies to mean some directive or action to compel compliance with the law, *see AMTRAK v. Aspen Specialty Ins. Co.*, 661 F. Appx. 10, 14-15 and n.4 (2d Cir. 2016) (requiring regulatory directive to establish "enforcement"); *Sarno Realty, Inc. v. Selective Ins. Co. of the Se.*, 2022 U.S. Dist. LEXIS 59562, 26-27 (D. Mass. March 31, 2022) ("the term 'enforcement' necessarily contemplates some form of statement or action undertaken by an official with authority to enforce an ordinance or code"); *Godwin v. State Farm Fire & Cas. Co.*, 518 P.3d 1045, 1053 (Wash. Ct. App. 2022) (enforcement means what a building official requires, not what the code might require), even the reasonable threat of such action, *see, e.g., N.A. Water Sys., LLC v. Allianz Underwriters Ins. Co.*, 2005 U.S. Dist. LEXIS 8526, 14 (N.D. Ohio May 10, 2005) ("threat of enforcement" enough); *State Farm Fire & Cas. Co. v. Metro. Dade Cnty.*, 639 So.2d 63, 66 (Fla. Ct. App. 1994) ("urging of compliance or fulfillment" enough, whether "before or after" agency "takes action"). Indiana has adopted a similar interpretation of "enforcement" in interpreting its Tort Claims Act. *See Mullin v. Mun. City of S. Bend*, 639 N.E.2d 278, 283 (Ind. 1994) ("the scope of the term 'enforcement' is limited to those activities in which a governmental entity or its employees compel or attempt to compel the obedience of another

to laws, rules or regulations, or sanction or attempt to sanction a violation thereof"); *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002) (same).

With this sharper lens, the court turns to the record. Justin Lichter (IRG's vice-president) testified that IRG is "working on putting together a cleanup plan now that [the EPA] confirmed that it is TSCA-regulated" [Tr. 629]. The court excluded *in limine* certain belatedly-disclosed written communications with the EPA, but this testimony was invited by the insurers. A reasonable jury would not need to speculate that this was merely IRG's opinion because the company hired Hull & Associates to "coordinate with [the] EPA and IDEM [] for the next steps in the cleanup" [Tr. 599-600]. IRG had "coordination calls" with the EPA on next steps of the work [Tr. 629]. Hull & Associates prepared a cost estimate for TSCA-mandated remediation in June 2019, and explained that the remediation would occur either under TSCA's PCB remediation waste standards or its continued use standards—ranging in cost between $23.9 million and $37.5 million [Ex. 35].

Dr. Tod Delaney, a Ph.D. environmental health engineer, testified as an expert in his field, and particularly the environmental impacts that result from the release of PCBs [Tr. 960]. He testified the EPA knew [Tr. 1008], though he expressed concern that the EPA had not been notified sooner because this would mean the decontamination work would cost more [Tr. 1009].[3] Dr. Delaney testified that the EPA needed to approve the clean-up plan [Tr. 995]; but, from this record, that seems to have been in progress, and a reasonable jury could find that this was being compelled by the EPA because of TSCA. *See supra*. More than this, Dr. Delaney testified TSCA would apply with PCB samples of one part per million (ppm), though in most cases the EPA looks at PCBs that are 30-50 ppm as opposed to one [Tr.

---

[3] Recall this point when the court turns to the bad faith claim, particularly when Jeff Pope, seemingly working for IRG, was aware of TSCA levels of PCBs—twice aware of even testing as high as 50 parts per million—but never advised IRG to report these levels to the EPA [Tr. 188, 272].

1000; *see also* Tr. 143, 159].[4] He explained to the jury that IRG had samples "definitely above TSCA" [Tr. 1000-1001]. And the record offered a reasonable jury evidence of levels as high as and higher than 50 ppm [Exs. 16 (Microbac testing), 49, 155, 216; Tr. 171, 178, 272, 993, 1322].

In short, a reasonable jury could find that the EPA was compelling the clean-up—that is, enforcing TSCA—and that there was cause to do so given the samples identified above 50 ppm and testimony from experts or those whom the jury could credit on this point.

Certain insurers next argue that the environmental damages were speculative, not reasonably certain. *See Country Contractors, Inc. v. A Westside Storage of Indianapolis, Inc.*, 4 N.E.3d 677, 694 (Ind. Ct. App. 2014); *Karma Int'l, LLC v. Indianapolis Motor Speedway, LLC*, 938 F.3d 921, 926 (7th Cir. 2019). They say the $13,141,216 awarded for environmental damages was based on the unproven assumption that the basement tunnels and substations would need to be remediated pursuant to TSCA, but the precise scope of clean-up was unknown. Under Rule 50(a), the court determined that IRG presented sufficient evidence on this front. The court sees it no differently today.

Dr. Delaney testified with reasonable certainty that the cost would be somewhere between $11.1 million and the higher $18 million and $20 million estimates [Tr. 1014, 1016]. When asked about whether these numbers were certain, he said, "There is not uncertainty in the numbers. There is uncertainty in what the EPA is going to require since it has been such a long period of time between the event and the possible remediation" [Tr. 1031; *see also* Tr. 1014-15 (differentiating between low occupancy and high occupancy clean-up)]. Dr. Delaney later clarified that "[t]here will be remediation," and his estimates were "pretty spot on" [Tr. 1031]. Dr. Delaney testified further that an approximate 17 percent increase for

---

[4] Robert West, the PCB remediation expert for the insurers, attributed the cause of certain high sampling to something other than the flood, but he too recognized one sample that triggered TSCA, particularly because it exceeded 50 ppm [Tr. 1582-83].

inflation should be added to the low-end estimate [Tr. 1014].[5] The jury wasn't unreasonable by taking the most conservative estimate for environmental remediation and adjusting for inflation—incidentally, the very same numbers that IRG asked for in its proof of loss back in June 2020 [Ex. 12 (requesting $11,165,010 and adjusting for inflation, $13,141,216]. The court thus denies the Rule 50(b) motion here.

D.  *Bad Faith Claim (Jeff Pope).*

The conduct of these insurers vis-à-vis Jeff Pope was disturbing, and the jury reasonably viewed it just so in awarding punitive damages against each insurer. At the close of IRG's case-in-chief, all insurers sought judgment as a matter of law under Rule 50(a), arguing that the evidence did not support the company's bad faith claim. The court denied the motion, summarizing the evidence and concluding that IRG presented more than enough evidence for a reasonable jury to find bad faith [Tr. 1436-40]. The insurers renew their motion on the bad faith claim under Rule 50(b), arguing that IRG failed to meet its burden to demonstrate that they breached their duty of good faith and fair dealing under any standard, much less by clear and convincing evidence.

"[A]n insured who believes that an insurance claim has been wrongly denied may have available two distinct legal theories, one in contract and one in tort, each with separate, although often overlapping, elements, defenses and recoveries." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind. 1993). Indiana law has long recognized a legal duty, implied in all insurance contracts, for the insurer to deal in good faith with its insured. *Id.* at 518. IRG was required to prove by clear and convincing evidence (1) that there was no legitimate basis for an insurer's conduct, (2) that the insurer acted with dishonest purpose, furtive design, or ill will, and (3) that the insurer's conduct was a responsible cause of damages to IRG. *See WellPoint, Inc. v. Nat'l Union Fire Ins. Co.*, 29 N.E.3d 716, 727 (Ind. 2015); *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005); *Hickman*, 622 N.E.2d at 518-19; *Brandell v. Secura Ins.*, 173 N.E.3d

---

[5] The jury heard testimony about this same 17.7 percent as a reasonable CPI index on the electrical damages [*see also* Ex. 262].

279, 284-85 (Ind. Ct. App. 2021) (articulating four types of conduct that might constitute bad faith and requiring "a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will").

The record offered a reasonable jury clear and convincing evidence of bad faith. In December 2016, IRG hired Jeff Pope of Burns & McDonnell Engineering Company to represent IRG in connection with the remediation of PCBs at the facility [Tr. 139]. This is an obvious point, but it bears repeating at the start—his job was to represent the company and to work for its benefit, not the insurers.

On December 23, 2016, Mr. Pope sent a proposal for cleaning the substations (Task 1), with onsite clean-up documentation and confirmation sampling (Task 2) to Peter Yanson, IRG's vice-president [Ex. 199; Tr. 153]. This proposal was based on a non-TSCA PCB remediation because, in December 2016, Mr. Pope believed the PCB levels in the substructure weren't above 50 ppm [Tr. 158-159]. On February 27, 2017, McLarens issued a report (No. 4) [Ex. 122], co-authored by Micah Thoman. Mr. Thoman testified about ongoing discussions among the insurance team and the insured at that time about whether TSCA would apply [Tr. 1327]. In March 2017, Mr. Pope submitted a work plan to IRG for cleaning substations 1 and 4 vaults and the utility tunnel at non-TSCA standards [Ex. 32]. Everyone understood, including Mr. Pope, that TSCA levels of contaminants would require notice to the EPA and an altogether different remediation plan.

A reasonable jury could find that something by way of a furtive design or dishonest purpose occurred soon thereafter by the insurers in early 2017 when they used him as their counter-agent, and later culminated in Mr. Pope becoming a turncoat consultant to work with the insurers by November 2018 (when he signed a contract with them about this same project), and reasonably without Mr. Pope seeing that his allegiances had been so turned. Despite elevated PCB levels, Mr. Pope's proposed plan to IRG was "presumed to be PCB-impacted, non-TSCA waste (below 50 mg/kg) and shall be managed accordingly until it can be properly characterized for disposal" [Ex. 32]. The burning question is why.

Just a month after his proposed remediation plan, on April 27, 2017, McLarens submitted another report to the insurers (No. 5)—this time surreptitiously listing Mr. Pope as part of the adjustment team rather than as a representative of the insured [Ex. 416 at 416.003]. On July 25, Mr. Thoman emailed Mr. Pope about his "concern[] with separating pumping in the tunnels due to PCB issues vs. pumping due to PCB issues in the ground water" [Ex. 90]. He asked Mr. Pope to be "very clear to keep these separate" in his upcoming meeting with the Indiana Department of Environmental Management (IDEM) [*id.*]. He also said he expected that IDEM would "continue[] to insist on pumping due to ground water even when the tunnels are clean" and that "we need to move fast to *distance ourselves from it and protect the insurers*" [*id.* (emphasis added)]. The insurers offered no innocent explanation for why their representative was directing the conduct and strategy of a consultant retained to act on behalf of IRG. Notably, no one from IRG was copied on this communication.

By August 2017, IRG's site manager (Jerry Graf) observed, and told Mr. Pope and the insurer representatives in an email, that the PCB test results were "running a little HOT" and that until they reached a non-detect level, "we will have to pay for disposal" [Ex. 109]. The next day, Mr. Thoman deleted the IRG site manager, communicated directly with Mr. Pope only, and copied only his colleague and one expert consultant working for the insurers (a cost estimator). Mr. Thoman directed Mr. Pope to investigate this and told him "[w]e might need to retain you on the adjustment side of this to run further test[s] and determine if it is indeed a historical issue" [*id.*]. A historical issue would have provided the insurers a basis to deny coverage. Mr. Pope testified he understood that is what it meant, though he still was under contract with IRG [Tr. 240]. The insurers offered no innocent explanation, not one a reasonable jury had to accept, for their furtive conduct. No evidence was presented that this direction or strategy for IRG's retained consultant was communicated with IRG, much less approved.

In September 2017, Mr. Pope received PCB test results from the Microbac laboratory [Tr. 179]. The laboratory reported PCB levels over 50 ppm (including samples showing 90, 150, and 210 ppm) [Ex.

16, App. B]. Mr. Pope understood the owner's obligation to alert the EPA but never once told IRG of these results; he just attached a complicated laboratory report where these results were buried to his proposed plan (a non-TSCA plan, mind you) and expected IRG to discover the discrepancy on its own [Tr. 178-80]. At trial, he admits these results could have made his plan different [Tr. 180]. Recall now that Dr. Delaney testified that delaying notice to the EPA made the remediation damages worse, so a reasonable jury could conclude that compensatory damages on the bad faith claim became coterminous to the compensatory damages on the environmental contract claim. *See Hickman*, 622 N.E.2d at 519-20.

The insurers weren't done. On September 18, 2017, IRG's site manager communicated with McLarens and Mr. Pope once more, noted an increase in PCB levels in the sump pump in the main tunnel, and said the drainpipes may have a large concentration of PCBs [Ex. 96]. That same day, Mr. Thoman followed up with Mr. Pope and Robert West (the remediation expert for McLarens and the insurers), copying only those affiliated with the insurers, noting that "we have a historical issue at hand with the ongoing PCB issues" and that "we need to draft a letter to the insured, potentially along with an in person meeting to go over these issues" [*id.*]. He further offered "[i]f there is anything we can put together to support our position (historical – not claim related) or any ideas you have, I welcome them" [*id.*]. He once more consciously removed IRG from this communication but coopted Mr. Pope's continued services.

In October 2017, Mr. Pope submitted his basement clean-up plan to IRG [Ex. 16], who approved it [Tr. 174]. Contemporaneous to this, Mr. Pope engaged in a call coordinated by McLarens, which called it a "call with *our experts*" [Ex. 9 at IFCC-3362]. No one from IRG was listed on the call, at least as described by McLarens. On November 13, Mr. Thoman emailed Mr. Pope, again copying only those affiliated with the insurers, and said he was "potentially work[ing] towards an early settlement; however, there ha[ve] been various road blocks on the way" and he would follow up with "much further detail and put a road map together to end our involvement" [Ex. 107]. Mr. Pope responded the same day: "I will

hold off on sending the work plan to IDEM until I hear back from you" [*id.*], indicating to a reasonable jury that his loyalties had been firmly shifted by the insurers, though at a time when his alliances by contract still rested with IRG. The insurers wanted to end their involvement in the claim and had enlisted IRG's consultant to work cross-purposes to what a reasonable jury could view as IRG's best interests. A furtive design it could be called, because once more everyone left IRG off the communication by design.

The insurers executed on this plan recommended by McLarens. On March 12, 2018, Mr. Thoman emailed Mr. Pope, copying only those affiliated with the insurers: "Jeff, [w]e are still a go tomorrow for a meeting at the JSH office. Anytime between 11:30 and [n]oon" [Ex. 299]. Mr. Pope does not recall telling IRG about this meeting [Tr. 208]. On March 14, Mr. Pope responded and proposed his consulting services to McLarens to prepare clean-up work plans for the Studebaker plant's basement decontamination [Ex. 92]. Two weeks later, Mr. Pope wrote to McLarens again about five outstanding invoices dating back to September 2017 [Ex. 298]—itself not a fact of concern except that Mr. Thoman replied that "we still await approval from the Market on your additional consulting fees" [*id.*].

On May 16, 2018, Messrs. Thoman, West, Pope, and Graf and others participated in a settlement meeting [Tr. 1292], which Mr. Thoman memorialized in a follow up email [Ex. 113]. On May 30, Mr. Thoman emailed Mr. Pope, Mr. West, and Mr. Stromeyer (again without IRG) inquiring whether any test results supported a non-TSCA cleanup [Ex. 113]. He said, "I am looking for anything that supports our position, even if indirectly" [Ex. 113]. Mr. Pope testified he found out that the PCB levels were over 50ppm "sometime in 2018 after we had completed the work for the tunnel clean-up" [Tr. 189], but he reviewed a Microbac laboratory report in September 2017 that showed PCB levels over 50ppm [Ex. 16]. On November 1, Mr. Pope sent Mr. Thoman his "proposal to provide consulting services" [Exs. 135, 154]. Mr. Thoman confirmed that the insurers accepted the proposal on November 7, telling Mr. Pope that he would "be splitting/making your invoice out to the members of the Market" [Ex. 134]. Mr. Pope never advised IRG that he—at best—was working for both sides [Tr. 198].

The arc of this story then comes full circle. In January 2019, McLarens asked both Mr. West and Mr. Pope to critique IRG's response on the environmental claim [Ex. 128]. They scheduled a meeting for February 6, 2019 [Exs. 5, 128]. The meeting concerned IRG's "latest paper addressing the seepage and pollution clean-up and our defense thereof" [Ex. 5]. After the meeting, McLarens directed Mr. Pope to disclose to the insurers "any documentation from the insured not previously seen" so the insurers could use the information to provide IRG with a specific list to continue the adjustment [Ex. 128]. McLarens likewise reviewed an expert report from Mr. Pope on February 14, 2019 [Ex. 5 at IFCC-C0233]. His work continued into August 2019 when Mr. Pope met not only with Mr. West and Mr. Thoman, but also the lawyers for the insurers [Ex. 126]. Two days after this meeting, the insurers sent IRG a coverage denial letter [Ex. 184].

On this record, a reasonable jury could find that directing IRG's consultant to work against the company's interests on remediation during the course of adjustment and when his interests were supposed to align with IRG, but also later hiring that very consultant who once worked for IRG on this same issue of remediation now to undermine the company's efforts for additional remediation or coverage, were in bad faith—an exercise of an unfair advantage over the insured with a furtive or dishonest design to protect the insurers (not the insured), pressure the insured toward a settlement, to elude TSCA-related decontamination obligations, and ultimately to deny coverage. *See Brandell*, 173 N.E.3d at 284-85. Indeed, a reasonable jury could find Mr. Pope's self-assessment refreshingly honest:

> Well, I mean the way you're characterizing my relationship here, it makes it look like I was, you know working both sides or working for one side, and I [] didn't believe I was at the time, but I guess somebody could look at that and make that determination [Tr. 255].

The insurers say they treated IRG exactly as they would treat every policyholder, and the court hopes not—as this jury reasonably concluded that they should not have acted the way they did. The insurers point to other testimony, aside from Mr. Pope's awakening in testimony, that might suggest an alternative

view of his role [Tr. 197, 254-55, 268], but the jury wasn't required to accept this alternative to the clear and convincing evidence of bad faith.

The insurers also renew their motion on the bad faith claim as it relates to the loss estimates. They point to Mr. Keating's testimony to argue that the only evidence presented to the jury shows that they withheld the Rough Order of Magnitude (ROM) because it was preliminary and prepared for internal use only. The court explained its focus was not on the ROM, but the later loss estimates from McLarens. The court denied this motion under Rule 50(a) because David Frangiamore (an expert) testified that this was a violation of industry custom or practice [Tr. 877-81, 883-84], and because Jeff Pikel testified that he was "astonished" that the cost estimates weren't provided after decades of experience as a broker [Tr. 703-04], all considered in light of what was transpiring then with Mr. Pope and when these loss estimates were being developed. No one has argued on Rule 50(b) (nor did anyone at Rule 50(a)) that IRG had not proven compensatory damages for this bad faith theory. Today the court merely determines that a reasonable jury could find that the nondisclosure of the cost estimates occurred with a dishonest purpose or furtive design (except Interstate) [ECF 176], and if nothing else use this as additional color of that conscious wrongdoing that would support a bad faith claim and those damages that flowed from their conduct vis-à-vis Mr. Pope.

Only Interstate adds to the arguments. At trial, under Rule 50(a), Interstate argued that IRG had not offered evidence of Interstate's bad faith because it never hired Mr. Pope. It claimed, and claims again today under Rule 50(b), that McLarens acted for all the other insurers, but not Interstate. This position is untenable on this record.

Interstate retained (along with other insurers) McLarens to act on its behalf and regularly approved its conduct. Shawn Keating (American Guarantee's National General Adjuster) testified that McLarens "had contact with all of the market" initially [Tr. 1127] and that "*all* of the carriers agreed to hire McLarens as the independent adjuster" [Tr. 1127 (emphasis added)]. McLarens provided reports

regularly to the market of insurers who then regularly reviewed, revised, or approved their conduct, and otherwise issued letters on behalf of all insurers [*see, e.g.,* Tr. 358, 1073, 1085-87, 1092, 1096, 1183].

Interstate also stipulated that it would not introduce any evidence that it acted independently of the market or should be considered separately, except as to its PCB policy exclusion [ECF 178]. Today is too late to pivot. McLarens, who represented all insurers (including Interstate), engaged and coopted Mr. Pope. Indeed, as early as April 25, 2017, Interstate saw that Mr. Pope had been shifted to the adjustment team rather than worked as IRG's consultant because McLarens reported it just so [Ex. 416]. He later sent his invoices to the market [Tr. 212]. No evidence was presented that Interstate was unaware, objected, or viewed the redirection and later retention of Mr. Pope as a rogue act by McLarens. The only evidence of an independent act by Interstate concerned a $360,000 ex gratia payment. *See infra.*

Interstate also argues that no evidence connected it with Mr. Pope because he consulted solely on the environmental claims, which Interstate's policy excluded. This misses the point. The argument might be worthwhile on the contract claim (and indeed was because the court granted Interstate's Rule 50(a) motion on its exclusion), but not the bad faith claim. The question is whether IRG presented sufficient evidence for the jury to find that Interstate, like all the insurers, acted in bad faith in furtively coopting Mr. Pope to its advantage to protect the insurers (not the insured), leverage settlement, elude TSCA, and deny coverage, such that Interstate caused IRG bad faith damages. A jury could reasonably say yes on this record.

Interstate had its exclusion in reserve, but it was not a silver bullet at the time that the market in concert executed its environmental redirection strategy with Mr. Pope.[6] Even if one day Interstate might enforce its exclusion of environmental losses, it was independently responsible and approving of McLarens' conduct on its behalf vis-à-vis Mr. Pope in such a manner as to have caused IRG bad faith

---

[6] Indeed, even before trial, the court explained that IRG could pursue against Interstate a theory of PCB encapsulation, but not removal [ECF 176]. IRG eventually abandoned the encapsulation theory during trial.

damages, even greater environmental losses according to Dr. Delaney—or so a reasonable jury could say. Interstate's exclusion bars contract losses, not compensatory damages in tort for the furtive strategy that the market together, and each insurer too, executed. The court denies the Rule 50(b) motion.

E. *Punitive Damages (Interstate).*

Interstate argues that its punitive damages award cannot stand because the jury never awarded compensatory damages on the bad faith claim against it. This is appropriately addressed in the Rule 59 motion. Interstate waived the argument about whether the jury received sufficient evidence of compensatory damages on the bad faith claim against Interstate, whether it acted with the requisite state of mind, and whether it ratified its agent's wrongdoing before Mr. Pope's formal retention. "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." Fed. R. Civ. P. 50(b) committee note (2006 amend.); *see Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010) ("if a party raises a new argument in its Rule 50(b) motion that was not presented in the Rule 50(a) motion, the non-moving party can properly object."). In its Rule 50(a) motion, Interstate argued only that it didn't hire Mr. Pope and that Mr. Pope dealt only with environmental cleanup. Nor would its new arguments prevail on this record. The court denies Interstate's Rule 50(b) motion.[7]

## RULE 59 MOTION FOR NEW TRIAL OR AMENDED JUDGMENT

A. *Standard.*

Rule 59 permits a party to move for a new trial or alter or amend the judgment. Fed. R. Civ. P. 59. The court may "grant a new trial on some or all of the issues." Fed. R. Civ. P. 59(a)(1). "A new trial

---

[7] Perhaps this could go unsaid because the court addressed this once before already [ECF 239], but Interstate adds on reply that IRG did an "about-face" on its compensatory damages for bad faith. Tellingly, none of the other six insurers joins this pitch. Interstate quotes the day five trial transcript about fees and costs—albeit just selectively. What Interstate excludes is when Indiana GRQ expressly reserved its answer as to its bad faith damages [Tr. 843]. Later the company spoke to "proximate damages resulting from bad faith" [Tr. 1104; *see also* Tr. 1105, 1107]. Whether clear in its later definition, IRG never waived its compensatory damages for bad faith.

is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014); *see Bowers v. Dart*, 1 F.4th 513, 521 (7th Cir. 2021). It is an "extraordinary remed[y] reserved for the exceptional case." *Childress v. Walker*, 787 F.3d 433, 442 (7th Cir. 2015) (citations omitted).

Rule 59 permits a new trial only when "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010) (quoting *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 636 (7th Cir. 1996)). The court will "uphold a jury verdict…as long as a reasonable basis exists in the record to support [the] verdict," *id.*, and construes the evidence "in the light most favorable to the prevailing party," *Carter v. Moore*, 165 F.3d 1071, 1079 (7th Cir. 1998).

Under Rule 59(e), a court may also "alter or amend a judgment." Fed. R. Civ. P. 59(e). This includes remittitur. *See Sommerfield v. Knasiak*, 967 F.3d 617, 622 (7th Cir. 2020); *Baier v. Rohr-Mont Motors, Inc.*, 175 F. Supp.3d 1000, 1007 (N.D. Ill. 2016). On review, a court must give a jury's damage determination "substantial deference" but "must also ensure that the award is supported by competent evidence." *Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1313 (7th Cir. 1985). If an award is excessive, "it is the duty of the trial judge to require a remittitur or a new trial." *Linn v. United Plant Guard Workers*, 383 U.S. 53, 65-66 (1966). Remittitur is appropriate for compensatory damage awards that are "monstrously excessive," bear no rational connection to the evidence, and are not "roughly comparable to awards made in similar cases." *Gracia v. Sigmatron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016).

Movants must show that "no rational jury could have rendered a verdict against them." *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006). Courts use the same analysis for Rule 59 motions as summary judgment, except they "now know exactly what evidence the jury considered in reaching its verdict." *Harvey v. Off. of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004). The court leaves issues of credibility and the weight of evidence to the jury. *Carter*, 165 F.3d at 1079.

B. *Contractual Statute of Limitations.*

The insurers rehash the argument that their contractual statute of limitation barred this action as untimely. The insurers point to no newly discovered evidence or manifest error of law or fact to cause the court to revisit its two prior rulings on this front. *See Harrington v. City of Chi.*, 433 F.3d 542, 546 (7th Cir. 2006). And rehashing old argument isn't a basis for Rule 59 relief. *See Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

The insurers argue that the court ignored *Huff v. Travelers Indem. Co.*, 363 N.E.2d 985 (Ind. 1977), in favor of *Schafer v. Buckeye Union Ins. Co.*, 381 N.E.2d 519 (Ind. Ct. App. 1978). Not so, and a reread of the court's prior ruling demonstrates as much:

> Though disfavored, Indiana enforces contractual provisions that shorten the time to commence an action if "reasonable time is afforded, except [when] there is fraud, duress, and the like," *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009), or when it contravenes a statute or public policy, *Brunner v. Econ. Preferred Ins. Co.*, 597 N.E.2d 1317, 1318 (Ind. Ct. App. 1992). "Provisions limiting actions on an insurance policy to twelve months have been upheld as valid and enforceable; consequently, actions on a policy that are brought after the expiration of such limitation periods will be barred." *United Techs. Auto. Sys. v. Affiliated FM Ins. Co.*, 725 N.E.2d 871, 874 (Ind. Ct. App. 2000). Such a provision prevents undue delay in pursuing a claim of loss. *Auto-Owners Ins. Co. v. Cox*, 731 N.E.2d 465, 467 (Ind. Ct. App. 2000).
>
> An insurer may waive such a provision or be estopped from asserting it, *Huff v. Travelers Indem. Co.*, 363 N.E.2d 985, 991 (Ind. 1977)—either expressly or impliedly, *Cox*, 731 N.E.2d at 467. Waiver or estoppel may "result from acts of [an] insurer causing [the] insured or claimant under the policy to delay bringing suit until after the time provided for in the policy." *Huff*, 363 N.E.2d at 991; *Summers v. Auto-Owners Ins. Co.*, 719 N.E.2d 412, 415 (Ind. Ct. App. 1999). If the insurer's conduct causes the insured to "reasonably believe" that the company won't insist on the suit's timeliness, the insurer "may no longer raise the limitation period as a defense." *Cox*, 731 N.E.2d at 468 (emphasis omitted). To permit otherwise would "allow the insurer to lull an insured into not pressing his rights and then deny liability on the basis of the limitation period." *Id.* Whether an insurer has waived the limitations period is usually a question of fact. *Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 381 (Ind. Ct. App. 2004). . . .
>
> Generally, an insurer need not inform an insured of his responsibilities under the policy. *Summers*, 719 N.E.2d at 416. The insured can read the contract—not least a sophisticated party like [IRG]. The insurers (and at times courts) start and end there, citing to *Auto-Owners Ins. Co. v. Hughes*, 943 N.E.2d 432, 435 (Ind. Ct. App. 2011), which in turn quotes longstanding precedent from *Statesman Ins. Co. v. Reibly*, 371 N.E.2d 414, 416 n.4 (Ind. Ct. App. 1978). *See also Trzeciak v. State Farm Fire & Cas. Co.*, 809 F. Supp.2d 900, 909 (N.D.

Ind. 2011) (citing *Hughes* and *Reibly*). An insurance company generally has neither a duty to inform an insured of his responsibilities under the policy nor an obligation to tell the insured that the carrier intends to assert a time limitation on suit. *Hughes*, 943 N.E.2d at 435; *see also Summers*, 719 N.E.2d at 416 (reciting the same language from *Reibly*).

But one must keep reading the law. *Summers* says an exception exists when "an insurance carrier does not deny coverage or liability, *and* proceeds to negotiate with the insured toward settlement of the claim." *Summers*, 719 N.E.2d at 416. In these circumstances, "the law will imply a waiver of the contractual limitation for the bringing of suit, unless and until the insurer puts the insured on notice that litigation is necessary if he desires to pursue the claim further." *Id.* Several Indiana cases after *Reibly* also apply this exception, including one just nine months after *Reibly*, *see Schafer v. Buckeye Union Ins. Co.*, 381 N.E.2d 519, 523 (Ind. Ct. App. 1978), and one from the Indiana Supreme Court, *see Huff,* 363 N.E.2d at 992 ("Once notice was given and *no objection was raised to the mode of documentation and liability was not denied* until long after the twelve-month period, then the insurer has waived his right to insist on [the] provision"). *See also Cox*, 731 N.E.2d at 468 ("unless the insurer otherwise places the insured on notice that suit must be brought to pursue the claim further," a lack of denied coverage and ongoing settlement negotiations constitute waiver); *Summers*, 719 N.E.2d at 416-17 (same); *Interstate Auction, Inc. v. Cent. Nat'l Ins. Grp., Inc.*, 448 N.E.2d 1094, 1102-03 (Ind. Ct. App. 1983) (same).

Rather intentionally, the court discussed *Huff* and the many other cases in Indiana consonantly on this issue. *See Legend's Creek Homeowners Ass'n v. Travelers Indem. Co. of Am.*, 33 F.4th 932, 935-36 (7th Cir. 2022) (also citing *Huff* and *Schafer* as dovetails in the law); *see also Comm'r v. Est. of Bosch*, 387 U.S. 456, 465 (1967) (federal court should not disregard decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise).

The insurers also point to no manifest error in the court's discussion of the factual record, so seem to rest only on their mistaken concern about *Huff*—one that *Huff* frankly answers. *Huff,* 363 N.E.2d at 992 (when "liability was not denied until long after the twelve-month period, then the insurer has waived his right to insist on [the] provision") (emphasis omitted). The record shows that the insurers never denied coverage until their August 2019 denial letter and until then made payments, continued to adjust the claim, requested information, and engaged in settlement negotiations—both within and after

the contractual limitation period (which would have otherwise run on August 15, 2017). IRG filed suit within a year of their denial. This record isn't disputed today. The court denies their Rule 59 motion.[8]

C. *Jury Instructions on Bad Faith Damages.*

The court turns to the market's argument about whether the jury awarded compensatory damages on the bad faith claim such that the jury could appropriately impose punitive damages on each insurer. This rehashed argument fares no better than the last. *See Oto*, 224 F.3d at 606. The court addressed this extensively before entry of judgment.

"[A]n insured who believes that an insurance claim has been wrongly denied may have available two distinct legal theories, one in contract and one in tort, each with separate, although often overlapping, elements, defenses and recoveries." *Hickman*, 622 N.E.2d at 520. Only a bad faith claim will support a recovery of punitive damages, and there must be compensatory damages on that claim first. *See id.*; *accord Crabtree v. Est. of Crabtree*, 837 N.E.2d 135, 137-38 (Ind. 2005). That said, "in most instances, tort damages for the breach of the duty to exercise good faith will likely be coterminous with those recoverable in a breach of contract action." *Hickman*, 622 N.E.2d at 519.

The jury found all seven insurers liable on the bad faith claim. The jury was instructed that, "[t]o prove a bad faith claim, [IRG] must prove . . . that [an] *insurer's conduct was a responsible cause of damages* to [IRG]" [ECF 229 Instr. 5 (emphasis added); *see also* Instr. 9]. The jury could not find against an insurer without concluding that an insurer's bad faith caused damages. Another instruction emphasized that, for compensatory damages on the bad faith claim, the jury must decide the amount that "will fairly compensate [IRG] for any damages that were responsibly caused by *that insurer's bad faith conduct*" [*id.* Instr. 12 (emphasis added)]. The jury was further instructed that, only if it found for IRG "on its bad faith claim" could the jury then "assess punitive damages against an insurer" and "as a result of *an insurer's bad*

---

[8] The insurers (including Interstate) also reiterate this argument under Rule 50(b), but they never raised this argument under Rule 50(a) to preserve it, *see Wallace*, 606 F.3d at 418, nor filed any motion to reconsider the court's summary judgment rulings under Rule 54(b).

*faith conduct* and the degree of reprehensibility of *an insurer's bad faith conduct*" [*id.* Instr. 15 (emphasis added) (repeatedly referencing "an insurer" or "that insurer")]. Three instructions thus told the jury it could award compensatory damages only for an insurer's bad faith conduct, and likewise punitive damages only based on that insurer's bad faith conduct.[9]

There was no need for more, not least when the law presumes the jury followed these instructions in assessing liability and awarding damages. *See United States v. Ajayi*, 808 F.3d 1113, 1123 (7th Cir. 2015). Juries are smart and capable, and this one certainly no less so. *Willis v. Lepine*, 687 F.3d 826, 834 (7th Cir. 2012). Jury instructions are to be assessed "in their entirety and not in artificial isolation." *United States v. Westmoreland*, 122 F.3d 431, 434 (7th Cir. 1997). The insurers nonetheless posit error in the court's refusal to give the following modified instruction 15:

> In deciding the amount of punitive damages, you may not base your determination on any compensatory damages for the Industrial Realty Group's breach of contract claim. Instead, you may only consider the amount of actual or potential harm suffered by [IRG] as a result of an insurer's conduct and the degree of reprehensibility of an insurer's conduct [ECF 225 at 8; *see* Tr. 1719-20].

The court actually incorporated the second sentence into its instructions, albeit a more precise version by emphasizing that punitive damages could only be assessed by "an insurer's *bad faith* conduct." [ECF 229 Instr. 15 (emphasis added); Tr. 1719-20]. The court declined the first sentence for several reasons, not least because it was a negative instruction that was adequately addressed positively by the panoply of other instructions [Tr. 1720]. And it was functionally redundant. *See supra*; *see also Doyle v. State*, 468 N.E.2d 528, 540 (Ind. Ct. App. 1984) ("negative instruction, telling the jury what was not at issue in the case [is] usually superfluous and may properly be refused when the jury has been instructed on the positive aspects of the same issue") (quotations and citation omitted).

---

[9] The verdict form likewise required the jury to consider each insurer's liability for bad faith separately. *See, e.g., Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010).

The court has "considerable discretion in phrasing, organizing, and adapting jury instructions to the specific needs of the case, as long as the instructions fairly and accurately summarize the law and have support in the record." *United States v. Benabe*, 654 F.3d 753, 775 (7th Cir. 2011). A jury instruction error warrants a new trial "only if the instructions as a whole misled the jury as to the applicable law." *United States v. Rainone*, 816 F.3d 490, 494 (7th Cir. 2016) (quotation and citation omitted). The misstatement of the law must "prejudice the objecting litigant," *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007), or affect their "substantial rights," *McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 868 (7th Cir. 1994). The instructions clearly informed the jury it could award compensatory damages only for an insurer's bad faith conduct, and likewise punitive damages only based on that insurer's bad faith conduct. Nothing in the instructions implied that the jury could merely assume compensatory damages for bad faith or award punitive damages based on an insurer's breach of contract. There is no reason to think the jury didn't follow the court's clear directives here. The court denies the Rule 59 motion.

D.  *Verdict Form.*

The insurers argue that the verdict form foreclosed the jury from considering compensatory damages for the bad faith claim separately—another rehashed argument. *See Oto*, 224 F.3d at 606. In truth, the verdict form foreclosed the jury from awarding a duplicative recovery. *See Hickman*, 622 N.E.2d at 520; *INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 577 (Ind. Ct. App. 2003).

The verdict form required the jury to consider each insurer's liability for bad faith, *see, e.g., Minix*, 597 F.3d at 830, based on instructions that required compensatory damages on this claim, *see EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2010) ("we consider the verdict form in light of the instructions given"). Despite this dovetail to the instructions, the insurers argue that there was no place on the verdict form for the jury to award compensatory damages on the bad faith claim separately. That was unnecessary when the compensatory damages, as they can be in these cases, were coextensive to the contract claim (at least overlapping), *see Hickman*, 622 N.E.2d at 519-20; *see also Cosme v. Clark*, 2023 Ind.

App. Unpub. LEXIS 259, 23 (Ind. Ct. App. Mar. 8, 2023), and indeed was unadvisable when the law forecloses a duplicative recovery, *see INS Investigations*, 784 N.E.2d at 577. In fact, the court instructed the jury that for any single wrong, IRG could receive only a "single recovery of compensatory damages, regardless of how many defendants could be liable for that single wrong or how many theories of recovery could apply to that single wrong" [ECF 229 Instr. 13].

The insurers could not agree on a proposed revision to the verdict form—certain insurers arguing for a separate line item for bad faith compensatory damages, despite the risk of inviting error with a double recovery, *see INS Investigations*, 784 N.E.2d at 577, and Interstate adhering to the suggestion that no such line item should appear on the verdict form [Tr. 1734-37]. Given the overlapping compensatory damages, particularly on the environmental claim, the court favored no additional option for the jury to award more damages. This comports with the law. For example, *INS Investigations* found error in the verdict form when it invited the jury to award compensatory damages separately on contract and negligence claims because the verdict allowed "a double recovery for a single wrong." *INS Investigations*, 784 N.E.2d at 577 ("law disfavors a windfall or a double recovery"); *see also Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 900 F.3d 377, 383 (7th Cir. 2018) ("plaintiff is only entitled to a single recovery for a single injury, regardless of how many defendants could be liable for that single injury, or how many different theories of recovery could apply to that single injury").

Illustrative of coterminous damages, *see Hickman*, 622 N.E.2d at 519, Dr. Delaney testified that the largest environmental remediation cost would be the removal of PCBs embedded in the concrete because nothing had been done since the flood. He testified that delaying notice to the EPA set the bar for the remediation damages [Tr. 1009, 1015-16]—a harm that was not just coterminous in measure of damages with the contract claim but a harm, if even required, likewise distinct to the market's tort too because it was caused when Mr. Pope was coopted to work counter-purposes to IRG's interests (*i.e.*, to treat this matter as a non-TSCA issue without notice to IRG or the EPA). And a reasonable jury could

find that this occurred because of how the insurers, in bad faith, redirected Mr. Pope. Mr. Lichter echoed that the company faced a drain of its resources because the "the cost will go up immensely now because of the PCB contamination in the basement" [Tr. 605]. Still to this day, because the court has said this before, the insurers never explain why the jury could not reasonably credit Dr. Delaney's testimony particularly, sampling evidence from the site, testimony from Mr. Pope and other witnesses, and certain communications and evidence of the market's conduct in redirection of Mr. Pope to tie environmental damages to their bad faith, even Interstate. *See supra; see also Hickman*, 622 N.E.2d at 519 (allowing tort recovery of "all damages directly traceable to the wrong and arising without an intervening agency").

In short, a reasonable jury could conclude that compensatory damages became coterminous on both the environmental contract claim and the bad faith claim—albeit from independent acts, one of breaching the policy and one of concerted bad faith conduct over time. Not surprisingly then, the law recognizes that tort damages for a bad faith claim can be "coterminous" with compensatory damages on the contract claim, *id.* at 519, and that the "two distinct legal theories" either may have separate awards or they may have "overlapping . . . recoveries," *id.* at 520; *accord Klepper v. ACE Am. Ins. Co.*, 999 N.E.2d 86, 98-99 (Ind. Ct. App. 2013); *McLaughlin*, 30 F.3d at 870-71; *Matusiak v. Am. Fam. Mut. Ins. Co.*, 2006 U.S. Dist. LEXIS 44572, 3-5 (S.D. Ind. June 29, 2006). This time, it was the latter on the bad faith claim.

To recall, the verdict form required the jury to consider each insurer's liability for bad faith damages separately—seven separate liability questions addressed this issue respectively among the seven insurers. The jury each time found each insurer liable for bad faith. The jury was instructed that to answer these questions in the affirmative that it had to find that IRG proved not just an "insurer acted with dishonest purpose, furtive design, or ill will but "that [the] insurer's conduct was a responsible cause of damages to [IRG]" [ECF 229 Instr. 5], only then deciding the amount that "will fairly compensate [IRG] for any damages that were responsibly caused by that insurer's bad faith conduct" [*id.* Instr. 12]. So, in following these instructions, the jury necessarily had to find that each insurer acted in bad faith *and* that

its bad faith conduct caused damages before answering the seven liability questions (under a separate section entitled, "Liability for Bad Faith") in the affirmative. Together, there was no error. *See Mgmt. Hosp.*, 666 F.3d at 440.

The court reviews jury awards with "substantial deference" so long as supported by competent evidence. *Ramsey*, 772 F.2d at 1313. Courts "uphold a jury verdict . . . as long as a reasonable basis exists in the record to support [the] verdict." *Pickett*, 610 F.3d at 440. This deference stems from "the acknowledgment that the actual measure of damages is an exercise in factfinding." *In re Innovative Constr. Sys.*, 793 F.2d 875, 888 (7th Cir. 1986) (quotations omitted). The court will not disturb the jury's verdict unless the award is "'monstrously excessive,' a product of passion or prejudice, or if there is no rational connection between it and the evidence." *Cygnar v. Chicago*, 865 F.2d 827, 847 (7th Cir. 1989). Movants must show that "no rational jury could have rendered a verdict against them." *King*, 447 F.3d at 534. That burden hasn't been met today. The court denies the Rule 59 motion.

E.   *Contractual Pro Rata Damages.*

With this landscape laid, the court turns to whether any contractual damages should be prorated among the market of insurers. Each insurer agreed to be responsible for a certain percentage of coverage; and, this wasn't in some separate contract only among the market of insurers (and thus not in front of the court), but in the lead policy or individual policies issued to IRG (thus in front of the court and part of the contract IRG sought to enforce). The insurers argue that the entire $24.7 million compensatory award should be allocated among the market according to their contractually-set prorated shares. IRG argues that none of it should be prorated because the entire award should be viewed as joint and several.

The court finds this "all-or-nothing" approach improper. That is not least true based on what the court has just said about the compensatory award for both the environmental contract claim and bad faith claim. *See supra*. In short, it makes no sense to prorate the $13,141,216 awarded for environmental damages when the jury reasonably could view these damages as coterminous and overlapping to the

contract and tort claims. The insurers offer no authority that a contract allocation among the market requires the court to prorate damages fairly attribute to their tort. Each insurer is individually liable for its own tort. *See Patel v. United Fire & Cas. Co.*, 80 F. Supp.2d 948, 958 (N.D. Ind. 2000).

The open questions are (1) whether the compensatory damages for electrical are fairly characterized as coterminous to the bad faith claim—and the court has not been offered a reason to answer this question anything but no; and thus (2) whether the electrical damages should be allocated among the insurers according to their contractually-fixed percentages of responsibility—and the answer here is yes. No one seems to cite this authority, but the court follows *Vernon Fire & Cas. Ins. Co. v. Sharp*, 349 N.E.2d 173, 177-79 (Ind. 1976).

To elaborate on the first question, IRG has not offered the court any reason to view the electrical damages for breach of the policy as coterminous or overlapping to any recovery on the bad faith claim. *See Hickman*, 622 N.E.2d at 519-20. Mr. Pope was not involved on the electrical side, only the environmental, so the bad faith conduct by the insurers vis-à-vis Mr. Pope would not seem to justify viewing the awarded electrical damages as compensating any harm from bad faith. IRG also claimed bad faith in withholding certain loss estimates—what competing testimony said might be shared or not shared with the insured to adjust the claim and help determine the amount of loss, and which certain witnesses called astonishing, shocking, and contrary to industry norms [*compare* Tr. 548, 703-04, 732-33, 877-82, *with* Tr. 1068-69]. But IRG never explains why any bad faith conduct in this lone respect was a responsible cause of the awarded electrical damages to the company.

The loss estimates at times included what McLarens reported to the market were "known damages" to the facility and, as McLarens believed, reflected IRG's "need to replace each of the six (6) substations" [Ex. 55 at 2589-90 (also discussing J.S. Held estimate)]. By October 7, 2016, McLarens reported a likely loss of $13 million—a number that was never shared with IRG until this litigation [Ex. 125 at Zur1718]. By November 4, 2016, McLarens reported that electrical work all totaled to date $4

28

million already [Ex. 124 at Zur1706]. Into 2017 and 2018, McLarens viewed the electrical loss as less [Ex. 122 at Zur1614; Ex. 117 at Zur1220], though it seems based on the claimed understanding (which the jury could reasonable discount) that IRG didn't want to replace all its electrical capabilities [Ex. 116 at IFCC2344]. More attention turned to the environmental losses in these McLarens reports.

Even without these loss estimates, IRG was well aware that its electrical system had not been replaced or restored in full—even IRG's chief financial officer (Mark Miley) testified that the company had only been paid $2.6 million and the company "kn[e]w that there are some things that are missing" Tr. 548]. All he mentioned was that the company "could have gotten through this thing so much quicker" [Tr. 548-49]. IRG knew eventually of the market's position on the lead policy's terms. In argument, IRG focused on the non-disclosure of the $13 million electrical estimate [Tr. 1821]. All witnesses seemed to concede it was not shared. But the court has not been presented with an argument that shows how the withholding of this estimate caused IRG electrical damages, more particularly the $11,577,827 awarded by the jury. Again, the withholding of the loss estimates could be considered by the jury as reasonable color to the overall efforts by the insurers to act with the requisite state of mind to prove bad faith, but the court has not been presented with a case for viewing the electrical losses as something that would not have occurred but for the withholding of the loss estimates—the definition of responsible cause in Indiana. *See* Indiana Model Civil Jury Instrs. § 3311 (2023) ("damages would not have occurred without the conduct"); *see also Hickman*, 622 N.E.2d at 518 ("harm that proximately results to an insured").

The court proceeds on the briefs alone. As noted by the court before [ECF 239], among the issues the insurers advanced for Rule 50(a) judgment at trial, they never once argued that IRG had not adduced evidence of this causative link from the withheld loss estimates. *See Crabtree*, 837 N.E.2d at 137-38; *Hickman*, 622 N.E.2d at 523. The court thus was never called on to decide this issue, nor for this reason would it be appropriate for Rule 50(b) consideration today, *see Wallace*, 606 F.3d at 418; but the

request to prorate damages now begs the answer to the question whether any compensatory damages should be so allocated among the insurers.

Vernon Fire reversed a trial court judgment that awarded damages based on a $94,108.09 fire loss. Vernon Fire, 349 N.E.2d at 179, 185. Two insurers joined to provide insurance of $125,000—a scheduled policy that covered certain items at certain amounts rather than a blanket policy—but the *pro rata* liability of each insurer was limited to $31,250 (only 25 percent of the scheduled values). *Id.* at 176. The two insurers tendered to the trial court an instruction that would have told the jury to enter judgment for each insurer in the amount of $23,527.02, or 25 percent of the total fire loss, which the trial court declined. *Id.* at 178. On appeal, the Indiana Supreme Court reversed the judgment of $31,250 against each insurer and directed final judgment of $23,527.02 against each insurer. *Id.* at 185.

To be sure, *Vernon Fire* concerned a *pro rata* policy limit, but the court views the individual percentage allocations among this market of insurers as little different. *Vernon Fire* also involved insurers who asserted this right before entry of judgment. Perhaps the court would be well within the law to deny the market's request today under Rule 59. This rule "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (citation omitted). The insurers never once argued the absence of proof on the causation prong of IRG's bad faith claim; and never argued that the award should be conformed to their contractually-set percentages before entry of judgment, though they had the opportunity to do so when arguing the punitive damages cap before entry of judgment. But the allocation of compensatory damages attributable to electrical losses leaves the jury's verdict altogether intact and only corresponds with what these insurers and IRG agreed by way of responsibility. *See Vernon Fire*, 349 N.E.2d at 175-79, 185; *see also Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 1021-23 (Ind.

Ct. App. 2014) (affording trial court broad discretion to apportion liability among insurers based on complex coverage cases).

Accordingly, the court grants the Rule 59 motion to amend the judgment only by allocating the amount of electrical damages among the seven insurers in the following chart. The remainder of the compensatory damages, given the market's joint tort, remains against the insurers jointly and severally. *See Nance v. Miami Sand & Gravel, LLC*, 825 N.E.2d 826, 835 (Ind. Ct. App. 2005) (describing circumstances permitting joint liability).

| Insurer | Percentage | Record | Amount Electrical Total $11,577,827 |
|---------|------------|--------|-------------------------------------|
| AGLIC | 66.66% | Ex. 45 at Zur2757 | $7,717,779.48 |
| Interstate | 10.00% | Ex. 1 at IFCC71 | $1,157,782.70 |
| Ironshore | 6.67% | Ex. 14 at Iron898 | $772,241.06 |
| Axis | 6.67% | Ex. 11 at ICCC1579 | $772,241.06 |
| Starr | 3.34% | Ex. 15 at Starr547 | $386,699.42 |
| Chubb | 3.33% | Ex. 15 at Starr549 | $385,541.64 |
| GSINDA | 3.33% | Ex. 15 at Starr551 | $385,541.64 |

F. *Decontamination Cost Sublimit (§ 2.03.06).*

The insurers ask the court to reduce the environmental award from $13,141,216 to $10,000,000 based on the decontamination cost sublimit in the lead policy [Ex. 45 § 2.03.06; *see also* §§ 5.02.07, 7.10]. Most attention to this point had been focused on the flood limit of $30 million, not this decontamination cost sublimit of $10 million.

A party may not use Rule 59(e) "to raise arguments or present evidence that could have been raised [before] entry of judgment," *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008), or "to complete presenting his case to the district court," *First State Bank v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 572 (7th Cir. 2009) (quotations omitted), and perhaps the better practice would have been to raise this issue before entry of judgment when otherwise asking the court to cap the judgment. That said, the court views

this as substantially raised by the insurers. They elicited from Jeff Pikel (IRG's broker) testimony about the decontamination cost sublimit [Tr. 722-23] and argued this sublimit before the jury [Tr. 1776-77].

In response, IRG argues that this sublimit would not cap tort damages; and, on this point, the company is right. *See Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 387 (Ind. Ct. App. 2004) (contractual limitations period did not apply to bad faith claim); *Patterson v. State Farm Mut. Auto. Ins. Co.*, 2006 U.S. Dist. LEXIS 85948, 15 (S.D. Ind. Nov. 28, 2006) (policy provisions inapplicable to tort claim for bad faith). Whatever effect this sublimit might have on contractual damages, it has no effect in limiting coterminous damages in tort for bad faith. Indeed, this dynamic tends to show that the jury's award for environmental losses wasn't just contract-based, but tort-based. Knowing about the decontamination cost sublimit and the inability to award more than $10 million for environmental loss based merely on a breach of the policy, the jury nonetheless awarded more—what it could do only if it found compensatory damages that were caused by the market's bad faith. The court denies the Rule 59 motion.

G.   *Undisclosed Inflation Costs.*

To the benefit of the insurers, the court excluded *in limine* IRG's late disclosure of approximately $14 million more in environmental losses [ECF 182 at 8-15]. *See* Fed. R. Civ. P. 26(e)(1), 37(c)(1); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). The court only permitted IRG to present to the jury an adjustment based on inflation of its previously disclosed damages—both electrical and environmental—based on the Consumer Price Index (17.7 percent). Even then, the court excluded IRG's argument based on an arguably less-than-reliable third-party rate (the CBRE Construction Cost Index's 27.9 percent) [ECF 182; Tr. 383-89]. The insurers complain of this CPI-based inflationary increase.

Inflation is certainly something the jury may consider. *See K Mart Corp. v. Beall*, 620 N.E.2d 700, 707 (Ind. Ct. App. 1993) ("awareness of general inflation … is within the zone of discretion given the trier of facts when assessing damages"); *Colonial Disc. Corp. v. Berkhardt*, 435 N.E.2d 65, 67 (Ind. Ct. App. 1982) (considering inflation even on appeal because an "awareness of general inflation and a constant

depreciation and cheapening of money is within the zone of discretion given the trier of facts when assessing damages"). The insurers offer no reason to disregard this prevailing law or dicker with the court's discussion of the *David* or Rule 37 factors.

And inflation's operation would in truth be no surprise to either side—particularly in the day and age of this trial. No one needs an economist, actuary, or other expert to assess inflation reasonably, particularly for these sophisticated parties. *See id.* The insurers also had more than adequate time to ready for crossexamination of cost increases due to inflation. Indeed, the increase from inflation for the electrical damages was disclosed in a supplement before trial; and for environmental damages during trial. Ben Rosolowski testified about the electrical and inflation [Tr. 792-93]. The insurers also took the opportunity to depose him (after day one of trial) before he testified to the jury [ECF 182; Tr. 6-7, 133]. Dr. Delaney too testified to a reasonable rate of inflation based on the Consumer Price Index in offering his environmental numbers [Tr. 1014]. The insurers had every opportunity to crossexamine these witnesses on these numbers, including whether an index was appropriate. Rule 59 is not a substitute. The court denies the motion.

H. *Punitive Damages Cap.*

The court addressed the arguments related to the punitive damages cap in Indiana already [ECF 239]. *See* Ind. Code § 34-51-3-4. Today's Rule 59 motion offers no reason to revisit this ruling. First, the insurers err by assuming that there were no compensatory damages awarded on IRG's bad faith claim. *See supra.* Second, though punitive damage awards are individual awards, *see Minix*, 597 F.3d at 830; *Bosco v. Serhant*, 836 F.2d 271, 281 (7th Cir. 1987)—and exactly what the jury was tasked to consider individually—five insurers now add that their individual punitive damage awards should be remitted based on three times their prorated share; but their *pro rata* argument is contract-based, not permitted in tort. The court also observes that its ruling on the punitive damages cap already accounts for its ruling today—in short, each punitive damage award is well within the punitive damages cap even viewing the

compensatory damages on the bad faith claim to be only the environmental award [ECF 239 at 5-6]. The court denies the Rule 59 motion accordingly.

I.   *Constitutional Review of Punitive Damages Award.*

Fourteenth Amendment due process prevents punitive damage awards from being "grossly excessive." *BMW of N. Am. v. Gore*, 517 U.S. 559, 562 (1996); *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018). The court examines three guideposts to decide a punitive damages award's constitutionality: the reprehensibility of the defendant's conduct, the ratio between punitive and compensatory damages, and any civil penalties that punish similar behavior or in comparable cases. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *Beard*, 900 F.3d at 954. Though the insurers are liable jointly and severally for compensatory damages in tort, punitive damages are imposed on individual defendants. *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019); *Minix*, 597 F.3d at 830.

The court considers a host of factors to adjudge the reprehensibility of a defendant's conduct. *See State Farm*, 538 U.S. at 419. The court weighs whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.* The insurers offer no argument on these factors, and three support viewing the conduct here as reprehensible in a manner to sustain constitutionally the jury's verdict. The harm was economic, though the bad faith conduct occurred over considerable time with repeated actions, and ultimately the jury could say with indifference toward the environmental effects of PCBs. The design here wasn't a mistake, but a calculated effort to reduce the market's exposure without regard to the insured or environment.

Punitive damages also must have a "reasonable relationship" to the compensatory damage award. *BMW*, 517 U.S. at 580. Though there is no exact constitutional formula, *id.* at 582-83, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm*, 538 U.S. at 425; *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 839 (7th Cir. 2013). Courts police "a range, not a point." *Est. of Moreland v. Dieter*, 395 F.3d 747, 757 (7th Cir. 2005). Depending on the compensatory damages amount and the harm, a greater ratio may be permissible. *State Farm*, 538 U.S. at 425. The analysis turns on the particular facts and circumstances of the harm. *Id.*; *see, e.g., Mathias v. Accor Econ. Lodging, Inc.,* 347 F.3d 672 (7th Cir. 2003) (upholding a punitive damages award ratio of 37:1 based on the case's specific facts). "So long as the award has a reasonable basis in the evidence, a jury has wide discretion in determining damages." *Gracia*, 842 F.3d at 1025.

Six insurers devote about a page to their argument, and Interstate largely echoes the points in less. First, they argue that the jury assessed identical amounts of punitive damages against each defendant, which to them shows no effort by the jury to make the award of punitive damages proportional to the award of compensatory damages. Their point misses its mark. For instance, all seven insurers acted in concert to cause and exacerbate environmental damages by redirecting and coopting IRG's environmental consultant, with repeated acts over time; and together the insurers caused $13,141,216 in compensatory damages for their bad faith. Rather than show a disproportionate consideration toward these seven insurers, the jury was well within its right to appreciate that all seven acted equally in sharing this furtive design of ill-will and in causing this harm. The jury had the opportunity to differentiate between the insurers on the verdict form and deliberately chose to assess the same amount against each. The law has upheld identical punitive damage awards based on the same compensatory damage amount. *See, e.g., Green*, 942 F.3d at 781-82 (upholding punitive damage awards of $250,000 against each defendant). A reasonable jury could equate joint conduct with the same punitive damages.

Second, the insurers argue that the ratio between an individual $12.5 million punitive damage award and the compensatory damages violates due process. Courts analyze the ratio of the individual punitive damage award to the compensatory damage award, even when defendants are jointly and severally liable for a sizeable compensatory award. *Green*, 942 F.3d at 782; *Est. of Moreland*, 395 F.3d at 757. The ratio here for each is less than 1:1—not a constitutional problem. The compensatory damages award for bad faith was $13,141,216 for each insurer—higher than each punitive damage award.[10]

The insurers offer no other argument for a constitutional review of punitive damages—and no record of comparable cases of lower punitive awards or measurable discrepancy in other penalties—so the court has not been presented with a record that the jury's verdict was grossly or constitutionally excessive. *See Green*, 942 F.3d at 782. Nor has the court been shown that the jury was motivated by passion, prejudice, or partiality. The jury made a rational and proportional determination about punitive damages against each insurer. Indeed, the jury cut IRG's request of $25 million against each insurer in half, showing that it was not motivated by passion or prejudice, but by discretion with an eye toward punishment and deterrence. The court denies the Rule 59 motion to remit the punitive damage awards.

J.  *Exclusion of Gerald Provencher.*

Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 (1962). That authority includes "the ability to fashion an appropriate sanction for conduct [that] abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Local rules often provide direction for how the court may do so and "have the force of law." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020). District courts have the oft-recognized authority to "require strict compliance with their local rules." *Id.* at 528; *see Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233

---

[10] This excludes the electrical losses. On this record, the lowest total compensatory damage awards are against Chubb and GSINDA for $13,526,757.60 ($385,541.64 electrical plus $13,141,216 environmental).

F.3d 524, 527 (7th Cir. 2000) ("have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules").

"The Indiana Rules for Alternative Dispute Resolution [ADR] (including the rules regarding privilege, confidentiality of communications, and disqualification of neutrals) apply to all alternative-dispute-resolution processes unless the court orders otherwise." N.D. Ind. L.R. 16-6(c). Under these rules, "[m]ediation sessions shall be confidential and closed to all persons other than the parties of record, their legal representatives, and persons invited or permitted by the mediator," though the law may otherwise require or authorize the disclosure of information. Ind. ADR R. 2.11. Confidentiality cannot be waived. *Id.* "Mediation shall be regarded as settlement negotiations governed by Indiana Evidence Rule 408." *Id.* The Indiana and federal rules are nearly identical and generally render evidence of conduct or statements made in compromise negotiations inadmissible. Ind. R. Evid. 408; Fed. R. Evid. 408. "Indiana judicial policy strongly urges the amicable resolution of disputes" and embraces "a robust policy of confidentiality of conduct and statements made during negotiation and mediation." *Horner v. Carter*, 981 N.E.2d 1210, 1212 (Ind. 2013). "[S]ettlement negotiation[s] are of course confidential for most purposes[.]" *In re Young*, 253 F.3d 926, 927 (7th Cir. 2001).

IRG moved to exclude Mr. Provencher before trial, and the court deferred this question pending an evidentiary hearing during trial. Mr. Provencher, intending to opine about insurance customs and practices, wasn't present at mediation but received IRG's and the insurers' mediation statements and exhibits. No sound explanation is given why he received these materials. Mr. Provencher's report says he reviewed IRG's and the insurers' mediation statements and exhibits in preparing his opinions. He further confirmed this in his deposition. More worrying yet, when asked if he relied on these materials (along with the others noted in his report), he said under oath, "Yes, sir." [ECF 147-7 Tr. 69].

At the evidentiary hearing during trial, he gave conflicting answers. To certain questions from the insurers, he answered that he had not relied on the confidential mediation submissions [Tr. 1554-55], but

later in a moment of candor he confessed that he not just saw the documents but could not say they had no influence on his opinions [Tr. 1561-62]. The reality is that the insurers put him in the tough position by providing him confidential mediation materials; and being a dutiful proposed expert he reviewed it all. The insurers then put him on the stand to invite him to contradict his deposition under oath. He was in this court's estimation uncomfortable. But despite his willingness to accept this invitation at one point, the court viewed him as candid only when he said he could not say one way or another whether this confidential information affected his opinions. Thereafter the parties declined to inquire whether Mr. Provencher's opinions, even singular ones, might be cleansed from this admission [Tr. 1562].

Given the sanctity of the mediation process, its protection in law as confidential, and the imprimatur of this process by the court through its local rules, the court used its inherent authority to enforce the rules. Mr. Provencher not just read the materials but relied on them in reaching his opinions. No one endeavored to take him through individual opinions to explain those that might be inoculated from this improper influence. In short, the bell had been rung, and the insurers could not quiet the tintinnabulations that lingered, so the court properly enforced the rules through exclusion. *See Chambers*, 501 U.S. at 44-45; *Hinterberger*, 966 F.3d at 527. In addition, his willingness to waffle between contradictory statements under oath demonstrated a fundamental unreliability, and his reliance on confidential material caused prejudice to IRG that substantially outweighed the probative value of opinions that at this point had become tainted. *See* Fed. R. Evid. 403; *see also* Fed. R. Evid. 702-703. This exclusion doesn't warrant a new trial under Rule 59.

K. *Exclusion of Exhibit 407.*

The insurers argue that the court's exclusion of Exhibit 407 warrants a new trial. They tried to introduce Exhibit 407 on their redirect examination of Micah Thoman [Tr. 1353] in response to IRG's introduction of Exhibits 49 and 53 [Tr. 1300-14, 1320-24]. Exhibits 49 and 53 were certain of his notes. Exhibit 407 contained additional notes, which the insurers argued would provide context [Tr. 1354]. IRG

objected to the evidence as beyond the scope of cross [Tr. 1353]. The court sustained the objection and ruled the evidence was inadmissible even under Rule 403 [Tr. 1354, 1363].

Rule 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "The erroneous exclusion of evidence warrants a new trial only if the error had a substantial and injurious effect or influence on the jury's decision." *Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023); *Bintz v. Bertrand*, 403 F.3d 859, 869 (7th Cir. 2005). The result must be "inconsistent with substantial justice." *Arrigo v. Link*, 836 F.3d 787, 794 (7th Cir. 2016). Decisions to exclude evidence are reviewed with substantial deference, *id.*, and "unless justice requires otherwise, errors in excluding evidence will generally not warrant a new trial." *Henderson v. Wilkie*, 966 F.3d 530, 534-35 (7th Cir. 2020) (internal quotations omitted) (citing Fed. R. Civ. P. 61).

Management of evidence introduced on cross-examination and redirect "is peculiarly committed to the district court's discretion." *United States v. Bozovich*, 782 F.3d 814, 816 (7th Cir. 2015) (emphasizing the deferential standard of review). In this situation, even if the court erred by sustaining the objection as beyond the scope of crossexamination—and there is some question whether these notes were from different days—the offer of proof presented nothing probative and instead invited speculative testimony that more than outweighed any probative value.

To get a new trial, the insurers argue that they were prejudiced by the exclusion of Exhibit 407 and the related testimony from Mr. Thoman because the exhibit "related to the alleged withholding of interim loss estimates as well as the source of the PCBs that allegedly led to the purported contamination," issues they claim "held particular significance to IRG's contractual and bad faith claims." The insurers contend that IRG's selective presentation of the notes allowed the jury to conclude that Mr. Thoman's notes were his own independent thoughts. But the offer of proof presented nothing about the

withholding of loss estimates, so that point makes no sense today [Tr. 1361-62]. The offer of proof invited Mr. Thoman to repeat certain comments in his notes about PCBs, but each time either he could not recall who said what, what it meant, or why he noted it, other than as reminder to come back to it later [*id.*]. After hearing this, the court clarified that it would not permit the testimony under Rule 403, which the court may raise on its own. *See Pickett v. Lindsay*, 56 F. Appx. 718, 723 (7th Cir. 2002) (citing Charles Alan Wright *et al.*, 22 *Federal Practice and Procedure* § 5224 (1978 & Supp. 2002) (court may exclude evidence under Rule 403 without request)); *see also United States v. Klemis*, 859 F.3d 436, 445 (7th Cir. 2017).

The insurers have not pointed to any specific information that would have influenced the jury's decision. *See Anderson*, 61 F.4th at 508. Nothing in the record or transcript indicates that justice required that Exhibit 407 be admitted. The insurers have not shown the court was incorrect to exclude the evidence, much less that the decision was substantially prejudicial. No new trial is warranted on this issue, so the court denies the motion on this basis.

L.  *Use of David Frangiamore's Testimony (Interstate).*

David Frangiamore, an attorney by training with deep experience in insurance claims handling, and expertise in the insurance industry's practices, offered testimony about such practices and industry custom. Interstate argues that the court prejudicially erred in allowing him to testify "about Interstate." Interstate identifies two lines of his testimony that it believes should have been excluded as to Interstate. The court decided to address objections question by question rather than preemptively bar his use against all insurers, including barring the testimony against Interstate only.

First, Interstate complains about Mr. Frangiamore's opinions about claims handling generally because, Interstate says, his testimony exceeded an explanation of complex terms [Tr. 877-81]. The introduction of Mr. Frangiamore's testimony about the relationship between an insurance company and policyholder, the importance of reading the insurance policy, the need to communicate the insurer's position on coverage clearly, and the need to investigate a claim fully and openly was not erroneous. It

fit contextually within his slated opinions (indeed his report), aided the jury's understanding, and presented no prejudice to Interstate. Indeed, Interstate never objected to a single question.

Second, Interstate complains about questions posed to Mr. Frangiamore as to whether the insurers—but not Interstate—followed industry custom and practice. When discussing withholding of the loss estimates, IRG prefaced its questioning, however: "Mr. Frangiamore, for this next set of questions, I will be referring to all of the insurance company defendants except for the insurance company defendant Interstate." [Tr. 881]. The court later sustained Interstate's objection as to whether the insurers followed industry custom and practice in addressing potential coverage, asking counsel to clarify the question [Tr. 884]. The court sees no error here. His testimony thus did not present an unfair slant against Interstate that warrants a new trial.

Third, Interstate complains about IRG's invitation to Mr. Frangiamore to read the first few lines of a May 30, 2018 email from McLarens (Micah Thoman) to Robert West, with a copy to Stuart Stromeyer and Jeff Pope [Ex. 113]—particularly, that the insurers were "looking for anything that supports [their] position." This exhibit was already in evidence. Interstate objected, but IRG explained that its question concerned the manner in which the market advanced their argument, so the court overruled the objection [Tr. 886-87]. This was a fair purpose. IRG inquired whether the email complied with industry custom; Interstate objected, and the court overruled this objection too [Tr. 887-88]. Mr. Frangiamore explained that the email reflected an adversarial relationship rather than a cooperative one. He never offered an opinion about Mr. Pope, his retention, or what the insurers did in coopting his services.

In addition to other insurers, Interstate had and took every opportunity to crossexamine Mr. Frangiamore [Tr. 930-41]. Interstate then moved to strike—not just his testimony as elicited by IRG, but as elicited by the other six insurers [Tr. 944-46]. Interstate's motion assumed that Mr. Frangiamore had been confined only to an explanation of contract terms, but Mr. Frangiamore was permitted to testify as to his opinions about engaging in substandard claim handling practices, as an example [ECF 184; *see also*

Tr. 831-32].[11] Mr. Frangiamore never crossed the line to get into bad faith. This was not an opinion about the alleged bad faith conduct vis-à-vis Mr. Pope. Instead, he offered helpful context for understanding the custom handling process that the insurers (all of them) followed, and this understanding of practices often is and was here helpful to the jury. *See Valley Forge Ins. Co. v. Hartford Iron & Metal, Inc.*, 2018 U.S. Dist. LEXIS 150478, 27-28 (N.D. Ind. Sept. 5, 2018) (collecting cases).

What is more, the court finds no substantial or injurious effect on the jury's decision merely because IRG asked Mr. Frangiamore to read a sentence from an exhibit already admitted into evidence (the first question to which Interstate objected), or merely because Mr. Frangiamore said this exhibit's language reflected to him an adversarial relationship rather than a cooperative one (the second question to which Interstate objected). *See Anderson*, 61 F.4th at 508. The court denies the Rule 59 motion.

M. *Ex Gratia Payment (Interstate).*

Interstate argues that the bad faith verdict and damages award should be vacated under Rule 59 because the court prohibited a certain part of Stuart Stromeyer's testimony. Interstate argued to the jury that it paid to IRG $360,000—what it characterized as an *ex gratia* payment. Interstate claimed that McLarens encouraged the insurer to withhold this payment to leverage settlement, but Interstate declined. Interstate argued this payment as counter-evidence of bad faith. Mr. Stromeyer's testimony was presented to the jury by way of deposition designation.

Interstate introduced evidence of this $360,000 payment through Peter Yanson (IRG's property manager), Jeff Pikel (IRG's broker), and Micah Thoman (McLarens) [Tr. 751, 1220-22, 1357-58]. The jury also received a McLarens report that reflected this $360,000 *ex gratia* payment from Interstate [Ex. 116 at IFCC2347]. In preview of its closing argument, Interstate observed that there were "many witnesses" who testified about it and its voluntary nature [Tr. 1715]. In addition, Interstate considered

---

[11] Interstates quotes comment from IRG about the scope of Mr. Frangiamore's testimony, but the court does not read this comment as stipulating that Mr. Frangiamore would offer this testimony and this alone [Tr. 831].

and had the option to call Keith Hargan (Interstate's vice-president) to discuss it even more, but declined [Tr. 4, 1650, 1714]. Interstate made its argument to the jury [Tr. 85-87, 1804].

Notwithstanding all this, Interstate says it wanted to introduce Mr. Stromeyer's testimony that McLarens suggested that Interstate delay making the $360,000 payment to IRG to leverage settlement, but Interstate refused. Interstate claims that this would have portrayed it in a different light than the other insurers. There are a host of problems with this argument.

First, Interstate today never once cites what precise parts of Mr. Stromeyer's deposition it thinks the court erred in excluding. Second, assuming Interstate's wishlist means pages 207-212 of his deposition, here is the notable oddity—Interstate originally objected to this very testimony because the court had excluded this as a bad faith theory for IRG at summary judgment. Interstate withdrew its objection mid-trial—that much is true—but the other insurers maintained the objection. Third, more than enough evidence about this *ex gratia* payment had been introduced at trial, with anything more being cumulative; and, to the extent there was probative value, it was the fact that the payment had been made— something already in evidence. What McLarens said about withholding it was not probative to the issues still being tried. *See* Fed. R. Evid. 401-403. Fourth, this designation set up a confusing mini-trial on the *ex gratia* payment—inviting IRG to argue an inference of bad faith from what McLarens suggested, though this was not an issue for the jury to decide [Tr. 761]. *See* Fed. R. Evid. 403. The cumulative, confusing, and delaying nature of this deposition testimony substantially outweighed what in truth was no probative value, or as the court described modest at best. In the end, the jury heard evidence and argument from Interstate about this *ex gratia* payment. The jury just didn't buy it as an immunization against bad faith. The court denies the Rule 59 motion.

N.  *IRG's Remarks During Closing (Interstate).*

Interstate seeks a new trial under Rule 59 because of IRG's remarks during closing arguments. "Parties seeking a new trial based on counsel's improper comments must show that misconduct occurred

and that it prejudiced their case." *Viramontes v. City of Chi.*, 840 F.3d 423, 431 (7th Cir. 2016) (quotations and citation omitted). The remarks must be "plainly unwarranted and clearly injurious." *Smith v. Hunt*, 707 F.3d 803, 812 (7th Cir. 2013). "Improper comments during closing argument rarely constitute reversible error," *Viramontes*, 840 F.3d at 431, and "brief and unrepeated" remarks even less so, *Banister v. Burton*, 636 F.3d 828, 834 (7th Cir. 2011). The court is "loathe to find that improper comments made during closing argument rise to the level" of a new trial. *Smith*, 707 F.3d at 812.

"Improper statements should be objected to when made, so as to give the trial judge a chance to correct any prejudice caused by the statement." *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 444 (7th Cir. 2009). "Counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that comments to the jury were improper and prejudicial." *Carmel v. Clapp & Eisenberg, P.C.*, 960 F.2d 698, 704 (7th Cir. 1992) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-39 (1940)); *see also Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 753 (7th Cir. 2018) (party waived argument over improper closing statements when counsel failed to object to prejudice). After all, there is "a longstanding presumption that curative instructions to the jury mitigate harm that may otherwise result from improper comments during closing argument." *Viramontes*, 840 F.3d at 431 (quotations omitted); *see also Clark v. Lashbrook*, 906 F.3d 660, 665 (7th Cir. 2018) (law "presume[s] that juries follow the court's instructions"). Only plain error might save a party—when the statements, viewed in light of the whole record, prevented a fair trial. *United States v. Briseno*, 843 F.3d 264, 269 (7th Cir. 2016) (no new trial "unless there was an error so egregious that the district judge should have stepped in even though no objection was made") (quotations omitted).

IRG argued for its punitive damages that the jury could take the total compensatory damage figure (rounded up to $25 million) and award another $25 million each to punish and deter the insurers

for what they did independently and collectively [Tr. 1760].[12] Interstate argues IRG's point was "extremely misleading" because it was only on the hook for 10 percent of the $11,577,827 in electrical damages ($1,157,782.70). Interstate continues by saying IRG should not have argued that it was suitable to lump the insurers together because they were to be considered separately for punitive damages.

There are many flaws with Interstate's argument. Of course, its argument crumbles at the start because it was also responsible for the bad faith compensatory award of another $13,141,216 that it and the other insurers caused. Interstate also had every opportunity to articulate its view of the evidence in its closing argument, including any percentage allocation. The jury knew this already from the evidence introduced at trial, but Interstate had the chance to combat this argument as pointedly as it preferred. This is the task of trial lawyers. Speaking of such tasks, Interstate also never objected, *see Briseno*, 843 F.3d at 269, and there wasn't any plain error here. A curative instruction would have been the remedy, but Interstate chose to gamble on the jury—a risk the law usually holds is "binding on the gambler," with few exceptions. *Holmes v. Elgin, J. & E. Ry.*, 18 F.3d 1393, 1398 (7th Cir. 1994) (citation omitted). IRG also told the jury to consider each insurer separately in choosing a punitive damages number ("each one has to pay"); and the court's instructions made this abundantly clear too [ECF 229 Instr. No. 18 ("[a]s to Indiana GRQ's bad faith claim, you must give separate consideration to each party when assessing punitive damages, if any")]. *See Clark*, 906 F.3d at 665. And, were that not enough, the prejudice that Interstate postulates never actually manifested; indeed, the jury rejected IRG's invitation and awarded only $12.5 million, not $25 million in punitive damages against Interstate. The extraordinary remedy of a new trial is not warranted on this record.

---

[12] "Ladies and gentlemen, what that amount of money is to send the signal to punish and deter, that's up to you. We suggest, given the fact that we have insurance companies—there is seven of them. It's not some mom-and-pop operation over there at that table. This is a suggestion, just a marker. Each one—they work together collectively, but they're working individually. They're separate policies. They all were involved, and they chose to do it independently and collectively. So we suggest they take the breach of contract damage number, just as a marker, and each one has to pay that again. Seven insurers times seven of those—just round it up to 25 million." [Tr. 1760].

O. *All Verdicts Against Weight of Evidence.*

The insurers ask for a new trial under Rule 59 by incorporating at times points from their Rule 50(b) motion. Certain of these arguments were made before, either at summary judgment under Rule 56 or for judgment as a matter of law under Rule 50(a). The third time may sometimes be the charm, but it isn't here under Rule 59, nor is that this rule's design. *See Vesely v. Armslist, LLC*, 762 F.3d 661, 666 (7th Cir. 2014). Whether individually or collectively, the arguments fail to demonstrate the jury's verdict was against the manifest weight of the evidence or that the trial was in some way unfair. *See Bowers*, 1 F.4th at 521; *Venson*, 749 F.3d at 656.

Deserving of final comment, the argument as to another $10 million sublimit (Special Flood Hazard Area or SFHA sublimit) the court still finds unconvincing. This argument was thoroughly addressed at summary judgment [ECF 128]. What is more, six insurers attempt to renew this argument under Rule 50(b) without making the argument first under Rule 50(a)—too little too late. *See Wallace*, 606 F.3d at 418. And rehashing the same argument isn't appropriate under Rule 59. *See Oto*, 224 F.3d at 606.

Interstate complicates this analysis only because it never raised the argument—not even at summary judgment or on reconsideration of summary judgment—but now tries to reach back and incorporate nearly a year later the summary judgment briefs of other parties. It cannot try to create an issue of fact now, nor raise arguments that it could have presented before entry of judgment or complete its presentation of a case it never made. *See Exxon*, 554 U.S. at 485 n.5; *First State Bank*, 555 F.3d at 572. The court thus denies the Rule 50(b) and Rule 59 motions filed by the insurers except as to the apportionment of electrical damages, which otherwise leaves the jury's verdict intact.

RULE 60 MOTION TO SET ASIDE JUDGMENT

This proves a good segue. Ironshore, and this insurer alone, now reads its policy as having an important distinction that it believes bears on this SFHA sublimit. This too is an argument it never made until now. Indeed, it is an argument it not just forfeited, but waived. Ironshore nonetheless asks for relief

under Rule 60. "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). This is "an extraordinary remedy reserved for extraordinary circumstances." *Word Seed Church & Civ. Liberties for Urban Believers v. Homewood*, 43 F.4th 688, 690 (7th Cir. 2022).

A. *Standard.*

Though at one time under which rule a post-judgment motion fell turned "on the time at which the motion is served," *Mares v. Busby*, 34 F.3d 533, 535 (7th Cir. 1994), now "whether a motion filed within [28] days of the entry of judgment should be analyzed under Rule 59(e) or Rule 60(b) depends on the *substance* of the motion, not on the timing or label affixed to it," *Obriecht v. Raemisch*, 517 F.3d 489, 493 (7th Cir. 2008); *but see Krivak v. Home Depot U.S.A., Inc.*, 2 F.4th 601, 604 (7th Cir. 2021) ("all substantive motions filed within the time period described by Rule 59(e) fall under that Rule regardless of the lingo associated with the post-judgment motion"). In short, it depends on the "reasons expressed by the movant." *Obriecht*, 517 F.3d at 493. The court addresses this motion under Rule 60(b).

The factors to be considered in an excusable neglect argument include "the danger of prejudice to the [movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Moje v. Fed. Hockey League, LLC*, 792 F.3d 756, 759 (7th Cir. 2015) (quoting *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). Though neglect generally "encompasses both simple, faultless omissions to act and, more commonly, omissions caused by carelessness," *Pioneer*, 507 U.S. at 388, not all conduct encompassed by neglect is excusable, *McCormick v. City of Chi.*, 230 F.3d 319, 327 (7th Cir. 2000) ("neither ignorance nor carelessness on the part of the litigant or his attorney provide grounds for relief under Rule 60(b)(1)"). "[A]ttorney in-attentiveness to litigation is not excusable, no matter what the resulting consequences the attorney's somnolent behavior may have on a litigant." *Easley v. Kirmsee*, 382 F.3d 693, 698 (7th Cir. 2004). Negligence won't suffice, as

"clients must be held accountable for the acts and omissions of their attorneys." *Id.* at 699-700. "If the lawyer's neglect protected the client from ill consequences, neglect would become all too common. It would be a free good." *Choice Hotels Int'l, Inc. v. Grover*, 792 F.3d 753, 755 (7th Cir. 2015). "[I]nexcusable attorney negligence does not constitute proper grounds for relief under Rule 60(b)(1)." *Helm v. Resolution Tr. Corp.*, 84 F.3d 874, 878 (7th Cir. 1996).

Even then, excusable neglect "covers unintentional omissions, such as missed filing deadlines," but not a party's "deliberate actions." *Edwards-Brown v. Crete-Monee 201-U Sch. Dist.*, 491 F. Appx. 744, 747 (7th Cir. 2012) (emphasis omitted). A party's "deliberate, strategic choice" cannot be excused. *Eskridge v. Cook Cnty.*, 577 F.3d 806, 809-10 (7th Cir. 2009). The "failure to contest a party's statement of uncontested facts is treated as a binding admission of the truth of those facts. An admission trumps evidence, rather than vice versa." *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 333 (7th Cir. 1993) (internal citations omitted).

B. *Analysis.*

The flood sublimit in the lead policy applied to "Locations with any part of the legal description within a [SFHA] and not otherwise listed herein" [Ex. 45 § 2.03.06]. The parties litigated the case from start to finish with the understanding that all insurers had agreed to this language—as a function of the lead policy, their individual policies, and by stipulation or admission in the course of litigation. Now after a jury verdict, Ironshore reads its policy to realize that its provision omits the last five words—"and not otherwise listed herein." These were important words that bore on the analysis of whether a $10 million SFHA sublimit or the $30 million flood coverage applied—an issue the court decided on summary judgment nearly a year ago. Ironshore now asks the court for relief from the judgment because of the insurer's own oversight. This isn't excusable neglect.

The court starts with the reason for the failure and delay. There isn't a good one. Step one in any coverage action is to read the insurance policy—in this case, policies. If believed, and if that wasn't done until after the jury's verdict, that is inexcusable by definition. That is particularly true when the meaning

of this very clause in the policy—indeed this mere sentence—reared its head at important points in the litigation because this sentence mattered. The parties knew it. They focused on it. They argued it. This wasn't mere oversight, carelessness, or mistake. And it wasn't excusable neglect. Instead, it was within Ironshore's reasonable control—the insurer merely needed to read its own policy. Surely it did.

This record thus is really worse. Each insurer filed a separate answer to the complaint. Ironshore's answer denied that it "followed form" to the lead policy, but it affirmatively asserted the defense that its $10 million sublimit said it covered "Locations with any part of the legal description within a [SFHA] *and not otherwise listed herein*" [ECF 22 (emphasis added)]. Ironshore says not to blame its answer simply because it asserted this so-called "sixth affirmative defense" when in reality it was no affirmative defense at all and really unnecessary. That only makes it worse—because that means it was elective, a choice. The court cannot fairly characterize as a mere scrivener's error the assertion of precise policy language that the insurer intends to utilize to defeat some measure of liability or damages.

This language arose again at summary judgment. Once more, Ironshore quoted this very same language and affirmatively represented to the court that this provision was "identical in each policy," not ever excluding its own [ECF 113 ¶ 19]. IRG asserted the same language, and Ironshore also responded to that submission by admitting this "accurately quotes" its policy [ECF 114 ¶ 18]. The court thereafter interpreted this provision uniformly across the lead policy and individual policies of the insurers, including Ironshore's policy, just as it had been invited—that this provision was written the same across all the market's policies. Even when this language mattered in the summary judgment ruling, Ironshore never bothered to read its policy as different and file a reconsideration motion.

This persisted into the final pretrial stage. IRG filed a motion *in limine* to foreclose the insurers from introducing evidence that anyone acted alone in the claim's adjustment [ECF 145].[13] In response to

---

[13] In reply, Ironshore advances argument about the motion *in limine* issue no. 4, but the one that matters here is issue no. 5.

this motion, all insurers (excepting Interstate but not Ironshore) agreed that "they will not be taking any positions on any issues different from each other" [ECF 156]. Ironshore thus once more affirmatively consented to this position. Ironshore tries to color this stipulation as something other than what it says— that won't do. At the final pretrial conference, the court directed the parties to file a joint notice concerning certain *limine* issues, including this one. All parties stipulated that all insurers (excepting only Interstate but not Ironshore) "will not introduce any evidence that they acted independently of one another and/or that they should be considered separately" [ECF 178].

This same understanding continued into the jury trial. For instance, during the instructions conference, Ironshore argued its position with reference to "the stipulation that [] the defendant insurers will not introduce evidence that they acted independently of one another" [Tr. 1656]. The court instructed the jury about this stipulation: "The parties have stipulated, with respect to the breach of contract claim only, that the insurers did not act independently of one another" [ECF 229 Instr. 18]. And it is the very breach of contract claim about which Ironshore now wishes to take a position independent of the market.

Enough said at this point. There is a difference between forfeiture and waiver. *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020). For over three years, Ironshore took a consistent position about its policy that aligned with the other insurers. This wasn't "mere failure to raise a timely argument, due to either inadvertence, neglect, or oversight"—what the law calls forfeiture—but the "intentional relinquishment or abandonment of a known right"—what the law calls waiver. *Id.* And by intentionally waiving the position that Ironshore tries to assert today, it cannot argue there was a good reason for its delay, nor really contend that this was even neglect or oversight, or even still a mistake wholly outside neglect that might be excused.[14] This was Ironshore's "deliberate, strategic choice" that cannot be excused. *Eskridge*, 577 F.3d at 809-10.

---

[14] "An inadvertent 'mistake' that might justify relief typically involves a misunderstanding of the surrounding facts and circumstances." *Eskridge*, 577 F.3d at 809. The party seeking relief "must make some showing of why he was justified in failing to avoid mistake or inadvertence." *Ben Sager Chems. Int'l, Inc. v. E. Targosz & Co.*, 560 F.2d 805,

Reversing three years of litigation prejudices IRG and contributes to delay without a good reason. The parties understood at the start that policy language would matter, and they knew that this case would invite a debate whether the insurers "followed form" of the lead policy. Indeed, the pleadings framed this issue early. Some discovery occurred on this issue, but apparently never specific to Ironshore's differential on the $10 million sublimit. There was no call to do so given Ironshore's admission on the sublimit. Ironshore claims that permitting this late position merely gives IRG what it "bargained for," but IRG bargained for not only its insurance policy but also the stipulations the parties reached here. It undoes the work of discovery, the work of summary judgment, the work of final pretrial proceedings, and the work of the trial; and now the court is addressing a motion from Ironshore that contributes to delay.

And the court must ask what purpose this would promote in exchange for this prejudice? It seems this differential in language appears only in Ironshore's policy, so it would not inure to the benefit of other insurers. At this point, Ironshore will have a judgment of only $772,241.06 (apportioned electrical damages) that would be subject to the sublimit, as the sublimit would not reduce tort damages (even those coextensive with a breach of contract). On this record, the request thus is materially moot. Disturbing the finality of a jury verdict on this basis makes no sense. *See Hubbell v. United Airlines, Inc.*, 17 F. Appx. 407, 409 (7th Cir. 2001).

Ironshore argues that there is no bad faith present. That may be so, but deliberate assertions and prejudice provide the basis for the court's ruling here, even without bad faith. The court denies Ironshore's Rule 60(b)(1) motion. The court likewise denies Ironshore's Rule 50(b) motion on this same issue, noting that Ironshore has no grounds to raise this argument on Rule 50(b) because it did not raise

---

809 (7th Cir. 1977). "[I]t would be an abuse of discretion to grant Rule 60(b) relief on the basis of a negligent mistake." *Lomas & Nettleton Co. v. Wiseley*, 884 F.2d 965, 967 (7th Cir. 1989); *see also Thomas v. Bridgeview Bank Grp.*, 716 F. Appx. 537, 538 (7th Cir. 2018) ("because [his] 'mistake' resulted from carelessness, Rule 60(b) relief is inappropriate").

it on Rule 50(a). *See* Fed. R. Civ. P. 50(b). Indeed, then, everyone was operating under the understanding endorsed by Ironshore that its policy mirrored the others.

PREJUDGMENT INTEREST

IRG asks the court to amend the judgment to include either $13,544,681.10 in prejudgment interest (accruing from the date of the flood, August 15, 2016) or alternatively $7,568,767.80 (accruing from the date the insurers denied coverage, August 23, 2019). The insurers oppose this request entirely in the first instance, and alternatively argue that the earliest possible accrual date is July 13, 2020 when IRG submitted its proof of loss. The insurers also argue that the award should be reduced by the jury's award of inflation.

A. *Standard.*

The court has discretion on whether to award prejudgment interest, *Pickett*, 813 F.3d at 647, though there is a presumption in favor of awarding prejudgment interest, *Frey v. Hotel Coleman*, 903 F.3d 671, 682 (7th Cir. 2018). The award aims to make a plaintiff whole. *Id.* In diversity cases, the court "must look to state law to determine the propriety of awarding prejudgment interest." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 981 F.3d 618, 635 (7th Cir. 2020). IRG pursues prejudgment interest only on its contract recovery, not tort. *Cf.* Ind. Code §§ 34-51-4-1, 34-51-4-7, 34-51-4-9 (all governing tort).

Under Indiana law, "an award of prejudgment interest in a breach of contract action is warranted if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable." *Song v. Iatarola*, 76 N.E.3d 926, 939 (Ind. Ct. App. 2017); *see also Cincinnati Ins. Co. v. Bact Holdings, Inc.*, 723 N.E.2d 436, 441 (Ind. Ct. App. 2000) ("ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at the time the damages accrued"). An award "is considered proper when the trier of fact does not have to exercise its judgment to assess the amount of damages," *Fackler v. Powell*, 923 N.E.2d 973, 979 (Ind. Ct. App. 2010), but need only perform a "simple mathematical computation," *Cincinnati Ins.*, 723 N.E.2d at 441 (citing *Harlan Sprague Dawley, Inc. v. S.E.*

*Lab Grp.*, 644 N.E.2d 615, 618 (Ind. Ct. App. 1994)). Prejudgment interest may be awarded if the factfinder merely must decide between methods of computation. *Harlan Sprague*, 644 N.E.2d at 618.

     B.  *Ascertainable Damages.*

The insurers argue that the eight-day jury trial's expert testimony and lengthy evidence presentation demonstrate IRG's damages were not readily ascertainable. They advance three arguments. First, they argue that IRG's damages claims evolved, pointing to differences between various Rule 26 disclosures and the final amount requested at trial. Second, they claim that the jury had to exercise judgment to reach the amount. Third, and related, they argue that there was a good faith dispute about damages between IRG and the market tied to factual determinations the jury made. For instance, they note that the jury had to determine whether the proper valuation was the replacement cost or the actual cash value and had to choose between loss estimates.

IRG responds that it only submitted two damage numbers to the jury at trial: $11,577,827 for electrical damages and $13,141,216 for environmental damages. The company says the jury accepted these numbers without needing to exercise discretion to calculate damages. IRG explains that the only calculation required was the inflation adjustment—easily computed by a simple mathematical formula. IRG also argues that the damages weren't subject to a good faith dispute just because the insurers raised defenses to coverage, citing *Burleson v. Ill. Farmers Ins. Co.*, 725 F. Supp. 1489, 1498 (S.D. Ind. 1989).

The court starts with the electrical loss. This loss was ascertainable according to accepted standards of valuation at the time of the loss (or soon thereafter). The parties knew within days of the flood that the transformers needed to be removed and replaced [Tr. 346]. Even McLarens believed and reported that the transformers could not be salvaged and advised replacing each damaged substation at the start [Tr. 701; Ex. 55 at 2592; Ex. 124 at Zur1705]. This work began immediately. All transformers were removed from the facility [Tr. 499-500, 531, 796, 1022].

The loss was ascertainable according to "accepted standards of valuation at the time the damages accrued." *Cincinnati Ins.*, 723 N.E.2d at 441; *accord Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 607 (7th Cir. 1985) (loss need not be ascertained before trial, just ascertainable as of a particular time according to known standards of value). Indeed, IRG procured a quote from CPI Group Limited that used such standards of valuation (or compiled quotes using such standards) to identify the cost to restore the company's electrical service. IRG presented this to the insurers [Ex. 12]. The jury received this same information through Ken Kutchek and Ben Rosolowski, which required no real judgment on the jury's part in deciding electrical damages [Tr. 483-84; 785-93; *see also* Exs. 12, 262]. In fact, the court confined Mr. Rosolowski's testimony before and during trial [ECF 182; Tr. 785-93]. That the jury needed to choose between two methods of computation—either replacement cost or actual cash value—does not mean that once the jury interpreted the policy that its damages calculation exceeded "fixed rules of evidence and accepted standards of valuation." *Cincinnati Ins.*, 723 N.E.2d at 441; *see also Harlan Sprague*, 644 N.E.2d at 618. And the inflation rate was a simple mathematical calculation to boot.

The court turns to the environmental loss. No one has asked for prejudgment interest based on tort liability, so the court examines this loss only through the coterminous lens of a contract loss. This was a moving target. *See Eden United v. Short*, 653 N.E.2d 126, 134 (Ind. Ct. App. 1995) (prejudgment interest in error when party presented wide variety of possible lost profit figures). It required dewatering, remediation, sampling, testing, interpretation of results, experts to evaluate the impact of these results, and interaction with IDEM and the EPA. There was ongoing evaluation whether the remediation would trigger TSCA; and, even then, the parties explored two TSCA remediation options depending on the standard adopted [Ex. 35]. Though IRG submitted a proof of loss with certain environmental figures [Ex. 12], even on the eve of trial IRG was endeavoring to amend its damages—adjusting them upward by nearly $14 million in supplemental disclosures. The court won't retrace this history here; it has been done already [ECF 182], but suffice to say come the eve of trial what was ascertainable by way of

environmental damages remained in discretionary flux—not what IRG would seek from the jury after the court ruled on motions *in limine* of course, but what the jury might decide after being invited to exercise its judgment in weighing the evidence and deciding damages based on something other than a simple mathematical computation.

To put a finer point on this, the jury received multiple valuations [Ex. 35 (Hull report)] and then heard testimony from Dr. Delaney speaking to what scenario he believed to a reasonable certainty made sense. He concluded that "it is somewhere between those two numbers" of the Hull report [Tr. 1016]. He opined that it would unlikely exceed $18 million. He expressed the view that it required some judgment whether the EPA would require a more stringent remediation in the future, though he could say there would be remediation [Tr. 1014-16, 1031].

The jury wasn't unreasonable then by choosing the most conservative estimate and adjusting for inflation, but the court cannot say on this record that the base damages merely required a simple mathematical calculation instead of a considerable exercise of the jury's judgment in deciding appropriate environmental losses, including what would be included as loss. *See Kosarko v. Padula*, 979 N.E.2d 144, 146 (Ind. 2012) (prejudgment interest inappropriate when damages are "incomplete" or "continuing" or "not readily determinable by the parties prior to the jury's verdict"); *Lash v. Kreigh*, 202 N.E.3d 1098, 1105 (Ind. Ct. App. 2023) (affirming denial of prejudgment interest when court had to exercise judgment "to determine which factors should comprise the calculation"); *Anderson v. Salling Concrete Corp.*, 411 N.E.2d 728, 735 (Ind. Ct. App. 1980) (reversing prejudgment interest award when the principal loss was too indeterminate based on differing appraisals); *see also Simmons*, 762 F.2d 591, 607 (7th Cir. 1985 ("not appropriate when the jury must use its best judgment to assess the amount for past and future injury"). The court concludes that only electrical damages were ascertainable for purposes of prejudgment interest.

C. *Computation Date.*

The parties disputed two distinct buckets of contractual damages in this case—electrical and environmental—and the court has been presented with no authority to foreclose its ability to assess prejudgment interest on the contractual losses that were distinct and ascertainable under Indiana law, given its fair discretion in such matters. *See Pickett*, 813 F.3d at 647. The court must decide which date prejudgment interest began to accrue on the electrical loss. IRG says August 15, 2016 (the date of the flood) or August 23, 2019 (the date of the denial of coverage). The insurers say July 13, 2020 (thirty days after IRG's proof of loss).

"Prejudgment interest is computed from the time the principal amount was demanded or due." *Cincinnati Ins.*, 723 N.E.2d at 441; *Abex Corp. v. Vehling*, 443 N.E.2d 1248, 1260 (Ind. Ct. App. 1983). IRG argues that the payment was due as soon as the damage was complete, but the insurers point to the lead policy. "The Company will pay for covered loss or damage within thirty (30) days or as required by law, after receiving the sworn statement of loss, if the Insured has complied with all the terms of this policy" [Ex. 45 § 6.18.04]. IRG submitted its proof of loss on June 13, 2020 [Ex. 12], making the operative due date July 13, 2020.

IRG offers no sound reason to deviate from the policy's plain language as to the due date. *See Thor Elec., Inc. v. Oberle &Assocs.*, 741 N.E.2d 373, 380-81 (Ind. Ct. App. 2000) (prejudgment interest calculated from the time the party was entitled to payment), *disapproved on other grounds*, *Inman v. State Farm Mut. Auto. Ins. Co.*, 981 N.E.2d 1202, 1205 n.3 (Ind. 2012); *accord Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 757 (Ind. 2018). IRG argues no prior demand that should trump the contractually-set due date. The flood may trigger coverage, *see Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 1017 (Ind. Ct. App. 2014), but within the meaning of the policy. IRG argues that following the policy here would grant the insurers a windfall for their bad faith conduct, but the jury compensated IRG for this bad faith; and IRG had a mechanism for achieving prejudgment interest for this tort.

D. *Effect of Inflation.*

The insurers next argue that prejudgment interest should be foreclosed or at worse reduced by the inflation amount already included in the jury's damage award. The insurers say that prejudgment interest and inflation address the same concern, so allowing both would grant a duplicative award. IRG responds that the two address different harms.

Within the context of this case, prejudgment interest and inflation are different. "Prejudgment interest is meant to fully compensate the injured party for the lost use of money." *R.K.W. Homes v. Burns*, 198 N.E.3d 405, 411 (Ind. Ct. App. 2022); *see also Song*, 76 N.E.3d at 939. It is based on the idea "that there has been a deprivation of the plaintiff's use of money or its equivalent and that unless interest is added, the plaintiff cannot be fully compensated for the loss suffered." *Harlan Sprague*, 644 N.E.2d at 619. Its purposes are "to encourage settlement, to incentivize expeditious resolution of disputes, and to compensate the plaintiff for the lost time value of money arising from unreasonable delay." *Wormgoor v. State Farm Mut. Auto. Ins. Co.*, 203 N.E.3d 1092, 1096 (Ind. Ct. App. 2023) (citation omitted).

Inflation here addressed the difference in value of equipment or services necessary to restore electrical power and remediate the property—price increases effectively. This damage exists wholly apart from IRG's inability to use its money had it been paid on time—the lost use of money, or the ability to use wealth to create more wealth. *See also United States v. City of Warren*, 138 F.3d 1083, 1096 (6th Cir. 1998); *Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 84 (2nd Cir. 1994); *Cook v. Rockwell Int'l Corp.*, 564 F. Supp.2d 1189, 1223 (D. Co. 2008); *Evans v. Connecticut*, 967 F. Supp. 673, 683 n.15 (D. Conn. 1997). Indeed, employing the discount invited by the insurers would take an 8 percent prejudgment interest rate downward by what the jury determined was reasonable for inflation at just over 17 percent. Rather than promote justice or the purpose of prejudgment interest, it would effectuate a windfall to the insurers.

Accordingly, the court awards prejudgment interest to IRG on the $11,577,827 in electrical damages awarded for breach of contract from July 13, 2020 at the rate of 8 percent per annum. IRG cites

as authority for this interest rate Indiana Code § 24-4.6-1-101, but this statute by its plain language addresses postjudgment interest in state court, not prejudgment interest. *See also Nehi Beverage Co. v. Petri*, 537 N.E.2d 78, 84 (Ind. Ct. App. 1989). Indiana Code § 24-4.6.1-102 affords the same interest rate for "things in action" (*e.g.*, contract action to recover money) when the parties have not contractually set the rate. And the insurers agree to this rate today. Prejudgment interest thus equals $2,758,116.26 (from July 13, 2020 to June 20, 2023), and the court amends the judgment to award this interest to IRG, apportioned to each insurer according to its assigned percentage. Postjudgment interest will accrue from June 20, 2023 by law, subject to any appeal. *See* 28 U.S.C. § 1961; *see also* Fed. R. App. P. 37; *Burlington N.R. Co. v. Woods*, 480 U.S. 1, 7 n.5 (1987).

BOND AND STAY

The parties debate the bonds offered by the insurers to effectuate a stay. "At any time after judgment is entered, a party may obtain a stay by providing a bond or other security. The stay takes effect when the court approves the bond or other security[.]" Fed. R. Civ. P. 62(b).

The seven insurers propose individual bonds that assume that their respective coverage allocations apply to all compensatory damages—which turns out in error. *See infra.* Collectively, their proposed bonds also create a shortfall from the total judgment—not on its face automatically an issue, but this stems too from an erroneous view of the law and scope of damages (Interstate too). The court accordingly denies a stay with leave for the insurers to renew their request with the guidance here (which can be made jointly in a single motion).

AGLIC says its bond cannot exceed $25 million. The insurer pits federal Rule 62 against Indiana Code § 34-49-5-3(a)—the former procedural rule giving the court discretion to decide the bond's amount and the latter statute restricting the state system from a bond that exceeds $25 million. Under these circumstances, the federal rule applies. *See, e.g., Burlington*, 480 U.S. at 4-8 (discretion afford by federal rule could not be truncated by state statute requiring postjudgment affirmance penalty); *Houben v. Telular Corp.*,

309 F.3d 1028, 1038-1040 (7th Cir. 2002) (Rule 62 applied over state rule that would foreclose court's discretion given by rule); *see also Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965). This Indiana statute has no application to bond approvals for judgments entered by federal courts sitting in diversity.

AGLIC offers Rule 62(f) as a vehicle to incorporate state law, but this subsection likewise does not apply. It speaks to whether "a judgment is a lien on the judgment debtor's property under the law of the state where the court is located." Fed. R. Civ. P. 62(f). Although a judgment can become a lien on real property in Indiana, once recorded in the county where that property sits, AGLIC has not identified any real estate in Indiana that would secure the judgment in this manner to secure a stay under Rule 62(f). *See Herron v. First Fin. Bank*, 91 N.E.3d 994, 996 (Ind. Ct. App. 2017).

Under today's circumstances, and given the jury's seven-fold finding of bad faith and not insubstantial award of both compensatory and punitive damages, the court believes that the amount bonded to secure a stay should equal the total amount. The court understands that each insurer will know its contractual allocation of electrical damages, its share of prejudgment interest, and its individual punitive damage award, whereas the environmental damages remain payable jointly and severally. The court leaves the allocation of the environmental damages for purposes of their bonds to the insurers, after conferring among each other and with IRG prior to the next motion; but the bonds together must satisfy the total awarded in the amended judgment.

### ATTORNEY FEES AND COSTS

The last port concerns attorney fees and costs. IRG requests $5,153,924.45 in attorney fees and costs—what it catalogues as attorney fees of $4,409,008.50, expert fees of $440,123.49, and other litigation costs of $304,792.46. The insurers oppose.

The court addresses attorney fees first. Rule 54 allows a recovery of attorney fees through the applicable statutory authority. Fed. R. Civ. P. 54(d)(2)(B)(ii); *see also Minn. Power & Light Co. v. Hockett*, 14 F. Appx. 703, 709 (7th Cir. 2001) ("availability of attorney[] fees to prevailing parties in diversity litigation

is governed by state law," barring some conflict with federal law). Generally, the American Rule requires each party to pay its own attorney fees. *See Ruckelshaus v. Sierra Club*, 463 U.S. 680, 683-84 (1983). This rule has "narrow exceptions," and a party must meet a "hefty burden" to demonstrate its right to fees. *River Ridge Dev. Auth. v. Outfront Media, LLC*, 146 N.E.3d 906, 911 (Ind. 2020).

IRG argues that an Indiana statute proves an exception, but it only permits an attorney fee award to a prevailing party when the other side acts inappropriately in litigation—for instance, pursuing a frivolous claim or defense or otherwise "litigat[ing] the action in bad faith." Ind. Code § 34-52-1-1(b)(3). It "codifies the common law bad faith exception to the American rule." *Techna-Fit, Inc. v. Fluid Transfer Prods.*, 45 N.E.3d 399, 418 (Ind. Ct. App. 2015). The statute "requires that the action must be litigated in bad faith which means that only conduct in the course of the litigation is relevant to the question of attorney's fees." *Duncan v. Yocum*, 179 N.E.3d 988, 1004 (Ind. Ct. App. 2021) (quotations omitted).

There may be circumstances in which an insurer's bad faith in denying coverage for a legitimate claim, deceiving the insured, or exercising an unfair advantage to pressure the claim's resolution may spill over into litigation, *see Tedesco v. State Farm Fire & Cas. Co.*, 599 F. Supp.3d 750, 760 n.9 (N.D. Ind. 2022); *Valley Forge*, 2017 U.S. Dist. LEXIS 1187 at 14, but this isn't one of those occasions, *see Kikkert v. Krumm*, 474 N.E.2d 503, 505 (Ind. 1985) ("allegedly obdurate behavior occurred before the lawsuit was filed"). IRG has not offered evidence of bad faith during the course of litigation, only the jury's finding of bad faith that occurred by the insurers before litigation. Winning the latter does not presuppose or establish the former.

The court turns to costs. The federal rules authorize an award of costs to the prevailing party. *See* Fed. R. Civ. P. 54(d)(1). "Cost" is a term of art. The court cannot award costs beyond what federal statute authorizes—and sometimes there are more than one that apply, though only two today. *See* 28 U.S.C. §§ 1821, 1920; *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-43 (1987); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 481 F.3d 442, 447 (7th Cir. 2007). IRG must establish that its costs were necessary

and reasonable, *U.S. Neurosurgical, Inc. v. City of Chi.*, 572 F.3d 325, 333 (7th Cir. 2009), though it need only "provide the best breakdown [of its costs] obtainable from retained records," *Northbrook Excess and Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991).

Costs don't include attorney fees, including local counsel fees. *See Pigeaud v. McLaren*, 699 F.2d 401, 403 (7th Cir. 1983). Costs don't include expert witness fees, unless court appointed or (for purposes here) within the narrow confines of §§ 1821 or 1920. *See Crawford Fitting*, 482 U.S. at 442; *Chi. Coll. of Osteopathic Med. v. George A. Fuller Co.*, 801 F.2d 908, 910-11 (7th Cir. 1986) (court cannot tax expert fees as costs outside § 1821). Costs don't include attorney travel or meals. *See Calderon v. Witvoet*, 112 F.3d 275, 276 (7th Cir. 1997); *Wahl v. Carrier Mfg. Co.*, 511 F.2d 209, 217 (7th Cir. 1975). Costs don't include electronic research fees. *See Craftwood II, Inc. v. Generac Power Sys., Inc.*, 63 F.4th 1121, 1130 (7th Cir. 2023). Other costs offered by IRG likewise aren't recoverable. The court thus awards only those costs permitted under § 1920 [ECF 243-2, Ex. B], noting that the insurers offer no objection to these as well:

| Category | Amount |
|---|---|
| eDiscovery | $15,106.00 |
| Copies | $327.40 |
| **Total** | **$15,433.40** |

To the extent IRG wished to pursue damages as a result of its bad faith claim, *see Hickman*, 622 N.E.2d at 519, including, for instance, sunk costs for environmental or other expertise, the jury was its ear. The court will not augment the damages the jury awarded for bad faith in the guise of Rule 54 costs. *See Crawford Fitting*, 482 U.S. at 442. And IRG has not itemized recoverable witness attendance or travel costs to facilitate even a partial award of such costs. *See id.*; *Chi. Coll.*, 801 F.2d at 910-11. Nor has IRG seemingly sought recovery of transcription cost. The time to meet its burden has now passed.

CONCLUSION

Accordingly, the court DENIES the motions for judgment as a matter of law [254, 257]; DENIES Ironshore's motion to set aside the judgment [259]; DENIES the motions for a new trial or to amend the judgment [254, 258], except the court GRANTS IN PART the motion [258] to apportion the electrical losses according to each insurer's contractually-established percentage of coverage; GRANTS IN PART IRG's motion for prejudgment interest [244]; DENIES the motions for bond approvals and stay with leave to renew in accordance with this order [251, 252, 253, 260, 262]; DENIES the motion for attorney fees but GRANTS IN PART its request for costs [242]; and DENIES AS MOOT the joint motion for an extension of time [268]. The court DIRECTS the clerk to enter an amended judgment that conforms to this ruling forthwith.

SO ORDERED.

March 22, 2024                                              *s/ Damon R. Leichty*
                                                            Judge, United States District Court